1        IN THE THIRD DISTRICT COURT -SALT LAKE

2           SALT LAKE COUNTY, STATE OF UTAH

3

4   ———————————————————————————————————————

5   STATE OF UTAH,                    :

6        PLAINTIFF.                   :

7   VS.                              :   CASE NO. 101401517FS

8   JOSEPH CHATWIN,                   :

9        RESPONDENT.                  :

10  ———————————————————————————————————————

11        PRELIMINARY HEARING - FEBRUARY 8, 2011

12                    BEFORE

13        THE HONORABLE CHARLENE BARLOW

14  ———————————————————————————————————————

15

16

17

18

19

20        Transcribed by Lisa Freebairn

21

22

23

24

                                                    1

1    WEST JORDAN, UTAH - FEBRUARY 8, 2011

2     JUDGE CHARLENE BARLOW PRESIDING

3    (Transcriber's note: speaker identification

4    may not be accurate with audio recordings.)

5      P R O C E E D I N G S

6   MR. JOHNSON: - John Johnson is here on his behalf.

7   THE COURT: Okay.  Who's here for the State?

8   MR. HILL: Joseph Hill on behalf of the State, Judge.

9   THE COURT: Okay, Mr. Hill.

10   Are we doing a prelim?

11   MR. JOHNSON: We are, Judge, yes.

12   THE COURT: Okay.

13   MR. JOHNSON: And, Judge, could I also at this time

14 introduce you to Lisa Marcy.  She is co-counsel.  She has not

15 filed an appearance, but I'd request her be allowed to join at

16 the defense table.

17   THE COURT: That will be fine.  I assume the State has

18 (inaudible)-

19   - and how do you spell your last name?

20   MS. MARCY: M as in Mary, A-R-C-Y, Your Honor.

21   THE COURT: M-A-R-C-Y, okay.  Ms. Marcy, welcome.

22   MS. MARCY: Thank you.

23   THE COURT: Okay.  So, Mr. Chatwin, if you'll have a

24 seat over here we'll let the State proceed.

25   (Inaudible)

1          THE COURT: Kay, Mr. Hill.

2          MR. HILL: Your Honor, I suspect calling two, maybe

3    three witnesses today.  I'd like to designate Officer Patterson

4    as my case manager.

5          THE COURT: Okay.

6          MR. HILL: And then my first witness would be Officer

7    Harris.

8          THE COURT: Kay.  So Officer Patterson can be case

9    manager here.

10          And then Officer Harris, if you'll step forward?

11          MR. JOHNSON: Judge, we'd like to invoke the

12    Exclusionary Rule.  By the way, just for the Court's

13    information, I am also presenting one witness.  She's also

14    present.  Her name is Kathy Torrence.

15          Kathy, would you stand up, please.

16          THE COURT: I'm assuming you want exclusionary on the

17    side of the State as well?

18          MR. HILL: Yes, Judge, that only makes sense.

19          THE COURT: Kay, those of you - so there's Officer

20    Harris, Officer Patterson.  Is there another officer or another

21    witness?

22          MR. HILL: There's one additionally, possibly, but

23    she's still in the hallway.

24          THE COURT: Okay.

25          MR. HILL: We'll see where things go.

3

1          THE COURT: Okay.  So, if you're called, if you're

2   going to be called as a witness, you'll need to wait outside

3   before you testify and then after you testify.  We'll let

4   Officer Harris stay cause he's gonna testify first.

5          But, ma'am, you'll have to wait outside and not

6   discuss the case while you're out there.  Okay, thank you.

7                         DAVID HARRIS

8          Having been first duly sworn,

9          testified upon his oath as follows:

10         THE COURT: Kay, Mr. Hill.

11         MR. HILL: Thank you, Judge.

12                    DIRECT EXAMINATION

13  BY MR. HILL:

14     Q    Sir, could you please state your name and spell your

15  last name?

16     A    David Harris, H-A-R-R-I-S.

17     Q    How are you employed, Mr. Harris?

18     A    Employed with Draper City.

19     Q    How long have you been employed there?

20     A    Four years.

21     Q    And do you have any law enforcement experience prior

22  to that time?

23     A    Yes, sir.

24     Q    Where is that at?

25     A    With Salt Lake City.

4

1    Q    How long were you with Salt Lake City?

2    A    Twenty-one years.

3    Q    And what are your, or what were your duties at Draper

4    City on May 18th of last year?

5    A    I was working a traffic patrol assignment.  I'm

6    assigned to the traffic unit.

7    Q    And that day did you respond to 12534 South 150 East?

8    A    I, I did.

9    Q    Can you, can you explain to the Court why you

10   responded there?

11   A    Yes.  There was an ATL broadcast, an attempt to

12   locate on a vehicle that had left the state liquor store in

13   Draper.  The broadcast was a person in a white vehicle was

14   leaving the store, was intoxicated, and the clerk at the store

15   got a license plate number.  Dispatch ran that number and said

16   it was located in Draper City and so I went and waited near

17   that address to see if the vehicle returned to the home

18   address.

19   Q    I see.  And did you ever locate that vehicle?

20   A    I did.

21   Q    What kind of vehicle was it?

22   A    It was a white Honda, I believe.

23   Q    And were there any occupants in that vehicle?

24   A    There was one.

25   Q    But, and I guess I say occupants.  Was there someone

5

1   driving that vehicle?

2        A    There was.

3        Q    Did you observe this person driving the vehicle?

4        A    Yes, sir.

5        Q    And where did you observe them driving?

6        A    I first saw it on 12450 South eastbound approaching

7   150 East.  I was parked right by the intersection.  The car

8   came up and made a right-hand turn onto 150 East and then

9   headed south on 150 East.

10       Q    Is that location in Salt Lake County?

11       A    It is.

12       Q    Did you at any time contact the driver of that

13  vehicle?

14       A    I did.

15       Q    And where did you contact him?

16       A    In the driveway of 12534 South.

17       Q    And did you identify the driver of that vehicle?

18       A    I did.

19       Q    How did you do that?

20       A    With an identification card.

21       Q    Did he supply that to you?

22       A    Yes, sir.

23       Q    And is that person you identified as the driver of

24  the vehicle in the courtroom today?

25       A    He is.

6

1     Q    Can you - or what's his name?

2     A    Joshua Chatwin.

3     Q    Can you indicate where he's sitting and what he's

4 wearing?

5     A    Yes.  He's sitting right here at the defense table.

6     Q    Can you be more specific?

7     A    The-

8     MR. JOHNSON: (Inaudible.)

9     MR. HILL: Okay, thank you.

10     THE COURT: Okay.  It's not Mr. Johnson and it's not

11 Ms. Marcy so it's probably-

12     THE WITNESS: - it's the one-

13     MR. JOHNSON: - (inaudible)-

14     THE WITNESS: - the one in the middle.

15     MR. HILL: - I, I figured as much, but just to be

16 clear for the record-

17     THE COURT: Yeah, and the record will, the record will

18 show identification.

19     MR. HILL: Thank you, Judge.

20     Q    (BY MR. HILL) Was, what else did you do when you

21 approached Mr. Chatwin?

22     A    I approached the vehicle.  He rolled the window

23 down.  Before we had any kind of a conversation, he turned the

24 car off.  It had been running as I walked up to it.  And he

25 handed me the keys through the window with no prompting.

7

1      Q    Is that before you said anything to him?

2      A    Yes, sir.

3      Q    What did you do next?

4      A    I asked if he had been drinking.  He, he said noth -

5  he didn't say anything.  He, he just stared ahead.  I asked

6  again, Have you been drinking?  He, once again, he said

7  nothing.

8      Q    I see.  Did, did anything indicate to you that he

9  might be impaired or intoxicated?

10     A    Well, the odor that I could smell.  I, I asked for

11  identification, registration materials.  He had some trouble

12  finding those materials.  As I recall, he took out a big pile

13  of papers and I asked him for registration materials.  He - I

14  could see the registration in his hand.  He could not identify

15  the registration.

16     Q    Did you - oh, I'm sorry.  Go ahead.

17     A    He produced an insurance card later.  He asked me if

18  it was the insurance card.  I asked him, Is it the insurance

19  card?  And he said, Well, I'm not sure.  Something like that.

20  And I had, I said, Yes, that is your insurance card.

21     Q    I see.  Did you ever smell any unusual odors about

22  him?

23     A    He smelled of al, an alcohol beverage I could smell.

24     Q    And were you able to determine where that was coming

25  from?

1     A     Coming out of the car, I could tell at that time.

2     Q     And based on those things, what did you do next?

3     A     I waited for another car to arrive and then I had him

4  exit the car to perform some field sobriety tests.

5     Q     And when, you say another car, is that another police

6  officer?

7     A     Another officer, yes, sir.

8     Q     I see.  Who was that other officer that arrived?

9     A     Officer Patterson arrived and Officer Baugh arrived.

10    Q     I see.  And were they driving the same vehicle or?

11    A     No, they were in a separate vehicle.

12    Q     I see.  And, I'm sorry.  So they arrived and then

13  what happens after that?

14    A     And then I had, I had Mr. Chatwin exit the vehicle

15  and I asked him if he'd perform field sobriety tests and we, he

16  did.  He performed some field sobriety tests.

17    Q     And what field sobriety tests did you have him

18  perform?

19    A     The horizontal gaze nystagmus test, the nine-step

20  walk and turn test and the one-leg stand test.  He refused to

21  take a portable breath test.

22    Q     I see.  Now, let's, let's just talk about each one of

23  those in order.  What, which was the first test that you

24  administered?

25    A     The horizontal gaze nystagmus.

9

1        Q      Okay.  And did he show any clues on that test?

2        A      I saw four clues.

3        Q      And how many clues total are there?

4        A      There's six clues.

5        Q      Okay.  And - I'm sorry, maybe I should back up just a

6   little bit.  Have you been trained in administering those

7   tests?

8        A      I have.

9        Q      Prior to this date, had you administered standardized

10  field sobriety tests before?

11       A      Yes, sir.

12       Q      If you can approximate how many times you've done

13  that before, what would you say?

14       A      A few hundred times.

15       Q      And is that spanning the, all of your career-

16       A      - yes-

17       Q      - as police officer?

18       A      Yes.

19       Q      Do you have any other specialized training in, I

20  guess, I don't know specifically what you call it, but field

21  sobriety tests, DUI, (inaudible)?

22       A      I've, I've twice been certified as a DRE and lots of

23  training at P.O.S.T., in-house training at both the Draper and

24  at Salt Lake City.

25       Q      I see.  On this date was your certification as a DRE

1    valid?

2         A    No, it was not.

3         Q    Was it lapsed at that point?

4         A    It's lapsed.

5         Q    Okay.  Would it, prior to this date, when was the

6    last time that you had been certified as a DRE?

7         A    That would have been in, well, it's at Salt Lake

8    City, probably five or six years ago.

9         Q    Okay.  So, I'm sorry, we kind of got off track there.

10   So, you performed the HGN, is that correct?

11        A    Yes, sir.

12        Q    And you stated that he showed four out of six clues?

13        A    Yes, sir.

14        Q    Okay.  And is that good or bad?  It, well, I guess

15   that's kind of a bad question.  Is that, what does that

16   indicate, four out of six clues?

17        A    That in, that indicates there's probably some

18   impairment.

19        Q    I see.  Now, what was the next test that you

20   performed?

21        A    The nine-step walk and turn.

22        Q    And how many clues are you looking for on that test?

23        A    Eight different clues.

24        Q    How many clues did Mr. Chatwin exhibit?

25        A    If I could look at this to kind of review what

11

1  happened, I?

2       Q     Would that help to refresh your memory?

3       A     It, it would.

4       Q     Please go ahead and do so.

5       A     Thank you.  He could not stand in the instruction

6  position.  He put his feet side by side, so that would be one.

7  He took 11 steps up and 11 steps back.  That would be two for

8  the number of steps.  He stopped and asked after the 11 steps

9  up if it was time to turnaround.  That would be three,

10 stopping.  And he asked me again if it was time to turn.  He

11 spun on both feets (sic) on the turn.  And on all steps he was

12 either offline meaning he, he stepped to one side or the other

13 of his feet or, or his feet were kind of askew.  So that would

14 be another.  So, and did not touch heel to toe.  So, six.

15 Well, and he raised his arms waist high.  So, seven.  Seven

16 clues.

17      Q     Okay.  Now, based on your training and experience

18 what did that number of clues indicate?

19      A     That would indicate impairment.

20      Q     I see.  And what was, was it the one-legged stand

21 that he also performed?

22      A     Yes, sir.

23      Q     How did Mr. Chatwin perform in that test?

24      A     I started to give the instructions and he, he raised

25 his arms when I asked him if it was time to do it.  And I, I

                                                              12

1    told him that is not, that is not what I instructed.  He, he

2    began to be a little argumentative at that point and said, No,

3    that's what you told me to do.  And I said, Would you like me

4    to re, to give you the instructions again?  And he said, No, I

5    understood them.  I'm gonna do it.  And then he proceeded with

6    the test and he did not do it as, as explained.

7         Q    Okay.  Did you indicate a certain number of clues or

8    was it, or was the test just not done?

9         A    Well, there would have, he put his feet down but he

10   never did, he never did perform the test as I instructed him to

11   do.  He raised his arms to the side and he raised his leg up so

12   that the thigh was parallel to the ground and his foot dangling

13   down.  And I, I, and he said, This is the way I've been

14   instructed to do it.

15        Q    I see.  So, just so I'm clear, so he's doing this?

16        A    Yes, sir, with his arms up like that.

17        Q    Okay.  Kind of a karate kid type?

18        A    Yes.

19        Q    Okay.  Maybe that helps the record, maybe not.  And

20   you stated before he did not perform a portable breath test?

21        A    He did not.

22        Q    Did you ask him to submit to an Intoxilyzer?

23        A    No, I did not.

24        Q    You did not.  Do you know if a blood draw was ever

25   performed on Mr. Chatwin?

13

1      A     There was.

2      Q     Where was that performed?

3      A     I believe it was IMC.

4      Q     I see.

5      A     I didn't accompany him there.

6      Q     Okay.  Are you aware of the results of that test?

7      A     I am.

8            MR. HILL: Your Honor, I'd like to (inaudible).

9            MR. JOHNSON: That's fine.  No objection.

10           MR. HILL: My I approach (Inaudible)?

11           THE COURT: Certainly.

12     Q     (BY MR. HILL) Mr. Harris, I'm showing you what's been

13 marked as State's Exhibit 1.  Do you recognize that document?

14     A     Yes.  That's a blood test result from the Health

15 Department.

16     Q     Is your name on that document?

17     A     It is.

18     Q     Is there a case number on that document?

19     A     There is.

20     Q     What case number is that?

21     A     2010003060.

22     Q     Does that number correspond to your Draper City

23 police case?

24     A     It does.

25           MR. JOHNSON: We'll stipulate to its admission.  No

                                                          14

1    objection.

2              MR. HILL: (Inaudible).  We'd ask that that document

3    be entered into evidence.

4              THE COURT: Based on the stipulation.

5              MR. JOHNSON: For the purposes of preliminary hearing.

6              THE COURT: And for these purposes, yes.

7              MR. JOHNSON: Sure.

8              THE COURT: It will be admitted.

9              (State's Exhibit 1 is received)

10             MR. HILL: And just for the record, Officer Harris,

11   what was the result of Mr. Chatwin's blood test?

12             THE WITNESS: .28.

13             MR. HILL: Thank you.  You can go ahead and pass that

14   to the Judge.

15             THE COURT: Thank you.

16             MR. JOHNSON: We'll stipulate (inaudible).

17             MR. HILL: Based on that stipulation, Judge, we'd like

18   to enter into evidence, State's Exhibit 2.  It's a document

19   (inaudible).

20             THE COURT: Okay.

21             Any objection?

22             MR. JOHNSON: There will be no objection for the

23   purpose of prelim.

24             THE COURT: Okay.  For these purposes, this hearing, I

25   will admit Exhibit 2.

                                                              15

1        (State's Exhibit 2 is received)

2        MR. HILL: Thank you.

3        Thank you, Officer Harris.

4        Nothing further for this witness at this time, Judge.

5        THE COURT: You may step down.

6        MR. JOHNSON: Oh, may I, cross?

7        THE COURT: Oh, excuse me.

8        MR. JOHNSON: (Inaudible).

9        THE COURT: No.

10       MR. JOHNSON: (Inaudible) nice.

11       THE COURT: Sorry.  I'm just on auto pilot here.

12       MR. JOHNSON: That's okay, Judge.  I appreciate that.

13                    CROSS EXAMINATION

14  BY MR. JOHNSON:

15       Q    Good afternoon.

16       A    Good to see ya-

17       Q    - how are you?

18       A    Good.

19       Q    Good.  Nice to see you again.  Off, it's Detective

20  Harris, isn't it?

21       A    No.

22       Q    No, just?

23       A    Just off, officer.

24       Q    Okay.  I would say(inaudible), but anyway.

25       A    Okay.

16

1    Q    Counsel was asking you about the fact that you've,

2    you've been with law enforcement for quite some time.

3    A    Yes, sir.

4    Q    In fact, we know each other from prior days.  And you

5    had indicated that not only do you have law enforcement

6    experience, but you've also had quite an extensive background

7    in DUIs?

8    A    Yes, sir.

9    Q    And you indicated that you've done, was it a hundred

10   arrests; is that right?  Or how, am I mis-characterizing?

11   A    On the FSTs I would guess hundreds.  I, I'm sure

12   there's (inaudible).

13   Q    Okay.  And then let's take it one step further.  So

14   you've done hundreds of field sobriety tests.  How many times

15   would you say that you've done an arrest on, on DUIs then?

16   A    A guess, I would - 2 to 300.

17   Q    Okay.  All right.  So, it's fair to say that you've

18   got a pretty opinion when on the basis of your law enforcement

19   background as well as your training, you've got a pretty good

20   handle on, on DUIs?

21   A    Yes, sir.

22   Q    Okay.  You indicated that you had a chance to

23   encounter my client at, an ATL, attempt to locate?

24   A    Yes, sir.

25   Q    And you made initial contact with him in the Draper

17

1    area?

2         A    Yes.

3         Q    And counsel was asking you about the fact what your

4    first impressions of my client were.  You indicated "was an

5    odor of alcohol"?

6         A    Yes.

7         Q    Did you also notice anything else about his personage

8    - slurred speech, glassy eyes, any of the other typical things

9    (inaudible)?

10        A    I remember slurred speech later on.

11        Q    Okay.

12        A    Not by the initial - we had very little conversation

13   right at first.

14        Q    Okay.  All right.  So can you kind of develop that a

15   little bit?

16        A    Setting in the car, looking forward.  Very little

17   interaction with me.  Did, would not speak with me initially.

18        Q    Uh-huh (affirmative).

19        A    And just not, just kind of standoffish, just-

20        Q    - sure-

21        A    - just not, not communicative.

22        Q    Okay.  All right.  How was his demeanor initially

23   with you?

24        A    Very, very quiet.

25        Q    Okay.  Did that ever change?

18

1     A     It did.

2     Q     Okay.  At one point you said that, and I've circled

3   this, that you told counsel that he became argumentative?

4     A     Yes.

5     Q     How, could you characterize that?  I mean, it's kind

6   of a broad, vague term, but.

7     A     It was while instructing for the one-leg stand.

8     Q     Uh-huh (affirmative).

9     A     He began as I said to raise his arms up and I, I

10  said, That's, that's not what I instructed you to do.  And he

11  said, Yes, it is.

12    Q     Okay.

13    A     And I says, No, it's not.  Would you like me to show

14  you again?  He says, No, you showed me and I know what, I know

15  how to do it.  I'm gonna do it.

16    Q     Okay.

17    A     Okay.

18    Q     Was he combative with you at that point when?

19    A     No.

20    Q     No.  Was he using vulgar language with you?

21    A     No.

22    Q     With the argumentative phase?

23    A     No.

24    Q     Okay.  And that's during the one-leg stand you said?

25    A     Yes, sir.

19

1     Q    And how many, I'm sorry, I didn't write this down,

2  but what, how many clues did you get out of?

3     A    Well, the one-leg stand would have been from the

4  actual clues, two.

5     Q    Two.

6     A    The arm, the arms above the waist and putting the

7  foot down.

8     Q    And how many was-

9     A    - he put his down.

10    Q    Out of how many?

11    A    Out of four.

12    Q    Out of four.  Okay.  All right.  Okay.  You

13  indicated, so you make this stop.  You made contact with my

14  client.  You asked him to do some field sobriety tests and he

15  complies with you?

16    A    Yes, sir.

17    Q    And at that point you indicated that two other

18  officers arrived, Officer Patterson and Officer Baugh?

19    A    Yes.

20    Q    Is that right?

21    A    Yes.

22    Q    And you indicated that they came in separate

23  vehicles?

24    A    Yes, sir.

25    Q    Is that the best of your recollection?

1     A    That is the best of my recollection.

2     Q    Okay.  May I ask did, did you prepare a report, a

3  crime report soon thereafter?

4     A    Yes.

5     Q    Okay.

6          MR. JOHNSON: May I approach the witness, please,

7  Judge?

8          THE COURT: Certainly.

9          MR. JOHNSON: (Inaudible).  I want you to take a look

10  at the second page and take a look at the first full paragraph

11  on the second page and if that's still is what your memory of

12  that event is after you read that information?

13          THE WITNESS: And it makes it sound like they were

14  together, but I believe they were separate.

15     Q    (BY MR. JOHNSON) Okay.  Although what does that

16  report say?

17     A    It says, "After a second unit arrived," then in

18  parenthesis I have Officer Patterson and Officer Baugh.

19     Q    Okay.  So again, that's what you recall, two separate

20  (inaudible)?

21     A    I believe so.

22     Q    All right.

23          MR. JOHNSON: (Inaudible)?

24          THE COURT: Certainly.

25     Q    (BY MR. JOHNSON) All right.  Also too, you asked my

1   client to perform some field sobriety tests and do you remember

2   how his balance was as he exited the vehicle?

3       A    Not too good.  I believe he lost balance walking to

4   the sidewalk.

5       Q    Okay.  And then, I'm paraphrasing from your report,

6   had to step back once to gain his balance, is that?

7       A    Yes, sir.

8       Q    (Inaudible)?

9       A    Yeah.

10      Q    All right.  Counsel introduced evidence to the Court

11  on, for the purpose of the prelim that he's a 2.8 (sic) BAC.

12      A    Yes.

13      Q    Pretty high?

14      A    That's pretty high.

15      Q    Pretty drunk?

16      A    That's drunk.

17      Q    Okay.  And then on the basis of the 2.8 (sic), the

18  four out of six clues on that horizontal gaze nystagmus, and

19  walk and turn seven out of eight clues, and the one-leg stand

20  two out of four clues, could you form a, a conclusion as to

21  whether my client was impaired at that particular point?

22      A    I-

23      Q    - and, the (inaudible) as well.

24      A    I thought he was impaired.

25      Q    Okay.  All right.  Now, thank you.  Officer, were

22

1    here today for a couple of different of charges.  Do you

2    remember anything about my client's interaction with Officer

3    Patterson?

4         A    No.  I missed that.

5         Q    Okay.  We didn't get to that part of the story.

6    Would you mind going a little bit further after the field

7    sobriety tests were performed by you.  What happened next?

8         A    Certainly.  I took him into custody, arrested him.  I

9    did not place him in my truck.  My truck would have been the

10   transport.  It's got a very, it's got a cage with about this

11   much room in it and very uncomfortable.

12        Q    When we talk about (Inaudible) because it's, it's,

13   the (inaudible), the recording of it.  If you can give me a

14   distance?  Foot?  Two feet, three feet?

15        A    Maybe a foot and a half.

16        Q    Okay.

17        A    It is extremely tight.

18        Q    Okay.  All right.  And I'm sorry to, to (inaudible).

19   When you talk about when he's put under arrest, did you put him

20   under arrest?

21        A    Yes, sir.

22        Q    And tell me how he was put under arrest?

23        A    I said, "You're under-

24        Q    - handcuffed?

25        A    Yes, yes.  Handcuffed behind his back.

23

1    Q    Behind his back?

2    A    Yes, sir.

3    Q    Okay.  This is kind of important for my information,

4    but when you handcuffed him, do you put, behind his back, do

5    you put hands together or wrists together?

6    A    Wrists together.

7    Q    Okay.  So in other words, both hands (inaudible)?

8    A    Yes.

9         THE COURT: So you got the back of the hands together;

10   is that-

11        MR. JOHNSON: - yeah, I'm sorry, the back of the

12   hands.

13        THE COURT: Okay.

14        MR. JOHNSON: So this, so am I-

15        THE WITNESS: - yes, sir, that is correct.

16        MR. JOHNSON: (Inaudible) correct?

17        THE WITNESS: You are.

18   Q    (BY MR. JOHNSON) Okay.  All right.  So he's

19   handcuffed - then what happens, please?

20   A    I left him with Officer Patterson while I went to

21   search the vehicle, begin the inventory, because I would do a

22   state tax impound on (inaudible)?

23   Q    Mr., Mr. Chatwin's vehicle?

24   A    Yes, yes.

25   Q    Okay.  Correct.  Go ahead.

24

1      A      The Honda.

2      Q      Okay.

3      A      I gathered a, gathered my camera.  Went and began

4  searching the vehicle.  I would guess I was at that for two or

5  three minutes I would guess.

6      Q      Okay.  Go ahead, please.

7      A      Turned around and Mr. Chatwin was laying down on the

8  ground, right down where the driveway meets the road.

9      Q      Okay.  All right.  Very interesting point you just

10  brought up.  You said that you had a camera.  Is there a camera

11  in the car?

12     A      No.  This is a, this is a little handheld camera.

13     Q      Okay.  Do you know whether Officer Patterson's car

14  had a stationary camera in it?

15     A      I don't believe so.

16     Q      Or, you said Officer Baugh was the second officer

17  that arrived?

18     A      Yes.

19     Q      Whether her car had a camera in it?

20     A      I'm almost certain hers does not.

21     Q      Does not.  Okay.  All right.  Okay.  All right.  And

22  then you see Mr. Chatwin on the ground?

23     A      Yes.

24     Q      Do you hear anything prior to - you're in the car,

25  Mr. Chatwin's car retrieving what, what, whatever's in there.

25

1  Do you hear any, anybody saying anything?

2      A    I heard nothing.

3      Q    Nothing.  And how far are you away from where my

4  client is on the ground?

5      A    His car was parked in the driveway almost up to the

6  home.

7      Q    Kay.

8      A    So 25-30 feet.

9      Q    Okay.  I'm really bad with distances.  So where you

10 sit and where I stand, is that about right or should I be

11 further out in distance?

12     A    It would be, it would further back, maybe back to

13 the, somewhere between the doors and this little gate here.

14     Q    Okay.  All right.  Remember what the weather

15 conditions were like that day?

16     A    Believe it was good weather.

17     Q    Okay.  Clear?  Nothing obscuring your view?

18     A    Nothing that I remember-

19     Q    - (inaudible)?

20     A    No.

21     Q    Could you hear, you, you said you couldn't hear any

22 commotion so obviously there was nothing-

23     A    - nothing that drew my attention to him.

24     Q    Okay.  All right.  Okay.

25          MR. JOHNSON: Can I have a moment, Your Honor?

26

1          THE COURT: Sure.

2          MR. JOHNSON: Visit with counsel?

3          THE COURT: Sure.

4          MR. JOHNSON: All right.  Thank you, that's all I

5    have.

6          THE COURT: Okay.  Now you may step down.

7          Do you want to call your next witness?

8          MR. HILL: Please.  The State would call Officer

9    Patterson to the stand.

10                    OFFICER PATTERSON

11          Having been first duly sworn,

12          testified upon his oath as follows:

13          THE COURT: If you'll have a seat up here, Mr. Patt,

14   Officer Patterson?

15          MR. JOHNSON: Can I just take a real quick break and

16   talk to the bailiff for two seconds?

17          THE COURT: Okay.

18          MR. JOHNSON: Okay, thank you.  Appreciate the break.

19   Thank you, Judge.

20          THE COURT: Kay, go ahead, Mr. Hill.

21                    DIRECT EXAMINATION

22   BY MR. HILL:

23      Q    Sir, would you please state your name, spell your

24   last name?

25      A    Officer, Officer Patterson.  P-A-T-T-E-R-S-O-N.

27

1    Q    Officer Patterson, how are you employed?

2    A    Draper City Police Department.

3    Q    How long have you been employed there?

4    A    About two years now.

5    Q    Do you have any law enforcement experience prior to

6    your time at Draper?

7    A    Just training and P.O.S.T.

8    Q    I see.

9    A    Okay.

10    Q    Now, obviously you've been in the courtroom today.

11    Are you familiar with the case that's been discussed?

12    A    Yes, I am.

13    Q    And did you have a role in that case?

14    A    Yes, I did.

15    Q    Can you describe for the Court – well, let's just

16    start from the beginning.  Where did you respond to?  What did

17    you do when you got there?

18    A    I responded to the address, the 12534 address to

19    backup Officer Harris on the suspected DUI.

20    Q    I see.  And when you got to that address, who was

21    there?

22    A    Officer Harris was.  And he, I saw him talking to an

23    individual in the white passenger car in the driveway of a

24    resident.

25    Q    Were there any other officers there at that time?

28

1      A      Officer Baugh arrived one to two minutes I would say

2  after me.

3      Q      After you?

4      A      Yeah.

5      Q      Is she driving a separate vehicle?

6      A      Yes.  She drives a pickup truck.

7      Q      I see.  And what kind of car do you drive?

8      A      I have an Explorer, Ford Explorer, SUV.

9      Q      And is it marked as a police vehicle?

10     A      Yes, uh-huh (affirmative).

11     Q      I see.  And, okay, so you show up there.  What do you

12  do?  What's your first interaction with the defendant in this

13  case?

14     A      He was still, he was just getting out of his vehicle

15  with Officer Harris to perform FSTs.  The primary officer

16  usually waits for a backup before FSTs are performed.  So as

17  soon as I got there he started to get him out of the vehicle

18  and started to perform the FSTs up on the sidewalk next to the,

19  to the garage there next to the home.

20     Q      And did you observe those FSTs?

21     A      Yes, I did.

22     Q      And what do you do when those FSTs are concluded?

23     A      I'm sorry?

24     Q      What do you, what did you do while those are going

25  on?

29

1      A      All you do is just backup, stay off to the side.   You

2      can take notes as well, you know, it's just for safety is

3      what's, is what the purpose is.

4      Q      I see.   And that's what you're doing at that point?

5      A      Yes.

6      Q      And when the field sobriety tests are done, what do

7      you do next?

8      A      Officer Harris handcuffed and placed him under

9      arrest.   I took over the, the custody of him while Officer

10     Harris went to search his vehicle and process his vehicle.

11     Q      All right.   And what's his demeanor while you, he's,

12     well, when you initially take custody of him?

13     A      He elevated a little bit at the end of the FSTs.

14     Then he quieted down again when he took, took custody and was

15     handcuff him.

16     Q      Just to unpack that a little, when you say he

17     "elevated a little bit," what do you mean?

18     A      Well, he started, he started to be more argumentative

19     with Officer Harris at the end of the, at the end of FSTs, you

20     know.   He, he started, his demeanor started to rise a little

21     bit, started to get a little upset.

22     Q      I see.   And you say that comes down a little bit when

23     he's-

24     A      - placed him under arrest, it went down again.   I

25     searched him inci, incident to arrest, started asking him, you

30

1    know, do you know have any weapons on you, any contraband, any

2    (inaudible)?

3        Q    And, and where is that search taking place?

4        A    Right in the grass, right in the yard there.

5        Q    Uh-huh (affirmative).

6        A    Just right next to the sidewalk where the FSTs were

7    taking place.

8        Q    I see.  Now when you say "sidewalk," is that sidewalk

9    closest to the street or?

10       A    No.  The sidewalk to the house.

11       Q    I see.

12       A    From the, from the driveway and then up to the front

13   door.  That sidewalk.

14       Q    I see.  Okay, so you search him incident to arrest?

15       A    Uh-huh (affirmative).

16       Q    What's his demeanor like at that point?

17       A    It's starting to raise a little bit.  I asked him if

18   he had anything on him before I started to search him and he

19   was starting to be a little vulgar.

20       Q    Okay.  And what do you mean by vulgar, is he swearing

21   at you or?

22       A    Yes.

23       Q    Okay.  And anything that precipitated that to your

24   knowledge?

25       A    No.  I just asked him if he had anything on him and -

31

1    do you want me to say what he said?

2        Q    No.

3        A    Okay.

4        Q    And it might be helpful if, if you don't understand

5    something I'll have you refer to your report.

6        A    Okay.

7        Q    But I just want to, you know, basically get what you

8    remember at this point.

9        A    Sure.

10       Q    If, if we need to clarify, we'll, we'll refer to that

11   report.

12       A    Kay.

13       Q    So, you search him.  And what happens next?

14       A    As am searching him, Officer Baugh asks him how he

15   got a scratch on his arm.  And then he kind of, kind of freaked

16   out at her.

17       Q    And what do you mean by "freak out," is he?

18       A    He, he kind of, he started to yell vulgarity at her.

19       Q    Okay.

20       A    And at the same time he's starting to get very, he's

21   moving around a lot.  His arms are, you know, moving a lot

22   behind him.  He's touching things on my belt.  You know, he's

23   a, he's a thinner kind of a guy so he's very flexible.  He's

24   got long hands and arms, and I could feel him, he was fiddling

25   with my belt a little bit, moving it around.

32

1    Q    And hands are in handcuffs, correct?

2    A    Yes.

3    Q    Okay.  And so I'm assuming, well, I'm not gonna

4    assume anything.  Where are you at that point?

5    A    Right behind him as I was performing the search.

6    Q    I see.  And are you, I mean, immediate behind him?

7    Are you hands on?  I mean, are you touching (inaudible)?

8    A    You start, you go, you go around the front, down one

9    side, move around to the front, down the other side.  So it's a

10   systematic search.  You're in the rear, then to the side, the

11   rear again, then the side again.

12   Q    So it's safe to say you were in pretty close

13   proximity?

14   A    Oh, yes.  Absolutely.

15   Q    And what's his demeanor like at that point ?

16   A    It's still (inaudible), as soon as Officer Baugh,

17   from that question, he, he kind of, you know, started to really

18   elevate with the vulgarities.  So then I walked him from the

19   yard over against Officer Harris's patrol vehicle for better

20   stability and safety of him and better, you know, able to keep

21   him secured as well.

22   Q    And what kind of vehicle is Officer Harris in?

23   A    It's a F-1, Ford 150 pickup truck.

24   Q    I see.  And does it have a shell in the back.

25   A    No, just a (inaudible) cover in the back.

33

1     Q    Okay.  So you say you take him over to the truck.  Do

2  you put him against the truck?

3     A    Yes.

4     Q    What part of the truck?

5     A    The bed, right against - right near the rear wheel.

6     Q    Okay.  In front of the rear wheel?

7     A    In front.

8     Q    Okay.  And what happens there?

9     A    He's, he's still being more vulgar.  He's still

10  saying, you know, a lot of vulgarities to me.  Still moving

11  around a lot.

12     Q    And by "moving around," can you describe how he's

13  moving?

14     A    Just moving his hands and arms a lot.  You know, if I

15  didn't have him against the truck, he was, he was swaying a

16  lot.

17     Q    And-

18     A    - you know, just really, really kind of a squirrely-

19  type of an action if that makes any sense.

20     Q    I see.  Is he touching you at all?

21     A    Yeah.  Is hand, his fingers are still touching the

22  front of me.  I'm trying to stay offline a little bit so he

23  doesn't, so he can't get to my belt.

24     Q    I see.

25     A    The driveway's at a slope so I was down a little bit,

1   you know, below him just a little.

2       Q    Now, does he touch any, ever touch anything on your

3   belt?

4       A    Yes.

5       Q    What does he touch?

6       A    As I was talking to him and still get him to calm

7   down, I heard the retention lock on my holster unlock.

8       Q    And what do you do at that point?

9       A    I look down and I could see his three fingers on the

10  rear sights of my gun.  So at this time I had one arm on his

11  bicep to steady him.  I look down-

12      Q    - what-

13      A    - pardon me?

14      Q    I'm sorry, I didn't mean to interrupt you.  I just

15  wanted-

16      A    - sure-

17      Q    - to clarify.  So you say you see three fingers?

18      A    Yes.

19      Q    What three fingers are on the gun?

20      A    These three fingers - thumb and two fingers.

21      Q    So that's thumb, index and middle finger?

22      A    Yes.

23      Q    And you say it's on the-

24      A    - yes, on top-

25      Q    - what part of your weapon?

35

1     A    Pardon me?

2     Q    What part of your weapon?

3     A    Just on the top, on the rear sights there, rear

4 sights in the back of the receiver.

5     Q    I see.  And, okay, and I'm sorry I interrupted you.

6 So you say that you had your arm?

7     A    Right, I had my right arm on his right bicep to

8 steady him.

9     Q    I see.

10    A    During this whole process.

11    Q    And what, and what do you do next when you see what

12 you just described (phonetic)?

13    A    I look down and I see his fingers on there.  I said,

14 Hey, let go.  I look up and his head was coming back towards my

15 face.  So I ducked my head down so he didn't hit me in the

16 face.  I took my left hand and attached it to the middle of the

17 cuffs.  Then I took and sidestepped to move him away from my

18 weapon side.

19    Q    So you say, what, so, you're facing towards him.

20 Which direction do you sidestep him?

21    A    To my, to my left.

22    Q    To your left?

23    A    Away, away from my weapon.

24    Q    And I guess that would be his left too?

25    A    His left as well, yes.

36

1      Q     Okay.  Now you say that you, you directed that way?

2      A     Yes.

3      Q     Is he resisting you at all at that point?

4      A     At, standing in front of me he was.

5      Q     Okay.

6      A     Directed him away from me, as soon as that happened,

7  I imagine due to his level of intoxication, everything just

8  went limp.

9      Q     Everything on him?

10     A     Yes.

11     Q     Okay.  Does he go on the ground?

12     A     Yes.

13     Q     Does he receive any injuries (inaudible)?

14     A     He hit his ear and his left side of his face on the,

15  on the driveway.

16     Q     Okay.  And can you describe how forcefully he hits

17  the ground?  I mean, I don't know, that's kind of a vague

18  question, if-

19     A     - yeah, I don't know.

20     Q     I mean-

21     A     - I mean, it seemed like he hit his head pretty hard.

22     Q     Okay.  And what do you do at that point?

23     A     At that time I, Dave, Officer Harris was coming back.

24  I told him, I said, He's hit the ground.  Let's call medical.

25  You can see he's got a little cut or something.  He started to

                                                              37

1    bleed a little bit.  He didn't move very much.

2        Q    Kay.

3        A    So, so let's get medical coming right away.

4        Q    Okay.  And does medical arrive on scene, eventually?

5        A    Medical does arrive on the scene, yes.

6        Q    Okay.  So at that point Officer Harris is in the

7    vehicle; is that correct?

8        A    He's, he's, he was searching his vehicle at that

9    point.

10       Q    Okay, yeah, and that's what I mean.

11       A    Right.

12       Q    Is anybody else there besides you and Mr. Chatwin?

13       A    Officer, Officer Baugh was there.

14       Q    Officer Baugh.  And how far away from you is she at

15   that point?

16       A    I wasn't really paying attention to her.  My full

17   attention was on him because, you know, of the elevation.

18       Q    Okay.

19       A    So I don't know if it would be - six to ten feet is a

20   guess.

21       Q    I see.

22       A    I'm not sure exactly.

23       Q    And so when you stated before that, I believe you

24   said that after you had looked down-

25       A    - uh-huh (affirmative)-

                                                                  38

1      Q    - towards your weapon, you look up and his head is

2  coming towards you?

3      A    Yes.

4      Q    Can you just describe that a little bit?  Is, I mean,

5  is he swaying?  Is he, what's going on?

6      A    Well, he was swaying and he would periodically arch a

7  little bit.  So when I looked up, his back would arch and his

8  head came back.

9      Q    Okay.  And it's coming towards?

10     A    Coming towards my face.

11     Q    I see.  And how did you interpret that?

12     A    As a, an attack, as in head butt.

13     Q    I see.

14     A    You know.

15     Q    Did you ever give him, and I guess I'm speaking of

16  the time frame from the time that you're searching him on the

17  grass incident to arrest to the time that he's against the

18  truck.  Did you ever give him commands, tell him things to do?

19     A    Oh, absolutely.  Just tell him, you know, just to be

20  calm.  This is not that big a deal.  This will be over in a

21  couple hours.  Just relax.  We're, you know.

22     Q    Did you ever give him specific commands about, I

23  mean, as far as (inaudible)?

24     A    There, there on the grass when he started to get

25  elevated I told him, Don't, don't resist me.  Just relax.

1  Cause he would go, he would tense up real big and then relax

2  and tense, and relax.  Things like that.  I told him, Don't,

3  don't resist.  Just relax.

4       Q    Okay.  Thank you, officer.

5            MR. HILL: Nothing further at this time, Judge.

6                        CROSS EXAMINATION

7  BY MR. JOHNSON:

8       Q    Good afternoon.

9       A    Good afternoon, sir.

10           MR. JOHNSON: Judge, do you know if there's a magic

11 marker, something (inaudible)?

12           THE COURT: There should be.

13           MR. JOHNSON: (Inaudible).

14      Q    (BY MR. JOHNSON) Officer Patterson, you were one of

15 two officers that came in after Officer Harris began the DUI

16 investigation; is that right?

17      A    Yes, sir.

18      Q    Okay.  And you came in a separate car from Officer

19 Baugh?

20      A    Yes, sir.

21      Q    Okay.  What kind of car did you drive?

22      A    Ford Explorer.

23      Q    Ford Explorer.

24      A    Yes, sir.

25      Q    Did Officer Baugh arrive in a truck?

                                                              40

1        A     Yes, sir.

2        Q     All right.  Do you recall seeing upon your arrival

3    where cars were parked?

4        A     Yes.

5        Q     Okay.  Would you mind drawing a diagram for the

6    (inaudible)-

7        A      - sure-

8        Q      - (inaudible).  I, I need some visual-

9        A      - sure-

10       Q      - as to where you were.  Where my client's car was.

11   As much information as you could give would be appreciated,

12   please.

13       A     (Witness is drawing diagram).

14       Q     And it's always good to have a north indicator too,

15   so.

16             THE COURT: Too bad the State can't afford some better

17   magic markers.

18             MR. HILL: It's a tough economy, Judge.

19             THE COURT: It's not gonna be any better after this

20   session.

21             MR. HILL: No.

22             THE COURT: We're gonna have to start using a slate

23   and chalk.

24             MR. JOHNSON: Awe, the good ole days.

25       Q     (BY MR. JOHNSON) Okay, great, thank you.  Now, yeah,

                                                                    41

1    if you could (inaudible) so the Judge can see counsel and

2    myself, so.  What did you draw, please?

3        A    Sorry, this is the street here, 150 East, and this is

4    the north.

5        Q    Got ya, thank you.

6        A    There's the house, driveway.  The vehicle involved,

7    suspect vehicle.

8        Q    Okay.

9        A    Officer Harris's vehicle.  My patrol vehicle.  And

10   Officer Baugh's vehicle.

11       Q    Okay.  All right.  So "D" is Harris?

12       A    Yeah.

13       Q    Okay.  Could we change that just to an "H" so I?

14       A    To what?

15       Q    "H".

16       A    "H" here?

17       Q    Yeah.  And then Baugh would be "B".

18       A    Right.

19       Q    And then let's put you for "P" for Patterson, please?

20       A    Kay.

21       Q    Okay, great.  All right.  So, cars are parked and

22   then tell me what happens next.  You arrive?

23       A    Right, I-

24       Q    - who come first, you, you or Baugh?

25       A    I, I did.

                                                              42

1     Q     Okay.

2     A     And maybe one to two minutes after is when she

3     arrived.

4     Q     Great, thank you.  Go ahead.  Please.

5     A     Here, I come around.  Officer Harris is talking to

6     the suspect here.

7     Q     Uh-huh (affirmative).

8     A     He's just (inaudible).

9     Q     Kay.

10    A     Right here is kind of a flatter, sidewalk concrete

11    area where he performed the FSTs.

12    Q     Okay.

13    A     Right here is where we placed him under arrest.

14    Q     Okay.  Let's stop right here.

15    A     Sure.

16    Q     And again, you heard Officer Harris's testimony about

17    how he's put under arrest.  Is that consistent with your memory

18    the fact that my client was handcuffed with his wrists facing

19    each other behind his back?

20    A     Yes.

21    Q     Okay.  All right.  Go ahead.

22    A     This is where he's placed under arrest.  (Inaudible)

23    this is the grass.

24    Q     Kay.  And let's go really slow.

25    A     Kay.

43

1     Q    Cause I'm, I'm, you know, not quick on the uptake.

2     A    Kay.

3     Q    How would you describe his physical demeanor at that

4  point?  You said he started to getting elevated?

5     A    Yes.

6     Q    Okay.

7     A    FSTs, at the end of the FSTs he started elevating.

8     Q    Okay.

9     A    Argumentative with Officer Harris.

10    Q    Okay.  And, and I know you were kind of staying from

11  words before.  I know the Judge has been around the block, so

12  let's, let's be to what you specifically remember my client

13  saying.

14    A    (Inaudible).

15    Q    If you can recall?

16    A    Sure.

17    Q    What did he say?

18    A    He was arguing with Officer Harris about the FSTs-

19    Q    - okay-

20    A    - about how he performed them, how he explained.

21    Q    Sure.  Okay.  Go ahead, please.

22    A    Kay.  So placed him under arrest.

23    Q    Okay.

24    A    This is a nice grass yard here.

25    Q    Right.

44

1    A    So right here's where I started to do my search

2    incident to arrest.

3    Q    Okay.  Let's talk about that.  You, now he's, he's in

4    custody.

5    A    Correct.

6    Q    Hands behind his back.  How do you do your search?

7    A    Search (inaudible) you got any weapons on you?  Do

8    you have anything (inaudible)?

9    Q    Right.

10   A    (Inaudible).

11   Q    Right.

12   A    Kay.

13   Q    Kay.

14   A    I asked him that.

15   Q    Kay.

16   A    He started getting vulgar with me (inaudible).

17   Q    What did he say?

18   A    He said, Dude, I ain't got shit on me.

19   Q    Okay.  Okay.

20   A    I said, (inaudible) for your safety and mine.

21   Q    Now, are you doing a face-to-face with-

22   A    - (inaudible)-

23   Q    - oh, so you're from behind?

24   A    Yes.

25   Q    So where are you - do a little side diagram if you

1    could, where you are in relation to him.  Let's call, let's do

2    "C".  Do a circle for "C" where my client would be.

3        A    Okay.

4        Q    And where you were we'll do a square with-

5        A    - okay.

6        Q    So are you left or right side of my client?

7        A    Right behind.

8        Q    Directly behind?

9        A    Yes.  He (inaudible).

10       Q    Correct.  Go ahead.

11       A    Started behind him.

12       Q    Kay.

13       A    (Inaudible).

14       Q    Okay.

15       A    And whatever (inaudible) go around the front,

16   systematically, go down one side or the other, whichever you

17   like.

18       Q    Okay.

19       A    Go around the other side.

20       Q    Can I stop you, please.

21       A    Sure.

22       Q    I, I got to do this.  So is my client turning and

23   looking at you or he is he facing (inaudible)?

24       A    No, no.  Facing away.

25       Q    Facing away, okay.  And again, what's his physical

46

1    characteristics.  He's, he's swaying, he's drunk?

2         A    Yes.

3         Q    Is he swaying?

4         A    Yes.

5         Q    Oh, he is, okay.

6         A    Swaying and moving.

7         Q    Okay.  And you've been with law enforcement for a

8    while (inaudible)?

9         A    (Inaudible).

10        Q    And you've also been trained on detecting people

11   under the influence of alcohol?

12        A    Yes.

13        Q    And you've also (inaudible) classes?

14        A    Yes, sir.

15        Q    And you've also arrested people under the influence

16   of alcohol?

17        A    Yes.

18        Q    All right.  Did you formulate an opinion about my

19   client's condition at that particular time and place?

20        A    Yes.

21        Q    What was that?

22        A    Highly intoxicated.

23        Q    Highly intox, highly intoxicated.  Okay.  Go ahead,

24   what happens next?  So, he's facing away?

25        A    Facing away.

```
 1      Q    Okay.

 2      A    Go down the other side, (inaudible).

 3      Q    Yeah.

 4      A    And so I'm starting to go down the left side, second

 5   side-

 6      Q    - uh-huh (affirmative)-

 7      A    - Officer Baugh is standing right here facing him.

 8      Q    Okay.

 9      A    She asked him, Hey, how did you get a scratch on your

10   arm?

11      Q    So is she close to you?

12      A    Yes.

13      Q    How far is that?

14      A    That's probably-

15      Q    - arm's length?

16      A    - five, no, five-six feet.

17      Q    Okay.  All right.  Now, before Officer Baugh arrives,

18   did you lift up my client's shirt see if he had any weapons

19   before she arrived?

20      A    No.

21      Q    After?

22      A    Yeah.

23      Q    Okay.  All right.  Let's, so put that in proper

24   sequence if you could for me, please.  What happens next then?

25      A    Do you want me to start over?
```

48

1    Q    No, no.  Not unless you really need to?

2    A    No.

3    Q    Okay, go ahead.

4    A    So, no, she's standing here this whole time as he's

5    doing the FSTs, she was here.

6    Q    Kay, all right.

7    A    So, she asked him that.

8    Q    About the scratches?

9    A    Yes.

10   Q    Okay.

11   A    And he got vulgar and yelled (inaudible).

12   Q    What did he say?

13   A    He says, Leave me the fuck alone.

14   Q    Okay.  Great, what happens next?

15   A    (Inaudible).  So I (inaudible) stand behind him

16   again.

17   Q    Directly behind him?

18   A    Yes.

19   Q    Okay.  Can I ask you a question?

20   A    Sure.

21   Q    When he said those words, were you upset?

22   A    Was I upset?

23   Q    Uh-huh (affirmative).

24   A    No.

25   Q    Were you offended that he was using vulgarity like

1    you call it?

2         A    No.

3         Q    Okay.

4         A    I was, I was surprised.

5         Q    Okay.  All right.  Although he's drunk?

6         A    Right.

7         Q    Okay.  Go ahead.

8         A    So he said that.  Everything elevated.  His demeanor

9    changed quite a bit.

10        Q    Kay.

11        A    Again, moving, pulling, swaying, turn (inaudible)-

12        Q    - let, let's talk a little bit about that.  His hands

13   are behind his back?

14        A    (Inaudible).

15        Q    And you've got, do you have your hands on him?

16        A    Just one hand, only on the shoulder.  Just

17   (inaudible).

18        Q    So you're indicating, your right hand?

19        A    (Inaudible).

20        Q    So your right hand is on which shoulder?

21        A    This one.

22        Q    What does "this one" mean?

23        A    His right.

24        Q    Okay, thanks.

25        A    Standing directly behind him (inaudible).

1       Q     Okay.  And he's moving and swaying?

2       A     Yes.  Moving.  Doing a lot of this.  He's a lanky

3   guy.  He's got long hands.

4       Q     (Inaudible).

5       A     And can move around, he could move a lot.

6       Q     Yeah.  But you're, are you an arm length away from

7   him?

8       A     No.

9       Q     No?  You're close?

10      A     Yes.

11      Q     Okay.  All right.  Go ahead.

12      A     So as soon as he started to elevate there that's when

13  I moved (inaudible) down.  (Inaudible), moved him down to this

14  portion (inaudible).

15      Q     Let's talk about it.  How did you move him down?

16      A     Just walked him down.

17      Q     Was he complaint at that point?

18      A     Yes.

19      Q     And was he saying anything to you?

20      A     Yeah, he was just pissed off, saying (inaudible)

21  bullshit.

22      Q     Okay.  So he was using more vulgarity?

23      A     Yes.

24      Q     Okay.  Kay.  And then what happens?

25      A     Came to here.  Officer Harris still was in here with

                                                              51

1    his, inside the vehicle.

2         Q    Right.

3         A    Still processing it.

4         Q    Okay.  Now where's Baugh?

5         A    She, I don't know exactly.  She's behind me here

6    somewhere.

7         Q    Okay.

8         A    I don't know exactly where.

9         Q    How far away is Baugh from you?

10        A    Same distance probably, six, you know, five to seven

11   feet.

12        Q    Okay.

13             MR. JOHNSON: - can I approach the witness, Judge?

14             THE COURT: Sure.

15        Q    (BY MR. JOHNSON) So (inaudible), stop me when you

16   think Baugh is-

17        A    - right there?

18        Q    About right there, okay.  So obviously you and I've

19   got pretty good (inaudible), right?

20        A    (No audible response).

21        Q    Okay.  Go ahead.

22        A    Cause I'm facing him once again.  I believe she was-

23        Q    - okay-

24        A    - right here.

25        Q    And I'm sorry.

                                                              52

1        A     You're fine.

2        Q     Forgive my ignorance on this one.  So when you're

3    facing him, tell me how you're facing him - middle, left,

4    right?

5        A     At this - the driveway has a slope to it.

6        Q     Okay.

7        A     So in order to have good balance, I had to be down a

8    little bit (inaudible).

9        Q     Okay.  All right.

10             MR. JOHNSON: Judge, this is a little out of protocol.

11   I've asked your bailiff if he wouldn't mind being my, my

12   demonstrative manikin for lack of a better word.

13             THE COURT: Don't know how much of an actor he is.

14             MR. JOHNSON: (Inaudible).  So, can I, can you

15   (inaudible) so that, to the best of your recollection, and

16   again, using this fine, fine individual here as where my client

17   would be and how you were situated and we can make a record of

18   (inaudible), please?  So we're at the truck.

19       A     We're at the truck.

20       Q     Okay.

21       A     So he's against the truck.

22       Q     Okay.  Is he leaning over?

23       A     Yes.

24       Q     Okay.

25       A     (Inaudible).

                                                              53

1        Q    Okay.  And (inaudible) hands, okay.  Very good.  He's

2   got, for the record, he's, he's got forward tilt (inaudible)-

3        A    - not much forward tilt because (inaudible).

4        Q    Okay.

5        A    So, so he's pretty much standing still (inaudible).

6        Q    Okay.

7        A    He's a little bit (inaudible) against the truck-

8        Q    - kay-

9        A    - (inaudible).

10       Q    Okay.  Very good.  And his, he's got his hands back

11  together.  (Inaudible) obviously done, handcuffed enough people

12  so wrists are against each other?

13       A    They don't, they don't (inaudible) because he's so

14  lanky.

15       Q    Okay.  All right.

16       A    (Inaudible) this way (inaudible)-

17       Q    - but the handcuffs are there, right?  Aren't they

18  (inaudible)?

19       A    (Inaudible).

20       Q    Okay.  All right.

21       A    So they can move.

22       Q    Okay.

23       A    You know.

24       Q    And can you maybe - the Judge needs to see this too.

25       A    Sure.

                                                              54

1      Q    So if there's some way you can demonstrate, but

2  again, that's not what you're position was.  You were off to

3  the left-hand side of him, right?

4      A    Just like this-

5      Q    - correct?

6      A    Just like this.

7      Q    Okay.  Okay.

8      A    (Inaudible).

9      Q    Sorry.  Go ahead, say that again, I'm sorry.

10     A    (Inaudible) because like I say, slope on the

11 driveway.

12     Q    Okay.

13     A    So (inaudible).

14     Q    Okay.  (Inaudible).

15     A    (Inaudible).

16     Q    Okay.  And then what happens?  Now, you say he was

17 grabbing at your belt?

18     A    Yes.

19     Q    When was he grabbing at your belt?

20     A    The whole time.

21     Q    Okay.  The whole time?

22     A    Yeah.  Cause he, he moved and he kind of, you know,

23 wiggle.

24     Q    Articulate what part of your belt.  Front side?

25     A    Front, front (inaudible) in the front.

55

1    Q    Okay.

2    A    This side, this side.

3    Q    Okay.  Now, you made a report after this fact, didn't

4    you?

5    A    Yes.

6    Q    Right after this incident?

7    A    Yes.

8    Q    Did you put that in the report that he was grabbing

9    at your belt?

10   A    Yes.

11   Q    Ever?  You did?

12   A    (Inaudible).

13   Q    Okay.  We'll have to ask you about that-

14   A    - okay-

15   Q    - in just a minute or two.  Okay.  So, he's grabbing

16   at your belt.  Doesn't that put you on notice that there's a

17   problem with this individual?

18   A    Yes.

19   Q    Okay.  So what happens next?

20   A    He's still getting elevated.  Saying (inaudible), "F"

21   you (inaudible).

22   Q    Okay.  And is he facing you or facing?

23   A    (Inaudible).

24   Q    So he's facing away?

25   A    Yes.

1        Q    Okay.  All right.  What, what happens next?

2        A    He's facing away.  I go, Hey, calm down a little bit.

3   Take it easy.

4        Q    Correct.

5        A    And then I hear the clip.

6        Q    Okay.  Is that the belt right there?

7        A    Yes.

8        Q    Is that the holster?

9        A    Yes.

10       Q    Okay.  All right.  So, what do you mean you hear a

11  click?

12       A    I hear the (inaudible) retention holster unlock.

13       Q    Okay.

14       A    I look down.  And I see it un, I seen it unlocked

15  with his three fingers on it.

16       Q    Uh-huh (affirmative).

17       A    I look up and I, as (inaudible) go like this.  I look

18  up.  As I said, Hey, the head comes back.

19       Q    Okay.

20       A    And I bring my head down-

21       Q    - okay.  Let, let's talk, let's talk about the click.

22  Now, Jeff is, the bailiff is, is obviously trying to do that

23  but it's impossible for him to do that-

24       A    - Jeff is not, he is not as near as flexible

25  (inaudible).  He can move his hands all around.

57

1      Q      Okay.

2      A      The thinner you are you can go underneath-

3      Q      - okay.  So you're saying that he not only undid the

4  safety (inaudible) on your holster, but he has three fingers-

5      A      - uh-huh (affirmative)-

6      Q      - a thumb, the, the mid, the first finger and the

7  middle finger?

8      A      Yes.

9      Q      All three of them are on your, your, the barrel of

10  your gun?

11      A      No, (inaudible).

12      Q      Oh, okay.  All right.  And so he's able to move that

13  and, and put all three fingers there?

14      A      Yes.

15      Q      Okay.  All right.  And again, he's facing forward?

16      A      Yes.

17      Q      He's intoxicated?

18      A      (No audible response).

19      Q      He's being belligerent with you and that's what your

20  statement is?

21      A      Yes.

22      Q      Kay.  Good.  What happens next?

23      A      As he, as I bring my head up he brings his head back.

24  I went (inaudible) cuffs, moved him away-

25      Q      - okay-

58

| | | |
|---|---|---|
| 1 | A | - from my weapon side. |
| 2 | Q | Let's stop and talk about his head arching back. |
| 3 | A | Right. |
| 4 | Q | He's still facing forward? |
| 5 | A | Right. |
| 6 | Q | As Jeff has demonstrated? |
| 7 | A | Right. |
| 8 | Q | He's able to come back and head butt you? |
| 9 | A | Yes. |
| 10 | Q | Okay.  And again, you know that he's being angry? |
| 11 | A | Yes. |
| 12 | Q | He's being belligerent? |
| 13 | A | (No audible response). |
| 14 | Q | Okay.  And you're that close and you're allowing him |
| 15 | | to do all that? |
| 16 | A | Yes. |
| 17 | Q | Okay.  Go ahead. |
| 18 | A | (Inaudible). |
| 19 | Q | Okay.  What happens next. |
| 20 | A | So he brings his head back, brings his head back.  I |
| 21 | | duck so he doesn't hit me in the face. |
| 22 | Q | Uh-huh (affirmative). |
| 23 | A | Attach my left hand onto the cuffs. |
| 24 | Q | Okay. |
| 25 | A | Move him away from my weapon side. |

1     Q      Kay.

2     A      And then he comes down on the ground.

3     Q      Okay.  Where's Baugh?  Which side is she?

4     A      Apparently she's over here?

5     Q      Okay.  All right.  Okay.  Okay.  All right.  And then

6   what happens?

7     A      Then I (inaudible) down.

8     Q      Okay, great.  Thanks, Jeff.

9            MR. JOHNSON: Okay.  Your Honor-

10           - (inaudible)-

11           - can I approach the witness, please?

12           THE COURT: Certainly.

13    Q      (BY MR. JOHNSON) All right.  You recognize this don't

14   you?  This is, this reads, Draper Police Report, Officer

15   Report.

16    A      Uh-huh (affirmative).

17    Q      And the name on the bottom is Jay (sic) Patterson, is

18   that you?

19    A      Yes, sir; 90-

20    Q      - is your number 9066?

21    A      Yes, sir.

22    Q      Okay.  Now you say (inaudible) testified to the Judge

23   that he was grabbing your belt a while before you actually-

24    A      - right-

25    Q      - did you put that in your report?

                                                              60

1       A    Yes.  I put that he was pulling against me.  As he

2    squirmed and pulled against me.

3       Q    Where is that?  He continued (inaudible)-

4       A     - this one here.

5       Q    Okay.  But that doesn't say "he pulled on my belt."

6    It says, "he squirmed and pulled against me."

7       A    Uh-huh (affirmative).

8       Q    My question to you again, Officer Patterson, is did

9    you articulate in this report which I assume was prepared at

10   the scene or almost thereafter-

11      A     - (inaudible)-

12      Q     - that "he pulled on your belt" prior to him undoing,

13   as a quote here, "unlocked the holster."  Did you put that in

14   your report about him grabbing at your belt?

15      A    Apparently not, no.

16      Q    Okay.  All right.

17           (Inaudible)

18      Q    (BY MR. JOHNSON) After this took place, did you high

19   five any of the officers after my client was down on the

20   ground?

21      A    Absolutely not.

22      Q    No?

23      A    No.

24      Q    Kay.  All right.

25           MR. JOHNSON: Can I have a moment, please?

61

```
 1              THE COURT:  Yes.

 2              (Inaudible)

 3              MR.  JOHNSON:  Okay.   (Inaudible) some clarification.

 4   You said that he was touching at your belt?

 5        A    Yeah.

 6        Q    He didn't grab your belt until actually you were able

 7   to articulate that he (inaudible), right?

 8        A    Can you say that again, please?

 9        Q    Was he touching or grabbing your belt?

10        A    Grabbing.

11        Q    Grab?

12        A    Yes, sir.

13        Q    All right.  How tall are you?

14        A    6'2".

15        Q    6'2".  And how tall is my client; do you remember?

16        A    6'1" or so.

17        Q    Okay.  All right.  And it is your testimony that when

18   you did the demonstration with Jeff that you, when he felt

19   like, after he, he arched-

20        A    - uh-huh (affirmative)-

21        Q    - and you, is that, is that the correct sequence, he

22   grabbed at your belt, then he grabbed at your gun and then he

23   arched his (inaudible)?

24        A    Yes.

25        Q    Is that the appropriate sequence?
```

1        A      Yes.

2        Q      That you (inaudible) him to your left?

3        A      Yes, I moved him to my left away from the weapon

4    side.

5        Q      Okay.  Although - okay.  You're sure about that?

6        A      Yes, sir.

7        Q      Okay.  All right.  Okay.

8               (Inaudible)

9               MR. JOHNSON: Okay.  (Inaudible).  Thanks.

10              THE COURT: You may step down.  Thank you, officer.

11              Does the State have any other witnesses?

12              MR. HILL: No, Your Honor.  The State will rest at

13   this time.

14              THE COURT: Kay.

15              Mr. Johnson?

16              MR. JOHNSON: Yes, Judge.  Could we call Kathy

17   Torrence to the stand, please?

18              THE COURT: Kay.

19              MR. UNKNOWN: Who is it?

20              MR. JOHNSON: Kathy Torrence, thanks.  Thank you.

21              THE COURT: Right here.

22                          KATHY ANN TORRENCE

23              Having been first duly sworn,

24              testified upon her oath as follows:

25              THE COURT: If you'll have a seat right up here?  And

                                                                    63

1    pull the chair up to the microphone.  We have to record these.

2              THE WITNESS: Kay.

3              THE COURT: So.  Thanks.  Kay, thank you.

4              Go ahead.

5              MR. JOHNSON: Ready?

6              THE WITNESS: Ready.

7              MR. JOHNSON: Okay.

8                        DIRECT EXAMINATION

9    BY MR. JOHNSON:

10        Q    Could you please state your full name, spell your

11   last name for the, well, first and last name for the Judge,

12   please?

13        A    Kathy Ann Torrence.  Kathy with a K.  Ann.  T-O-R-R-

14   E-N-C-E.

15        Q    Kay.  Kathy, you're a resident of Salt Lake County

16   are you not?

17        A    Yes, I am.

18        Q    All right.  I would like to draw your attention to

19   some events that took place in, the date of, (inaudible)

20   memorized, May 18th of 2010.  Living in Draper at the time?

21        A    Yes, I was.

22        Q    Did you see something happen outside or close to your

23   residence?

24        A    Across the street, yes, I did.

25        Q    Okay.  Would you mind telling the Court what your

                                                                64

1    recollection of the events on May 18th of 2010 were?

2        A    The entire?

3        Q    Sure, from soup to nuts, from beginning to end.

4        A    Takeoff to touchdown?

5        Q    Yeah, sure.

6        A    Okay.  I noticed that a police car had pulled in

7    behind my neighbor's car that's directly across my street.

8        Q    Uh-huh (affirmative).

9        A    And-

10       Q    - who are your neighbors?

11       A    The Chatwin's.

12       Q    Chatwin, so you know Josh, don't you?

13       A    Yes, I do.

14       Q    Have you developed a friendship with Josh?  I mean-

15       A    - prior to the date of this happening?

16       Q    Yeah.

17       A    I didn't even know who he was before this happened.

18       Q    Okay.  All right.  Go ahead, please.

19       A    Okay.  So, anyway the officer approached the car and

20   asked him, apparently he gave him some paperwork and Josh got

21   out of the car and the officer patted him down.  And-

22       Q    - kay, let me stop you right here, I'm sorry.  And I,

23   again, (inaudible) I don't, I don't track well if I don't ask

24   questions (inaudible).  When you're viewing this scene, your,

25   you indicated you're across the street from?

1    A    Correct.

2    Q    Okay.  Do you recall what time of day this was?

3    A    It was around noonish.

4    Q    Noon.  Do you recall the weather conditions that day?

5    A    It was sunny beautiful day.

6    Q    (Inaudible)-

7    A     No snow.  Nothing.

8    Q    Anything that might have caused you not to see, or

9  anything obscuring your vision?

10   A    Nothing.

11   Q    Trees?

12   A    No, no trees at all.

13   Q    Telephone pole?

14   A    No telephone poles.  Nothing.

15   Q    No (inaudible)?

16   A    Nothing.

17   Q    Okay.

18   A    Yeah.

19   Q    All right.  And how far are you away - you said about

20  50 feet away?

21   A    Correct.

22   Q    Okay.  So you see - what do you see?

23   A     Well, I see the officer's truck pull in kind of

24  catty-corner.  And he's parked, you know, he pulls straight in.

25  And then he pulled in, you know, like facing, kind of like

66

1    south.  It wasn't straight in or, it was just kind of, you

2    know, in.

3         Q    Okay.  Do you recall what color that truck was?

4         A    It was white.

5         Q    White.  Okay.  Go ahead.

6         A    So anyway, at which point they, they gave him a

7    sobriety test.  But before that happened, two other police

8    trucks show up.

9         Q    Okay.  All right.

10        A    Well, you know, Ford Explorers.

11        Q    Okay.  All right.

12        A    Those pull up.  And then, so they start administering

13   the, you know, to see if you're, what do you call it?

14        Q    (Inaudible).

15        A    Sobriety test.

16        Q    Field sobriety tests?

17        A    Yes.

18        Q    Okay.  Are they, is that anywhere close to the, the

19   cars that you saw or (inaudible)?

20        A    Well, it was in the street right next to, like here's

21   the driveway and then the sidewalk, of course.

22        Q    You know what, it might be helpful.  There's, I don't

23   want you-

24        A    - want me to draw pictures?

25        Q    Yeah.  Would you mind?

                                                              67

1     A     No.

2     Q     If, if there's someway - (inaudible) save that,

3   preserve that, that drawing (inaudible)-

4           MS. UNKNOWN: Do you have another one?

5           MR. JOHNSON: I don't know.

6           THE COURT: That's it.

7           THE WITNESS: That's all we get?

8           MR. JOHNSON: Yeah.

9           THE COURT: The only one we got.

10          MR. JOHNSON: Maybe, how (inaudible) that upper left-

11  hand corner?

12          THE WITNESS: Okay.  So, what would you like me to

13  draw?

14    Q     (BY MR. JOHNSON) You, it's your call.

15    A     Okay.

16    Q     But just don't draw on that one.

17    A     Okay.  That's, we can, I guess we can still go with

18  that.  I guess that would be north?

19    Q     Sure.

20    A     Okay.  Can I just talk about this picture?

21    Q     Of course.

22    A     Okay.

23    Q     That'd be helpful.

24    A     I don't know what this is, but I'm guessing that's

25  the car?

1       Q       Okay.

2       A       Okay.  So-

3       Q       - whose car?

4       A       Josh's (inaudible).

5       Q       Okay.  All right.

6       A       The white car.

7       Q       Okay.

8       A       Okay.  So this would be the officer's car, but this

9    isn't where it was.  It was actually over here more.

10      Q       Okay.

11      A       This is the garage door.

12      Q       Okay.

13      A       And then this would be, you know, so it's like, it's

14   like right here.

15      Q       Okay.

16      A       Right (inaudible).

17      Q       Do you want maybe dotted line-

18      A       - (inaudible)-

19      Q       Okay.  What - dotted line's fine (inaudible).

20      A       (Inaudible).

21      Q       Yeah, whatever.

22      A       (Inaudible)?

23      Q       Yeah, whatever.  Or do dotted lines so we know that

24   it's your drawing.

25      A       (Inaudible) I can just use different colors.

69

1     Q    That would be good.

2     A    Okay.  I have (inaudible).

3     Q    Okay.

4     A    (Inaudible), okay.  So his car was parked right here.

5     Q    Yeah.

6     A    Okay.  And there, and that was the officer's.  And this is the sidewalk.

8     Q    Kay.

9     A    There's a sidewalk.  And the sidewalk (inaudible).

10     Q    Kay.

11     A    And the other two officers, I don't know what this is supposed to be, but-

13     Q    - what you remember.

14     A    They were parked in front of the street.

15     Q    Okay.

16     A    You know, in front of the house (inaudible).

17     Q    Okay.

18     A    And then (inaudible).  Those guys come over and then-

19     Q    - who's those guys, please?

20     A    Oh, sorry.

21     Q    It's okay.

22     A    The police officers.  The two, the two, the original guy was there.

24     Q    Okay.

25     A    Who pulled him over.  And then two more came.  A man

1    and a woman.

2         Q    Okay.

3         A    And so they all came over here.  This is the

4    sidewalk.

5         Q    Kay.

6         A    (Inaudible).

7         Q    Kay.  Go ahead, you're doing good.

8         A    (Inaudible) and they were telling him what to do, you

9    know, like-

10        Q    - the field sobriety tests, sure.

11        A    - you need to, you know, do all that stuff.

12        Q    Kay.

13        A    So then at which point they determined that they

14   wanted to give him a Breathalyzer.  And so he said no, I'm

15   guessing, cause then the officer threw him in the grass and

16   then they handcuffed him.

17        Q    Kay.  Do you remember how he was handcuffed?

18        A    Behind his back.

19        Q    Okay.  All right.  Then what happened, please?  And

20   if you need to-

21        A    - (inaudible).

22        Q    And if you need to sit down, please do.

23        A    (Inaudible).

24        Q    Yeah, okay.

25        A    Then they, you know, they check him again to make

```
 1   sure he didn't have any weapons or anything on him.  And then-
 2        Q    - now, so we've indicated there are three officers.
     Do you remember how many officers checked him for weapons?
 3
 4        A    Two.
 5        Q    Two.  Who were they?
 6        A    The original officer and then the next male officer.
 7        Q    Okay.  Now, do you recognize this officer that's
 8   seated at counsel table?  No?
 9        A    No.
10        Q    If you don't, you don't.
11        A    I don't.
12        Q    Okay.  All right.  So there was a second, there were
13   two-
14        A    - I mean, I can say to you kind of, but I'm gonna say
15   no.
16        Q    Okay.  All right.  What happens next, please?
17        A    Okay, so then, the first officer goes into the back
18   of, he has a pickup truck with, you know, a King cab, you know,
19   so there's like two cabs - two, there's a back seat and a front
20   seat.
21        Q    Right.
22        A    And he starts taking stuff out of the back of his
23   truck.
24        Q    Uh-huh (affirmative).
25        A    And then putting it in the back of the pickup truck.
```

72

1    Q    Okay.

2    A    You know, you could tell like one was a rifle.  He's

3    just putting stuff to, so they can make room for him to get in.

4    Q    Him - who?

5    A    Josh.

6    Q    Josh, okay.

7    A    You know, cause they're gonna take him apparently.

8    So he's handcuffed and they've got him next to the, the car.

9    Q    Josh?  Let's see if, if we can give names, that would

10   be great.

11   A    Oh, okay.  So after he does all that, the first

12   officer goes back to the white car.

13   Q    Kay.

14   A    And then the other male officer takes Josh and has

15   him stand behind the, on the side of the truck.  So you've got

16   the two doors and then you have, like the, the bed of the

17   truck.

18   Q    Okay.

19   A    So he's standing there handcuffed.

20   Q    Okay.  So at this point you're gonna have to help me

21   out.

22   A    Draw pictures again?

23   Q    (Inaudible) diagram over here.  So where is Josh with

24   the second officer?   Approximately?

25   A    Well, let's just say (inaudible).  He's, he's behind

73

1    the first, the second door.

2         Q    Josh?

3         A    Yes, Josh is behind the second door.

4         Q    All right.

5         A    On the left because then they're just gonna put him

6    in the truck.

7         Q    Okay.

8         A    So he's like (inaudible) pickup truck that is, you

9    know.

10        Q    Kay.  All right.

11        A    But he's just, you know, like here's the door and

12   standing (inaudible).

13        Q    Kay.  And can you hear anything at this point?

14        A    I can't hear nothing.

15        Q    All right.  All right.  So what, what, what happens

16   to Josh next?  And again, he's facing the pickup truck.  Does

17   he stay facing the pickup truck?

18        A    Uh-huh (affirmative), yeah, he's facing (inaudible).

19        Q    Is he standing upright?

20        A    Uh-huh (affirmative).

21        Q    Okay.  Then what happens?

22        A    Then he turns like and looks in my direction and he's

23   saying something to the officer.

24        Q    Looks toward, toward your-

25        A    - like (inaudible) he's talking.

1    Q    Uh-huh (affirmative).   Okay.

2    A    So then the officer, whatever, whatever was said, the

3   officer got mad and grabbed him. Just threw him down to the

4   ground.

5    Q    Okay.

6    A    Nothing happened to - whatever he said made that

7   officer mad.

8    Q    Okay.  All right.  So let me ask you, because this is

9   a pretty fast sequence.

10   A    Sorry.

11   Q    Did you - that's fine, that's fine.  So your

12   testimony is the officer is facing Josh?

13   A    He's standing behind Josh.

14   Q    And where's Josh facing?

15   A    He's facing north.

16   Q    Okay.  Did you see Josh moving his hands toward the

17   officer?

18   A    No, he did not.

19   Q    Did you see Josh reaching (inaudible) the officer's

20   belt?

21   A    No.

22   Q    Did you see the, Josh undo the gun clip on the

23   officer's holster?

24   A    - he did not do that.

25   Q    - Are you sure?

75

1       A      I'm absolutely positive.  Guarantee it just did not

2    happen.

3       Q      (Inaudible)?

4       A      Because he was, he was standing there just talking.

5    And I'm watching the whole thing.

6       Q      Okay.  Did you see Josh head butt the officer?

7       A      He did not do that.

8       Q      You're sure?

9       A      I'm absolutely positive.

10      Q      Why?

11      A      Why am I positive?

12      Q      Yes.

13      A      Because I would have, I mean, how do look this way

14   and head butt somebody?

15      Q      Yeah, okay.

16      A      I mean, he's just handcuffed, looking, and then he's

17   talking.  And then he whipped by the arm and whipped him

18   around.

19      Q      Okay.  And then what happened to Josh after that?

20      A      What happened to him after that?

21      Q      Yeah.  He whipped him around, where did Josh land?

22      A      Out in the gutter.

23      Q      Kay.  So-

24      A      - so you have the, the rest of the driveway.

25      Q      Uh-huh (affirmative).

76

1     A   The sidewalk, the driveway.  And his head was down in

2  the, kind of like in the street.  So where the water would run

3  on the gutter.

4     Q   Yeah.

5     A   That's where his head ended up.

6     Q   Okay.  So if, if the officer is behind Josh?

7     A   Correct.

8     Q   Did the officer throw Josh to his left?

9     A   Counterclockwise.

10    Q   To his right, counterclockwise?

11    A   Uh-huh (affirmative).

12    Q   So literally-

13    A   - yeah.

14    Q   Spun him around?

15    A   Just like that.

16    Q   Okay.  Not to his left?

17    A   I mean, if he took him, if he was to grab him and go

18  like that with him, he didn't do that.  He just went, Wham!

19    Q   Yeah.  And let's talk about how he grabbed him, okay?

20  So, Josh has got his hands behind his back?

21    A   Correct.

22    Q   How did he, how did the officer grab him?

23    A   By, by his arm.  Like, you know, like this-

24    Q   - which arm - left arm, right arm?

25    A   It would be his left arm.

1    Q    Okay.  All right.  And then what happened?

2    A    And then what happened then, the female officer was

3  standing kind of like, so you have, what had happened, she was

4  just like, Huh, what, what was that all about?

5    Q    Uh-huh (affirmative).

6    A    And then she went over and told the other, cause the

7  first, the original officer, he never, never went over to Josh

8  to see if he was okay or what was going on.  In the meantime,

9  you're looking at Josh's head and it's turning bright red and

10  purple.  Cause you can tell, it's like, you know, there's blood

11  obviously, there's a problem.  So she went and told the guy,

12  the original officer in his car, oh, in Josh's car, cause he

13  was still rifling through it.  And they must have called the,

14  the ambulance and all that at that point.  Cause as soon as

15  they got there, then I, you know, walked across the street to

16  get my neighbor to get the phone number of - the grandparents

17  live right next door, so somebody could go out there and make

18  sure everything was okay.

19    Q    Okay.  And then did you provide some information to

20  Draper City PD right after this?

21    A    I wrote a brief synopsis of what happened.

22    Q    Okay.  And it was, was it a sworn statement that you

23  provided to the officers?

24    A    When you say "sworn," what do you mean?

25    Q    Well, did it say that "any false statement you make

78

```
 1    (inaudible)"?

 2         A     No, it was, that was sworn then, yeah.

 3         Q     Okay.  All right.

 4         A     (Inaudible), yeah.

 5               MR. JOHNSON: And if I may?

 6               MR. HILL: Yeah.

 7               MR. JOHNSON: All right.

 8               May I approach the witness, Judge?

 9               THE COURT: Certainly.

10         Q     (BY MR. JOHNSON) Do you recognize that?

11         A     Yes, I do.  That's my handwriting.

12         Q     Was that, is that (inaudible)?

13         A     That's exactly what I gave the officers.

14               MR. JOHNSON: Can I have this marked and move to be

15    admitted (inaudible)?

16               THE COURT: Do you have any objection to its

17    admission?

18               MR. HILL: No, Judge.

19               THE COURT: Okay.

20               MR. JOHNSON: Thanks.

21               THE COURT: Thank you.

22               (Defense Exhibit 1 is received)

23               (Inaudible)

24         Q     (BY MR. JOHNSON) Okay.  All right.  Prior to Josh

25    laying on the ground, did you see him wiggling around?
```

79

1     A    Huh-uh (negative).

2     Q    No.  And again, I'm sorry, just the obvious question,

3 anything obstructing your view?

4     A    Nothing.  Absolutely nothing.

5     Q    All right.

6     A    Absolutely nothing.

7     Q    Okay.  And could you see if you could give me a

8 perspective on where, you said driveway, if I was you watching

9 me, how far away are you from (inaudible)?

10    A    Well, I'm in the front window of my house.  It's not

11 like a small street.  It's kind of just it's, cause it was

12 supposed to be I guess frontage road.  But it's, so from here,

13 I guess from here to-

14    Q    - me or further?

15    A    It would be further.

16    Q    Yeah.  To that door?

17    A    Perhaps.

18    Q    Okay.  All right.  Again, that's pretty far away?

19    A    Uh-huh (affirmative).

20    Q    What's your vision like?

21    A    With my glasses?

22    Q    Yeah.

23    A    I don't know, 20-20.

24    Q    Did you have them on that day?

25    A    Oh, absolutely.  I watch, I didn't want to miss

1   anything.

2        Q    Okay.  All right.  Okay.  Anything else?  Nothing.

3   Thanks.  Appreciate that.

4             THE COURT: Okay, Mr. Hill, any correct?

5             MR. HILL: Yes, just briefly, Judge.

6                        CROSS EXAMINATION

7   BY MR. HILL:

8        Q    Ms. Torrence, just referring back to-

9             - I don't know if you still have that in front of

10  you, that witness statement?

11            THE COURT: I, I have it here.

12            MR. HILL: If I could just-

13            MR. JOHNSON: - I've got another copy if you want?

14            THE COURT: No, that's okay.

15            MR. HILL: Oh, no-

16            THE COURT: - I've read through it, so.

17       Q    (BY MR. HILL) Okay.  I'm just curious about the first

18  line.  You stated, approximately 12:00 p.m. I "fitnessed the

19  neighbor."

20       A    I know, I'm sorry.  I was really nervous after the

21  whole thing.  I wrote it out really fast.

22       Q    Okay.

23       A    Cause I want, I didn't know how soon they needed it.

24  So I just - it's supposed to be "witnessed."

25       Q    Well, yeah, and I assumed so.  I just wanted to make

                                                              81

1    sure.

2         A    Right, right, right.  I got it, I know.  I mean.

3         Q    I just, yeah, didn't want to assume anything.

4         A    I didn't "fitness" anything.

5         Q    Okay.  And this, how all, how long after you observe

6    all this do you write this statement?

7         A    After the whole thing ended?  Like right after-

8         Q    - what-

9         A    - right after the, they got there to take care of

10   him.

11        Q    Okay.

12        A    To take care of his injuries.  It was like right

13   after that.  As soon as the supervisors and people started

14   showing up, I went over and told them that I saw everything and

15   they asked me to write a report.

16        Q    Okay.  So what's the time frame from the time you see

17   these events to the time you write the report - if, if you can

18   (inaudible)?

19        A    Probably 15-20 minutes.

20        Q    Okay.  So it's, it's fairly-

21        A    - oh, absolutely.

22        Q    Okay.  Now you are a flight attendant, correct?

23        A    Correct.

24        Q    Are you working that day, well, I'm mean, obviously

25   you're not at the airport-

```
 1        A    - yeah-

 2        Q    - but are you going to work, gonna go to work that

 3   day?

 4        A    No.  I was off.

 5        Q    Okay.  You're not, you're off here in town?

 6        A    (No audible response).

 7        Q    Okay.  Had you had anything to drink that?

 8        A    No.  Absolutely not.

 9        Q    Any prescription medications?

10        A    Well, I just take one.

11        Q    What's that?

12        A    It's a generic form of Lexapro.

13        Q    Okay.

14        A    It's cause I'm going through menopause and I don't

15   want yell at anybody.

16        Q    Well, yeah, and I don't-

17        A    - that's the truth.

18        Q    That's what, that's what we're asking here.

19        A    And my job is kind of difficult, right?

20        Q    Sure.  I understand.  And I, and I don't mean to, to

21   ask you for any other reason.  I'm just trying to establish

22   (inaudible)-

23        A    - that's all, I just take-

24        Q    - if you're taking anything that affects your-

25        A    - no, not like that-
```

83

1      Q      - perception, ability to perceive things?

2      A      No.

3      Q      Does it affect your eyesight at all?

4      A      No.

5      Q      Okay.  Does it affect your mood at all?

6      A      Well, yeah, it makes me not want to yell at people.

7      Q      Okay.

8      A      So you know what I mean?

9      Q      Yeah, no, I do.  I do.  That's fine.

10     A      It's hard dealing with the public.

11     Q      Okay.  So, so you stated that, and I just want to

12  make sure we're, we're I'm standing here that from where you're

13  sitting (inaudible) is about to that back door that you can?

14     A      Perhaps, yeah.

15     Q      See this.  Okay.  So, and so, what, what sort of

16  yard, do you have yard in your front yard?

17     A      I do.

18     Q      Okay.  And-

19     A      - (inaudible)-

20     Q      - how big of a yard is that?  I mean, dimensions,

21  but, I mean, from me to you, am I (inaudible) window?

22     A      No.

23     Q      Okay.

24     A      You're not in my yard.

25     Q      Okay.  So it's smaller than that, so.

1     A    Oh, yeah.

2     Q    Okay.  So.

3     A    Now you're standing on my sidewalk.

4     Q    Okay.  (Inaudible) sidewalk.  And then so there's a

5 street here?

6     A    Correct.

7     Q    And then other side of (inaudible)?

8     A    Correct, their house, right.

9     Q    Got ya.  When you walk over to, well, and if I'm

10 remembering correctly, you say you walk over to the scene?

11     A    When I, when – after the whole thing happened, once

12 he was, the paramedics and people got there, I went out my

13 garage door, across the street to Heidi's house, my neighbor

14 that lives next door to them.

15     Q    Okay.

16     A    And went and got her to see if we could get the phone

17 directory list for our ward.

18     Q    Okay.

19     A    And, to get the grandparent's phone number.  So went

20 to her next door neighbor's to get it.

21     Q    Oh, I see.  So, okay.

22     A    They had it.  She didn't have it with her.

23     Q    So, and I guess, and so when you come to where the

24 police officers are, in that area I guess is what I'm referring

25 to, do you talk to anybody, say anything to anybody there?

85

1      A      Yeah, I did.

2      Q      What do you say?

3      A      I told, there was a sergeant standing by his truck

4  and some people and I walked over to them cause I didn't want

5  to get involved with that.  So I went over and told him, I just

6  wanted you to know I saw what happened in case you want me to

7  write a report.

8      Q      Got ya.  And do you remember talking to anybody

9  related to Joshua, at the scene there?

10     A      The only person I talked to was his, it's a family

11 member named Mary Lou, I think.

12     Q      Do you know what her relationship to the defendant

13 is?

14     A      I don't remember.

15     Q      Okay.

16     A      I know she, I think she's a family member.

17     Q      What do you say to her when you get there?

18     A      I told her I saw everything.

19     Q      Okay.

20     A      Cause there, and then she was telling me just to let

21 everybody handle.  And I'm like, Let everybody handle it?

22 There's, the, so.

23     Q      Okay.

24     A      But-

25     Q      - did you say anything to the effect, We got 'em?

86

1     A     Pardon me?

2     Q     Anything to the effect, We got 'em?  Or?

3     A     We got 'em?  We got who?

4     Q     I'm asking you did you ever say anything like that?

5     A     We got 'em?  I don't think so.

6     Q     Okay.

7     A     But you're talking back in May.  But I don't know

8  what you would mean by that, by me saying, You got 'em?

9     Q     That's fine.

10    A     Doesn't sound like something I'd say.

11    Q     Okay.  So, and you stated, let's see, what time did

12 you wake up that morning?

13    A     What time did I wake up that morning?

14    Q     Yeah.

15    A     I don't remember.  Like, usually like 9:30-10:00.

16    Q     Okay.  So - and what I'm getting at, you're not

17 rolling out of bed as you're standing in the window.  I mean,

18 you've been up for a while?

19    A     Yeah.  I've been up for like-

20    Q     - I don't know, I don't - I don't know what a

21 schedule of a flight attendant is so I'm just trying to-

22    A     - usually you sleep when you get the opportunity to.

23    Q     Okay.  And that's why-

24    A     - but I didn't just roll out of bed and like go to my

25 window.  I was already, I had been up for a little while.

87

1      Q     Okay.  Fair enough.  And now, you stated a lot of

2  things on direct that I think were inferences from what you

3  saw.  But when you see, so when you see Joshua up against the

4  truck, you try to, you say he turns his head and you think he's

5  saying something?

6      A     Yeah.  You could see his lips are moving.

7      Q     Okay.

8      A     He's saying something, you know, he's trying to talk

9  to the officer behind him.  He's saying something.  But he's,

10  you know, you can only talk, turn so far, so his head is just

11  like looking directly at my window, you know, directly in my,

12  where I'm at.

13      Q     Okay.

14      A     Towards me.

15      Q     And, and then your perception is that that angered

16  the officer?

17      A     He obviously said something and that pissed off the

18  cop and the cop lost it.  That's exactly what I thought.

19      Q     Okay.

20      A     He was just talking.  And then he grabbed him and

21  just threw him on the ground.

22      Q     Well, you don't know, I mean, if the officer was mad?

23      A     I don't know if he's mad, no.

24      Q     Okay.

25      A     But I know if, obviously, if he said something, he

                                                                88

```
 1    threw him on the ground.

 2         Q    No-

 3         A    - said something that pissed him off.

 4         Q    Okay.  In your perception?

 5         A    In my perception.

 6         Q    Okay.  Where is, so where is the officer standing?

 7    When, when he turns his head like that and he talks to him, can

 8    you describe how the officer is standing behind him?

 9         A    How he is standing behind him?

10         Q    Right.

11         A    He's just standing behind him.

12         Q    Okay.  Well, I mean, what I'm getting at, okay, so I

13    can be directly behind someone, I can still behind them if I'm

14    on this side.  So, I mean, is he, I mean, (inaudible)?

15         A    Right.

16         Q    You understand what I'm saying?

17         A    Yeah, pretty much like that, yeah.

18         Q    Okay.

19         A    Right behind him.

20         Q    Okay.  And is he close to him?

21         A    He was probably this far away from him.

22         Q    So you're indicating two feet?

23         A    Is that two feet?

24         Q    I don't know.  I'm asking - I'm horrible at judging

25    distances.
```

89

1    A    As am I.

2         THE COURT: Looks more like a foot to me.

3         THE WITNESS: You're going with the commercial aren't

4    you?

5         THE COURT: Foot long, (inaudible), yeah.

6         MR. HILL: Okay.

7         THE COURT: That looks like maybe a foot, 18 inches.

8         MR. HILL: Okay.  Fair enough.

9         THE COURT: From what I can see of her fingers.

10        MR. HILL: Okay.  I don't have any further questions,

11   Judge.  Thank you.

12        MR. JOHNSON: Just some followup, I'm sorry about

13   that, Ms. Torrence.

14                         REDIRECT

15   BY MR. JOHNSON:

16    Q    When you indicated you wanted to volunteer to law

17   enforcement, you said you spoke to a sergeant?

18    A    Correct.

19    Q    You wanted to give them some information?

20    A    Correct.

21    Q    How did the sergeant react to that?

22    A    He was, he gave me a clipboard and was fine with it.

23    Q    Okay.

24    A    And then he came over to my house and talked to me

25   inside the house.

1    Q    Okay.  And then Mr. Hill was asking you a question

2  about something and you, you stopped midstream.  Something

3  about "let him handle it."  Would you just finish that thought

4  for me?

5    A    Oh, when she said I?  Cause apparently the, when the

6  family, the grandparents had come over, they had asked the

7  officers what had happened.  And they had told them that story,

8  whatever their story was.  And so they were saying, they

9  thought what I, I, how do I say this?

10   Q    As honestly as possible.

11   A    They said that, what they said wasn't true.  So the

12  family, well, she thought that, you know, just let the officers

13  handle it, Kathy, you don't know what's going on.  You don't

14  know what the family's been through.  And I go, yeah, but I

15  know what I've seen.  I know what I saw.  I knew exactly what I

16  saw.

17   Q    Okay.  Thank you.

18   A    You're welcome.

19        MR. JOHNSON: That's all I have.

20        THE COURT: You may step down, thank you.

21        MR. JOHNSON: Judge, we're not gonna call any further

22  witnesses.  I've had a chance to talk to my client.  He knows

23  he has-

24        THE ?WITNESS: (Inaudible).

25        THE COURT: - yes, thank you.

91

1          MR. JOHNSON: - an opportunity to testify at this

2    point and it would be my advise to him (inaudible).

3          THE COURT: Okay.

4          Does the State have anything further?

5          MR. HILL: No, Judge.  I will save the argument for

6    rebuttal.

7          THE COURT: Okay.

8          MR. JOHNSON: And may I excuse this witness?

9          THE COURT: Certainly.

10         You may be excused, ma'am.

11         THE COURT: Mr. Johnson, do you have any argument?  He

12   wants to save it for rebuttal.

13         MR. JOHNSON: Well, yes, Judge.  I, I do.  I'm not

14   gonna call it anything short of a mistake in judgment, but I

15   think that there has been sufficient testimony.  And I know

16   that at the, the level of a preliminary hearing it's a very

17   minimal threshold, Judge.  Clear and convincing evidence at

18   best, at best, that a crime has been committed and this is the

19   individual who committed it.  There's no doubt that there is

20   issues about a DUI.  We stipulated to that.  What there is

21   doubt about, and I think it's beyond 50 percent, is the fact

22   that my client did not attempt to disarm this peace officer.

23   We have a (inaudible) person.  And also, so that takes care of

24   the first degree felony.  In, in disarming or attempting to

25   disarm.

1          Secondly, the assault on a peace officer which is a

2     third degree felony didn't happen either.   And I hope the Court

3     with the information that we provided, as scant as it is, there

4     isn't a sufficient enough basis to get either one of those

5     charges bound over.   (Inaudible).

6          THE COURT: Thank you.

7          Mr. Hill?

8          MR. HILL: I'll be brief, Judge.   I mean, to a

9     probable cause standard, I think the State's shown enough on

10    all the, the counts to bind them over at this point.   The Court

11    acting in its role as a magistrate at this point is not allowed

12    to weigh evidence if, of, or to compare, weigh evidence of one

13    witness against the other.   I think taken the inferences in the

14    light most favor to the State from what the officers have

15    testified to, Officer Patterson testified that the defendant

16    was belligerent and angry.   He said he saw the retention

17    holster on his gun.   He heard and saw it come open.   Saw the

18    defendant's fingers on his gun.   He stated that the defendant

19    arched his head back and what he perceived as an attempt to

20    head butt him to, to (inaudible) is enough to bind over.   The

21    other counts concerning the DUI and the driving on suspended,

22    the ignition interlock, I think there's sufficient evidence of

23    that (inaudible) certified of the driving record.

24          And then obviously I think there's been enough that

25    the defendant was interfering with the officer's duties and not

93

1    compliant with the commands that the officer was giving him.

2    So I, I would submit that there has been enough evidence to

3    bind over all counts, Judge.

4              THE COURT: Kay.  Thank you.

5         Recognizing the role as a magistrate, I can't weigh

6    the evidence.  I can't weigh the testimony.  I just can't.  The

7    disarming a peace officer is to did intentionally take or

8    remove or attempt to take or remove.  I think the evidence is

9    sufficient to show probable cause to believe that that crime

10   did occur and that the defendant is the one who committed that

11   crime on the probable cause standard.  So I'm binding over

12   Count I.

13        Assault by a prisoner, again, I believe that the

14   testimony is sufficient to sustain the burden for a probable

15   cause that there was an attempt to head butt, so I am bind over

16   on Count II as well, the third degree felony.

17        The other matters are misdemeanors.  I think there's

18   sufficient evidence for them to proceed with the two felony

19   counts.  So I'm going to bind the, the matter over for trial.

20             MR. HILL: Judge, may I withdraw (inaudible)?

21             THE COURT: Yes.  And I'm assuming, Mr. Johnson, do

22   you want yours as well?

23             MR. JOHNSON: Yes, please.

24             THE COURT: Okay.  Kay, let's get-

25             (Inaudible - conversation scheduling hearing date)

94

1          COURT CLERK: March 17th at 8:30.

2          MR. JOHNSON: Okay.  Great.

3          MR. HILL: That was March 17th?

4          THE COURT: March 17th.

5          MR. JOHNSON: All right.  Thank you.

6          THE COURT: Thank you.

7          (Whereupon the hearing was concluded)

1       CERTIFICATION

2          I, LISA FREEBAIRN, hereby certify that I transcribed

3    the proceedings in the matter of <u>State of Utah versus Joseph</u>

4    <u>Chatwin</u> and that the foregoing is a true and correct

5    transcription of the Preliminary Hearing to the best of my

6    understanding, skill and ability on said date.

7          DATED this 27th day of August, 2012.

8                         /S/ LISA FREEBAIRN

1        COURT CLERK: March 17th at 8:30.

2        MR. JOHNSON: Okay.  Great.

3        MR. HILL: That was March 17th?

4        THE COURT: March 17th.

5        MR. JOHNSON: All right.  Thank you.

6        THE COURT: Thank you.

7        (Whereupon the hearing was concluded)