```
            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF UTAH
                     CENTRAL DIVISION
_____
                                )
JOSHUA CHATWIN,                 )
                                )
          Plaintiff,            )
                                )
vs.                             )  Case No. 2:14-cv-00375
                                )
DRAPER CITY; OFFICER J.         )  Judge Dale A. Kimball
PATTERSON, in his               )
individual and official         )
capacity; OFFICER DAVID         )
HARRIS, in his individual       )
and official capacity;          )
OFFICER HEATHER BAUGH, in       )
her individual and              )
official capacity; and          )
JOHN DOES 1-10,                 )
                                )
          Defendants.           )
                                )
_____


         VIDEOTAPED DEPOSITION OF:  KIRK TORGENSEN

                 Taken:   June 17, 2016

         Reported by: Kelly Sommerville, RPR
```

Intermountain Court Reporters
Murray, UT 84107
(801) 263-1396

---

```
 1     Videotaped deposition of KIRK TORGENSEN, taken on
 2  behalf of Defendants, at the law offices of Durham
 3  Jones & Pinegar, 111 East Broadway, Suite 900, Salt
 4  Lake City, Utah, on June 17, 2016, commencing at 1:31
 5  p.m., before KELLY SOMMERVILLE, Certified Shorthand
 6  Reporter, Registered Professional Reporter and Notary
 7  Public in and for the State of Utah, pursuant to
 8  Notice.
 9              A P P E A R A N C E S
10  For the Plaintiff:
11       CLYDE SNOW & SESSIONS
         Lisa A. Marcy
12       201 South Main Street, 13th Floor
         Salt Lake City, Utah 84111
13
14  For the Defendants:
15       DURHAM JONES & PINEGAR, P.C.
         R. Blake Hamilton
16       111 East Broadway, Suite 900
         Salt Lake City, Utah 84111
17
18  For Draper City:
19       MIKE BARKER
         City Attorney
20       1020 East Pioneer Road
         Draper, Utah 84020
21
22  Also Present:  Libby Lowther
23
24
25
```

---

```
 1                  I N D E X
 2  WITNESS:  Kirk Torgensen
 3  EXAMINATION BY MR. HAMILTON................PAGE   4
    EXAMINATION BY MS. MARCY...................PAGE 106
 4
 5  EXHIBITS:
 6  No. 1 - Report of Expert Witness...........PAGE   6
    No. 2 - E-mail, Invoice #DS048313, Letter
 7          of Engagement......................PAGE  15
```

---

```
 1       Salt Lake City, Utah, June 17, 2016, 1:31 p.m.
 2            THE VIDEOGRAPHER:  This is the videotaped
 3  deposition of Kirk Torgensen in the matter of Chatwin
 4  vs. Draper City, et al., being held in the law offices
 5  of Durham Jones & Pinegar in Salt Lake City, Utah on
 6  June 17, 2016.  The time is 1:31 p.m.  My name is Gavin
 7  Bohne, certified legal videographer.  Our court
 8  reporter is Kelly Sommerville with Intermountain Court
 9  Reporters.  Will Counsel please state their appearances
10  for the record, and the witness will then be sworn.
11            MR. HAMILTON:  Blake Hamilton on behalf of
12  the defendants.
13            MS. MARCY:  Lisa Marcy for Joshua Chatwin.
14            MR. HAMILTON:  And also in the room we have
15  Mike Barker on behalf of Draper City.
16            (Witness was sworn.)
17                    KIRK TORGENSEN,
18   having been first duly sworn to tell the truth,
19          was examined and testified as follows:
20                      EXAMINATION
21  BY MR. HAMILTON:
22       Q.   Good afternoon, Mr. Torgensen.  I know
23  you've taken many depositions, I'm sure.  Have you
24  actually ever sat for a deposition?
25       A.   I have.
```

**Page 21**

1  A.  Yes. Since 1991, I believe I started
2  teaching at the police academy in 1991, and did so for
3  the next 20-plus years. Part of that experience was
4  taking a look at legal issues that are associated with
5  police work, and I was involved in helping develop
6  curriculum. I was involved in drafting exams for
7  students to take as part of the process of being able
8  to go through the academy to show proficiency.
9       And then I spent years, and within that,
10 teaching students all kind of legal classes associated
11 with issues in police work, whether it be liability, or
12 search and seizure, or report writing, everything that
13 sort of entailed in the legal aspect of being a police
14 officer.
15      That included use of force classes. There
16 were several use of force classes that cadets had to
17 take in order to go through the curriculum. And it
18 specifically looked at legal issues with respect to the
19 use of force. What the case law and the constitutional
20 statutes say about the use of force, problems,
21 potential problems, in using certain kind of force,
22 sort of that whole thing.
23  Q.  And if you look down a couple of para -- or
24 a couple of lines after that sentence that we just
25 looked at, it says that "We discussed the

*Intermountain Court Reporters 801.263.1396*

**Page 22**

1  constitutional issues and the case law that gives
2  guidance as to how to use" -- "how the use of force
3  would be viewed by courts and juries to determine if it
4  was reasonable."
5       Is this what you were talking about, the
6  training that you provided to the police academy?
7  A.  It is.
8  Q.  Okay.
9  A.  I also, within the police academy sphere, I
10 also taught for years in the advanced officer portion.
11 This is officers who have graduated in -- from the
12 academy, become police officers, they've typically been
13 in the field for five, ten, fifteen years. They have
14 mandatory training they have to perform every year to
15 keep certified. And part of that training was a use of
16 force aspect of their curriculum, and I taught that.
17 It's called the "advanced officer course," and I taught
18 that for the police academy for many years.
19 Q.  Let's talk about not the advanced training,
20 but the training that you would provide to cadets.
21 A.  Okay.
22 Q.  Again, according to your experience here
23 that you've listed in your report, you said that you
24 taught this for 23 years; is that correct?
25 A.  Correct.

*Intermountain Court Reporters 801.263.1396*

**Page 23**

1  Q.  So what -- what years were you teaching at
2  POST?
3  A.  I think I started in 1991, and I think I
4  taught at the academy until -- well, just with -- with
5  the basic program, probably 2015, maybe --
6  Q.  Okay.
7  A.  -- end of 2014.
8  Q.  And you would agree with me that during
9  that period of time that cadets are taught -- or were
10 taught those things that you lay out in that sentence,
11 correct?
12 A.  Correct.
13 Q.  For example, when you were instructing the
14 academy -- and you would agree with me that you were
15 instructing the academy when Officer Patterson actually
16 went through the academy, true?
17 A.  Probably true, yes.
18 Q.  And so you would agree that he would have
19 been trained regarding the constitutional requirements
20 regarding the use of force in the academy?
21 A.  There was a class that specifically focused
22 on that, yes.
23 Q.  So in that class that specifically focused
24 on that, you would agree that he received training
25 regarding those constitutional requirements, true?

*Intermountain Court Reporters 801.263.1396*

**Page 24**

1  A.  I don't know if I could guarantee it, if I
2  didn't do it, but it certainly -- it certainly was a
3  course that was required for each cadet to take, and so
4  I would assume, yes.
5  Q.  And you would agree that during that time,
6  he would have also been taught about statutory
7  requirements regarding the use of force, true?
8  A.  True.
9  Q.  And you would agree that he would have
10 learned about the case law that gives guidance
11 regarding the use of force?
12 A.  Yes.
13 Q.  And you would agree that he would have been
14 taught how courts view the use of force and whether
15 it's reasonable or not?
16 A.  True.
17 Q.  And you would agree that he would have
18 received instructions on how juries view the use of
19 force and whether it's reasonable or not?
20 A.  True.
21 Q.  And so he would have been trained what use
22 of force was reasonable in the academy, true?
23 A.  He would have been trained on the concepts
24 of what the standard was and particularly how juries
25 and courts looked at how an officer does or does not

*Intermountain Court Reporters 801.263.1396*

**Page 25**

1  meet that standard.
2  Q.   And so he would have been trained
3  specifically on what use of force would be considered
4  to be reasonable?
5  A.   True.
6  Q.   And how that analysis would take place?
7  A.   True.
8  Q.   If you go to the next page of your report,
9  the first full paragraph on that page, you have a
10 sentence that starts on the third line, it says "I
11 explained."  Do you see that?
12 A.   The first full paragraph?
13 Q.   Yes, the first full paragraph --
14 A.   Uh-huh, I do.
15 Q.   -- on that page.  That sentence says "I
16 explained the need for policy and procedure to be
17 straightforward and simple," and there's a comma there.
18 I'd like to talk about that.
19       You would agree with me that police
20 policies should be simple.  They should be able -- an
21 officer should be able to understand them, correct?
22 A.   They should be straightforward, correct.
23 Q.   Okay.  And your language here is simple,
24 "straightforward and simple," true?
25 A.   What I meant by simple is that it needs to

*Intermountain Court Reporters 801.263.1396*

**Page 26**

1  be understandable to the individual who is reading it.
2  Not simple in the sense that's it's lacking, but simple
3  in the sense that it's straightforward enough so that
4  the person reading it can understand what the intent
5  is.
6  Q.   Right.  You wouldn't want to have a policy
7  that was convoluted?
8  A.   Correct.
9  Q.   You would want it to be straightforward,
10 like you just said, correct?
11 A.   Correct.
12 Q.   And you would want it to be simple enough
13 that they could grasp the concept, true?
14 A.   True.
15 Q.   And you would agree with me that even
16 though you can have a good policy, it doesn't mean that
17 the policy itself will be followed, true?
18 A.   True.
19 Q.   Have you ever had any experience with that,
20 where you've seen officers where the policy was clear
21 and yet their actions didn't follow the policy?
22      (Libby Lowther entered deposition.)
23 A.   I --
24      MR. HAMILTON:  And let me just stop you
25 there.  Just for the record, Libby Lowther has just

*Intermountain Court Reporters 801.263.1396*

**Page 27**

1  joined the deposition, just so her appearance is on the
2  record.
3  Q.   So the question I was asking was, did you
4  -- have you had any experience where you've seen an
5  officer where there's been a policy that's been clear,
6  and yet they have not followed that policy?
7  A.   I have.
8  Q.   Have you ever had personal experiences
9  where you've been accused of not following a simple
10 policy?
11 A.   I have not had a personal experience where
12 that's been claimed, no.
13 Q.   Okay.  Have you ever had a personal
14 experience where it's been claimed that you haven't
15 followed a specific state statute?
16 A.   Well, I want to be fair and clear about
17 this.  I was -- as a chief deputy in the attorney
18 general's office for 13 years, there were lawsuits
19 filed against the attorney general's office that I was
20 named in, a lot of employment type of lawsuits, or
21 those kind of things, and so I guess the answer to that
22 is yes.  It's --
23 Q.   With -- with respect to state statutes?
24 A.   I don't know specifically with respect to
25 state statutes, but certainly legal issues that were

*Intermountain Court Reporters 801.263.1396*

**Page 28**

1  raised in lawsuits.
2  Q.   Let's look down to the next paragraph.  It
3  says "As the chief deputy attorney general for 14" --
4  "13 years, I had the responsibility to create policy
5  and procedure office wide."
6       I'd like to understand what policies you
7  actually created.  Can you recall any of the policies,
8  the specific policies, you created in your position?
9  A.   Sure.  We had -- really, when I became the
10 chief deputy, the AG's office really was sort of
11 lacking in policy.  And so we ended up developing much
12 better policies over the course of that time.  I was
13 involved in some of the -- we had a Law Enforcement
14 Bureau, where he had, I think, 30 sworn officers who
15 worked for the attorney general's office.  I was
16 involved in looking and improving policies with respect
17 to that, which ran the whole gamut from search and
18 seizure, use of force, evidence collection.
19      We had policies that we adopted that I was
20 very, very involved with, with respect to management,
21 and what was expected of man -- expected of management.
22 So we had all kinds of policies that we ended up
23 adopting.
24 Q.   During your period of time, do you recall
25 specifically working on the use of force policy for the

*Intermountain Court Reporters 801.263.1396*

**Page 37**

Q. But, again, during that period of time, again, same questions that I asked with respect to your time at the Utah attorney general's office. Do you have any recollection of actually physically making, you personally, making any changes to the use of force policy?

A. I -- I -- I would guarantee you that that happened at Adult Probation & Parole. If those changes were sitting down with somebody and saying, "This doesn't look right or this needs to be changed," those discussions happened all the time.

Q. Okay. With respect to the use of force policy at the AG's office, again, you've been critical of the use of force policy with respect to Draper City that was in place in 2010, correct?

A. Correct.

Q. And with respect to your rebuttal report, and we haven't looked at that yet, and we can mark it as an exhibit, if you need to, but you also opined about something that Mr. Wallentine talked about in his report, where he talked about the chiefs' association getting together and making changes to use of force policies throughout the state. Do you remember that?

A. I do.

Q. And do you recall earlier, when you were

**Page 38**

talking about the use of force policy at the attorney general's office, you said that you had some recollection of Ken Wallentine talking to you about the need to change policies in kind of a nationwide change with respect to use of force policy?

A. I don't know if it was nationwide, but I do recall the whole discussion. There were a number of issues. It wasn't just use of force. There were a number of critical law enforcement issues that we were trying to engage in with the sheriffs' association or the chiefs' association. And I -- yeah, I recall those discussions about the need to -- to look at improving what was in place.

Q. Okay. I want to talk specifically, though, about the use of force policy, and let me just cut to the chase here. In 2010, it's true that the use of force policy at the attorney general's office was almost identical to the use of force policy in Draper City?

A. I don't know that. I know that your expert has said that. I have not independently verified that.

Q. Okay. You wouldn't be here today telling me that the use of force policy, where you were the division chief or the chief deputy, and the buck at least came to your desk as one of the higher-ups in

**Page 39**

management, was unconstitutional, correct?

A. If, in fact, the policy at the attorney general's office in 2010 was similar to the one in Draper, I would say that that policy was inadequate. And if that's the fact, that's the fact.

Q. And let's not -- let's not quibble about terms, but language is important, and so I want to talk specifically about whether it was constitutional or unconstitutional. Would you say that that policy was unconstitutional in 2010 at the AG's office, where you were in charge, if it was indeed identical to Draper City's?

A. If it -- the problem with the policy is that it is so bare bones, and it is so -- it states the conclusion that force has to be reasonable. And in my many years of experience, that is not sufficient to guide somebody in what it means, how to comport yourself with it. If that was true and that's what the AG policy said, I think it was lacking in giving the direction and the guidance to officers in the AG's office of what was expected of them, and if that's the way it was, then that's the way it was.

Q. But you would agree with me that in 2010, that the Draper City policy, and again, if -- if the AG's office policy was similar or identical to it, did

**Page 40**

correctly state the law in Utah, true?

A. It recited the state statute which said that force had to be reasonable.

Q. And that's a correct statement of Utah state statute at that point in time, true?

A. It was a correct statement of the law.

Q. Okay. And not only was it a correct statement of state law, but that state statute and federal law were consistent with respect to use of force, true?

A. I don't understand.

Q. That use of force, again, this is from your report here, if you flip over to the next page, you can look at the exact language, second full paragraph underneath your opinions, the language you used there is that "The 2010 use of force policy in place at the time of the incident simply cites the Utah state statute which states that force may be used which is reasonably believed to be necessary to effect an arrest. In other words, the officers are told simply to use force that is reasonable."

And, sir, you would agree with me that that is the standard with respect to use of force. Force -- when you use force as an officer, it has to be reasonable, true?