Walter Reichert, M.D.   *   June 24, 2016

```
                                                    1
      IN THE UNITED STATES DISTRICT COURT
       DISTRICT OF UTAH, CENTRAL DIVISION
JOSHUA CHATWIN,            )
                           ) Deposition of:
    Plaintiff,             )
                           ) WALTER REICHERT, M.D.
vs.                        )
                           ) Civil No.
DRAPER CITY; OFFICER J.    ) 2:14-cv-00375
PATTERSON, in his          )
individual and official    ) Judge Dale A. Kimball
capacity; OFFICER DAVID    )
HARRIS, in his individual  )
and official capacity;     )
OFFICER HEATHER BAUGH, in  )
her individual and official)
capacity; and JOHN DOES    )
1-10,                      )
                           )
    Defendants.            )

         June 24, 2016 * 3:47 p.m.
   Location:  Western Neurological Center, P.C.
              1187 East 3900 South
              Salt Lake City, Utah 84124
      Reporter:  Lisa Bernardo, CSR, RPR
```

```
                                                    2
 1              A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
 3       Lisa A. Marcy
         CLYDE SNOW & SESSIONS< P.C.
 4       Attorneys at Law
         201 South Main Street, 13th Floor
 5       Salt Lake City, Utah 84111
         Tel: 801.322.2516
 6       Email: lmarcy@clydesnow.com
 7
    FOR THE DEFENDANT:
 8
         R. Blake Hamilton
 9       DURHAM JONES & PINEGAR, P.C.
         Attorneys at Law
10       111 East Broadway, Suite 900
         Salt Lake City, Utah 84111
11       Tel: 801.415.3000
         Email: bhamilton@djplaw.com
12
13  ALSO PRESENT:
14       Mark Barker, Draper City
         Libby Lowther, Lowther & Associates
15
                     -oOo-
16
                   I N D E X
17
    WALTER REICHERT, M.D.:                     PAGE
18
       Examination by Mr. Hamilton               3
19     Examination by Ms. Marcy                 67
       Further Examination by Mr. Hamilton     79
20
                     -oOo-
21
                 E X H I B I T S
22
    NO.             DESCRIPTION                PAGE
23
    1   Report of Expert Witness Walter Reichert
24      M.D.                                     5
25
```

```
                                                    3
 1              P R O C E E D I N G S
 2
 3             WALTER REICHERT. M.D.,
 4   called as a witness, being first duly sworn, was
 5        examined and testified as follows:
 6
 7                   EXAMINATION
 8  BY MR. HAMILTON:
 9      Q.   Thank you, Dr. Reichert.  I apologize
10  again for the delay in starting the deposition.
11  Thank you for your patience.
12           I'm sure you have had your deposition
13  taken before, correct?
14      A.   I have.
15      Q.   When was the last time you had your
16  deposition taken?
17      A.   You know, I honestly don't remember.  It's
18  been a long time.  Years ago.
19      Q.   Since it's been such a long time, I'm just
20  going to go over some rules really quickly that will
21  help this process go quicker and smoother.
22           I'm here to ask you questions about you
23  being retained as an expert witness on the other side
24  of this case, and so I'm not here to try to trick you
25  in any way.  I'm just trying to understand your
```

```
                                                    4
 1  opinions, your methodology in formatting those
 2  opinions.
 3           If I ask a question you don't understand,
 4  please just ask me to rephrase, okay?  Does that make
 5  sense?
 6      A.   Yes.
 7      Q.   And you understand that you just were
 8  administered an oath, correct?
 9      A.   I do.
10      Q.   It's the same oath that you would be under
11  if you were to testify at a court of law, so even
12  though we're sitting here in your offices you are
13  under the same obligations.  Do you understand that?
14      A.   I do.
15      Q.   Is there any reason why you cannot give
16  truthful testimony today?
17      A.   No.
18      Q.   Any reason why your testimony would be
19  impaired in any way?
20      A.   No.
21      Q.   Are you on any medication or any medical
22  condition that would cause your testimony to be
23  impaired?
24      A.   No.
25      Q.   At any point in time if you want to take a
```



CitiCourt — THE REPORTING GROUP

```
                                  13
1       A.   Correct.
2       Q.   So that is a direct quote from Ms. Marcy?
3       A.   Correct.
4       Q.   So at that point in time, did she provide
5   you any information about why she believed Mr.
6   Chatwin was thrown to the ground?
7       A.   No.
8       Q.   But she is the one that used that term,
9   "thrown to the ground"?
10      A.   Yes.
11      Q.   And you then go on and offer your opinion.
12  "It is my opinion that Mr. Chatwin suffered injuries
13  after being thrown to the cement.  This will result
14  in future damages."
15           And that's your stated opinion to that
16  question, correct?
17      A.   Correct.
18      Q.   I would like to look specifically at that
19  opinion for a moment.  When you use the term "thrown
20  to the cement," what are you basing the fact that he
21  suffered those injuries because he was thrown to the
22  cement?
23      A.   I base that opinion on his injuries.  If
24  you're wondering do I know that he was thrown to the
25  ground, of course, I don't know that he was thrown to
```

```
                                  14
1   the ground because, of course, it's obvious that I
2   wasn't there.  But my opinion is based on his
3   injuries, not being thrown.  Does that make -- do I
4   make myself clear?
5       Q.   No.  I need to get a little more
6   clarification from that.  Based upon his injuries
7   alone, would you be able to tell us to a reasonable
8   degree of medical certainty that he actually had been
9   thrown to the ground?
10      A.   I don't think I can state that.
11      Q.   So you're not of the opinion that his
12  physical injuries to a reasonable medical degree of
13  certainty indicate that he actually was physically
14  thrown to the ground?
15      A.   Let me see if I can answer your question
16  this way, Mr. Hamilton.  I am not an expert in the
17  physics of bodily harm, can I say, do you know what I
18  mean, or the physics of seeing people twisted and
19  turned.  So in that sense, I don't think I can answer
20  your question to know if he was actually thrown or if
21  he fell or exactly what happened.  Does that answer
22  your question?
23      Q.   Sure.  You don't have any expertise in
24  kinesiology --
25      A.   That would be a good word to use.
```

```
                                  15
1       Q.   -- is that correct?
2       A.   That is correct.
3       Q.   And so you're not some forensic expert
4   that's looking at injuries and trying to determine
5   what caused those injuries, true?
6       A.   I cannot -- I am not an expert in that
7   kind of field.
8       Q.   And so you cannot testify or provide an
9   expert opinion about what type of action caused an
10  injury, true?
11      A.   I really can't.  I am just on, look, I --
12  I'll hit the rewind button for one second.  I see the
13  patient.  It's been a couple of years now because his
14  accident, if I remember, it was like 2012.  '14.
15  Excuse me.  Oh, '10.  Oh, my God.  Okay.  That's a
16  long time ago.  Excuse me.  And I was not there.  I
17  am not an expert in the physics of bodies twisting
18  and turning.  I know what he suffered, but exactly
19  what kind of force it may have taken to have him
20  suffer those injuries and what exact position he was
21  in and these kind of details, I can only rely on the
22  evidence from what I have here.  Does that answer
23  your question?
24      Q.   It does, but I want to make sure the
25  record is clear.  So when you state, "It is my
```

```
                                  16
1   opinion that Mr." --  you put Chaplin --
2       A.   That's a mistype.
3       Q.   A typo?
4       A.   Yeah.
5       Q.   "Mr. Chatwin suffered injuries after being
6   thrown to the cement."  That's really not your
7   opinion.  You are not saying that he was thrown to
8   the cement?
9       A.   There's two answers in that question.
10  One, he suffered injuries, and, two, was he thrown.
11  I guess I would have to say if we're deciding.  If
12  we're going to parse that sentence up, I would have
13  to say that he did suffer injuries and how those
14  injuries occurred after being -- was he thrown or did
15  they occur in some other way, I can't answer.
16      Q.   Okay.  So your opinion really is that he
17  did suffer injuries?
18      A.   That is true.
19      Q.   Going to the next sentence, you say, "This
20  will result in future damages."
21           Now, with respect to that sentence, is
22  that your opinion?
23      A.   It is.
24      Q.   What type of future damages do you entail
25  that he may suffer?
```



21

1    A.    How can I answer that question?
2    Q.    Let me move on to a different question.
3  When was the last time you diagnosed someone with
4  tinnitus?
5    A.    I don't diagnose people with tinnitus.
6  They say, I've got a ringing in my ear.  I say,
7  you've got tinnitus.
8    Q.    Would you agree with me that there are
9  specialists that can diagnose a person with tinnitus?
10    A.    They can't diagnose it anymore than I can
11  than I just did with you.  If they said -- if you
12  came in and said, I've got ringing in my ear, and
13  they said, you don't have ringing in your ear, then
14  you would say, Doctor, either I'm a liar or you
15  aren't telling me the truth.
16    Q.    So when you say that he had tinnitus,
17  you're basing that off of his self-report, correct?
18    A.    That is the only way it gets reported,
19  that is tinnitus.  There is no testing that can be
20  done that -- that is -- if somebody comes in -- okay,
21  we're getting off topic, but let's go ahead.  If
22  somebody comes in and says, I've got a headache, and
23  the doctor says, no, you don't, you would say this
24  doctor is out of his gore.  He's a liar.  If you come
25  in and say, I've got ringing in my ear, and the

22

1  doctor says, no, you don't, you would say this guy
2  needs his hearing checked, right?  Okay.  That's what
3  we're talking about.
4    Q.    Sir, you're aware that Mr. Chatwin had
5  gone and seen an otorhinolaryngologist, correct?
6    A.    I am.
7    Q.    And I apologize.  How do you say that
8  word?
9    A.    Otorhinolaryngologist.
10    Q.    Otorhinolaryngologist?
11    A.    Uh-huh (affirmative).  Audiometrics.  Who
12  know audiometrics?
13    Q.    Yeah.  I have a brother that teaches up at
14  the University of Colorado and he's an ear, nose,
15  throat specialist, and I never attempt to try to say
16  what he calls himself.  I just stick with ear, nose,
17  throat.
18    A.    Yeah.  That's reasonable.
19    Q.    So you knew that he had gone and seen that
20  specialist?
21    A.    I did.
22    Q.    And you knew that he had never followed up
23  with that specialist?
24    A.    Okay.  If I said that, then I don't
25  remember right now, but, sure.  If he just saw him

23

1  once, I think that is correct.  You would have to
2  review my records to be absolutely certain, but let's
3  accept that for right now.
4    Q.    And let's jump down here now to question
5  3 --
6    A.    Okay.
7    Q.    -- because your answer, little paragraph
8  (b), your answer to question number 2 is similar to
9  your response to question number 3.
10          Question 3 was, "Whether the tinnitus in
11  Mr. Chatwin's ear was caused by the incident."
12          And you stated, "It is my opinion that his
13  tinnitus is caused by the injury, as above."
14    A.    Uh-huh (affirmative).
15    Q.    Is that your opinion?
16    A.    That is my opinion.
17    Q.    And so when I was talking about reviewing
18  Dr. Goldman's report, you saw that he was critical
19  with you with respect to that opinion.  Did you see
20  that?
21    A.    Okay.  Let's just look.  Let me just
22  review what he said real quick.  It is here.  And
23  maybe you can point me to the page in which he is
24  remarking or critical of my -- I'm on page 13.
25    Q.    If you go to page 14.

24

1    A.    14.
2    Q.    If you look at that first paragraph.
3    A.    I am looking.
4    Q.    Sorry.  I apologize.  And then flip over
5  to the next page.  It continues on and then if you
6  look, he actually responds specifically to your
7  opinion number 3 there where the paragraph says
8  "Number 3."  Do you see that?
9    A.    I do.
10    Q.    He says, "Tinnitus is an extremely
11  difficult process to understand, even more so to
12  treat."
13          Would you agree with that?
14    A.    I would agree with the second half of that
15  sentence.  It's extremely difficult to treat.  I
16  would disagree with the first half of that, that most
17  cases of tinnitus that I see are in patients that
18  have had -- that have what's called otosclerosis,
19  where they're more elderly patients and they have --
20  this is a lousy term, but let me use it -- arthritis
21  of the little bones in their ears that cause
22  conductive hearing loss and they will then develop
23  tinnitus as part of their hearing loss.  That is very
24  hard to treat.
25          There can be multiple causes of tinnitus,



                                    37

1    do with an overactive nervous system, probably has to
2    do with the trigeminal nerve.  It's something people
3    just don't make up.  It's a real neurological
4    problem.  Guess what?  There's no blood test, there's
5    no imaging, there's no migraine, you know, factor
6    that we can order.  People come and say -- the reason
7    we do all of this imaging on people with migraine is
8    to make sure that they don't have another more
9    serious medical problem that we are not diagnosing
10   while we're -- why we think we're treating their
11   migraine.  So migraine is, by definition, assuming
12   we've excluded all other medical problems, a
13   physiological condition.
14        Q.    That is only noted because of a
15   self-report of the patient?
16        A.    That's because they have a history to
17   support that condition.
18        Q.    And when you say "history," in fact, you
19   continue on with your opinion there and you say,
20   "This opinion is based on his history.  I consider
21   him a reliable historian."
22             We have already talked about why you
23   consider him a reliable historian.
24        A.    That is correct.
25        Q.    You would agree with me, though, that one

                                    38

1    way that you can corroborate history is by seeing if
2    that is something that he's complained about as he's
3    been treated?
4         A.    That's true.
5         Q.    For example, if Mr. Chatwin really was
6    suffering from worsening migraines, if he would have
7    been seen by someone from the headache clinic at the
8    U and there were medical records, you would be able
9    to corroborate his self-reporting to you with those
10   medical records?
11        A.    We always like corroboration or other
12   records if we've got them.
13        Q.    And you didn't have them in this case,
14   correct?
15        A.    We did not have them in this case.
16        Q.    And with respect to him being a reliable
17   historian, one of the reasons you told me he was a
18   reliable historian was specifically his communication
19   to you about his migraines and the fact that the
20   first time he saw you he was telling you about how
21   his migraines had increased since the incident almost
22   six years ago?
23        A.    Yeah.
24        Q.    And that you gave him some medication and
25   he never took that medication, but the next time he

                                    39

1    saw you, he said his migraines were better; is that
2    correct?
3         A.    Yes.  When I saw him again, I said, hey --
4    let me just look at my note here real quick.
5              Migraine.  Had a few mild headaches only,
6    yeah.  And he hadn't -- he said, I haven't really
7    needed to use it.  Uh-huh.  They seemed to get a
8    little bit better, so, yeah.
9         Q.    You continue on in this opinion and I'm
10   looking now at little (e) paragraph.
11        A.    Little (e) paragraph.  Okay.
12        Q.    You state there, "He complains of
13   depression.  This is based on his history.  Again, I
14   consider him a reliable historian."
15             So with respect to depression, you're not
16   an expert psychologist, right, or psychiatrist?
17        A.    Okay.  A little background.
18        Q.    That's all right.
19        A.    As part of my neurological training I did
20   psychiatry rotations.  I am not a psychiatrist or a
21   practicing psychiatrist.  I don't treat people for
22   psychiatric problems.  But I did do psychiatry as a
23   neurologist and my board exam, I'm sorry, my board
24   certificate is from, what it's actually called,
25   American Board of Psychiatry and Neurology.

                                    40

1         Q.    Would you hold yourself as a board
2    certified psychiatrist?
3         A.    No.
4         Q.    Would you say you have expertise as a
5    psychiatrist?
6         A.    No.
7         Q.    Do you frequently treat patients with
8    psychiatric conditions?
9         A.    What do you mean by "psychiatric
10   conditions"?
11        Q.    Do you -- well, let's look specifically at
12   depression.  Do you frequently treat people with
13   depression and prescribe them antidepressants?
14        A.    If it's related to their neurological
15   problem.  I don't treat people just for psychiatric
16   depression, anxiety, that kind of thing.  But if, for
17   example, if somebody comes in with migraine headaches
18   and -- let me put it this way.  The most number one
19   common comorbidity in people that have migraine is
20   actually anxiety, with some depression.
21             If somebody comes in and says, my, God,
22   I've got these migraine headaches, they're killing
23   me, and, by the way, I'm not having panic attacks,
24   and whatever, I might start them on an
25   antidepressant/ antianxiety agent.  But I am not a



                                                41

1  psychiatrist and I will tell them if they have a real
2  problem, they've got to see somebody who's got
3  expertise in this, because this is, you know, beyond
4  my expertise.
5          But to answer your question, yes, I
6  sometimes do use those medications if it is relevant
7  to their neurological care.
8      Q.  So the only time that you would prescribe
9  an antidepressant or an antianxiety drug is if it's
10 related to their neurological condition and then you
11 would tell them to go have a psychiatrist or someone
12 with those expertise treat them with respect to that?
13     A.  Or even sometimes even their general
14 practitioner will sometimes take over that kind of
15 care, because sometimes the GPs give people all of
16 these antidepressants and stuff, which, for better or
17 for worse, that's just the way it works out.  Because
18 I don't want to go into a big, huge thing about
19 mental health, but -- so I won't.
20         But be that as it may, if it's -- I'll
21 repeat myself again.  If it's relevant to their
22 neurological care and I think I can handle it, I will
23 do, but I don't treat people just for psychiatric
24 problems and I'm not a psychiatrist.
25     Q.  And that's because you don't have those

                                                42

1  expertise?
2      A.  I don't have those expertise.
3      Q.  And you wouldn't claim that you are
4  otherwise qualified to give an opinion about a
5  patient's psychiatric condition, correct?
6      A.  I would have to say no.  I mean, look,
7  I've been hanging around a long time.  I have a
8  pretty good idea of where they're at, but not really.
9      Q.  And would you agree with me that
10 neurologists don't commonly give opinions about
11 psychiatric conditions?
12     A.  That's probably true.  Yes.
13     Q.  With respect to determining Mr. Chatwin's
14 psychiatric condition of depression, again, you just
15 are basing that off of what he reported to you,
16 correct?
17     A.  That's correct.
18     Q.  You had no records showing that he had
19 been treated for depression?
20     A.  None that I can think of right now without
21 reviewing his records.  None of which I'm aware of
22 right at this time.
23     Q.  And you wouldn't be here to offer an
24 opinion about the methodology or be able to testify
25 about the methodology of creating a psychiatric

                                                43

1  workup, would you?
2      A.  No.
3      Q.  Because that's not something you do?
4      A.  No.
5      Q.  Going back to your opinion number 1, I
6  apologize to do that, but I want to clarify one
7  thing.  You would agree with me that neurologists
8  don't commonly get into the causation?  You said
9  that's something we as lawyers like to talk about,
10 but you would agree with me that neurologists don't
11 commonly give opinions about the causes of head
12 injuries, correct?
13     A.  Let me qualify that.  Okay.  If someone is
14 in a car and smashes into a brick wall and they have
15 a head scenario, I would say smashing into that brick
16 wall caused their head injury.
17     Q.  Sure.  But you wouldn't get into
18 testifying about what amount of force?
19     A.  I can't do that, no.  No, I cannot do
20 that.
21     Q.  And you didn't do that in this case?  You
22 didn't go through any type of methodology to
23 determine whether he was thrown to the ground,
24 correct?
25     A.  I did not.

                                                44

1      Q.  I would like you to look at question
2  number 6.
3      A.  Uh-huh (affirmative).
4      Q.  Question number 6 was, "The amount of
5  force required to cause Mr. Chatwin's shoulder
6  injury."
7          And, again, that's in quotation marks.
8  With respect to all of these questions, they are all
9  in quotation marks.  So my understanding from your
10 earlier testimony was that that was because Ms. Marcy
11 provided you that question?
12     A.  She provided me that question, yes.
13     Q.  And she would have given that to you
14 verbatim, that was the question she gave you?
15     A.  That was the question she gave me.
16     Q.  And if you look further in that paragraph,
17 your next sentence says, "It is my opinion that a
18 significant amount of force would have been required
19 to produce a shoulder injury."
20     A.  Uh-huh (affirmative).
21     Q.  Sir, are you a board certified orthopedic
22 surgeon?
23     A.  No.
24     Q.  Okay.  Do you have any board
25 certifications with respect to being an orthopedist?



45

1  A.   No.
2  Q.   Do you have any experience as an
3  orthopedist?
4  A.   No.
5  Q.   Do you frequently treat patients'
6  orthopedic conditions?
7  A.   Yes, in the sense that when people come
8  into my office with pain in an extremity, arm pain,
9  back pain, leg pain, that I examine them carefully
10 for an orthopedic cause for their symptoms, which may
11 involve determining whether or not an orthopedic
12 condition exists.
13      For example, I saw a patient recently who
14 came in for a, quote, back problem, who turned out to
15 have a vascular necrosis of both of his hips.  So I
16 am not a board certified orthopedist.
17      Again, I've hung around and so I am aware
18 that sometimes orthopedic problems can mimic
19 neurological problems in terms of pain in an
20 extremity.  I don't treat those problems and if they
21 seem to exist, I send them to an orthopedist.
22 Q.   Would you agree with me that you don't
23 have qualifications to give an opinion about a
24 patient's orthopedic condition?
25 A.   I would -- I would parse that up in this

46

1  way.  If someone comes in and they have a shoulder
2  problem and I move their arm at the shoulder and it
3  hurts, I would say you have a shoulder problem.
4       Now, if by that you mean is that an
5  orthopedic problem and do I have qualifications to
6  say you've got a shoulder problem, I'd say I have
7  that qualification.  But if you're asking me do I
8  have qualifications to say do you have a rotator --
9  does that patient have a rotator cuff tear, do they
10 have a subacromial bursitis, do they have an
11 occipital tinnitus, I do not have those expertise.
12 Q.   Specifically, do you have the expertise in
13 diagnosing a separated shoulder?
14 A.   No.
15 Q.   And, again, we have already gone into the
16 fact that you don't believe you have expertise to
17 diagnose how much force was used to cause an injury?
18 A.   That is correct.
19 Q.   So with respect to your opinion under
20 number 6, would you stand by that opinion?
21 A.   Okay.  I may have gone out a little bit on
22 a limb there.  I will tell you this.  Mr. Chatwin is
23 a very muscular guy.  I base that opinion, and maybe
24 I'll have to eat my words a little bit, so be it, but
25 here we go.  He's a very muscular guy, and I base

47

1  that just on -- on not expertise of being an expert
2  in kinesiology, thank you for that word.  But, hey,
3  listen, my personal experience about being around
4  people that are intoxicated is they tend to collapse
5  to the ground.  And if I have to eat my words on
6  question number 6, then I will, because I maybe went
7  out a little bit on a limb.
8  Q.   So with respect to number 6, is it fair to
9  say that as we're sitting here today that you don't
10 believe you should have probably been giving an
11 opinion on question 6?
12 A.   Yes, that's probably true.  Okay.  That's
13 probably true.  I may have gone out a little bit on a
14 limb for that one.
15 Q.   And so with respect to number 6 and in
16 your opinion regarding number 6, at trial you don't
17 anticipate testifying and providing that opinion at
18 trial?
19 A.   I don't think I could do that at trial in
20 open court.  I really don't think I could.
21 Q.   And I know these are kind of similar to
22 other questions I have asked, but I just want to make
23 sure this is clear as well.  You don't have any
24 expertise in police practices, correct?
25 A.   No.  No.

48

1  Q.   You don't have any --
2  A.   No.
3  Q.   -- expertise with respect to use of police
4  force?
5  A.   I have none.
6  Q.   Or what a proper maneuver by the police
7  would be to take somebody into custody?
8  A.   I have no idea about any of that.
9  Q.   So if we could look up to number 5.
10 A.   Uh-huh (affirmative).
11 Q.   And we're going to bounce around just a
12 little bit here because this kind of ties into
13 another portion of your report as well.
14      Question number 5 was, "The effects of
15 alcohol and balance, posture and coordination."
16      And you say, "The patient's blood alcohol
17 level was extremely high at 0.319.  At this level,
18 alcohol would significantly impair his cognition,
19 coordination, dexterity, speech, and balance.  At
20 levels greater than 0.25 there is a risk of
21 asphyxiation and choking, at levels greater than 0.30
22 stuporous possible, and at levels greater than 0.35,
23 coma may be present."
24      What qualifications do you have with
25 respect to diagnosing the conditions of a person that



```
                                      49                                              51
 1  is intoxicated?                                1  Googled.  I'm sorry.  I don't remember that.
 2       A.   I have no special -- I have no special
                                                   2       Q.   Those other two, PubMed --
 3  expertise.                                     3       A.   PubMed is probably peer-reviewed.  At
 4       Q.   So where are you drawing those conditions
                                                   4  least it publishes medical articles.  You know what I
 5  from?  What --                                 5  mean?
 6       A.   Research off the internet.          6       Q.   And is that a subscription?
 7       Q.   So when you were asked that question by
                                                   7       A.   No, that's not.
 8  Ms. Marcy, the effect of alcohol --            8       Q.   Is that just a -- you can Google PubMed --
 9       A.   Yeah.                                9       A.   I may have looked at Mayo Clinic
10       Q.   -- and balance, posture and coordination,
                                                  10  Proceedings.  What else did I look?  I don't remember
11  what you did is just got online --            11  where.  I'm sorry.  I really don't remember.  This
12       A.   I got online.                       12  was done in January.
13       Q.   What did you look at?               13       Q.   You don't recall exactly what your
14       A.   I looked at probably UpToDate, which is an
                                                  14  methodology was with respect to formulating this
15  online, oh, what do you call it, medical thing for
                                                  15  opinion --
16  doctors.  You know what I mean?  And then just -- I
                                                  16       A.   No.
17  don't remember what I Googled, just, you know,
                                                  17       Q.   -- except for that you --
18  alcohol levels, cognition, you know, correlation
                                                  18       A.   I just went online and plowed through it.
19  between alcohol levels and functioning, or I don't
                                                  19       Q.   Is this another one of those opinions that
20  remember exactly what, or exactly where, but that's
                                                  20  at trial you would be leery of giving?
21  what I did.                                   21       A.   Okay.  The answer is probably yes, because
22       Q.   Okay.  With respect to this UpToDate, is
                                                  22  it should be probably given by somebody who sees
23  that a peer reviewed --                       23  alcoholics all of the time.  Look, when I see people
24       A.   Yes.                                24  intoxicated in the hospital, that's a one-off kind of
25       Q.   -- source?                          25  thing.  Do you know what I mean?

                                      50                                              52
 1       A.   Yes.                                 1           Like this guy, if I would have seen him in
 2       Q.   And do you recall what information you
                                                   2  the hospital, that's why I had to Google this, is
 3  were actually able to get off of UpToDate?     3  because this was so high that I almost couldn't
 4       A.   Of that, no, but it's an online thing.
                                                   4  believe it.  You know what I mean?  This guy was even
 5  It's a subscription thing and it's peer-reviewed and
                                                   5  up and walking around.  I looked at it twice to make
 6  -- but I -- I don't know if I actually used that for
                                                   6  sure that I had it right.  And that's why I had to
 7  UpToDate or if I just went on like Medscape or PubMed
                                                   7  Google it, because it was so high.
 8  or what or those other -- Medscape, PubMed, UpToDate,
                                                   8       Q.   And so do you intend to offer this type of
 9  and that.  I just Googled around and looked for
                                                   9  an opinion during trial?
10  alcohol levels correlating with mental status. 10       A.   The opinions that I would offer at trial
11       Q.   Would you agree with me to be able to
                                                  11  is that it was so high, I had to Google it to get my
12  render this opinion that, in essence, what you did is
                                                  12  feet on the ground.
13  a Google search?                               13       Q.   Do you feel like you don't have the
14       A.   That's basically true.  That is what I
                                                  14  qualifications to testify about something like this?
15  did.                                           15       A.   I would testify that I do not treat
16       Q.   You did a Google search?             16  alcoholics or detox alcoholics and exact correlation
17       A.   With also the online things that I have
                                                  17  between alcohol levels and behavior should be
18  available to me.                              18  determined by people who do that all of the time.
19       Q.   When you say the online things that you
                                                  19       Q.   Sir, I want to now kind of just talk a
20  have --                                        20  little bit about what information you were provided.
21       A.   Like UpToDate.                       21  Were you provided with a copy of Mr. Chatwin's
22       Q.   Are there any other things besides   22  deposition transcript?
23  UpToDate that you may have looked at?          23       A.   Uh-uh (negative).  Deposition transcript?
24       A.   Yeah.  I'm sorry.  I don't remember.  It
                                                  24       Q.   Where he testified under oath.
25  could have been PubMed, UpToDate, Medscape.  I just
                                                  25       A.   No.
```



```
                                                     77
 1   I see people riding around on motorcycles without
 2   helmets.  It's just a little nuts, like, look if you
 3   want to ride a motorcycle, I guess that's okay, but
 4   at least wear a helmet.  That's all I'm saying.
 5        Q.   Okay.  You were asked some questions about
 6   the line in here that says you just didn't think his
 7   hearing was going to get any better.  Was that based
 8   on anything objective?
 9        A.   Yeah.  His examination showed that he was
10   still having problems six years later.
11        Q.   What I'm asking for is when you say the
12   left cranial nerve VIII --
13        A.   Yeah.
14        Q.   -- was damaged, what --
15        A.   That goes to --
16        Q.   How do you know that it was damaged?
17        A.   I know that because his hearing is poor on
18   that side and that's what the cranial nerve does.  It
19   goes to your ear.
20        Q.   And you used the word when you were
21   talking about helmet, you said head injuries are,
22   let's see, "neurological community considers head
23   injuries to be cumulative."
24             What does "cumulative" mean?
25        A.   That more injuries over time is bad.
```

```
                                                     78
 1   Well, ala Mohammed Ally, ala Steve Young, ala, you
 2   know, anybody like that, we really do not think that
 3   it's good to have multiple head injuries.
 4        Q.   What does -- above there you say, "It's
 5   well-know that hemosiderin is epileptogenic."
 6             What is hemosiderin?
 7        A.   Hemosiderin is the breakdown product from
 8   blood and it is -- what happens is a waste product
 9   with blood is broken down and what's left over is an
10   iron-containing compound.
11        Q.   And is that something bad?
12        A.   Well, it's bad in the sense that the body
13   may not be able to clear it.  Certainly the brain may
14   not be all to clear it.  And it's irritating to the
15   nevous system.  And epileptogenic means it may cause
16   seizures later.
17        Q.   And what is this -- so what does this
18   hemosiderin have to do with Josh's situation?
19        A.   That he -- the fact that he had some
20   bleeding means that his -- that puts him at a risk
21   then for the seizures that can happen from
22   posttraumatic bleeding either in the brain or at the
23   surface of the brain.
24        Q.   Let's see.  Now, in Dr. Goldman's report
25   he says when he looked at the images he saw no
```

```
                                                     79
 1   descriptions of hemosiderin deposition within the
 2   substance of the brain.  You're saying it's there and
 3   he's saying it's not.
 4        A.   Okay.  Our radiologist thought there was
 5   some at the surface of the brain, on the MRI report.
 6   I looked at it.  I thought there was some, too.  It's
 7   not quite clear if it's on the surface of the brain
 8   or in the brain.  Either way, there's probably a
 9   little bit of blood that had been -- that was there,
10   and either way it's not good.  It just represents the
11   injury.
12        Q.   Okay.
13        A.   And you could think of hemosiderin as you
14   whacked your thigh with something or another and
15   you've got a bruise.  A hemosiderin might represent
16   the residual of the breakdown products of that
17   bruise.
18             MS. MARCY:  That's all I have.
19                  FURTHER EXAMINATION
20   BY MR. HAMILTON:
21        Q.   A few follow-up questions.  You talked a
22   little bit about the fact that you did do a rotation
23   and you used air quotations when you talked about it
24   and said psychiatry --
25        A.   Oh, yeah.
```

```
                                                     80
 1        Q.   -- during your residency.
 2        A.   Yes.
 3        Q.   I just wanted to establish when your
 4   residency was.  We're talking about the years of 1975
 5   to 1978, correct?
 6        A.   No.  Yes.  '75 to '78.  Yes.
 7        Q.   And so you haven't done any type of
 8   psychiatric rotation since 1978?
 9        A.   That is correct.
10        Q.   And during your psychiatric rotations you
11   had attendings who, you said someone that was
12   actually a psychiatrist, to tell you what to do?
13        A.   Yes.  We rotated on the psychiatric floor
14   as psychiatrists and -- but we had attendings and we
15   were under supervision.  And this was not like a real
16   psychia -- we were not practicing psychiatry.  This
17   was in the hospital in a controlled situation.
18        Q.   You also were asked some questions with
19   respect to the paragraph dealing with alcohol and the
20   Google research that you did --
21        A.   Uh-huh (affirmative.)
22        Q.   -- involving impairment.
23        A.   Uh-huh (affirmative).
24        Q.   And Ms. Marcy asked you some questions
25   about that and you referred to the fact that you had
```

