```
              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF UTAH
                        CENTRAL DIVISION
  _____
                                  )
  JOSHUA CHATWIN,                 )
                                  )
              Plaintiff,          )
                                  )
  vs.                             )  Case No. 2:14-cv-00375
                                  )
  DRAPER CITY; OFFICER J.         )  Judge Dale A. Kimball
  PATTERSON, in his               )
  individual and official         )
  capacity; OFFICER DAVID         )
  HARRIS, in his individual       )
  and official capacity;          )
  OFFICER HEATHER BAUGH, in       )
  her individual and              )
  official capacity; and          )
  JOHN DOES 1-10,                 )
                                  )
              Defendants.         )
                                  )
  _____


           VIDEOTAPED DEPOSITION OF:  KIRK TORGENSEN

                  Taken:  June 17, 2016

           Reported by: Kelly Sommerville, RPR


              Intermountain Court Reporters
                   Murray, UT 84107
                    (801) 263-1396
```

Page 1

```
 1     Videotaped deposition of KIRK TORGENSEN, taken on
 2  behalf of Defendants, at the law offices of Durham
 3  Jones & Pinegar, 111 East Broadway, Suite 900, Salt
 4  Lake City, Utah, on June 17, 2016, commencing at 1:31
 5  p.m., before KELLY SOMMERVILLE, Certified Shorthand
 6  Reporter, Registered Professional Reporter and Notary
 7  Public in and for the State of Utah, pursuant to
 8  Notice.
 9              A P P E A R A N C E S
10  For the Plaintiff:
11     CLYDE SNOW & SESSIONS
        Lisa A. Marcy
12      201 South Main Street, 13th Floor
        Salt Lake City, Utah 84111
13
14  For the Defendants:
15     DURHAM JONES & PINEGAR, P.C.
        R. Blake Hamilton
16      111 East Broadway, Suite 900
        Salt Lake City, Utah 84111
17
18  For Draper City:
19     MIKE BARKER
        City Attorney
20      1020 East Pioneer Road
        Draper, Utah 84020
21
22  Also Present:  Libby Lowther
23
24
25
```

Page 2

```
 1                    I N D E X
 2  WITNESS:  Kirk Torgensen
 3  EXAMINATION BY MR. HAMILTON...............PAGE   4
    EXAMINATION BY MS. MARCY..................PAGE 106
 4
 5  EXHIBITS:
 6  No. 1 - Report of Expert Witness...........PAGE   6
    No. 2 - E-mail, Invoice #DS048313, Letter
 7          of Engagement......................PAGE  15
```

Page 3

```
 1        Salt Lake City, Utah, June 17, 2016, 1:31 p.m.
 2           THE VIDEOGRAPHER:  This is the videotaped
 3  deposition of Kirk Torgensen in the matter of Chatwin
 4  vs. Draper City, et al., being held in the law offices
 5  of Durham Jones & Pinegar in Salt Lake City, Utah on
 6  June 17, 2016.  The time is 1:31 p.m.  My name is Gavin
 7  Bohne, certified legal videographer.  Our court
 8  reporter is Kelly Sommerville with Intermountain Court
 9  Reporters.  Will Counsel please state their appearances
10  for the record, and the witness will then be sworn.
11           MR. HAMILTON:  Blake Hamilton on behalf of
12  the defendants.
13           MS. MARCY:  Lisa Marcy for Joshua Chatwin.
14           MR. HAMILTON:  And also in the room we have
15  Mike Barker on behalf of Draper City.
16           (Witness was sworn.)
17                    KIRK TORGENSEN,
18     having been first duly sworn to tell the truth,
19           was examined and testified as follows:
20                      EXAMINATION
21  BY MR. HAMILTON:
22     Q.   Good afternoon, Mr. Torgensen.  I know
23  you've taken many depositions, I'm sure.  Have you
24  actually ever sat for a deposition?
25     A.   I have.
```

Page 4

**Page 21**

1   A.   Yes. Since 1991, I believe I started
2   teaching at the police academy in 1991, and did so for
3   the next 20-plus years. Part of that experience was
4   taking a look at legal issues that are associated with
5   police work, and I was involved in helping develop
6   curriculum. I was involved in drafting exams for
7   students to take as part of the process of being able
8   to go through the academy to show proficiency.
9        And then I spent years, and within that,
10  teaching students all kind of legal classes associated
11  with issues in police work, whether it be liability, or
12  search and seizure, or report writing, everything that
13  sort of entailed in the legal aspect of being a police
14  officer.
15       That included use of force classes. There
16  were several use of force classes that cadets had to
17  take in order to go through the curriculum. And it
18  specifically looked at legal issues with respect to the
19  use of force. What the case law and the constitutional
20  statutes say about the use of force, problems,
21  potential problems, in using certain kind of force,
22  sort of that whole thing.
23  Q.   And if you look down a couple of para -- or
24  a couple of lines after that sentence that we just
25  looked at, it says that "We discussed the

**Page 22**

1   constitutional issues and the case law that gives
2   guidance as to how to use" -- "how the use of force
3   would be viewed by courts and juries to determine if it
4   was reasonable."
5        Is this what you were talking about, the
6   training that you provided to the police academy?
7   A.   It is.
8   Q.   Okay.
9   A.   I also, within the police academy sphere, I
10  also taught for years in the advanced officer portion.
11  This is officers who have graduated in -- from the
12  academy, become police officers, they've typically been
13  in the field for five, ten, fifteen years. They have
14  mandatory training they have to perform every year to
15  keep certified. And part of that training was a use of
16  force aspect of their curriculum, and I taught that.
17  It's called the "advanced officer course," and I taught
18  that for the police academy for many years.
19  Q.   Let's talk about not the advanced training,
20  but the training that you would provide to cadets.
21  A.   Okay.
22  Q.   Again, according to your experience here
23  that you've listed in your report, you said that you
24  taught this for 23 years; is that correct?
25  A.   Correct.

**Page 23**

1   Q.   So what -- what years were you teaching at
2   POST?
3   A.   I think I started in 1991, and I think I
4   taught at the academy until -- well, just with -- with
5   the basic program, probably 2015, maybe --
6   Q.   Okay.
7   A.   -- end of 2014.
8   Q.   And you would agree with me that during
9   that period of time that cadets are taught -- or were
10  taught those things that you lay out in that sentence,
11  correct?
12  A.   Correct.
13  Q.   For example, when you were instructing the
14  academy -- and you would agree with me that you were
15  instructing the academy when Officer Patterson actually
16  went through the academy, true?
17  A.   Probably true, yes.
18  Q.   And so you would agree that he would have
19  been trained regarding the constitutional requirements
20  regarding the use of force in the academy?
21  A.   There was a class that specifically focused
22  on that, yes.
23  Q.   So in that class that specifically focused
24  on that, you would agree that he received training
25  regarding those constitutional requirements, true?

**Page 24**

1   A.   I don't know if I could guarantee it, if I
2   didn't do it, but it certainly -- it certainly was a
3   course that was required for each cadet to take, and so
4   I would assume, yes.
5   Q.   And you would agree that during that time,
6   he would have also been taught about statutory
7   requirements regarding the use of force, true?
8   A.   True.
9   Q.   And you would agree that he would have
10  learned about the case law that gives guidance
11  regarding the use of force?
12  A.   Yes.
13  Q.   And you would agree that he would have been
14  taught how courts view the use of force and whether
15  it's reasonable or not?
16  A.   True.
17  Q.   And you would agree that he would have
18  received instructions on how juries view the use of
19  force and whether it's reasonable or not?
20  A.   True.
21  Q.   And so he would have been trained what use
22  of force was reasonable in the academy, true?
23  A.   He would have been trained on the concepts
24  of what the standard was and particularly how juries
25  and courts looked at how an officer does or does not

 1  meet that standard.
 2      Q.   And so he would have been trained
 3  specifically on what use of force would be considered
 4  to be reasonable?
 5      A.   True.
 6      Q.   And how that analysis would take place?
 7      A.   True.
 8      Q.   If you go to the next page of your report,
 9  the first full paragraph on that page, you have a
10  sentence that starts on the third line, it says "I
11  explained."  Do you see that?
12      A.   The first full paragraph?
13      Q.   Yes, the first full paragraph --
14      A.   Uh-huh, I do.
15      Q.   -- on that page.  That sentence says "I
16  explained the need for policy and procedure to be
17  straightforward and simple," and there's a comma there.
18  I'd like to talk about that.
19           You would agree with me that police
20  policies should be simple.  They should be able -- an
21  officer should be able to understand them, correct?
22      A.   They should be straightforward, correct.
23      Q.   Okay.  And your language here is simple,
24  "straightforward and simple," true?
25      A.   What I meant by simple is that it needs to

                                                    25
              Intermountain Court Reporters 801.263.1396

 1  be understandable to the individual who is reading it.
 2  Not simple in the sense that's it's lacking, but simple
 3  in the sense that it's straightforward enough so that
 4  the person reading it can understand what the intent
 5  is.
 6      Q.   Right.  You wouldn't want to have a policy
 7  that was convoluted?
 8      A.   Correct.
 9      Q.   You would want it to be straightforward,
10  like you just said, correct?
11      A.   Correct.
12      Q.   And you would want it to be simple enough
13  that they could grasp the concept, true?
14      A.   True.
15      Q.   And you would agree with me that even
16  though you can have a good policy, it doesn't mean that
17  the policy itself will be followed, true?
18      A.   True.
19      Q.   Have you ever had any experience with that,
20  where you've seen officers where the policy was clear
21  and yet their actions didn't follow the policy?
22           (Libby Lowther entered deposition.)
23      A.   I --
24           MR. HAMILTON:  And let me just stop you
25  there.  Just for the record, Libby Lowther has just

                                                    26
              Intermountain Court Reporters 801.263.1396

 1  joined the deposition, just so her appearance is on the
 2  record.
 3      Q.   So the question I was asking was, did you
 4  -- have you had any experience where you've seen an
 5  officer where there's been a policy that's been clear,
 6  and yet they have not followed that policy?
 7      A.   I have.
 8      Q.   Have you ever had personal experiences
 9  where you've been accused of not following a simple
10  policy?
11      A.   I have not had a personal experience where
12  that's been claimed, no.
13      Q.   Okay.  Have you ever had a personal
14  experience where it's been claimed that you haven't
15  followed a specific state statute?
16      A.   Well, I want to be fair and clear about
17  this.  I was -- as a chief deputy in the attorney
18  general's office for 13 years, there were lawsuits
19  filed against the attorney general's office that I was
20  named in, a lot of employment type of lawsuits, or
21  those kind of things, and so I guess the answer to that
22  is yes.  It's --
23      Q.   With -- with respect to state statutes?
24      A.   I don't know specifically with respect to
25  state statutes, but certainly legal issues that were

                                                    27
              Intermountain Court Reporters 801.263.1396

 1  raised in lawsuits.
 2      Q.   Let's look down to the next paragraph.  It
 3  says "As the chief deputy attorney general for 14" --
 4  "13 years, I had the responsibility to create policy
 5  and procedure office wide."
 6           I'd like to understand what policies you
 7  actually created.  Can you recall any of the policies,
 8  the specific policies, you created in your position?
 9      A.   Sure.  We had -- really, when I became the
10  chief deputy, the AG's office really was sort of
11  lacking in policy.  And so we ended up developing much
12  better policies over the course of that time.  I was
13  involved in some of the -- we had a Law Enforcement
14  Bureau, where he had, I think, 30 sworn officers who
15  worked for the attorney general's office.  I was
16  involved in looking and improving policies with respect
17  to that, which ran the whole gamut from search and
18  seizure, use of force, evidence collection.
19           We had policies that we adopted that I was
20  very, very involved with, with respect to management,
21  and what was expected of man -- expected of management.
22  So we had all kinds of policies that we ended up
23  adopting.
24      Q.   During your period of time, do you recall
25  specifically working on the use of force policy for the

                                                    28
              Intermountain Court Reporters 801.263.1396

**Page 37**

1  Q. But, again, during that period of time,
2  again, same questions that I asked with respect to your
3  time at the Utah attorney general's office. Do you
4  have any recollection of actually physically making,
5  you personally, making any changes to the use of force
6  policy?
7  A. I -- I -- I would guarantee you that that
8  happened at Adult Probation & Parole. If those changes
9  were sitting down with somebody and saying, "This
10 doesn't look right or this needs to be changed," those
11 discussions happened all the time.
12 Q. Okay. With respect to the use of force
13 policy at the AG's office, again, you've been critical
14 of the use of force policy with respect to Draper City
15 that was in place in 2010, correct?
16 A. Correct.
17 Q. And with respect to your rebuttal report,
18 and we haven't looked at that yet, and we can mark it
19 as an exhibit, if you need to, but you also opined
20 about something that Mr. Wallentine talked about in his
21 report, where he talked about the chiefs' association
22 getting together and making changes to use of force
23 policies throughout the state. Do you remember that?
24 A. I do.
25 Q. And do you recall earlier, when you were

**Page 38**

1  talking about the use of force policy at the attorney
2  general's office, you said that you had some
3  recollection of Ken Wallentine talking to you about the
4  need to change policies in kind of a nationwide change
5  with respect to use of force policy?
6  A. I don't know if it was nationwide, but I do
7  recall the whole discussion. There were a number of
8  issues. It wasn't just use of force. There were a
9  number of critical law enforcement issues that we were
10 trying to engage in with the sheriffs' association or
11 the chiefs' association. And I -- yeah, I recall those
12 discussions about the need to -- to look at improving
13 what was in place.
14 Q. Okay. I want to talk specifically, though,
15 about the use of force policy, and let me just cut to
16 the chase here. In 2010, it's true that the use of
17 force policy at the attorney general's office was
18 almost identical to the use of force policy in Draper
19 City?
20 A. I don't know that. I know that your expert
21 has said that. I have not independently verified that.
22 Q. Okay. You wouldn't be here today telling
23 me that the use of force policy, where you were the
24 division chief or the chief deputy, and the buck at
25 least came to your desk as one of the higher-ups in

**Page 39**

1  management, was unconstitutional, correct?
2  A. If, in fact, the policy at the attorney
3  general's office in 2010 was similar to the one in
4  Draper, I would say that that policy was inadequate.
5  And if that's the fact, that's the fact.
6  Q. And let's not -- let's not quibble about
7  terms, but language is important, and so I want to talk
8  specifically about whether it was constitutional or
9  unconstitutional. Would you say that that policy was
10 unconstitutional in 2010 at the AG's office, where you
11 were in charge, if it was indeed identical to Draper
12 City's?
13 A. If it -- the problem with the policy is
14 that it is so bare bones, and it is so -- it states the
15 conclusion that force has to be reasonable. And in my
16 many years of experience, that is not sufficient to
17 guide somebody in what it means, how to comport
18 yourself with it. If that was true and that's what the
19 AG policy said, I think it was lacking in giving the
20 direction and the guidance to officers in the AG's
21 office of what was expected of them, and if that's the
22 way it was, then that's the way it was.
23 Q. But you would agree with me that in 2010,
24 that the Draper City policy, and again, if -- if the
25 AG's office policy was similar or identical to it, did

**Page 40**

1  correctly state the law in Utah, true?
2  A. It recited the state statute which said
3  that force had to be reasonable.
4  Q. And that's a correct statement of Utah
5  state statute at that point in time, true?
6  A. It was a correct statement of the law.
7  Q. Okay. And not only was it a correct
8  statement of state law, but that state statute and
9  federal law were consistent with respect to use of
10 force, true?
11 A. I don't understand.
12 Q. That use of force, again, this is from your
13 report here, if you flip over to the next page, you can
14 look at the exact language, second full paragraph
15 underneath your opinions, the language you used there
16 is that "The 2010 use of force policy in place at the
17 time of the incident simply cites the Utah state
18 statute which states that force may be used which is
19 reasonably believed to be necessary to effect an
20 arrest. In other words, the officers are told simply
21 to use force that is reasonable."
22     And, sir, you would agree with me that that
23 is the standard with respect to use of force. Force --
24 when you use force as an officer, it has to be
25 reasonable, true?