

## Joshua Chatwin
## vs.
## Draper City, et al.
## Civil No. 2:14-cv-375

# Deposition of: Kenneth R. Wallentine
Date Taken: June 28, 2016

Alpine Court Reporting
Location in Salt Lake City and Provo
801-691-1000

Kenneth R. Wallentine
June 28, 2016

Page 109

1      A.    Yeah, I should not have worn dark

2   trousers that day.

3      Q.    Oh, kidding.  And he was very loud, the

4   loudest panting dog I've ever heard, so --

5      A.    I'm a former dog handler, yeah, I noticed

6   that, too.

7      Q.    Yeah.

8      A.    So, yes, I have since stood there.

9      Q.    And so you looked through the window from

10  her vantage point?

11     A.    Yes, uh-huh.

12     Q.    And have you changed your mind about that

13  statement you made in paragraph 6?

14     A.    No.  If anything, I think it's even more

15  difficult.  Because as I looked through the

16  window, I saw that the window -- it wasn't just

17  dirty, it had some hard water stains.  Yeah, I

18  continue to think that that -- that the distance

19  and seeing through the window would make it very

20  difficult for anyone to see with great detail at

21  that distance.

22     Q.    How far away would you say the window was

23  from where the stand-in was in the driveway?  I

24  think somebody had a measuring tape there.

25     A.    Somebody had a measuring tape.  I held

Kenneth R. Wallentine
June 28, 2016

Page 110

1    the end of the tape, but I held the down end that

2    started at zero or one.

3        Q.    Would you say it was an average width of

4    a street in the suburbs?  Not a main street, but

5    an actual --  like a Sandy or Draper suburb?

6        A.    I think that's fair.  A newer suburb

7    where we tend to have wider streets.  And then, of

8    course, there's an angle, so that increases the

9    distance as well, you know, the distance from the

10   street, the curb and across the sidewalk and her

11   lawn into her house.  I'm sorry, I wouldn't feel

12   comfortable in giving you a number, but I would

13   say that it -- the number would be what it is.

14   Somebody did measure it.  But I can agree it was

15   an average width street.  It's wider than mine and

16   I live in a newer neighborhood, so --

17       Q.    When you were looking at the stand-in,

18   could you see him moving through the window?

19       A.    I could see that he was moving.

20       Q.    Could you see him talking?

21       A.    I don't recall whether I could see

22   whether his lips were moving or not.

23       Q.    Would you have been able to identify his

24   hair color?

25       A.    I wasn't concentrating on that, but I

Kenneth R. Wallentine
June 28, 2016

Page 111

1    think that I probably could have.  I think I

2    probably could have.

3         Q.    His height?

4         A.    It's pretty difficult at that kind of

5    distance to accurately -- I mean, my experience

6    with people describing suspects many years of

7    being a cop, a street cop and detective, people

8    who give height estimates from that distance are

9    often wrong.

10        Q.    Well, wouldn't you -- he was standing

11   next to a truck.

12        A.    Sure.

13        Q.    So would you be able to say he was -- if

14   looking through that window, could you say he was

15   taller or shorter than the truck?

16        A.    Well, I could say that from my distance.

17   So, you know, being elevated and looking at an

18   angle and the truck being parked on the street

19   level, I could make -- I think I would have been

20   able to make a comparative distance.  I have a

21   similar truck, so I could probably come up with a

22   guesstimate if I were back there looking.

23        Q.    I just meant -- at this point I'm just

24   asking taller.  If you could see the individual

25   being taller or shorter than the truck.

Kenneth R. Wallentine
June 28, 2016

Page 112

1        A.    Right.  I think so.

2        Q.    Okay.  What about if that individual was

3    in handcuffs?  Could you see that?

4        A.    I don't know.  I don't know.  I think

5    that it would be difficult, but I also think it

6    would be possible.

7        Q.    What about a bigger movement like if that

8    person that was standing in there put his head

9    back to head-butt?  Do you think he would have

10   been able to see that through the hard water

11   stains on the window?

12       A.    Well, I don't mean to suggest that the

13   only impediment to accurate perception are the

14   hard water stains.  You also have the window

15   itself, lighting conditions, as well as the angle

16   of perception.  And it also depends on whether I'm

17   looking -- I mean, I can see much better now, you

18   know, whether I am looking through my bifocal,

19   trifocal, or monofocal vision, my lenses.

20       Q.    I'm just asking about you.

21       A.    Sure.  You're asking about me and I'm

22   just telling you there are a lot of different

23   factors.  I think that it's certainly a

24   possibility, but I think it's also possibly I

25   wouldn't.

Kenneth R. Wallentine
June 28, 2016

Page 113

1      Q.    And you would agree you didn't see any

2   trees or bushes or any mailboxes or anything from

3   your view to the vehicle?

4      A.    There were some thorn bushes, but I don't

5   think that they were high enough that they really

6   posed a considerable obstruction to viewing.

7      Q.    I know this looks like a lot, but I'm

8   actually almost done.  So do you want to take a

9   break?

10     A.    I think I'm fine.  And, you know, I know

11  that lawyers have a propensity to kill trees.

12     Q.    I know.

13     A.    It doesn't look like a lot.

14     Q.    I know.

15  (Exhibit-3 marked.)

16  BY MS. MARCY:

17     Q.    All right.  So this is -- 3's the report

18  of expert witness, Trevor Petersen.  So if we go

19  forward here, looking at Trevor Petersen's

20  background and qualifications, do you think it

21  sounds like he has a lot of training as a police

22  officer in pretty much all the subjects you get

23  trained in?

24     A.    I think so.  I actually have some

25  familiarity with Mr. Petersen.

Kenneth R. Wallentine
June 28, 2016

Page 127

1   balance and just fallen down?

2          Answer:  No.

3          No, he didn't fall down, he was thrown

4   down.

5          Question:  So you're positive about that?

6          Answer:  That he was thrown down?

7          Question:  Yes.

8          Answer:  I'm positive he was thrown down,

9   I saw the officer throw him to the ground."

10         Okay.  Now, assuming those facts are

11  true, just the way they are, just assuming that

12  Kathy Torrence's version is correct, was the force

13  used on Officer Patterson reasonable given the

14  circumstances?

15      A.    You mean the force by Officer Patterson?

16      Q.    Uh-huh, yes.

17      A.    I'm willing to assume that all of that's

18  correct, but I also -- I mean, you mentioned

19  twice, and I think she actually mentioned more

20  than twice, that she had memory difficulties and

21  that that was chemically induced.  At least her

22  perception it was chemically induced.

23         Having studied and experienced and

24  interviewed a number of persons who report similar

25  emotional responses -- physiological responses

Alpine Court Reporting
801-691-1000

Kenneth R. Wallentine
June 28, 2016

Page 128

1    accompanying emotional responses, I am confident

2    that it is accurate to say that the actual

3    chemical isn't adrenaline.  That doesn't matter.

4    But what one perceives to be adrenaline may well

5    significantly impact the ability not only to

6    perceive but to form a memory.

7              So assuming that all of that is correct

8    and assuming that the circumstances unfolded

9    exactly as she reports them here, whether she

10   could perceive them or not, whether she saw them

11   or not, there's nothing in there to suggest to me

12   that she cannot -- that she can say that

13   Mr. Chatwin did not grasp Officer Patterson's

14   firearm.  So assuming all that, no, force was not

15   excessive.

16       Q.    Okay.  So I want to make sure.  My

17   question was not whether she was under anything.

18   Not whether she had issues with seeing.  Not

19   whether the light was unclear or anything else.

20   I'm saying assuming that the facts that we just

21   discussed absolutely happened --

22       A.    Sure.

23       Q.    -- not what Officer Patterson said.  I'm

24   just looking for a yes or no.  Was the force used

25   by Officer Patterson moving Mr. Chatwin to the

Kenneth R. Wallentine
June 28, 2016

Page 129

1    ground reasonable force given the circumstances

2    that we've described today?

3         A.    Yes.   And in my prior answer, I wasn't

4    trying to add anything to it.   But to do exactly

5    what you said, and that's assume that everything

6    is true, including her self reporting of her

7    memory and perception issues.

8         Q.    So you're saying, yes, it was reasonable?

9         A.    Yes.

10        Q.    Okay.   When you talk about the -- you

11   said something about she was under the influence

12   of some chemical?

13        A.    Yes.

14        Q.    What are you talking about?

15        A.    I'll give you the short version.   What

16   most -- what most people perceive as an adrenaline

17   rush is chemically a response from the amygdala,

18   A-M-Y-G-D-A-L-A -- well, I don't even want a

19   physiology lecture, but it's a chemical response

20   from the brain that diffuses throughout the neural

21   system.   And it is a chemical that we think is

22   giving us a rush.   It's called an adrenaline rush.

23   But what it does is it alters -- it alters sensory

24   perception and it also alters our ability to form

25   memory.   A lot of people think memory is like a

Kenneth R. Wallentine
June 28, 2016

Page 130

1    VCR, a camera.  You know, we record like a camera.

2    We don't.  But that's a chemical reaction.

3            I'm not saying -- I mean, she may have

4    had chemicals that she consumed.  And I remember

5    talking about medications.  I don't remember if it

6    was here or the day we were at her home.  She may

7    have had alcohol that she consumed.  She may have

8    had any chemicals -- any number of chemicals.

9    What I'm talking about is she describes here a

10   physiological chemical response, adrenaline.  It's

11   actually more adrenaline.

12       Q.    But you're not an expert on physiological

13   responses, are you?

14       A.    I have testified as an expert on

15   physiological responses to trauma and emotional

16   events in officer-involved shootings.  I'm not a

17   doctor.  Can't even play one on TV.  I'm the dumb

18   one in the family.  There are five, soon to be

19   six, doctors in my family.  I'm not one of them.

20   But she describes what I have observed, been

21   trained in, and seen to be a chemical response.

22   She calls it a chemical response.  She doesn't use

23   the word chemical.

24       Q.    So you're not -- but you weren't hired to

25   give opinions about adrenaline and the effects on

Alpine Court Reporting
801-691-1000

Kenneth R. Wallentine
June 28, 2016

Page 131

1   the body?

2       A.   No.   I'm just answering your questions,

3   saying assuming to be true.  And assuming as she

4   reports that the adrenaline affected her, I think

5   she's right.  It did.

6       Q.   Are you planning on testifying at trial

7   about the effects of adrenaline on the body?

8       A.   Well, if you ask me a question like that

9   at trial, I'm going to answer the same way.

10      Q.   All right.  Let's go to --  I think it's

11  7.

12  (Exhibit-7 marked.)

13  BY MS. MARCY:

14      Q.   All right.  So I've shown you what's been

15  marked for identification purposes as Exhibit 7.

16      A.   Patterson's.

17      Q.   Right.  Patterson's deposition.

18      A.   Yes.

19      Q.   I'm going to go through some portions of

20  this and ask you a couple questions about it and

21  then I'll be done.

22      A.   Okay.

23      Q.   All right.  So go to page 16.

24      A.   I just want to emphasize again, I'm here.

25  You're right, this is your chance.  Do not feel