# EXHIBIT 3

```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF UTAH, CENTRAL DIVISION


JOSHUA CHATWIN,                )
                               ) CASE NO.
           PLAINTIFF,          ) 2:14-cv-00375
                               )
Vs.                            )
                               )
DRAPER CITY; OFFICER J. PATTERSON, )
IN HIS INDIVIDUAL AND OFFICIAL )
CAPACITY; OFFICER DAVID HARRIS, IN )
HIS INDIVIDUAL AND OFFICIAL    )
CAPACITY; OFFICER HEATHER BAUGH, IN )
HER INDIVIDUAL AND OFFICIAL    )
CAPACITY; AND JOHN DOES 1-10.  )
                               )
           DEFENDANTS.         )


           Videotaped Deposition of Trevor Petersen

                   Taken:  July 13, 2016




           Reported by: Linda J. Smurthwaite, RDR


                 Intermountain Court Reporters
                     Murray, UT 84107
                      (801) 263-1396
```
Page 1

```
                        I N D E X
WITNESS              EXAMINATION BY         PAGE
Mr. Petersen         Mr. Hamilton           4


EXHIBITS:
No. 1  Subpoena                             12
No. 2  Documents produced by witness        13
No. 3  Report of Trevor Petersen            14
No. 4  Report of Petersen in
       Rebuttal to Wallentine               62
```
Page 3

```
 1   Videotaped deposition of Trevor Petersen, taken on
 2   behalf of Defendant, at 111 So. Broadway, Salt Lake City,
 3   Utah, on July 13, 2016, commencing at 9:00 AM, before
 4   LINDA J. SMURTHWAITE, Certified Shorthand Reporter,
 5   Registered Professional Reporter and Notary Public in and
 6   for the State of Utah, pursuant to Notice.
 7   APPEARANCES

     FOR THE PLAINTIFF:    CLYDE SNOW & SESSIONS, P.C.
                           BY: Lisa A. Marcy
                           201 So. Main Street
                           13th Floor
                           Salt Lake City, UT 84111

     FOR DEFENDANTS:
                           DURHAM, JONES & PINEGAR
                           BY: Blake Hamilton
                           111 E. Broadway
                           Suite 900
                           Salt Lake City, UT 84111

                           Mike Barker
                           Draper City Attorney
                           1020 E. Pioneer Road
                           Draper, UT 84020

     Videographer:         Gavin Bohne
```
Page 2

 1   Salt Lake City, Utah, July 13, 2016, 9:00 a.m.
 2
 3   VIDEOGRAPHER:  This is the deposition of Trevor
 4   Petersen in the matter of Chatwin verse Draper City,
 5   being held in the law offices of Durham Jones and Pinegar
 6   in Salt Lake City, Utah, on July 13, 2016. The time is
 7   9:03, a.m. My name is Gavin Bohne, certified legal
 8   videographer, our court reporter is Linda Smurthwaite
 9   with Intermountain Court Reporters. Will Counsel please
10   state their appearances for the record, and the witness
11   will be sworn.
12       MR. HAMILTON: Blake Hamilton on behalf of the
13   defendants, and then I have Mike Barker, who's the Draper
14   City attorney. We also have in the room Cole Crowther,
15   who's a third -- going into his third year of law school
16   at the University of Utah, and we may be joined by Libby
17   Lowther who is the adjuster for URMMA at some point.
18       MS. MARCY: Lisa Marcy for plaintiff, Joshua
19   Chatwin.
20       TREVOR PETERSEN
21   was duly sworn, was examined and
22   testified as follows:
23   BY MR. HAMILTON:
24   Q.  Good morning, Mr. Petersen.
25   A.  **Good morning, sir.**

Page 4

**Page 69**

1  Q. Sir, what I'm getting at is this is your
2  first time ever being a commercial expert, correct?
3  A. Correct.
4  Q. This is the first time you've ever written a
5  report, correct?
6  A. No, sir.
7  Q. An expert report?
8  A. Yes, sir.
9  Q. Sorry. First time you've ever written an
10 expert report, first time you've ever been retained as an
11 expert commercially on police practices, correct?
12 A. Yes, sir.
13 Q. And you're saying here that your methodology
14 is the standard methodology used in the field, true?
15 That's what you're stating here?
16 A. Yes, sir.
17 Q. How did you come to that conclusion that it's
18 the standard methodology?
19     MS. MARCY: Objection, form.
20     THE WITNESS: Because of what I had just explained
21 before. That these practices were nationally accredited,
22 and we use them to evaluate our own officers within Weber
23 County Sheriff's office on use of force.
24 Q. Okay. So the training that you received from
25 CALEA, did they say this is the methodology used to make

**Page 70**

1  a determination of whether their use of force is
2  reasonable or not reasonable?
3  A. No, they did not.
4  Q. Or follows the standard practice?
5  A. It is my understanding that as a CALEA
6  accredited law enforcement agency, that as long as we
7  meet these standards, then that's the accepted practices
8  nationwide. So that is my opinion of that being a
9  standard methodology.
10 Q. Did you use, in your time as a certifiable
11 police officer, law enforcement officer, did you actually
12 ever go to any training about how to evaluate officers
13 use of force and whether it was, or met the standard?
14     MS. MARCY: Objection, form.
15     THE WITNESS: I attended a SWAT commander's
16 decision-making course that was performed by the National
17 Tactical Officer's Association that dealt with the
18 decision making on use of force issues, as a SWAT
19 commander, as well as it would also relate to any other
20 types of law enforcement response.
21 Q. Let's start with this phase. During your
22 time as a certifiable law enforcement officer, did you at
23 any point in time have the occasion to evaluate officers
24 use of force and make a determination of whether their
25 use of force was appropriate to the standard practices in

**Page 71**

1  the field of law enforcement?
2      MS. MARCY: Objection, form.
3      THE WITNESS: Could you please repeat that
4  question.
5      MR. HAMILTON: Sure.
6  Q. During the entire time that you were an
7  officer, law enforcement officer --
8  A. Yes, sir.
9  Q. -- did you ever have the occasion to review
10 another officer's use of force and make a determination
11 or evaluate whether their use of force was reasonable or
12 met the general standard for use of force?
13 A. Yes.
14 Q. When was that?
15 A. The last one was in, I want to say 2010 or
16 2011, when the Grand County Sheriff or Grand County
17 attorney's office contacted the Weber County Sheriff's
18 office with the incident involving Brody Young, who was
19 the state park ranger who was shot multiple times in
20 Moab, Utah. They requested that Weber County assist with
21 the investigation. I was assigned as use-of-force
22 investigator to evaluate whether or not Brody Young used
23 the appropriate force in discharging his duty weapon.
24 Q. Okay. Besides that one occasion, did you
25 ever have any other occasions where you --

**Page 72**

1  A. Yes, sir.
2  Q. How many occasions?
3  A. As I recall, on the use-of-force committee
4  with the Weber County Sheriff's office, we would meet
5  quarterly, and we would have a list of all the incidents
6  that officers used force, and we would evaluate those.
7  Q. How long were you on that committee?
8  A. To the best of my recollection, a couple
9  years. Two years, maybe.
10 Q. During that two-year period, during your
11 quarterly meetings, can you give me an estimate of how
12 many cases you actually evaluated?
13 A. To the best of my recollection, I believe
14 there was anywhere from 60 to 100 a quarter.
15 Q. And you say a quarter?
16 A. Correct.
17 Q. So are you saying that there was -- there
18 could have been as many as 400 a year that you evaluated?
19 A. Possibly, yes.
20 Q. And what did you do when you evaluated those
21 use-of-force incidents?
22 A. We evaluate all the information involved in
23 the reports, which can include injuries to officers
24 and/or the individual being arrested. The level, the
25 mental or the physical condition of the individual being

| | |
|---|---|
| 1  Q.   Okay. So you at least attended three<br>2  meetings, and you attended less than 12?<br>3  A.   Possibly, yes.<br>4  Q.   And during those meetings you would review<br>5  between 60 to a hundred cases you said?<br>6  A.   Possibly, yes.<br>7  Q.   I want to understand how that review actually<br>8  took place. Were you provided materials before you went<br>9  to the meeting?<br>10 A.   No, sir.<br>11 Q.   Okay. When you attended the meeting, how<br>12 long were the meetings usually?<br>13 A.   I don't recall.<br>14 Q.   Were they a full day?<br>15 A.   I don't recall, sir.<br>16 Q.   Something you could accomplish, you know, in<br>17 a morning?<br>18 A.   Depending on the cases.<br>19 Q.   Do you ever remember any of them lasting<br>20 longer than a day?<br>21 A.   I don't recall.<br>22 Q.   You can't recall whether you had a meeting<br>23 and had to come back the next day because you'd been<br>24 meeting all day, and couldn't get through all the cases?<br>25 A.   No, sir, I don't.<br>97<br>Intermountain Court Reporters *** (801) 263-1396 | 1  Officer takes out his duty weapon and clears the<br>2  structure. That's considered -- and doesn't discharge<br>3  his weapon. Finds it to be the wind blew the door open<br>4  or jarred the window or a false alarm-type situation.<br>5  That's reported as a use of force. And those are things<br>6  that we review up to, like I said, actually using an asp,<br>7  pepper spray, taser, arrest control techniques.<br>8  Q.   So, let me make sure I have a complete<br>9  understanding of this. If an officer drew their taser<br>10 but didn't fire it, would that instigate a review?<br>11 A.   Yes, I believe so.<br>12 Q.   If an officer drew their pepper spray, but<br>13 didn't use it, would that instigate a review? Would that<br>14 be reviewed?<br>15 A.   I don't believe so.<br>16 Q.   Okay. So, this included from the very low<br>17 end, an officer drawing their taser but not using it, or<br>18 an officer using some type of arrest control where they<br>19 had to go hands on?<br>20 A.   Correct.<br>21 Q.   All the way up to an officer shooting<br>22 somebody, correct?<br>23 A.   Yes, sir.<br>24 Q.   Okay. And it entailed you coming in and<br>25 having a meeting and you were provided, it sounds like, a<br>99<br>Intermountain Court Reporters *** (801) 263-1396 |
| 1  Q.   Just have no recollection about that?<br>2  A.   No, sir.<br>3  Q.   And you -- but you do recall that you were<br>4  provided no materials before you'd meet?<br>5  A.   Yes, sir.<br>6  Q.   And so, how -- how were the facts of the case<br>7  given to you?<br>8  A.   We would arrive to our meeting, we would<br>9  discuss the cases. We'd go over the case reports, the<br>10 materials that were provided. The officer submitted<br>11 their witness statements, so forth. And make our<br>12 determination.<br>13 Q.   First of all, what type of cases would you<br>14 review?<br>15 A.   Everything.<br>16 Q.   Okay. So any time any type of force was<br>17 used?<br>18 A.   It could have been just from when you draw<br>19 your duty weapon, that's a show of force. You have to<br>20 report it as a use of force. So you look at the<br>21 situation.<br>22      For example, officer responds to a burglar alarm at<br>23 2:00 a.m. -- this is just an example -- finds an open<br>24 door at a business or residence or something. Alarm<br>25 company doesn't have contact with the responsible owner.<br>98<br>Intermountain Court Reporters *** (801) 263-1396 | 1  police report; is that correct?<br>2  A.   Yes, sir.<br>3  Q.   Would you read all the police reports? I<br>4  mean, did every incident require you to review the police<br>5  report?<br>6  A.   We went through, as a committee, read through<br>7  the cases, and gave our opinions and made a determination<br>8  on whether the use of force was appropriate in the<br>9  situation.<br>10 Q.   And was it just like a -- did you vote? Did<br>11 you just say okay, let's call for a vote and say who<br>12 thinks this was reasonable?<br>13 A.   I don't think we formally called for a formal<br>14 vote. I think it was just based on dealing with the<br>15 SOPs, comparing what had occurred to the use of force<br>16 continuums and so forth, and then we made the<br>17 determination.<br>18 Q.   At that time was Weber County using a use of<br>19 force continuum?<br>20 A.   I believe so.<br>21 Q.   Okay. So was it basically taking that use of<br>22 force continuum and matching up, 'okay, here's what the<br>23 facts were, is that level of force appropriate under the<br>24 use of force continuum'?<br>25 A.   And our standard operating procedures.<br>100<br>Intermountain Court Reporters *** (801) 263-1396 |

92:25, 95:13, 96:12, 97:3, 97:6, 102:21, 103:1
POST [14] - 10:19, 11:4, 11:7, 11:10, 11:14, 33:4, 33:20, 37:6, 78:2, 78:6, 112:8, 114:8, 114:10
potential [5] - 11:5, 11:15, 17:21, 37:6, 50:25
Power [4] - 38:11, 41:2, 41:4, 42:25
practice [4] - 68:4, 68:20, 70:4, 76:12
practices [10] - 68:1, 68:12, 69:11, 69:21, 70:7, 70:25, 73:24, 76:24, 77:3, 112:16
precaution [1] - 54:14
precautions [4] - 53:6, 53:13, 53:18, 54:1
preliminary [2] - 56:5, 104:6
prepare [1] - 111:2
prepared [2] - 30:16, 111:11
preparing [1] - 107:24
present [4] - 14:22, 54:3, 54:13, 55:19
presentation [1] - 39:13
presentations [2] - 37:23, 41:5
preservation [3] - 116:6, 117:1, 117:2
pretty [1] - 74:12
prevent [1] - 60:7
print [1] - 111:4
private [2] - 44:1, 44:5
problem [2] - 56:14, 115:1
procedure [1] - 76:21
procedures [15] - 14:19, 14:23, 37:24, 53:1, 56:7, 56:17, 56:20, 66:3, 66:20, 67:13, 77:4, 77:9, 77:22, 100:25, 113:13
proceed [1] - 92:4
proceedings [1] - 118:10
process [2] - 5:12, 114:2
produced [2] - 3:9, 18:5
Professional [3] - 2:5, 118:6, 118:22
professional [4] -

20:3, 32:8, 34:4, 34:7
program [1] - 21:12
progress [1] - 43:12
projectiles [1] - 88:17
prone [4] - 60:17, 60:19, 61:1, 61:7
proper [16] - 14:19, 22:24, 52:25, 53:6, 53:12, 53:17, 56:6, 56:17, 56:19, 56:20, 67:12, 76:21, 77:22, 79:10, 84:16, 89:11
prosecutor [2] - 10:17, 12:13
Protective [1] - 27:10
prove [1] - 10:6
provide [22] - 6:3, 6:21, 7:10, 13:3, 14:23, 16:13, 16:16, 18:18, 19:16, 21:25, 23:25, 24:1, 30:24, 45:23, 52:10, 52:15, 52:18, 89:18, 92:17, 105:15, 114:3, 114:7
provided [20] - 13:9, 14:2, 15:17, 16:17, 18:5, 40:4, 41:6, 45:18, 48:20, 50:1, 52:5, 58:17, 78:4, 84:12, 91:3, 97:8, 98:4, 98:10, 99:25, 106:1
providing [3] - 19:22, 45:16, 78:6
public [2] - 44:1, 44:4
Public [3] - 2:5, 118:6, 118:22
publication [1] - 41:1
publications [4] - 37:11, 40:4, 41:14, 41:20
published [3] - 37:13, 37:22
purpose [1] - 113:8
pursuant [2] - 2:6, 118:8
push [2] - 10:17, 84:20
put [15] - 20:7, 60:4, 60:17, 60:19, 60:25, 61:7, 73:25, 74:4, 74:11, 83:20, 83:25, 87:12, 89:11, 89:25
puts [1] - 81:19

**Q**

qualification [1] -

82:11
qualifications [1] - 90:6
qualified [1] - 90:3
qualifies [1] - 66:19
qualify [1] - 81:25
quarter [4] - 72:14, 72:15, 73:8, 96:11
quarterly [3] - 72:5, 72:11, 95:23
questioning [1] - 32:16
questions [8] - 6:9, 6:15, 19:20, 76:9, 91:25, 94:21, 114:24, 114:25
quick [1] - 94:4
quickly [2] - 85:2, 112:24
quite [1] - 8:20

**R**

range [2] - 43:17, 102:16
ranger [1] - 71:19
ranges [2] - 52:13
rattle [1] - 92:1
rattling [1] - 92:1
RDR [2] - 1:19, 119:2
reach [2] - 30:19, 64:3
reaching [2] - 31:3, 65:15
reaction [3] - 46:24, 47:4, 47:5
reading [2] - 53:9, 53:20
real [2] - 66:22, 90:15
realize [1] - 115:1
REASON [1] - 119:8
reason [10] - 5:23, 6:21, 29:17, 57:24, 58:13, 77:24, 85:17, 112:15, 112:18, 116:4
reasonable [4] - 70:2, 71:11, 100:12
rebuttal [5] - 62:6, 87:15, 106:9, 107:3, 107:7
Rebuttal [1] - 3:11
receive [4] - 11:14, 35:25, 37:5, 109:14
received [9] - 15:16, 35:9, 38:13, 38:24, 65:22, 69:24, 74:16, 87:2, 105:22
recess [1] - 113:2
reckless [3] - 10:20,

10:22, 12:17
recognize [2] - 14:6, 14:9
recognized [6] - 67:12, 68:10, 68:24, 76:20, 77:21, 79:10
recollection [5] - 18:21, 49:17, 72:8, 72:13, 98:1
recommendation [1] - 114:21
recommendations [1] - 113:19
record [18] - 4:10, 6:1, 8:4, 8:5, 8:11, 9:6, 9:7, 9:10, 11:13, 13:8, 19:13, 48:12, 48:13, 94:5, 112:24, 116:3, 118:12
recorded [2] - 105:23, 118:11
records [1] - 106:21
Recreation [3] - 36:15, 36:19, 36:25
redirect [1] - 91:20
referred [1] - 119:6
reflects [1] - 119:8
refreshers [1] - 5:11
regard [1] - 79:9
regarding [9] - 11:11, 11:18, 47:18, 47:20, 59:16, 64:24, 65:16, 80:11, 104:11
regards [2] - 17:15, 17:17
Registered [3] - 2:5, 118:6, 118:22
relate [1] - 70:19
related [2] - 32:17, 118:14
relating [1] - 66:3
relayed [1] - 109:22
relied [6] - 74:20, 75:8, 75:9, 75:12, 75:19, 89:19
rely [5] - 18:13, 19:22, 48:20, 49:23, 73:17
relying [5] - 57:16, 58:2, 66:1, 90:20, 93:4
remove [2] - 84:19, 86:19
render [2] - 88:20, 89:3
repeat [4] - 18:7, 71:3, 78:22, 88:21
rephrase [1] - 15:7
Report [2] - 3:10, 3:11
report [44] - 14:11, 16:17, 18:14, 20:2,

37:9, 41:1, 42:1, 44:21, 45:11, 52:21, 55:21, 57:20, 57:21, 58:8, 62:1, 62:6, 62:8, 65:15, 67:3, 69:5, 69:7, 69:10, 74:11, 75:2, 75:6, 81:14, 83:18, 87:12, 87:15, 89:25, 90:24, 98:20, 100:1, 100:5, 102:4, 106:9, 106:10, 107:3, 107:7, 107:9, 107:24, 111:8, 111:11, 112:22
reported [1] - 99:5
Reported [1] - 1:19
reporter [3] - 4:8, 6:7, 6:13
Reporter [7] - 2:4, 2:5, 118:6, 118:21, 118:22, 119:2
Reporters [1] - 4:9
reports [14] - 49:7, 53:20, 54:25, 57:13, 57:16, 58:17, 58:21, 60:4, 72:23, 74:1, 74:4, 98:9, 100:3, 101:10
reprimand [1] - 35:21
requested [1] - 71:20
require [1] - 100:4
required [1] - 114:11
requiring [1] - 114:8
research [2] - 74:5, 111:13
researched [4] - 74:11, 74:13, 74:17, 111:17
residence [5] - 34:18, 34:19, 34:20, 35:3, 98:24
residing [1] - 118:6
resign [1] - 24:7
respect [18] - 18:13, 24:23, 38:3, 40:3, 57:18, 58:2, 63:21, 65:17, 75:19, 80:25, 88:12, 89:24, 90:1, 90:19, 92:22, 103:3, 108:13, 112:16
responded [1] - 34:14
responding [1] - 43:24
responds [1] - 98:22
response [7] - 6:18, 13:6, 13:11, 14:2, 31:1, 70:20, 110:15
responses [2] - 47:8, 47:12