Lisa A. Marcy (#5311)
lmarcy@clydesnow.com
**CLYDE SNOW & SESSIONS, P.C.**
201 South Main Street, 13th Floor
Salt Lake City, Utah 84111
Telephone: 801-322-2516
Facsimile: 801-521-6580

John K. Johnson (#3815)
jkjohnson1080@hotmail.com
**JOHN K. JOHNSON, LLC**
10 West 300 South, Suite 800
Salt Lake City, Utah 84101
Telephone: 801-915-2616

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOSHUA CHATWIN,<br><br>      Plaintiff,<br>v.<br><br>DRAPER CITY; DRAPER CITY POLICE DEPARTMENT; POLICE CHIEF MAC CONNOLE; OFFICER J. PATTERSON, in his individual and official capacity; OFFICER DAVID HARRIS, in his individual and official capacity; OFFICER HEATHER BAUGH, in her individual and official capacity; and JOHN DOES 1-10,<br><br>      Defendants. | MEMORANDUM IN OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF PROPOSED EXPERT WITNESS KIRK TORGENSEN<br><br>Civil No. 2:14-cv-375<br>Judge Dale A. Kimball<br>Magis. Judge Dustin B. Pead |

Plaintiff, Joshua Chatwin, by and through his counsel of record, hereby submits this Memorandum in Opposition to Defendants' *Daubert* Motion *in Limine* to Exclude Testimony of Proposed Expert Witness Kirk Torgensen ("Defendants' Motion").

{01034566-1}

## ARGUMENT

**I.      Kirk Torgensen is Qualified to Offer his Opinions.**

Defendants assert that Kirk Torgensen ("Torgensen") is not qualified to testify in this case. An examination of Torgensen's education, training, and experience, however, should convince this Court that Defendants' contentions in this regard are misplaced.

Rule 702 sets forth what the Tenth Circuit has described as a "liberal standard" regarding expert qualification. *United States v. Gomez*, 67 F.3d 1515, 1526 (1995). Rule 702 states: "A witness qualified as an expert by knowledge, skill, experience, training, or education" can offer opinion testimony. However, "[n]either Rule 702 nor any other rule or precedent. . .sets forth a specific method by which the trial judge must determine the qualification of an expert." *Id*.

Torgensen's qualifications are adequate, and his experience is essential to the questions the jury must decide in this case. Torgensen was the Chief Deputy Attorney General for the State of Utah for fourteen years wherein he had direct supervision over all the civil rights cases, among many other cases. He was the Section Chief for the Civil Rights Litigation Section of the Utah Attorney General's office wherein he defended all civil rights litigation cases. As an adjunct professor, he taught criminal justice programs at Weber State University as well as classes at the University of Utah on constitutional law. He has been an instructor at the Utah Police Academy since 1990. His duties there included developing the entire legal curriculum for the Peace Officers Academy. As an instructor for the Narcotics Officer Training, Utah, Torgensen trained these officers on search and seizure and use of force. *See* Exhibit 1, Curriculum Vitae of Kirk Torgensen. He stated in his report that he has spent more than twenty-four years of study and review of writing proper policy and procedures and has taught and trained others on how to the same. He has had many years of producing and implementing policy

and procedure and providing training for employees of the Utah Attorney General's office. He is an expert in constitutional law involving the use of force and training officers. In fact, Torgensen was the boss of Mr. Kenneth Wallentine, Defendants' expert, while he was at the Attorney General's office. Torgensen hired Wallentine. *See* Exhibit 2, Portions of Kirk Torgensen Deposition, June 17, 2016 ("Torgensen Dep."), p. 110:7-25; 111, line 1. Courts have deemed similar qualifications as adequate to offer expert opinions. *See, e.g., Vondrak v. City of Las Cruces*, 2009 WL 3241555 *13 (D. New Mexico 2009).

      Mr. Torgensen testified that he drafted exams and curricula as part of the police academy:

> A    Yes. Since 1991, I believe I started teaching at the police academy in 1991, and did so for the next 20-plus years. Part of that experience was taking a look at legal issues that are associated with police work, and I was involved in helping develop curriculum. I was involved in drafting exams for students to take as part of the process of being able to go through the academy to show proficiency. And then I spent years, and within that, teaching students all kind of legal classes associated with issues in police work, whether it be liability, or search and seizure, or report writing, everything that sort of entailed in the legal aspect of being a police officer. That included use of force classes. There were several use of force classes that cadets had to take in order to go through the curriculum. And it specifically looked at legal issues with respect to the use of force. What the case law and the constitutional statutes say about the use of force, problems, potential problems, in using certain kind of force, sort of that whole thing.
> 
> . . .
> 
> A    I also, within the police academy sphere, I also taught for years in the advanced officer portion. This is officers who have graduated in -- from the academy, become police officers, they've typically been in the field for five, ten, fifteen years. They have mandatory training they have to perform every year to keep certified. And part of that training was a use of force aspect of their curriculum, and I taught that. It's called the "advanced officer course," and I taught that for the police academy for many years.

Torgensen Dep., p. 21:1-22; 22:9-18.

Contrary to Defendants' assertions, Torgensen was very involved in developing policies on search and seizure and use of force:

> A    Sure. We had -- really, when I became the chief deputy, the AG's office really was sort of lacking in policy. And so we ended up developing much better policies over the course of that time. I was involved in some of the -- we had a Law Enforcement Bureau, where he had, I think, 30 sworn officers who worked for the attorney general's office. I was involved in looking and improving policies with respect to that, which ran the whole gamut from search and seizure, use of force, evidence collection. We had policies that we adopted that I was very, very involved with, with respect to management, and what was expected of man -- expected of management. So we had all kinds of policies that we ended up adopting.
>
> . . .
>
> A    I know that it changed. I know there was a discussion at some point where we -- our office was involved in changing the use of force policy, kind of in an overall law enforcement was looking at policies in general. And I remember discussions with Ken Wallentine with respect to that.
>
> . . .
>
> A    I recall looking at that specifically. I remember discussions about portions of the use of force policy. I'll give you an example of -- I was concerned that our policy was lacking with respect to engagement and pursuits by agents with their cars. And I recall asking folks who worked for me to engage in that discussion and look at the policy. So yeah, I was very involved in those kind of things. Again, I had 500 employees that I was responsible for, so it was one of many things I did.

*Id.*, 28:9-23; 33:17-22; 36:16-25.

Torgensen went on to explain the problems with the Draper City Policy:

> A    If it -- the problem with the policy is that it is so bare bones, and it is so -- it states the conclusion that force has to be reasonable. And in my many years of experience, that is not sufficient to guide somebody in what it means, how to comport yourself with it. If that was true and that's what the AG policy said, I think it was lacking in giving the direction and the guidance to officers in the AG's office of what was expected of them, and if that's the way it was, then that's the way it was.

*Id.*, 39:13-22.

Although Defendants' counsel asked Torgensen directly to make a legal conclusion ("whether [Draper City policy] was constitutional or unconstitutional"), Torgensen did not make

a legal conclusion. Instead, basing on his many years of experience, he explained that the policy did not give guidelines on how police officers needed to comport themselves. The policy provided no direction or guidance to the officers. Federal Rules of Evidence 704(a) provides "that an expert's opinion testimony 'is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.' Opinions embracing legal standards may, however, be excluded for other reasons, such as the likelihood of jury confusion, the danger of unfair prejudice or the inability of such evidence to assist the trier of fact. *See* Fed. R. Evid. 403, 702 (citations omitted). *Karns v. Emerson Elec. Co.*, 817 F.2d 1452, 1459 (10th Cir. 1987); 704(a). If legal terms are not so complex or shaded with subtle meaning to be beyond the understanding of the average person, then those opinion should be allowed. *Id*. In Torgensen's testimony, he explained that he was talking about guidelines and direction.

If this Court determines that other opinions by Torgensen constitute legal conclusions, those portions of his testimony can be eliminated. In addition, Torgensen presents a unique situation in that he is a licensed attorney and so part of his specialty also as an attorney is search and seizure, use of force, and constitutional issues. He is therefore not only an expert on the use of force, but an expert in this area of law. He is therefore appropriately giving an opinion about the case law he has studied and applied to his classes for the last quarter of a century. "A review of the case law indicates that lawyers may testify as expert witnesses as to certain matters." *Hamstein Cumberland Music Group v. Estate of Williams*, 2008 WL 4525782 * 1 (N.D. Okla. 2008). Lawyers may only testify as to legal matters when those matters involve questions of fact. *Id.* Torgensen's testimony should be allowed because it can be "addressed in a manner which is helpful to the trier of fact, without invading the province of the court or the jury, provided that

the direct examination is carefully crafted." *Ward v. Healthsouth Corp.*, 2006 WL 5349213 (W.D. Okla. 2006).

It is confusing that Defendants want to exclude Torgensen's proposed testimony in one place because they claim it is based on legal conclusions; however, they immediately claim that his testimony is unreliable because they claim that he stated that Draper City's use of force policy is a correct statement of the law, or, another legal conclusion. Yet as noted above, Torgensen testified about the problems with the policy. Throughout his deposition, he expressed concern about the lack of direction and guidance. *See, e.g.*, 39:13-22.

> A    I still have a problem with the fact that the policy's lacking.
> . . .
> A    Well, I would hope that the training is occurring. However, I will say this: If the policy is lacking -- what is written down is typically what cops pay attention to. We all do. And if what's written down is ambiguous and not clear, then I will tell you it sends a message that it isn't important. So if I came upon a policy that I felt like was -- was ambiguous, I would be concerned that from an agency standpoint, I need to change that policy to make a clear statement to the employee what is expected of them. So I think when you have a policy that's lacking, you -- you're starting off from the beginning with a problem.

*Id.*, 43:20-21; 44:12-24

In his expert report, whereas Torgensen does make conclusions, he also give opinions, bases and reasons for his opinions on the ultimate issue. He notes the lack of training records, the details about necessary training and the facts about how the 2013 policy is much more comprehensive than the 2010 policy. Finally, Defendants state that Torgensen's testimony about training should be excluded because he "ignores the evidence that Officer Patterson was trained on use of force in 2009." Defendants' Memorandum in Opposition, p. 4. Torgensen actually testified that training at the Academy was only one type of training. In fact, he testified that other training should have occurred with Draper City:

| | |
|---|---|
| Q | And you, in your report, are also critical of the fact that Officer Patterson, you couldn't find any indication that he had received training with respect to alcohol and drugs being -- being an impairment and a factor that he should have been taught by Draper City? |
| A | Yeah. I looked very carefully to see if Patterson acknowledged having received any training from Draper PD with respect to any use of force issue, and there was no evidence that he had received any, and that concerned me. |
| | . . . |
| A | . . . That training cannot be, is not, not even close, the end to the training that a police officer has to continue to get to become really proficient at their job. And that's why they have these mandatory hours that have to be done every year to keep their certification. If they don't do that, they can lose their certification. Because it's clear that the academy does a good job to a certain point. It's the police department's responsibility to make sure that that training continues and continues in an efficient and significant way. |
| Q | Why is it important for that training to continue? |
| A | Well, I can tell you that the police academy's -- the legal part of the police academy on the use of force may have been eight hours all total. And you can understand that somebody who's brand-new to this, eight hours is enough to kind of get them a foundation, but it certainly isn't the end-all, never could be the end-all. There are things that occur in law enforcement that changes. There are -- there are all kinds of issues that become important, whether or not you -- how you can restrain somebody. And I, you know, have been aware of cases in Utah where, you know, suspects have been hogtied and died from that, even though there was absolutely no training or no indication that that was a safe method to do. And so those things change. It's ever evolving. You have to stay on top of, you know, the current -- what's the best practice. |

*Id.*, 53:12-22; 111:20-25; 112:1-25; 113, line 1.

## **CONCLUSION**

Based on the foregoing, this court should deny Defendants' Motion.

DATED this 15th day of August 2016.

                                      CLYDE SNOW & SESSIONS

                                      /s/ Lisa A. Marcy
                                      Lisa A. Marcy
                                      *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of August 2016, I caused a true and accurate copy of the foregoing Memorandum in Opposition to Defendants' *Daubert* Motion *in Limine* to Exclude Testimony of Proposed Expert Witness Kirk Torgensen to be filed via the Court's ECF system, which in turn sent copies to counsel of record in accordance with the Court's protocols.

/s/ Michelle Carter