# EXHIBIT 2

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF UTAH
                   CENTRAL DIVISION
-----------------------------------------------------
JOSHUA CHATWIN,                )
                               )
           Plaintiff,          )
                               )
vs.                            )  Case No. 2:14-cv-00375
                               )
DRAPER CITY; OFFICER J.        )  Judge Dale A. Kimball
PATTERSON, in his              )
individual and official        )
capacity; OFFICER DAVID        )
HARRIS, in his individual      )
and official capacity;         )
OFFICER HEATHER BAUGH, in      )
her individual and             )
official capacity; and         )
JOHN DOES 1-10,                )
                               )
           Defendants.         )
-----------------------------------------------------


         VIDEOTAPED DEPOSITION OF: KIRK TORGENSEN

                  Taken: June 17, 2016

            Reported by: Kelly Sommerville, RPR




                Intermountain Court Reporters
                    Murray, UT 84107
                    (801) 263-1396
```

Page 1

```
 1    Videotaped deposition of KIRK TORGENSEN, taken on
 2  behalf of Defendants, at the law offices of Durham
 3  Jones & Pinegar, 111 East Broadway, Suite 900, Salt
 4  Lake City, Utah, on June 17, 2016, commencing at 1:31
 5  p.m., before KELLY SOMMERVILLE, Certified Shorthand
 6  Reporter, Registered Professional Reporter and Notary
 7  Public in and for the State of Utah, pursuant to
 8  Notice.
 9              A P P E A R A N C E S
10  For the Plaintiff:
11       CLYDE SNOW & SESSIONS
         Lisa A. Marcy
12       201 South Main Street, 13th Floor
         Salt Lake City, Utah 84111
13
14  For the Defendants:
15       DURHAM JONES & PINEGAR, P.C.
         R. Blake Hamilton
16       111 East Broadway, Suite 900
         Salt Lake City, Utah 84111
17
18  For Draper City:
19       MIKE BARKER
         City Attorney
20       1020 East Pioneer Road
         Draper, Utah 84020
21
22  Also Present: Libby Lowther
23
24
25
```

Page 2

```
 1                    I N D E X
 2  WITNESS: Kirk Torgensen
 3  EXAMINATION BY MR. HAMILTON................PAGE   4
    EXAMINATION BY MS. MARCY...................PAGE 106
 4
 5  EXHIBITS:
 6  No. 1 - Report of Expert Witness...........PAGE   6
    No. 2 - E-mail, Invoice #DS048313, Letter
 7          of Engagement......................PAGE  15
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1       Salt Lake City, Utah, June 17, 2016, 1:31 p.m.
 2            THE VIDEOGRAPHER: This is the videotaped
 3  deposition of Kirk Torgensen in the matter of Chatwin
 4  vs. Draper City, et al., being held in the law offices
 5  of Durham Jones & Pinegar in Salt Lake City, Utah on
 6  June 17, 2016. The time is 1:31 p.m. My name is Gavin
 7  Bohne, certified legal videographer. Our court
 8  reporter is Kelly Sommerville with Intermountain Court
 9  Reporters. Will Counsel please state their appearances
10  for the record, and the witness will then be sworn.
11            MR. HAMILTON: Blake Hamilton on behalf of
12  the defendants.
13            MS. MARCY: Lisa Marcy for Joshua Chatwin.
14            MR. HAMILTON: And also in the room we have
15  Mike Barker on behalf of Draper City.
16            (Witness was sworn.)
17                    KIRK TORGENSEN,
18       having been first duly sworn to tell the truth,
19            was examined and testified as follows:
20                      EXAMINATION
21  BY MR. HAMILTON:
22       Q.   Good afternoon, Mr. Torgensen. I know
23  you've taken many depositions, I'm sure. Have you
24  actually ever sat for a deposition?
25       A.   I have.
```

Page 4

Intermountain Court Reporters 801.263.1396

**Page 21**

A. Yes. Since 1991, I believe I started teaching at the police academy in 1991, and did so for the next 20-plus years. Part of that experience was taking a look at legal issues that are associated with police work, and I was involved in helping develop curriculum. I was involved in drafting exams for students to take as part of the process of being able to go through the academy to show proficiency.

And then I spent years, and within that, teaching students all kind of legal classes associated with issues in police work, whether it be liability, or search and seizure, or report writing, everything that sort of entailed in the legal aspect of being a police officer.

That included use of force classes. There were several use of force classes that cadets had to take in order to go through the curriculum. And it specifically looked at legal issues with respect to the use of force. What the case law and the constitutional statutes say about the use of force, problems, potential problems, in using certain kind of force, sort of that whole thing.

Q. And if you look down a couple of para -- or a couple of lines after that sentence that we just looked at, it says that "We discussed the

**Page 22**

constitutional issues and the case law that gives guidance as to how to use" -- "how the use of force would be viewed by courts and juries to determine if it was reasonable."

Is this what you were talking about, the training that you provided to the police academy?

A. It is.

Q. Okay.

A. I also, within the police academy sphere, I also taught for years in the advanced officer portion. This is officers who have graduated in -- from the academy, become police officers, they've typically been in the field for five, ten, fifteen years. They have mandatory training they have to perform every year to keep certified. And part of that training was a use of force aspect of their curriculum, and I taught that. It's called the "advanced officer course," and I taught that for the police academy for many years.

Q. Let's talk about not the advanced training, but the training that you would provide to cadets.

A. Okay.

Q. Again, according to your experience here that you've listed in your report, you said that you taught this for 23 years; is that correct?

A. Correct.

**Page 23**

Q. So what -- what years were you teaching at POST?

A. I think I started in 1991, and I think I taught at the academy until -- well, just with -- with the basic program, probably 2015, maybe --

Q. Okay.

A. -- end of 2014.

Q. And you would agree with me that during that period of time that cadets are taught -- or were taught those things that you lay out in that sentence, correct?

A. Correct.

Q. For example, when you were instructing the academy -- and you would agree with me that you were instructing the academy when Officer Patterson actually went through the academy, true?

A. Probably true, yes.

Q. And so you would agree that he would have been trained regarding the constitutional requirements regarding the use of force in the academy?

A. There was a class that specifically focused on that, yes.

Q. So in that class that specifically focused on that, you would agree that he received training regarding those constitutional requirements, true?

**Page 24**

A. I don't know if I could guarantee it, if I didn't do it, but it certainly -- it certainly was a course that was required for each cadet to take, and so I would assume, yes.

Q. And you would agree that during that time, he would have also been taught about statutory requirements regarding the use of force, true?

A. True.

Q. And you would agree that he would have learned about the case law that gives guidance regarding the use of force?

A. Yes.

Q. And you would agree that he would have been taught how courts view the use of force and whether it's reasonable or not?

A. True.

Q. And you would agree that he would have received instructions on how juries view the use of force and whether it's reasonable or not?

A. True.

Q. And so he would have been trained what use of force was reasonable in the academy, true?

A. He would have been trained on the concepts of what the standard was and particularly how juries and courts looked at how an officer does or does not

**Page 25**

1  meet that standard.
2  Q. And so he would have been trained
3  specifically on what use of force would be considered
4  to be reasonable?
5  A. True.
6  Q. And how that analysis would take place?
7  A. True.
8  Q. If you go to the next page of your report,
9  the first full paragraph on that page, you have a
10 sentence that starts on the third line, it says "I
11 explained." Do you see that?
12 A. The first full paragraph?
13 Q. Yes, the first full paragraph --
14 A. Uh-huh, I do.
15 Q. -- on that page. That sentence says "I
16 explained the need for policy and procedure to be
17 straightforward and simple," and there's a comma there.
18 I'd like to talk about that.
19        You would agree with me that police
20 policies should be simple. They should be able -- an
21 officer should be able to understand them, correct?
22 A. They should be straightforward, correct.
23 Q. Okay. And your language here is simple,
24 "straightforward and simple," true?
25 A. What I meant by simple is that it needs to

**Page 26**

1  be understandable to the individual who is reading it.
2  Not simple in the sense that's it's lacking, but simple
3  in the sense that it's straightforward enough so that
4  the person reading it can understand what the intent
5  is.
6  Q. Right. You wouldn't want to have a policy
7  that was convoluted?
8  A. Correct.
9  Q. You would want it to be straightforward,
10 like you just said, correct?
11 A. Correct.
12 Q. And you would want it to be simple enough
13 that they could grasp the concept, true?
14 A. True.
15 Q. And you would agree with me that even
16 though you can have a good policy, it doesn't mean that
17 the policy itself will be followed, true?
18 A. True.
19 Q. Have you ever had any experience with that,
20 where you've seen officers where the policy was clear
21 and yet their actions didn't follow the policy?
22        (Libby Lowther entered deposition.)
23 A. I --
24        MR. HAMILTON: And let me just stop you
25 there. Just for the record, Libby Lowther has just

**Page 27**

1  joined the deposition, just so her appearance is on the
2  record.
3  Q. So the question I was asking was, did you
4  -- have you had any experience where you've seen an
5  officer where there's been a policy that's been clear,
6  and yet they have not followed that policy?
7  A. I have.
8  Q. Have you ever had personal experiences
9  where you've been accused of not following a simple
10 policy?
11 A. I have not had a personal experience where
12 that's been claimed, no.
13 Q. Okay. Have you ever had a personal
14 experience where it's been claimed that you haven't
15 followed a specific state statute?
16 A. Well, I want to be fair and clear about
17 this. I was -- as a chief deputy in the attorney
18 general's office for 13 years, there were lawsuits
19 filed against the attorney general's office that I was
20 named in, a lot of employment type of lawsuits, or
21 those kind of things, and so I guess the answer to that
22 is yes. It's --
23 Q. With -- with respect to state statutes?
24 A. I don't know specifically with respect to
25 state statutes, but certainly legal issues that were

**Page 28**

1  raised in lawsuits.
2  Q. Let's look down to the next paragraph. It
3  says "As the chief deputy attorney general for 14" --
4  "13 years, I had the responsibility to create policy
5  and procedure office wide."
6         I'd like to understand what policies you
7  actually created. Can you recall any of the policies,
8  the specific policies, you created in your position?
9  A. Sure. We had -- really, when I became the
10 chief deputy, the AG's office really was sort of
11 lacking in policy. And so we ended up developing much
12 better policies over the course of that time. I was
13 involved in some of the -- we had a Law Enforcement
14 Bureau, where he had, I think, 30 sworn officers who
15 worked for the attorney general's office. I was
16 involved in looking and improving policies with respect
17 to that, which ran the whole gamut from search and
18 seizure, use of force, evidence collection.
19        We had policies that we adopted that I was
20 very, very involved with, with respect to management,
21 and what was expected of man -- expected of management.
22 So we had all kinds of policies that we ended up
23 adopting.
24 Q. During your period of time, do you recall
25 specifically working on the use of force policy for the

```
 1  Wallentine, because Ken was very proficient at that
 2  program and I think he helped develop it. So I
 3  remember looking at the program. I don't know, frankly
 4  -- I think I did oftentimes go to somebody to help me
 5  get logged on to it.
 6       Q.   Would you be able to tell me what your last
 7  password was to log on?
 8       A.   I don't recall.
 9       Q.   Okay. With respect to the use of force
10  policies at the AG's office, do you ever recall
11  actually working on the use of force policy?
12       A.   It depends on how you define "work."
13       Q.   Did you ever review it?
14       A.   I don't recall.
15       Q.   You don't recall ever reviewing the use of
16  force policy?
17       A.   I know that it changed. I know there was a
18  discussion at some point where we -- our office was
19  involved in changing the use of force policy, kind of
20  in an overall law enforcement was looking at policies
21  in general. And I remember discussions with Ken
22  Wallentine with respect to that.
23       Q.   So you can recall discussions with Ken
24  Wallentine about the fact that the policy changed, but
25  do you actually recall looking at the language of the
                                                       33
                       Intermountain Court Reporters 801.263.1396
```

```
 1  policy and the changes that were made?
 2       A.   I don't recall if I looked at it before the
 3  changes were made. At some point, I do believe I
 4  looked at it.
 5       Q.   So sitting here today, the best -- to your
 6  best recollection, you can remember, or you believe at
 7  some point you did look at the policy, but you don't
 8  know how many times, and you can't be for sure that you
 9  actually looked at an old policy before it changed,
10  true?
11       A.   That's true. I can't recall.
12       Q.   And you don't recall ever making any kind
13  of red lines or notes on the old use of force policy
14  before it changed?
15       A.   I don't recall.
16       Q.   And you don't recall getting on line and
17  actually making any changes on line to that policy
18  before it changed?
19       A.   I don't recall that, no.
20       Q.   But you do recall having a discussion with
21  Ken Wallentine?
22       A.   I believe there was a discussion about a
23  bigger movement to change policies. Use of force might
24  have been one of many. I know that we went through
25  changing our evidence collection policy. I know that
                                                       34
                       Intermountain Court Reporters 801.263.1396
```

```
 1  systematically we looked at an inventory policy for the
 2  AG's office, which hadn't existed. So those things
 3  were kind of a moving thing. It was a consistent --
 4  obviously I relied upon -- I had 13 divisions reporting
 5  to me from all kinds of different areas. The Law
 6  Enforcement Bureau was one of 13. And so I typically
 7  would get involved in those things as they were brought
 8  to my attention by the bureau director.
 9       Q.   Sitting here, though, today, can you -- can
10  you recall ever creating a policy for the Utah attorney
11  general's office regarding law enforcement?
12       A.   Me, where I sat down and wrote it out?
13       Q.   Yes.
14       A.   No.
15       Q.   Sitting here today, can you recall, during
16  your 13 years with the attorney general's office, ever
17  making -- personally making substantial changes to a
18  policy regarding law enforcement?
19       A.   It's hard to answer that in light of the
20  fact that there were discussions and had input. If
21  what you're asking, did I sit down and put something in
22  writing? I don't know whether that happened or not. I
23  can't recall.
24       Q.   So you can't recall actually putting
25  anything in writing. Can you recall having something
                                                       35
                       Intermountain Court Reporters 801.263.1396
```

```
 1  printed off for you where you were making notes over
 2  those law enforcement policies and making changes?
 3       A.   I think that had the division director been
 4  doing his job, he would have provided those documents
 5  to me for my review, and I -- my recollection --
 6  recollection is that occurred.
 7       Q.   But you can't recall ever actually doing
 8  the physical writing yourself, where you were making
 9  the changes, or after receiving a document like that
10  from the division?
11       A.   I don't know. I cannot recall whether that
12  occurred.
13       Q.   Okay. During your time at Adult Probation
14  & Parole, do you recall what the use of force policy
15  was there?
16       A.   I recall looking at that specifically. I
17  remember discussions about portions of the use of force
18  policy. I'll give you an example of -- I was concerned
19  that our policy was lacking with respect to engagement
20  and pursuits by agents with their cars. And I recall
21  asking folks who worked for me to engage in that
22  discussion and look at the policy. So yeah, I was very
23  involved in those kind of things. Again, I had 500
24  employees that I was responsible for, so it was one of
25  many things I did.
                                                       36
                       Intermountain Court Reporters 801.263.1396
```

**Page 37**

Q. But, again, during that period of time, again, same questions that I asked with respect to your time at the Utah attorney general's office. Do you have any recollection of actually physically making, you personally, making any changes to the use of force policy?

A. I -- I -- I would guarantee you that that happened at Adult Probation & Parole. If those changes were sitting down with somebody and saying, "This doesn't look right or this needs to be changed," those discussions happened all the time.

Q. Okay. With respect to the use of force policy at the AG's office, again, you've been critical of the use of force policy with respect to Draper City that was in place in 2010, correct?

A. Correct.

Q. And with respect to your rebuttal report, and we haven't looked at that yet, and we can mark it as an exhibit, if you need to, but you also opined about something that Mr. Wallentine talked about in his report, where he talked about the chiefs' association getting together and making changes to use of force policies throughout the state. Do you remember that?

A. I do.

Q. And do you recall earlier, when you were

**Page 38**

talking about the use of force policy at the attorney general's office, you said that you had some recollection of Ken Wallentine talking to you about the need to change policies in kind of a nationwide change with respect to use of force policy?

A. I don't know if it was nationwide, but I do recall the whole discussion. There were a number of issues. It wasn't just use of force. There were a number of critical law enforcement issues that we were trying to engage in with the sheriffs' association or the chiefs' association. And I -- yeah, I recall those discussions about the need to -- to look at improving what was in place.

Q. Okay. I want to talk specifically, though, about the use of force policy, and let me just cut to the chase here. In 2010, it's true that the use of force policy at the attorney general's office was almost identical to the use of force policy in Draper City?

A. I don't know that. I know that your expert has said that. I have not independently verified that.

Q. Okay. You wouldn't be here today telling me that the use of force policy, where you were the division chief or the chief deputy, and the buck at least came to your desk as one of the higher-ups in

**Page 39**

management, was unconstitutional, correct?

A. If, in fact, the policy at the attorney general's office in 2010 was similar to the one in Draper, I would say that that policy was inadequate. And if that's the fact, that's the fact.

Q. And let's not -- let's not quibble about terms, but language is important, and so I want to talk specifically about whether it was constitutional or unconstitutional. Would you say that that policy was unconstitutional in 2010 at the AG's office, where you were in charge, if it was indeed identical to Draper City's?

A. If it -- the problem with the policy is that it is so bare bones, and it is so -- it states the conclusion that force has to be reasonable. And in my many years of experience, that is not sufficient to guide somebody in what it means, how to comport yourself with it. If that was true and that's what the AG policy said, I think it was lacking in giving the direction and the guidance to officers in the AG's office of what was expected of them, and if that's the way it was, then that's the way it was.

Q. But you would agree with me that in 2010, that the Draper City policy, and again, if -- if the AG's office policy was similar or identical to it, did

**Page 40**

correctly state the law in Utah, true?

A. It recited the state statute which said that force had to be reasonable.

Q. And that's a correct statement of Utah state statute at that point in time, true?

A. It was a correct statement of the law.

Q. Okay. And not only was it a correct statement of state law, but that state statute and federal law were consistent with respect to use of force, true?

A. I don't understand.

Q. That use of force, again, this is from your report here, if you flip over to the next page, you can look at the exact language, second full paragraph underneath your opinions, the language you used there is that "The 2010 use of force policy in place at the time of the incident simply cites the Utah state statute which states that force may be used which is reasonably believed to be necessary to effect an arrest. In other words, the officers are told simply to use force that is reasonable."

And, sir, you would agree with me that that is the standard with respect to use of force. Force -- when you use force as an officer, it has to be reasonable, true?

**Page 41**

1  A. True. But the purpose of a policy is not
2  to just simply flat-out state what the -- what the law
3  is. The policy is to be useful in directing and
4  guiding and making sure that the people who are
5  responsible comply with it. To state a conclusion that
6  it has to be reasonable basically tells someone almost
7  nothing. What is reasonable? What is unreasonable?
8  In all of the years I've taught, we -- we have to spend
9  a tremendous amount of time talking about the fact that
10 -- in fact, we joke about it. You have to use force
11 that is reasonable. You look at a student and the
12 student goes, "Well, how do I know what's reasonable or
13 not?" And the only way you can do that is by going
14 through and using case law and scenarios and studies
15 and looking at things that have been found clearly to
16 be unreasonable.
17         When you take somebody and you're trying to
18 guide them through policy -- a policy, for me, is there
19 to give someone direction and guidance as to what's
20 expected of them. When you state the conclusion that
21 it has to be reasonable, it is while a true statement
22 of the law, practically, it's useless.
23 Q. Okay. And I understand that you're
24 critical of this policy. But I want to talk, again, my
25 question was specific, that this was a correct

**Page 42**

1  statement, not only of state law, but federal law?
2  A. It's a correct statement of the law.
3  Q. It's a correct statement of the law, true?
4  A. True.
5  Q. And, therefore, as a correct statement of
6  the law, it's not unconstitutional, correct?
7  A. That -- that's a complex question, because
8  the responsibility of the police department is to have
9  a policy and to have training, which is going to
10 describe to an officer what, in fact, is reasonable and
11 what is not reasonable.
12         So if your policy is lacking with respect
13 to their constitutional need to provide reasonable
14 force, then it can lead to the fact that the policy is
15 part of them not meeting their constitutional
16 obligation.
17 Q. So let's talk about this, because this
18 sounds like exactly what you did for 23 years in the
19 academy. You would tell the cadets that when you use
20 force, the law specifically states that your use of
21 force has to be reasonable, correct?
22 A. Correct.
23 Q. And then you said that it was kind of a
24 joke, because then one of the cadets would raise their
25 hand and say, "Well, what does that mean?" And then

**Page 43**

1  you would go through and provide training, correct,
2  about what case law said regarding what was reasonable
3  and was not reasonable?
4  A. Correct.
5  Q. Is that correct?
6  A. That's correct.
7  Q. Okay. So a department, and I know you may
8  say it's not best practices or ideal, but a department
9  could have a policy that correctly states the law and
10 then provides training on that policy, just like you
11 did in the academy, true?
12 A. Could they have a policy that states the
13 law and then do training with respect to the policy?
14 Q. Yes.
15 A. Yes, they must.
16 Q. Okay. So here, you have a policy that
17 correctly states the law, and then as long as there's
18 training going on that explains what reasonable use of
19 force is, you wouldn't have a problem with that, true?
20 A. I still have a problem with the fact that
21 the policy's lacking.
22 Q. And that was a poor use of words on my
23 part. I know that you would have a problem with it,
24 and you would consider it not best practices, but you
25 wouldn't be critical of it, like you are critical of

**Page 44**

1  Draper here, correct?
2         MS. MARCY: Objection. Ambiguous.
3  Q. (BY MR. HAMILTON) Okay. Let me try to
4  clear that up for you. If you have a policy, and
5  again, you were the chief -- or the deputy chief at the
6  time, and the AG's office has a policy exactly
7  identical to this policy in Draper City, obviously you
8  would hope that the people underneath you and you
9  yourself would be taking the time to train those
10 officers, law enforcement officers, what reasonable
11 force was, true?
12 A. Well, I would hope that the training is
13 occurring. However, I will say this: If the policy is
14 lacking -- what is written down is typically what cops
15 pay attention to. We all do. And if what's written
16 down is ambiguous and not clear, then I will tell you
17 it sends a message that it isn't important.
18         So if I came upon a policy that I felt like
19 was -- was ambiguous, I would be concerned that from an
20 agency standpoint, I need to change that policy to make
21 a clear statement to the employee what is expected of
22 them. So I think when you have a policy that's
23 lacking, you -- you're starting off from the beginning
24 with a problem.
25 Q. Okay. But again, you would agree, and

**Page 53**

Q. You think -- do you believe it's important to also train on that factor?
A. Critical.
Q. And you're obviously critical of the 2010 policy for not including that as one of the factors that an officer should look at when making a determination on their use of force, true?
A. The lack of understanding what impairment brings to the --
Q. Yes.
A. Yes, it's true.
Q. And you, in your report, are also critical of the fact that Officer Patterson, you couldn't find any indication that he had received training with respect to alcohol and drugs being -- being an impairment and a factor that he should have been taught by Draper City?
A. Yeah. I looked very carefully to see if Patterson acknowledged having received any training from Draper PD with respect to any use of force issue, and there was no evidence that he had received any, and that concerned me.
Q. Sir, do you -- do you drink alcohol?
A. I do.
Q. Have you ever used drugs before?

**Page 54**

A. No.
Q. With respect to alcohol, have you ever had an incident with the police where alcohol played a role?
A. With the police?
Q. Yes.
A. I have.
Q. When was that?
    MS. MARCY: Objection. Outside the scope of what we're here for, so move to strike. I don't know what you're getting at. This is his idea. He's an expert witness.
    MR. HAMILTON: Credibility and bias is always relevant. He's admitted to the fact that he's being critical of Draper City with respect to the fact that in their 2010 policy, they didn't talk about drugs and alcohol and the impairment that could be when making a determination of use of force.
    He's stated now, on the record, under oath, that he is also critical of Draper City in the fact that they didn't provide training to Officer Patterson regarding impairment and how that could have impacted his use of force and whether he needed to use force. This clearly is relevant to the witness's credibility and bias.

**Page 55**

    MS. MARCY: No, I don't -- I don't believe so. We are talking about -- we are talking about a policy and procedure and what his background is as an expert as far as his training, specialized knowledge, all of those things have to deal with the policies, not with him personally. What he does socially or whatever issues happen, if there's an issue, you can pull up the report and do whatever you want with it, but not -- we don't need to talk about things in his personal life that have nothing to do with him as an expert witness.
    MR. HAMILTON: He's stated now that on multiple occasions that when writing this report, when he came to his opinions, that he was relying upon his experience. And, again, his experience with respect to law enforcement and any experience he had with law enforcement where alcohol has been involved and any negative experience clearly could have rendered him to have some bias.
    MS. MARCY: Well, I think that mischaracterizes. That's not what happened at all. You were asking questions about -- you were asking questions about the policies and the procedures and what he does to train, and he trains police officers.
    And now you're saying because he had some sort of personal involvement, you're saying that goes

**Page 56**

to his opinions about what the Draper City policies and procedures are.
    MR. HAMILTON: Do you want us to get the Court on the phone? Are you going to instruct the witness not to answer?
    MS. MARCY: Yeah, I am.
    MR. HAMILTON: Okay. Well, then, I'm going to make my record. We can fight it out in court.
    THE WITNESS: Fine.
Q. (BY MR. HAMILTON) Sir, you've testified now, under oath, that you've had an experience where alcohol played a role in involvement with police, correct?
A. Correct.
Q. And my question was, when was that? Are you --
    MS. MARCY: And we said we weren't going to get into this, so you're making a record and we're not going to answer it.
    THE WITNESS: If you're going to ask me does it impact my ability to --
    MR. HAMILTON: So let me --
    THE WITNESS: -- look fairly at law enforcement, absolutely not.
Q. (BY MR. HAMILTON) Sorry. I don't mean to

**Page 109**

County law enforcement. It covered sort of the gamut. There was some discussion about use of force. There were search and seizure issues, liability issues, just kind of a laundry list of things.

Q. Okay. When we were talking about Exhibit-2, did you prepare that invoice?

A. I did not. I don't prepare the invoice. It was sent in to someone at the office at Court OPS/ Private OPS, who prepared the document and sent it out.

Q. So who prepared it? Do you know?

A. I don't know for sure. All I know is that -- I think it was maybe perhaps Cory Warnick, who is a partner in the firm.

Q. So describe the process for putting together -- your process for putting together the invoice.

A. All I did was report to them the hours, the activity, and sent it to them. So --

Q. How -- how did you do that? I mean what -- by what method?

A. I think, on this particular one, I think I talked to Cory on the phone and went over it with him on the phone is my recollection. And the last one I think I might have done via a text or something. I'm not sure.

**Page 110**

Q. And remind me we need to get that to Mr. Hamilton.

A. We'll get that.

Q. Okay. You said you worked with Mr. Valen -- Wallentine. Describe your work relationship as far as -- as far as hierarchy.

A. Ken Wallentine was hired to be the director of the Law Enforcement Bureau at the AG's office. He had been working at the Department of Public Safety. It was a competition. We went through interviews and I was part of the interview team. And I made the -- well, in conjunction with Mark Shurtleff, the attorney general, we decided to offer him the job as the -- the director of the Law Enforcement Bureau of that division.

Q. And after you offered him the job, how would you describe the hierarchy as your -- as far as your business work relationship?

A. Yeah. He answered directly to me, so his chain of command was a direct line to me. He was one of the division managers that was underneath me. So I had -- I had a lot of interaction with him, daily interaction with him, on issues.

Q. So if you had to use one word to say what your position was with him, what would it be?

**Page 111**

A. Well, I was his direct supervisor.

Q. Okay. Why -- since POST training exists, why do you train police departments for other training, if -- with the assumption -- let me rephrase that. If POST training is supposed to be so adequate, why -- as far as use of force, then why does other training for other police departments even exist?

MR. HAMILTON: Objection. Form.

THE WITNESS: The academy is a -- it's a limited amount of weeks. And over the years, there's always been this real tough battle for how many -- you can only do so many weeks, otherwise, it gets too expensive. It -- the chiefs and sheriffs aren't happy with their people going through and not being on the force. So you have to make tough decisions as to priority and time and everything else, and literally, that training is to get someone to a standard. And I would say a minimum standard that, you know, they are now certifiable to go be a police officer.

That training cannot be, is not, not even close, the end to the training that a police officer has to continue to get to become really proficient at their job. And that's why they have these mandatory hours that have to be done every year to keep their certification.

**Page 112**

If they don't do that, they can lose their certification. Because it's clear that the academy does a good job to a certain point. It's the police department's responsibility to make sure that that training continues and continues in an efficient and significant way.

Q. Why is it important for that training to continue?

A. Well, I can tell you that the police academy's -- the legal part of the police academy on the use of force may have been eight hours all total. And you can understand that somebody who's brand-new to this, eight hours is enough to kind of get them a foundation, but it certainly isn't the end-all, never could be the end-all.

There are things that occur in law enforcement that changes. There are — there are all kinds of issues that become important, whether or not you -- how you can restrain somebody. And I, you know, have been aware of cases in Utah where, you know, suspects have been hogtied and died from that, even though there was absolutely no training or no indication that that was a safe method to do. And so those things change. It's ever evolving. You have to stay on top of, you know, the current -- what's the

best practice.

The courts will give you guidance, of course, where police departments do something that they shouldn't have done and you've got to make sure that you are aware of that. You have to change because the court says you have to change. An example of that is, you know, forever we taught police officers when you made an arrest in a vehicle stop, that search incident to arrest on the vehicle was perfectly okay, the passenger compartment. And all of a sudden the United States Supreme Court came out with a decision that said that's not true. Even though we had been doing it for 30 years, just like that, that day forward, that changed the entire scenery. And so it's incumbent upon law enforcement to make sure they get that information to their officers so that they can change immediately how they're doing business.

Q. Okay. And just with your training, just describe -- just describe -- and obviously we're not going to be here for an entire day, but if you can describe some of the particularities as far as what you do for your training of these police agencies.

A. It really depends upon the agency, but there are always some -- some topics that are -- Fourth Amendment seems to always be a topic that's

113

challenging. It's challenging because it changes with court decisions. It's challenging because, as we've discussed here today, sometimes it's hard to put a real clear definition on what it is.

So at any given training, you may be talking about searches, searches of homes, searches of individuals, who you can stop, who you can't stop, how you can -- when you can search people without a warrant, when you can't.

With use of force, it's, like I said, always talking about -- the Taser, for me, was an example of one that I worried about in my career, because this is, in all respects, it's a great tool to have if you need to use it. But at the same time, I was concerned that cops would be using it in a situation that it wasn't reasonable to use it. Where you say to somebody, you know, "Put your hands behind your back," they don't put their hands behind their back, you take out the Taser and you Tase them. You have to get into some very specific discussion about the fact that that amount of force is not commensurate with the threat that you're facing at that moment. And that there has to be something in addition to that to raise the threat level to make that use of that force reasonable. So it's very down and dirty kind of things

114

where you have to get very specific and talk about specific kind of factors.

Q. So what kind of -- so how long does this training last? Like, let me just say, like -- I'm asking, like, during the day, as well as how many weeks, that kind of thing.

A. At the academy or otherwise?

Q. At -- at the individual agencies.

A. Boy, most agencies that I'm aware of has -- they have training several times a month, and it oftentimes is a half a day or a day. A lot of agencies will have an eight-hour block that they have -- sometimes they break it into two four-hour sessions because they have to have officers out on the street.

And there are items, and so you take the most critical items that you have the greatest risk if you don't do it right, and you come up with a curriculum for the year, where you then go through and systematically train on those items, and then you repeat it every year. So I would say that most departments probably do a day or two a month.

MS. MARCY: Okay. Let me just look for a second here. I'm done.

MR. HAMILTON: Would you like the deposition sent to you or to Ms. Marcy?

115

THE WITNESS: Send it to her.
MR. HAMILTON: Okay.
THE VIDEOGRAPHER: Off the record. The time is 4:20.
(Deposition concluded at 4:20 p.m.)

116