Lisa A. Marcy (#5311)
lmarcy@clydesnow.com
**CLYDE SNOW & SESSIONS, P.C.**
201 South Main Street, 13th Floor
Salt Lake City, Utah  84111
Telephone:  801-322-2516
Facsimile:  801-521-6580

John K. Johnson (#3815)
jkjohnson1080@hotmail.com
**JOHN K. JOHNSON, LLC**
10 West 300 South, Suite 800
Salt Lake City, Utah  84101
Telephone:  801-915-2616

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOSHUA CHATWIN,<br><br>    Plaintiff,<br>v.<br><br>DRAPER CITY; DRAPER CITY POLICE DEPARTMENT; POLICE CHIEF MAC CONNOLE; OFFICER J. PATTERSON, in his individual and official capacity; OFFICER DAVID HARRIS, in his individual and official capacity; OFFICER HEATHER BAUGH, in her individual and official capacity; and JOHN DOES 1-10,<br><br>    Defendants. | MEMORANDUM IN OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF PROPOSED EXPERT WITNESS WALTER REICHERT, M.D.<br><br><br>Civil No. 2:14-cv-375<br>Judge Dale A. Kimball<br>Magis. Judge Dustin B. Pead |

Plaintiff, Joshua Chatwin, by and through his counsel of record, hereby submits this

Memorandum in Opposition to Defendants' *Daubert* Motion *in Limine* to Exclude Testimony of

Proposed Expert Witness Walter Reichert, M.D. ("Defendants' Motion").

{01034112-1}

# INTRODUCTION

Dr. Reichert's expert report (the "Reichert Report") contains Rule 26 compliant expert information that is relevant, admissible, and will assist the trier of fact in reaching conclusions in this matter. In point of fact, defendants only produced a proposed expert report by an independent medical examiner who admitted that he had never examined Mr. Chatwin. That report contains no information to assist the trier of fact in reaching conclusions on the issues in this matter, which makes the Reichert Report, and Dr. Reichert's attendant trial testimony, even more crucial.

The Reichert Report is a clear and concise 20-page examination of the damages Mr. Chatwin experienced and possible future damages resulting from the use of force by Defendant Patterson and Defendant Draper City. The Reichert Report includes reasons, methodologies, and conclusions regarding those injuries and damages.

The primary aim of the Reichert Report is to assist the trier of fact in understanding the primary facts at issue:  what damages did Mr. Chatwin sustain as a result of Defendant Patterson's use of force against Mr. Chatwin and what damages may he suffer?  To determine the answers to these questions, Mr. Chatwin's expert, Dr. Reichert, employed his expertise as a medical doctor and neurologist to examine Mr. Chatwin and to opine as to those damages. As allowed by any Rule 703 expert, in his report, Dr. Reichert properly relied upon the medical records created immediately after Mr. Chatwin's injuries as well as Mr. Chatwin's discussions about his injuries and suffering.

Dr. Reichert's testimony at trial will clearly assist the trier of fact in making the relevant and germane determinations of the damages sustained and possible future damages to Mr. Chatwin in order to compensate Mr. Chatwin for those injuries and damages.

Adorned as a motion in limine, Defendants' Motion is actually a pretrial attempt to argue the weight and credibility Defendants would like the trier of fact to place on Dr. Reichert's trial testimony. It is the province of the jury, and the jury alone, to determine how much weight to give to Dr. Reichert's trial testimony, which is contained in the Reichert Report.

## ARGUMENT

I. **Dr. Reichert's Report and Testimony Comport with Rule 702, Federal Rules of Evidence.**

Dr. Reichert's Report and testimony about Mr. Chatwin's medical and mental health conditions are relevant as well as reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Rule 702 provides that "a witness who is qualified as an expert by *knowledge, skill, experience, training, or education* may testify in the form of an opinion. . .." Rule of Evidence 702 (2011) (emphasis added). Dr. Reichert is a neurologist who also did his residency in psychiatry.

> A neurologist is a medical doctor with specialize training in diagnosing, treating, and managing disorders of the brain and nervous system. Neurologists do not perform surgery. . . . Many neurologists also have additional training in other areas – or subspecialties – of neurology such as stroke, epilepsy, neuromuscular disease, and movement disorders. These are some of the more common subspecialties within the field of neurology. . . . Common neurological disorders include:
> - Amyotrophic lateral sclerosis
> - Alzheimer's disease
> - Brain and spinal cord injuries
> - Brain tumors
> - Epilepsy
> - Headache
> - Pain
> - Multiple sclerosis
> - Parkinson's disease
> - Stroke
> - Tremor

> . . .
>
> Neurologists are principal care providers, consultants to other doctors, or both. When a person has a neurological disorder that requires frequent care, a neurologist is often the principal care provider. People with disorders, such as Parkinson's disease, Alzheimer's disease, seizure disorders, or Multiple Sclerosis may use a neurologist as their principal care doctor.
>
> In a consulting role, a neurologist will diagnose and treat a neurologic disorder and then advise the primary care doctor managing the person's overall health. For example, a neurologist may act in a consulting role for conditions such as stroke, concussion or headache.
>
> . . .
>
> An accurate diagnosis is the first step toward effective treatment. A diagnosis involves getting a detailed health history of the patient, a *neurological test for mental status*, vision strength, coordination, reflexes and sensation. . . .

*American Academy of Neurology*, www.patients.aan.com/go/workingwithyourdoctor.

Contrary to Defendants' assertions, Dr. Reichert, as a medical doctor, can and should give opinions as a principal care provider and consultant to other doctors, in conformity with the opinions of the American Academy of Neurology. Dr. Reichert has been board certified by the American Board of Psychiatry and Neurology since 1979. *See* Exhibit 1, Curriculum Vitae Walter H. Reichert, M.D., attached. He graduated from the University of Utah School of Medicine, did his residency at Cornell University, his neurology fellowship at Memorial Sloan Kettering, he was Chief Resident Neurologist and Assistant Professor at Cornell Medical School. He received numerous awards, including graduating magna cum laude, Phi Kappa Phi, Alpha Omega Alpha, and Honors in Medicine. He has published many papers, including papers about migraines. *Id*.

"The gatekeeper inquiry under Rule 702 is ultimately a flexible determination, keeping in mind that rejection of expert testimony has been the exception rather than the rule." *See Goebel*

*v. Denver and Rio Grande Western Railroad Company*, 215 F.3d 1083, 1089 (10th Cir. 2000); *see also* Fed. R. Evid. 702, Advisory Committee Notes (December 1, 2000). "Vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible testimony." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. *See also Ruff v. Ensign-Bickford Industries, Inc.*, 171 F.Supp. 2d 1226, 1232 (D. Utah 2001). Although the "gatekeeper" function requires a court to assess the reasoning and methodology underlying the expert's opinion, "the district court need not 'recite the *Daubert* standard as though it were some magical incantation, or apply all of the reliability factors suggested in *Daubert* or *Kumho*.'" *Goebel*, 215 F.3d at 1089. "What is necessary is that the expert arrive at his. . .opinion by relying upon methods that other experts in his field would reasonably rely upon in forming their own, possibly different opinions." *Head v. Lithonia*, 881 F.2d 941 (10th Cir. 1989).

> In the Tenth Circuit, a district court assesses the admissibility of expert testimony using a two-step analysis: First, the court must determine if the expert is qualified by "knowledge, skill, experience, training, or education," Fed. R. Evid. 702 to render an expert opinion. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). If the expert is so qualified, the court must then assess "whether her opinions were 'reliable' under *Daubert*. (citations omitted).

*Poche v. Joubran*, 389 Fed. Appx. 768, 771 (10th Cir. 2010).

In *Poche*, the court found that a general surgeon was qualified to testify about the standard of care for a gastroenterologist because of his experience. *Id.* at 773. In his role as a neurologist, Dr. Reichert has extensive experience in regard to concussions, brain injuries, mental conditions, and headaches:

      a.    *Type and Amount of Force and Shoulder Injuries.*

> Q    Do you have a sense, as a doctor, do you have a sense, even in a general way, about what kind of force would cause damage to a shoulder?
> A    Okay.
> Q    Making contact with cement.
> A    Okay. In part -- I don't really. In part, it depends on did that person -- in what way did the person land on their shoulder, was it a curb, was it flat, was their arm extended, was their arm tucked to their side. I don't know if I would want to go out on a limb and -- you know what I mean? What was the position of the shoulder, was it internally rotated, externally rotated, was there a sharp curb there, and this kind of stuff.
> Q    But I notice that you're describing scenarios about -- you're describing what you need to consider in addressing the force, so how do you know those -- how do you know how to do that?
>     . . .
> A    Just from my personal experience as a doctor.

Exhibit 2, Portions of Deposition of Dr. Walter Reichert, June 24, 2016 ("Reichert Dep."), 72:20-25; 73:1-22.

      Dr. Reichert is not testifying about the precise cause of the injuries but rather, he gave his opinions based upon his experience as a doctor, not an expert or causation of injuries. Instead, he explained that he could not know whether Mr. Chatwin was thrown to the ground because he was not present. He gave an opinion that Mr. Chatwin did suffer those injuries:

> Q    I would like to look specifically at that opinion for a moment. When you use the term "thrown to the cement," what are you basing the fact that he suffered those injuries because he was thrown to the cement?
> A    I based that opinion on his injuries. If you're wondering do I know that he was thrown to the ground, of course, I don't know that he was thrown to the ground because, of course, it's obvious that I wasn't there. But my opinion is based on his injuries, not being thrown. Does that that make -- do I make myself clear?
>     . . .
> Q    So you're not of the opinion that his physical injuries to a reasonable medical degree of certainty indicate that he actually was physically thrown to the ground?
> A    Let me see if I can answer your questions this way, Mr. Hamilton. I am not an expert in the physics of bodily harm, can I say, do you know what I mean, or the physics of seeing people twisted and turned. So in that sense, I don't think I can answer your question to know if he was actually thrown

        or if he fell or exactly what happened. . . . I know what he suffered, but exactly what kind of force it may have taken to have him suffer those injuries and what exact position he was in and these kind of details, I can only rely on the evidence from what I have here. . . . I would have to say that he did suffer injuries and how those injuries occurred after being -- was he thrown or did they occur in some other way, I can't answer.

Q    Okay. So your opinion really is that he did suffer injuries?
A    That is true.

*Id.*, p. 13:11-25; 14:1-4, 16:22; 15:18-23; 16:12-18.

    b.    *Effects of Alcohol.*

Q    Do you get any training on the effects of alcohol on the body?
A    Okay. Okay. Oh, my God, going back a long time ago I did training as an internal medicine resident in St. Louis, which included rotations at St. Louis City Hospital. We saw a lot of drunks there. The hospital has been torn down since. And so in those days I knew, you know, a little bit more about alcohol and stuff and levels and how to detox these people, whatever, but I haven't done that for a long time.
Q    I'm not talking about levels. I'm talking about just the effects of alcohol on a body.
A    Oh, okay. Look, I mean, I just know from my neurology training in general where I tend to get involved with alcohol tends to be about withdrawal seizures in people that have drank too much. People that are intoxicated, and like this gentleman here, one way or the other end up with some kind of a head injury.
    . . .
Q    I'm just trying to get -- I'm interested in how you know -- whether you know anything about the effect of alcohol on the body.
A    I know something -- I know something about it, but it's my training and experience.

*Id*., 74:2-21; 8:8-12.

Q    So when you asked that question by Ms. Marcy, the effect of alcohol --
A    Yeah.
Q    -- and balance, posture and coordination, what you did is just got online --
A    I got online.
Q    What did you look at?
A    I looked at probably UpToDate, which is an online, oh, what do you call it, medical thing for doctors. You know what I mean? And then just -- I don't remember what I Googled, just, you know, alcohol levels, cognition, you know, correlation between alcohol levels and functioning, or I don't remember exactly what, or exactly where, but that's what I did.

{01034112-1}    7

> Q     Okay. With respect to this UpToDate, is that a peer reviewed --
> A     Yes.
> Q     -- source?
> A     Yes.
> Q     And do you recall what information you were actually able to get off of UpToDate?
> A     Of that, no, but it's an online thing. It's a subscription thing and it's peer-reviewed and -- but I -- I don't know if I actually used that for UpToDate or if I just went on like Medscape or PubMed or what or those other -- Medscape, PubMed, UpToDate, and that.

*Id.*, 49:7-25; 50:2-10.

Dr. Reichert has a sufficient history of understanding the effects of alcohol on a body as a medical doctor. He used a peer-reviewed site. Google was merely the search engine. His testimony is therefore relevant and reliable in the area of the effects of alcohol on the body.

      c.     *Hearing Impairment and Tinnitus.* Dr. Reichert testified that although he was not an audiologist, he studied audiology

> As part of my neurological training and everyday practice of neurology, we examine every patient for their cranial nerves. One of those cranial nerves, is cranial nerve VIII. So although I have not undertaken a degree in audiology and don't perform hearing tests, part of a complete neurological examination is an examination of all our patient's cranial nerves. Cranial nerve VIII is one of those cranial nerves. And when I examined Mr. Chatwin, he had decreased hearing on the left. We knew he had a skull fracture on the left, and the cranial nerve VIII is a nerve that is susceptible to injury in a skull fracture.

*Id.,* 18:22-25; 19:1-11.

As for a discussion of Mr. Chatwin's tinnitus, Dr. Reichert stated:

Okay. We're talking about two different things, then. Tinnitus is the subjective complaint of ringing in the ear. Mr. Chatwin complained of that. He also complained of decreased hearing. Now, both of those symptoms go along with injury to cranial nerve VIII, and also the cochlea in the ear where hearing is heard, if I may use that word. There's a little -- there's a cochlear organ in your temporal bone in your ear where the cranial nerve VIII interprets the hearing.

*Id.*, 20:2-11.

Dr. Reichert also eliminated other causes for the tinnitus:

Q    Do you ever see patients, let's say, younger than 40 that have the arthritis in their ear that causes tinnitus?
A    Yes. It can happen at any age. . . . But in general it's a condition that happens to older patients.
Q    Did Josh Chatwin have any signs of this type of arthritis?
A    No. Because, really, I'm thinking more that his tinnitus and hearing loss were due to injury of the nerve itself from the skull fracture.

*Id.*, 70:8-23.

Dr. Reichert therefore presented sufficient factual foundations upon which to base his conclusions.

    d.    *Depression and Migraines.*

Dr. Reichert gave an opinion about possible "worsening posttraumatic migraines" based upon Plaintiff's history and the fact that Dr. Reichert considers Plaintiff to be a reliable historian. Contrary to Defendants' assertions, Dr. Reichert is not testifying that he considers Plaintiff to be credible or truthful. He was explaining how migraines could become worse:

A    Yeah, weren't doing that bad. But we all know as neurologists there is such a thing as posttraumatic migraine and that can happen in the future. I have no idea what the future is going to hold. Of course, none of us have a crystal ball.

*Id.*, 30:24-25; 31:1-3

    A reliable differential diagnosis typically, though not invariably, is performed after physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests, and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out and determining which of those that cannot be excluded is the most likely.

*Westberry v. Gislaved Gummi Ab*, 178 F.3d 257, 262 (4th Cir. 1999).

A reliable differential diagnosis such as Dr. Reichert's passes scrutiny under *Daubert*.

*See In re C.R. Bard, Inc.*, 940 F.Supp. 2d 589, 602 (S.D. West Virginia 2013).

   Dr. Reichert explained that because Mr. Chatwin was not malingering, he believed Mr. Chatwin.

 A If somebody comes in and says I've got a headache, and the doctor says, no, you don't, you would say this doctor is out of his gore. He's a liar. If you come in and say, I've got a ringing in my ear, and the doctor says, no, you don't, you would say this guy needs his hearing checked, right?

*Id.*, 21:21-25; 22:1-2.

 He explained further:

 Q Why do you believe he's a good historian, or a reliable historian?
 A A reliable historian. Let's see if I can make this simple. Mr. Chatwin had a head injury. He had a skull fracture. He was hospitalized. He had problems, including his clavicle problem. He had a problem including the tinnitus problems, and had headaches. I didn't review the whole thing. There may be other problems there, but let me just run with that for a minute, please. When I examined him he had plenty of opportunity to say and exhibit both -- he had plenty of opportunities on his physical examination to have what we sometimes call in the medical professional functional elaboration. You know, sometimes in medicine what we see is almost as -- sometimes in medicine what we don't see is almost as important as what we do see. By that, I mean this. Is here we have someone who comes in, who, let's be blunt, who has an attorney, who is in some litigation, who you might expect that when you examine his strength, for example, and I'm just making this up a little bit because I'm going to ham this up a little bit, even though it's a deposition. That we examine his strength. Oh, he's weak all over. Or that left arm, oh, my arm, I can't move it, it's weak. Uh-uh. He's strong. Or how are your headaches doing? My headaches aren't doing too bad. In spite of the fact this guy had a skull fracture. Do you know what I mean? And we don't see any -- we don't see any magnification of symptoms. Are you familiar with that scenario? We don't see any -- what looks like what we used to call sometimes secondary gain when we were doing psychiatry.
 Q Malingering?
 A What's that?
 Q Malingering.
 A Okay.

*Id.*, 27:3-25; 28:1-8.

 A . . . And there's sort of an inverse relationship between the number of symptoms in my experience that a patient will report and the weight that

{01034112-1}   10

    those symptoms need to be given. In some ways the fewer symptoms that a patient reports, the more you need to pay attention to them. The most difficult patients to evaluate, of course, are the ones that have 10,000 symptoms and it's -- and good luck as a doctor because you're flopping in the breeze. You can't figure out what is going on. Do you know what I mean? If somebody comes in with just a few symptoms, boy, you better pay attention to them because something is not good there.

 Q Okay.
 A That's why I consider him reliable.

*Id.*, 29:4-19

   Dr. Reichert is also qualified to testify about Mr. Chatwin's depression. Although he admitted that he was not qualified to necessarily give an opinion about a patient's psychiatric condition, he did explain that he did a rotation in psychiatry and also prescribed medication and treats patients for psychiatric illnesses related to neurology.

 Q I was little unclear on the boards certified stuff. You said you were board certified in psychiatry, but you don't practice psychiatry.
 A No. The board certification, the name of the board is The American Board of Psychiatry and Neurology. Now, I did a neurology residency. As part of that residency, we rotate through psychiatry to get training in psychiatry. But the emphasis of my boards is neurology. But I did actually take a part of my both written examination and my oral examination in neurology included a psychiatry component.
 Q Okay. When you were a resident, did you prescribe, what would you call it?
 A Psychiatric medication.
 Q Psychiatric medication?
 A Yes. When I was rotating through psychiatry, I prescribed actually medication for things like schizophrenia, and, you know, excessive compulsive disorder, anxiety, and all that kind of stuff. But I don't do that anymore. That was when I was a resident rotating through that service.

*Id.*, 70:24-25; 71:1-20.

   Even when an expert claims that he does not have expertise in a particular area, the court can find that he is qualified "based on his experiences, discussions and observations of the

procedure being performed, and his extensive research in this specific subject area." *In re C.R. Bard, Inc.,* 940 F. Supp. 2d at 618.

Notably, although Defendants challenge Dr. Reichert's ability to testify as to all of the preceding subjects based upon his status as a neurologist, they are willing to submit testimony of their own neurologist, Alan J. Goldman, M.D., about these very same subjects. *See* Exhibit 3, Expert Report of Alan J. Goldman, M.D. Defendants therefore undermine their own arguments about the reliability and relevance of Dr. Reichert's testimony as a neurologist.

## CONCLUSION

Based upon the foregoing reasons, this court should deny Defendants' Motion.

DATED this 15th day of August 2016.

CLYDE SNOW & SESSIONS

/s/ Lisa A. Marcy
Lisa A. Marcy
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of August 2016, I caused a true and accurate copy of the foregoing Memorandum in Opposition to Defendants' *Daubert* Motion *in Limine* to Exclude Testimony of Proposed Expert Witness Walter Reichert, M.D., to be filed via the Court's ECF system, which in turn sent copies to counsel of record in accordance with the Court's protocols.

/s/ Michelle Carter