# EXHIBIT 3

### ALAN J. GOLDMAN, M.D.

*A Professional Corporation*
*Consulting Neurology*
*Diplomate, American Board of Neurology and Psychiatry*

5872 South 900 East, Suite 250                          Phone:  (801) 314-2308
Salt Lake City, Utah 841021                             FAX:    (801) 441-1730

March 28, 2016

Mr. R. Blake Hamilton
Durham, Jones, & Pinegar
111 East Broadway, Ste. 900
Salt Lake City, Utah 84110

| Re: | Joshua Chatwin |
|---|---|
| Case: | Chatwin v. Draper City, et al. |
| DOI: | 05-18-10 |
| Date of report: | 03-28-16 |

Dear Mr. Hamilton:

In my role as a Neurological Independent Medical Evaluator, I performed a Medical File Review on March 12, 2016 concerning Mr. Joshua Chatwin. It is my understanding that Ms. Lisa Marcy has raised several questions to Dr. Walter Reichert concerning Mr. Chatwin's current medical status following an injury on 05-18-10. In responding to Dr. Reichert's Report, I will also address those questions. Please be advised that I have never physically met or ever clinically examined Mr. Chatwin and all of the comments that I will make are based completely on the information that was contained within his Medical File.

Mr. Chatwin is currently 34 years of age.

The following are my findings and conclusions.

## REVIEW OF MEDICAL RECORDS

05-19-10 – Heathyr Best. *Draper City Police Department Witness Statement.* "I'm with ME114 and got called to alcohol intoxication/assault on 05-18-10 at 1204 hrs. Upon arrival, the patient was sitting on the ground, handcuffed in the back, and blood covering the left side of his face/head. The patient did not want to cooperate and was very agitated. When we cleaned the blood off, it showed that he was bleeding from the ear. When we tried to place the patient on a backboard, the patient was very combative. The patient also smelled of alcohol and appeared intoxicated. The patient was confused and would not answer all questions appropriately. When

Re:  Joshua Chatwin
March 28, 2016
Page Two


we back-boarded patient, he was then handcuffed to the board with both hands and taken to hospital".

05-19-10 – Jason Kamp. *Draper City Police Department Witness Statement.* "At approximately 1204, we were dispatched. Upon arrival, I noticed our patient sitting upward next to a police vehicle. The patient had been handcuffed and had blood on the left side of his face. I also noticed blood in the gutter that I assume was from the patient's head. After I surveyed the scene, I noticed that the patient was not being very cooperative with the paramedics trying to assess his injuries. As they were assessing him, I noticed an elderly woman approaching. She began asking what we had done to her grandson and what we were doing to him. I asked her to please step back, which she did, and then I explained that we were there to help her son. The patient's aunt was also on scene now and stated that she wanted to know what was going on. After I was done talking to the aunt and grandmother, I returned to the patient where the paramedics were washing his face wound with water. The patient was still being uncooperative with the medics. We were finally able to calm the patient down enough to get him onto a backboard and get a collar on him. I then watched the paramedics load the patient into the ambulance. I went back and explained to the aunt and grandmother that we would be transporting him to IMC. I also told the officers that we would be transporting to IMC. I then terminated our command and went to the hospital".

05-19-10 – Mike Washburn. On 05-19-10, we responded to Draper City to provide medical for a patient in police custody. The patient had a decreased level of consciousness [Glasgow Coma Scale 14], a small laceration on his left ear, and was uncooperative. Bleeding was easily controlled when isolated from the crowd of police, fire, and bystanders. The patient was still uncooperative but generally could be convinced to remain calm and allow treatment. The patient was assessed, history was obtained, and the patient was transported to IMC. En route, the patient received oxygen and an IV was started. Vital signs were [illegible] throughout the call with all signs within normal limits. The patient made no statements to me about what happened before we arrived.

05-18-10 – IMC Hospital ER. Ross Greenlee, MD. A 28-year-old male who apparently sustained a head injury. He was restrained by a police officer after being pulled over for erratic driving. Apparently, he somehow received a head injury. He was brought to the ER for evaluation of his head injury and the alteration of his level of consciousness. I have nothing to add to the information already detailed by the  Emergency Medicine Resident. I confirmed all aspects of the history. On physical examination, BP: 140/90; pulse: 90/minute; respiratory rate: 20/minute. The patient smells strongly of alcohol, is combative, and uncooperative. Contusion to the left forehead, injury to his ear with some ecchymosis on the penna.  More importantly, he has blood draining out from the external canal with a hemotympanum. He is alert. He cannot follow commands. He is combative. He moves all extremities. It was clearly indicated that we will need to obtain a CT scan of his brain. He was given Versed and Haldol but was still not cooperative.

RE: Joshua Chatwin
March 28, 2016
Page Three


He will need to be intubated and chemically paralyzed. Etomidate and suxanocholine were administered. The patient was intubated. CT of the brain and neck were obtained. The CT scan reveals a skull fracture with an epidural hematoma. Impression: Head injury, skull fracture, epidural hematoma, alcohol intoxification. The patient will be admitted to the trauma service with appropriate neurosurgical consultation. Plain films of the chest show no visible trauma. Endotracheal tube is in good condition. CT of the brain showed pneumocephalus, left-sided epidural hematoma. Laboratory studies are discussed. Slight elevation of liver function is noted. Blood alcohol is negative. Remainder of the toxic screen was pending.

05-18-10 – Trauma Team note in the ER by Julie Anne Horyna [for Mark Howard Stevens, MD.]. History of injury is noted. The patient was driving erratically and pulled over by the police. Altercation ensued. The patient's head struck the ground per report. Blood was coming from his left ear. On examination, BP: 155/109; pulse: 113; respirations: 18/minute. Left tympanic membrane has blood around it and blood coming from the left ear. There are no step-offs, deformities, abrasions, or lacerations to his back. He was extremely combative and had to be intubated for the safety of the staff and for his evaluation. Glasgow Coma Scale was initially 14 and then upgraded to 15. Past history is unknown.

05-18-10 – James M. Wilson, MD. History of injury is outlined. Head trauma during a traffic stop per EMS. The patient is alert, combative, not answering questions. On examination, BP: 147/97; pulse oximetry is 90% on room air, pulse is 85/minute. The patient is handcuffed on a backboard and restrained. There are some abrasions over the left frontal and temporal regions of his skull. There are also abrasions on his left cheek. A significant amount of blood is coming from the left tympanic membrane. The left penna and tragus of his left ear are swollen. The tympanic membrane itself, on the other side, was not visualized secondary to blood coming from his ears. The patient is not oriented on examination. He is awake and alert, combative, and screaming. He is moving all extremities appropriately. He withdraws to pain. At times, he follows commands. CT of brain shows comminuted minimally displaced skull fracture on the left side of the parietal and temporal bones. There is a small amount of subarachnoid hemorrhage and varying fluid in the sphenoid sinus. CT of cervical spine shows no fractures. Blood on his ears seems to be coming from a basilar skull fracture. Impression: Temporal bone fracture, subarachnoid hemorrhage, alcohol intoxification.

05-18-10 – Joel McDonald, MD. [Neurosurgical Evaluation]. The patient's history is unobtainable from the patient due to sedation and oral endotracheal intubation. The patient was stopped by police earlier in the day for erratic driving, became combative, and required restraints. During the course of subduing this gentleman, his head struck the pavement and he sustained a loss of consciousness. Transported to ER. He was noted to have blood dripping from the left ear. He was very combative and chemically paralyzed. Glasgow Coma Scale at that point

**RE: Joshua Chatwin**
**March 28, 2016**
**Page Four**

was reported as 14. There is evidence in the records that he is also under the influence of alcohol. On examination, BP: 155/109; pulse: 114/minute. Contusion of the left temporal region. Blood slowly dripping from his left ear. He has conjugate roving gaze with no attempt to make eye contact. Most likely, he is still partially under the effects of drugs. He seems to move all extremities purposely in symmetric manner with good strength. Symmetric reflexes. Appropriate withdraw from pain. No obvious deformities of the extremities. No palpable step-offs in the posterior cervical region. CT of the head shows minimally displaced fracture of the cranial vault and the temporal squama with an underlying small epidural hematoma that appears acute. Minimal effacement to the brain. No intrinsic parenchymal swelling. No shifting of midline structures. Ventricular systems are patent and normal in shape and size. Air fluid level in the sinuses suggest a displacement of the nasal bone. Impression: Left temporal skull fracture with a small acute epidural hematoma. The patient's examination is grossly non-focal although he is partially sedated. The skull fracture and small epidural on the left in the temporal region is discussed. "It will be prudent to observe in the ICU with serial neurological examinations and repeat the CT scans in 6-8 hours. I do not feel that steroids, anti-convulsants, or antibiotics are necessary. When he is awake and alert, maintenance of his cervical collar should be undertaken." The C-spine shows no acute fractures, soft tissue swelling, or subluxation but this would not completely exclude a ligamentous injury.

05-18-10 – Mark Kringlen, MD. CT brain: Comminuted and minimally depressed skull fracture of the left parietal and temporal bones. Temporal bone CT may be helpful. There is a small amount of extra- axial hemorrhage along the left parietal and temporal lobes. Air is also present along the temporal and frontal lobes. Layering of fluid in the sphenoid sinus, likely related to intubation.  In the sphenoid sinuses and the nasal pharynx, there is also fluid.

05-18-10 – Mark Kringlen, MD. CT cervical spine: No evidence of cervical spine injury. Fluid in the mastoid air cells related to skull fracture which is not well seen on this examination.

05-18-10 – Brent Stephenson, MD. CT scan [follow-up]: No significant change in small focus of cortical hemorrhage or extra axial blood in the posterior left frontal lobe region. Left parietal and temporal bone fractures with partial opacification of the sphenoid sinus and left mastoid air cells. There also appears to be a transverse fracture through the mastoid air cells.

05-19-10 – Alcohol screening, Jody Carter, APRN:  Serum ethanol greater than 0.1.

05-19-10 – Jody Carter, APRN. The patient has no tenderness to palpation, flexion, extension, and lateral movements of his neck. Cervical collar is removed.

05-19-10 – Jody Carter, APRN. Thoracic and lumbar spine are clinically cleared.

Re:  Joshua Chatwin
March 28, 2016
Page Five

05-19-10 – Jerry Handy, MD. Portable chest  after extubation: No evidence of acute cardio pulmonary disease.

05-19-10 – Berkley Hansen, MD. X-ray of the bilateral acromioclavicular joints: Mild grade 1 separation to the left AC joint. No evidence of instability.

05-20-10 – Spencer Gald, MD. Bilateral lower extremity venous duplex scans: No deep or superficial venous thromboses  in either lower extremity.

05-20-10 – Scott Gardner, PA-C/Steven Granger, MD. Discharge Note: The patient was placed under arrest, put in handcuffs when he tried to run. He was tackled and hit his head on the ground. He had blood coming from his left ear. Transported to IMC. Neurosurgeon evaluated the patient for a left temporal epidural hematoma and associated skull fracture. He was kept in the ICU overnight. The day following admission, he was awake, alert, oriented, and cooperative. CT scan showed near resolution of the epidural hematoma. The patient still had blood coming from his left ear consistent with a skull based fracture. He stayed in the ICU a second night. On the morning of 05-20-10, he was awake, alert,  oriented, eating a regular diet, off of supplemental oxygen, and wanted to go home. He was discharged in the morning. Discharged diagnosis: Fall, trauma. Left temporal epidural hematoma with associated left temporal bone fracture and hemotympanum from external auditory canal fracture. Acute alcohol intoxification with blood alcohol level of 3.90 mg/dl. Mild traumatic brain injury [concussion]. The patient is discharged on Norco, Senna, ibuprofen, and will avoid strenuous activities for at least one month. He will follow-up with Dr. McDonald in one month and a repeat CT scan will be obtained.

The laboratory studies as referenced above were reviewed. Calcium was initially somewhat low as was sodium. Drug screen showed the alcohol level of 3.19. PTT was slightly initially elevated. Drug screen of the urine was positive for benzodiazepine and cannabinoids.

A total hospital bill of $23,622.50 was noted.

The hospital records  included in the package  also included physician's orders and progress notes.

05-19-10 – Michelle Hanks, MSW, LCSW. Medical and Trauma Social Work and Case Management. The patient is admitted to hospital for a secondary injury sustained, by report, in an altercation with police as a skull fracture and other injuries. The patient was awake, alert, pleasant, and participated in conversation. He acknowledged alcohol and marijuana usage.  He stated that he comes home from work, sits, drinks, and watches TV or plays video games. He lives with his parents. He never married. He drinks up to a half a liter of Vodka daily and intermittent tetahydrocannabinoid use. He expressed a desire to stop drinking and

Re: Joshua Chatwin
March 28, 2016
Page Six

acknowledged the need for assistance. Encouraged him to have a multifaceted approach utilizing
affiliation with his church as well as counseling and group support.

Handwritten progress notes were also included in the package. One note [unknown author]
claims "A 28-year-old male was stopped by the police for driving erratically. An altercation
ensured and the patient's head reportedly hit the pavement. He was seen as an Emergency Room
patient and upgraded when blood was" [*Reviewer's Note*: incomplete Trauma and Physical
Worksheet].  Critical Care progress notes were also included.

05-19-10 – Aileen Carole Johnson, Occupational Therapist. The patient has no further needs for
O.T. at this time. He is discharged from acute Occupational Therapy services.

Records from the Unified Fire Authority with charges were included in the package. Michael
Washburn performed a physical examination. Bilateral eye reactions were sluggish. Glasgow
Coma Scale was 14. A 28-year-old male who had an altercation with the police department and
hit his head on the ground on the left side. He has a minor laceration on the left ear. GSC is 14.
Unknown if patient was disoriented due to ethanol or head injury. The patient is stable, however,
combative.

06-08-11 – John Butler, MD. ENT Evaluation. The patient is being evaluated for ringing in his
ears. This is on the left, constant, and an audible noise, worse at night. He had a head injury,
skull fracture, and a left ruptured tympanic membrane one year after an assault. There is a
decrease of hearing in the left ear. He has not received any treatment. Examination is undertaken.
He smokes an average of 1/2 pack of cigarettes a day and drinks 4-14 alcoholic beverages per
week. He denies history of alcoholism. There is no drug addiction. Examination reveals BP:
154/90; pulse: 101/minute. The patient is 6 feet 4 inches tall and weighs 195 pounds. There was
dry blood in the left ear canal. The nasal septum is deviated to the left. There is a hyperactive gag
reflex. Neurological examination is unremarkable. He is awake and alert. Impression: Left
tinnitus and left conductive hearing loss. The patient has had a history of trauma with a skull
based fracture. There is no dizziness. Conductive hearing loss on the left is noted.  Differential
diagnosis include tympanosclerosis, doubt ossicular discontinuity. Discussed practical hearing
suggestions, i.e., face to face conversation, and stressed importance of mitigating background
noise and distraction/multi tasking. He will reduce stress and stimulants such as caffeine and
decongestants. He will follow-up in six months.

The actual testing pattern [audiogram] was included in the package.

01-16-13 – John Butler, MD. A letter addressed to Attorney John Johnson. "Mr. Chatwin was
seen on 06-08-11. History is of a sudden onset of ringing and subjective hearing loss in the left
ear after an assault, which he claimed occurred one year prior to the visit. He also sustained a

Re: Joshua Chatwin
March 28, 2016
Page Seven

skull fracture on the left and a left ruptured eardrum. Tinnitus is worse at night and in quiet
environments. It fluctuates minimally. Past history is unremarkable. There is no prior hearing
loss, ringing, or any past trauma. Physical examination was unremarkable except for dry blood
on the external canal, which was removed. The tympanic membrane was intact. Malleolus
appeared to be in a normal position. Audiogram confirmed a predominantly mixed hearing loss
in the high frequency range, only on the left, maximum at 4,000 hz frequency. Right hearing was
within normal limits. In response to your questions: A 0% impairment rating in the left ear and
when evaluated binaurally. He does not have a pre-existing condition to exchange his hearing
change or ringing. It was recommended that he return for a six month follow-up for a repeat
audiogram to assess any changes, but to date, he has not returned. Based on his 06-08-11
audiogram, he would not require future treatment including surgery. The air bone gap on his
audiogram would likely not change from a surgical procedure. As his hearing loss is limited to a
select frequency range of one ear only, he does not require hearing aids now. I cannot determine
if the assault will accelerate the use of hearing aids in the future.

05-19-10 – Chris Middlemiss, Draper City Police Department, Witness Statement.  "Upon our
arrival, we found a 28-year-old male sitting on the ground next to a police truck. The patient was
handcuffed behind the back. The patient's face was covered with blood on the left side,
obviously bleeding from the ear. The patient was also clearly agitated and difficult to manage. I
asked an officer what happened and he stated 'we had this guy cuffed and he became agitated
and stated grabbing at the officer behind him, resisting, so he and other officers took the guy
down and he hit his head on the ground'. There was a puddle of blood on the ground where I
assume he hit his head. After cleaning his face, we found no obvious injury/trauma. A small
laceration was noted on the outer ear, this is where the blood was coming from. Unknown if
patient was bleeding in the inner ear. Unknown if the patient sustained a closed head injury.
However, he was agitated. The patient calmed down in the ambulance. The patient was stable en
route with no other changes."

12-07-15 – Deposition of Joshua Patterson. Mr. Patterson attended Community College in
Fairfield, California, 1993-1995, majoring in Criminal Justice. He also went to heavy equipment
school in Portland, Oregon. He has a certificate of completion, March, 1996. After that, he
started working on construction in California. He worked in construction until 2010. He was
hired by Draper City, 2010. He had been going to the police academy at night starting in January,
2009. He became a Police Officer "to help people and to make a difference." He attended Salt
Lake Community College, class of 060, which is the Police Academy [SLCC Academy]. There
was 10 months of training including criminal procedure, physical training, defensive tactics, law,
and ethics. Defensive tactics include arrest control, officer safety, controlling a scene, controlling
a suspect. It is taught by the Law Enforcement instructor. Intoxicated people are the same as any
other person. Officer safety should always be the same. Defensive tactics are not different. There
is training for placing someone in handcuffs.

Re:  Joshua Chatwin
March 28, 2016
Page Eight


There is no training as to what to do with an individual after he is placed in handcuffs. "You search them for contraband, weapons before you place them in the control vehicle. You have the suspect with a wider stance, lower him down to your level so they are stable as well, have their balance so they cannot automatically try to resist you more accurately by having a physical advantage. Start with the waistband, that's generally where most weapons are hidden. Move up and down, either side.  There was instruction in resist techniques. Resist would be not complying with commands, actively resisting, and not just verbally but also physically. You always try to read someone's demeanor, someone who is calm, passive, agree with what you say, listen to what you ask, and if someone is very verbally combative, that's an indicator that they could be possibly physically combative. They could be physically combative by trying to fight you, trying to run away, trying to break your grasp, trying to punch you, kick you, stop you. You are trying to read body language of an intoxicated person. It does not have anything to do with arrest or not or control or not. You try to move the suspect away from any weapons that you may have.  You try to gain control if they are already combative while standing." Mr. Patterson did not remember exactly what happened on the day of concern. He has not reviewed his report. He is certified by the Police Officer Standards of Training.

Mr. Patterson became employed as a Police Officer with Draper City within a few months after graduation.   One day a month, there is training. It could be from taser training to active gunman/active shooter training, all aspects of law enforcement including defensive tactics. Training lasts a full shift, 10 hours.

The last time Mr. Patterson was trained in the use of force was in the  Academy. Various aspects of the manual were undertaken in the field training daily observation report. Discussion of reasonable force was undertaken. Mr. Patterson read his report indicating [page 86, lines 14-17]. "I noticed the suspect's demeanor becoming more and more agitated and aggressive. He became argumentative towards officer Harris about how he was performing on the test". Officer Patterson was read  in his report that "I [Officer Patterson] told him several times to stop resisting me and to relax. He continued to act aggressive and combative which caused me concern for his safety and mine. He was very elevated, very emotional, angry. You are holding a suspect when you search him so they don't hurt themselves or you. He was pulling against my arm and hand that was holding him". He started fumbling with the officer's gun belt. Mr. Patterson was directly behind the suspect performing a search. He was standing. There was nothing in front of him. "For better security and control, I escorted the suspect over to Officer Harris' patrol vehicle, told him to  face the vehicle and lean against it to help keep the suspect from losing his balance and falling over due to his level of intoxification… I suspected he would resist more actively". Mr. Patterson feared for his safety as well as the other officers. The suspect had unlocked his holster and his right hand was on his duty weapon. "I ordered him to let go as he arched his back and swung his head back towards my face attempting to head butt me. I attached my left hand on the handcuffs and pulled his hands away from my weapon, attached my

**Re: Joshua Chatwin**
**March 28, 2016**
**Page Nine**

right hand on his right biceps and moved him down and away from my primary weapon side".
Mr. Chatwin is in handcuffs with three fingers on his gun after unlocking the lock. Mr.
Patterson's first thought was to get him away from his weapon. He always grabbed the right side
because Mr. Chatwin was going to fall down the driveway.

The report goes on to state "I [Officer Patterson] placed the suspect into a prone position next to
Officer Harris' patrol vehicle". He moved him to ground. That's when he fell to the ground.
Officer Patterson again reiterated that he "moved him away from my primary weapon side and
he went to the ground" [page 108, lines 2-3]. When he moved him from the patrol car, "in a split
second, he is on the ground". His right hand was on his biceps and his left hand was on his cuffs.
All the way to the ground he was still holding onto Mr. Chatwin. He was lying on the ground in a
prone position, face down. "Due to the level of intoxification of the suspect, his head swayed
down and his left ear came in contact with the ground. I immediately told the suspect to stop
resisting me and to comply" [page 112, lines 12-16]. Mr. Patterson does not recall which part of
Mr. Chatwin's body went to the ground first. "It was very quick." The report then went on to
state "it appeared that the suspect had lost consciousness momentarily and then I noticed him
moving and had some light bleeding from his left ear". He was on the ground, his head was
bobbing, turning, moving, and squirming. The officer was behind him. We picked him up from
prone position on the driveway to set him against the seat against Officer Harris' vehicle and
called for medical." Further discussions were undertaken as to movements of Mr. Chatwin and
Officer Patterson. Officer Patterson was kneeling for 30-45 second next to Mr. Chatwin before
he was moved to the sitting position against the police officer's car.

Discussions of witnesses and witness statements were undertaken. On page 179, Officer
Patterson again stated, "I believe his head hit the ground. I don't know which force during the
time or during when the report was written. I did not have a gage of how his head hit the
ground". Officer Patterson went on to then state, "in a split second, I moved him away from my
weapon side before he went to the ground and that's when he went limp".

Officer Patterson stated with Emeryville Police Department in January, 2012, in California. He
was there for 2 ½ years and then decided that he did not want to be an Officer anymore. He
worked for a construction firm after that, Anselmo Services. He has never been subject to any
discipline in either the Draper City or the Emeryville Police Departments. He was never subject
to any type of allegations including his ex-wife about any physical or emotional abuse.

Examination by Mr. Hamilton was undertaken. Officer Patterson does not believe that officers
are always fighting. He does not believe that Draper City did not provide adequate training. He
does agree that it is important for an officer to make sure that they were always training. He had
no intention to hurt Mr. Chatwin on May 18, 2010 when he was sworn at by Mr. Chatwin. That
did not upset him and cause him to want to injure him or bring physical pain to him. He removed

Re: Joshua Chatwin
March 28, 2016
Page Ten


him from his gun side for safety and control, his safety, his partner's safety, the safety of the public, and for Mr. Chatwin's safety himself.

01-06-16 – Walter Reichert, MD. Initial Office Neurological Consultation. The patient's chief complaint is of Traumatic Brain Injury, occurring on 05-18-10. The patient reports that he was refused service at a Draper liquor store. When he drove home, he was met in the driveway of his parents' home by police authorities. He was arrested. He was handcuffed with his hands behind his back. He was turned and put face forward against his truck. He has no memory of events beyond that. The next thing he can remember is awakening in the IMC Intensive Care Unit, intubated, about 12 hours or so later. He was told that a Draper Police Office had spun him about and to the ground such that he struck his head on a cement curb. Contact with IMC was undertaken. The patient was agitated and uncooperative. He had ecchymosis around his head on the left and on the pinna of his left ear with blood draining from his left external ear canal and a left hemotympanum. He was sedated, intubated, and chemically paralyzed to obtain appropriate imaging. A CT of the brain showed a left epidural hematoma, a left skull fracture, and a left pneumocephalus. A cervical spine CT scan was negative for fractures. Blood alcohol was 319 mg%. He was seen by Dr. Joel McDonald, neurosurgically, but there was no surgery. The following day, a CT scan showed that the epidural hematoma and pneumocephalus had improved. He was discharged to home without medical follow-up. He has had no medical care since his discharge. No follow-up imaging since his last CT in the hospital, 05-18-10.

Mr. Chatwin has continuing tinnitus and decreased hearing in his left ear and mild left shoulder pain, mainly with activity. He suffered a left shoulder grade 1 separation at the AC joint. He has increasing headache. There is a history of migraine with aura with headaches occurring infrequently prior to the accident, perhaps once or twice a year. He now has headaches twice monthly, He has had two sets of three headaches in a row, all associated with migrainous aura. Some depression is also occurring. He denies seizures, loss of consciousness, weakness, loss of sensation, difficulty with speech, difficulty with memory, and neck pain. He is a recovering alcoholic. He has been dry 70 days and is in a treatment program. History of his prior migraines are outlined which start with a visual small black spot, paracentrally to the right of center, with a border of faint color. This engrossed about 80% of his visual field, blocks his vision, lasts 30 minutes, and then a severe headache lasting 24 hours occurs. He has taken Excedrin with no help. There is a family history of migraine.

Physical examination is undertaken. BP: 125/85; pulse: 68/minute. The patient is a healthy appearing male in no acute distress. He is alert, oriented times three, and cooperative. Speech is clear. Mood and affect are appropriate. There are no deficits in memory, language, or fund of knowledge. Cranial nerves revealed hearing decreased on the left to finger rub and a tuning fork. Weber examination lateralizes to the right. Strength, sensation, and cerebellar examinations are normal. Reflexes are symmetric. Tandem walk and Romberg examinations are normal. The CT

Re:  Joshua Chatwin
March 28, 2016
Page Eleven

scans are described with fractures in the left parietal and temporal bones and the left mastoid. A left temporal epidural hemorrhage is also noted. Pneumocephalus in the left parietal and temporal regions are also noted. There is effacement of the gyral and sulcal markings over the left hemisphere suggesting edema. A follow-up CT scan [05-18-10] showed resolution of the extra axial temporal hemorrhage but shows the fractures and fluid in the left mastoid air cells as well as in the sphenoid sinus. There is also a loss of the normal gyral and sulcal markings over the left hemisphere. Impression: Left temporal skull fractures, mastoid fracture; left epidural hematoma. There was also left hemisphere edema at the time of his acute brain injury and left hemisphere pneumocephalus which has resolved by the second CT. There is a left sensory neuro hearing loss with symptomatically decreased hearing in the left ear.  There is left tinnitus. Worsening of migraine with aura. Post-traumatic migraine with aura. Mild left shoulder pain as residual to separation of left AC joint and pain with activity. Mild depression.

Recommendations for an MRI of the brain with gadolinium, MRV, MRA times two, and an EEG.  Treatment of his increasing migraine with aura was discussed. Sumatriptan will be started as will Aleve with first dosage of Sumatriptan. If headaches are worse, he may need to be placed on a migraine preventative. He will need to be careful to avoid any potentially addicting medications due to his history of alcohol abuse. Effervescent aspirin with caffeine for severe headache was also discussed. The concepts of rebound headaches and medication over usage headaches were also discussed.

01-11-16 – MRI of the brain: Tiny area of old hemorrhage measuring 0.4 cm x 0.6 cm along the peripheral left superior lateral parietal lobe. "This finding is in the exact location of the patient's acute hemorrhage on 05-18-10. Findings suggest that this small area of old hemorrhage is in the extra axial tissue rather than in the parenchyma, as discussed above. There is no corresponding defect in the parenchyma. Healed old fracture of the adjacent left parietal/temporal bone. Minor air fluid level or mucosal thickening in the left ethmoidal and right maxillary sinus.

MRA of intracranial arteries: Normal.

MRA of the neck arteries: Normal.

Contrast enhanced cerebral MR venography: Normal.

01-13-16 – An  addendum by Dr. Steven Edelman to the brain MRI: Review  of the patient's head MRI showed an old mildly depressed left parietal bone skull fracture, especially on the axial FLAIR and coronal T2 weighed sequences producing a minimal focal 0.6 cm extra axial indentation on the adjacent left parietal lobe. In the same location is a minute extra axial hemosidirin deposit related the patient's old tiny epidural hematoma. Underlying parenchyma shows no signal abnormality. No edema or gliosis is seen.

Re: Joshua Chatwin
March 28, 2016
Page Twelve

01-11-16 – Walter Reichert, MD. EEG: Normal. Photic stimulation, hyperventilation, and the drowsy state were obtained. An well organized moderate amplitude, well modulated 10 hz alpha rhythm is noted.

01-12-16 – Walter Reichert, MD. A letter addressed to Ms. Lisa Marcie answering a number of questions as follows:

>   Question #1: "It is my opinion that Mr. Chatwin suffered injuries after being thrown to the cement. This will result in future damages".

>   Question #2a: "The patient suffered a traumatic brain injury with left epidural hematoma, pneumocephalus, likely brain edema, and skull fracture."

>   Question #2b: Left cranial nerve VIII damage producing left sensory neuro-hearing loss and subjective decreased hearing and tinnitus.

>   Question #2c: Worsening post-traumatic migraine.

>   Question #2d: Left shoulder acromioclavicular separation.

>   Question #2e: Depression.

>   Question #3: "It is my opinion that his tinnitus is caused by the injury as above".

>   Question #4: "It is my opinion that Mr. Chatwin's head injury, itself, may have contributed to his violent behavior, assuming that occurred. Depending on a patient's degree of head injury and underlying degree of confusion and disorientation, it would not be unexpected for a patient to become "combative" or "violent". It is well known that patients who have suffered head injury, seizures, and other neurological trauma may need to be restrained, sedated, or otherwise dealt with".

>   Question #5: "The patient's blood alcohol level was extremely high at 0.391 mg%. This would significantly impair his cognition, coordination, dexterity, speech, and balance."

>   Question #6: "It is my opinion that a significant amount of force would have been required to produce a shoulder injury. It is my opinion that, at such an elevated blood alcohol level, simply collapsing to the ground have not have produced a shoulder injury".

Re:  Joshua Chatwin
March 28, 2016
Page Thirteen

Question #7:  "An unconscious individual with a significant head injury should have required immediate medical attention with activation of 911. He should have been handled very carefully due to the possibility of cervical spine instability from a cervical injury occurring at the time of the head trauma. If it all possible, he should have been placed horizontally and kept warm while waiting for paramedics. If a seizure had occurred, prevention of aspiration would have been necessary. Even simply checking the pulse would have been reasonable. No CPR intervention was needed."

Dr. Reichert went on to state that he considers the patient "to be at risk for future post-traumatic epilepsy as he suffered significant head injury with fracture, bleeding, and residual blood products are imaged on MRI. Hemosidirin is elipotogenic. Future medical expenses would include physician visits, imaging, EEGs, and medication. This would be especially problematic for the patient in view of his history of alcohol dependence. He will need to be essentially vigilant to remain alcohol free. There is now no way to prevent post-traumatic epilepsy from occurring. Mr. Chatwin is also having post-traumatic migraine with aura which may require specific anti-migraine treatment and physician visits in the future." Dr. Reichert does not expect his hearing to improve. "He will need to avoid future head injuries. The neurological community considers head injuries to be cumulative. He will need to be certain that, in the future, he takes measures to wear a helmet. He should avoid any sports or activities that put him at risk for recurrent head injury. The MRI indicates the skull fracture remains mildly decreased which is a continuing concern.  He will require a CT of the brain for further continual evaluating bony abnormality from his skull fracture. I recommend neurosurgical consultation".

Dr. Reichert's opinions are said to be to a reasonable degree of medical certainty and probability based on the knowledge gained from his experience accumulated in his 44 years of medical practice as a physician and 37 years as a Board Certified Neurologist.

## DISCUSSION

I will now respond to Dr. Reichert's answers to the seven questions that Ms. Marcy posed.

1.     Do you believe that Mr. Chatwin suffered injuries based upon being thrown to the cement by an officer, which may result in future damages?

Response:  My review of the above documents did not state that Mr. Chatwin was "thrown to the cement by an officer". Sometime, however, on 05-18-10, it is obvious that Mr. Chatwin sustained fractures to his left temporal and parietal bones, his left mastoid air cells, and a left hemispheric epidural hemorrhage. I have not reviewed the CT scans of that date as to the possibility of cerebral edema, as discussed

Re: Joshua Chatwin
March 28, 2016
Page Fourteen

by Dr. Reichert, but *none* was described by the interpreting radiologists on two scans of that day with Dr. Mark Kringlen actually stating "<u>no</u> evidence of cerebral edema." There was also no evidence of a mass effect or shift of the midline cerebral structures and normal architecture to the brain's ventricular system. It is apparent, from the ENT evaluation of Dr. John Butler [06-08-11] that Mr. Chatwin does have a left conductive hearing loss and subjective tinnitus, neither of which were historically present prior to the events of 05-18-10. In his letter of 01-16-13 to Mr. John K. Johnson, however, *no* impairment rating for the left ear was given nor was it suggested that Mr. Chatwin required a hearing aid. Dr. Butler also stated "I cannot determine if the assault will accelerate the use of hearing aids in the future".

I also respectfully disagree with Dr. Reichert that Mr. Chatwin, now almost six years post injury, is at risk for a seizure. Although I am hopeful of reviewing all of Mr. Chatwin's brain images, I saw no descriptions of hemosiderin deposition within the substance of the brain, itself, nor of any actual damage to the brain. I also found no literature publications discussing seizures after hemosiderin deposition in the surrounding brain membranes, as occurs with an epidural hematoma. I, thus, do <u>not</u> believe that Mr. Chatwin is at risk of a seizure on the basis of this head trauma. In addition, his skull fracture is always noted to be "minimally depressed" and unchanged over these almost six years and I doubt it is causing any physiologic brain abnormalities as his EEG was completely normal.

I, therefore, again disagree with Dr. Reichert in that I do not feel that any further neurosurgical contacts are necessary as a result of the 05-18-10 injury.

I do agree that, with his history of alcohol and drug abuse, Mr. Chatwin must refrain from the usage of such chemicals, however, I would give that advice to anyone, whether they had had a head trauma or not. As above, Mr. Chatwin's EEG of 01-11-16 is completely normal with no evidence of injury or epileptogenic discharges. In addition, his most current brain images report normal anatomy and only a "tiny area of old hemorrhage" outside the actual brain substance.

I do agree with Dr. Reichert that Mr. Chatwin reports an increase of his migraine frequency, but I saw no follow-up reports documenting that frequency. There actually seemed to have been no neurological follow-ups following his hospitalization so Mr. Chatwin's medical status over these many years is evidence-based unknown.

My final disagreement with Dr. Reicherts's responses concerning "future damages" is with cumulative concussions/head traumas. Although I agree that Mr. Chatwin should exhibit caution when participating in contact sports or in other activities that may involve a head injury, I do not feel that he needs to wear a helmet in his daily life activities. If he were to ski, ride a bike, white water canoe, race horses, or perform other recreational

Re: Joshua Chatwin
March 28, 2016
Page Fifteen

or personal activities in which the possibility of head trauma could very well occur statistically, it would be common sense for anyone to wear a helmet.

2.      What are those damages?

Response: I have addressed this issue in my answer to Question #1. Overall, I believe Mr. Chatwin has had a very good recovery from his injury. He does not need EEGs or other images. Neurologic follow-ups and medication should be for migraines, only.

3.      Is the tinnitus in Mr. Chatwin's ear caused by the incident?

Response: Tinnitus is an extremely difficult process to understand and even more so to treat. Most Neurologists defer to the expertise of their Otorhinolaryngology colleagues or a Neuro-Otologist the definitive answer to this question.

4.      What is the possibility of violent behavior resulting from the effect of head trauma?

Response: Violent behavior can be a response depending upon the severity of the head trauma. In reading Officer Patterson's deposition, the reports of witnesses, and all of the hospital health care providers, and in knowing that Mr. Chatwin's drug screen was positive for alcohol and marijuana, it was apparent that he was aggressive, if not violent, prior to and after his going to the ground and sustaining a head trauma. The absolute answer to this question is "yes", folks with head traumas can most certainly be violent.

5.      What is the effect of alcohol on balance, posture, and coordination?

Response:  Alcohol and marijuana can impede all of the above motor functions along with judgment, behavior, and personality, including becoming violent.

6.      What is the amount of force required to cause Mr. Chatwin's shoulder injury.

Response:  Board Certified Neurologists usually defer to the expertise of Orthopedic Surgeons any discussions of possible shoulder injuries and such should be done here.

7.      What medical assistance, if any, should have been applied to an unconscious individual whose head had struck the cement?

Response: Elementary first aid should be applied to anyone whose head has struck the cement. One must assess the individual's physical and cognitive states, ensure that there are no unusual or rapid movements of the head and neck, no bleeding, and that vital signs are obtained. Pupillary reactions, extremity movements, breathing, and cognitive

Re:  Joshua Chatwin
March 28, 2016
Page Sixteen

awareness should be monitored. It is also best to keep the patient calm, warm, and leave them on the ground, if safe, and moving about as little as possible until the paramedics arrive. One should compress any areas of bleeding and ensure that an airway is open. Once there is an evaluation by a paramedic team, safe transport to a gurney and hospital setting may then be undertaken. After the appropriate healthcare providers have arrived, an intravenous line should be started and oxygen delivered nasally or by a mask, again, depending on the severity of the individual's status and areas of injury.

I thank you for allowing me the opportunity to have performed this Medical File Review. Please be advised that the entire review, the dictation, and the editing of this report was done solely by me. As previously stated, I have never physically met or ever clinically examined Mr. Chatwin and all of the comments which I have made are based completely on the information that was contained within his medical records. As above, I would like to review all of his brain images and reserve the right to re-visit some of the above questions depending upon my thoughts after such a review.

Finally, please also be advised that I have never attempted to achieve a doctor/patient relationship with Joshua Chatwin.

If I can be of any further assistance, please do not hesitate to contact me.

Sincerely,

ALAN J. GOLDMAN, M.D.
Diplomate, American Board of Neurology & Psychiatry

AJG/dh

*Alan J. Goldman, M.D.*
*A Professional Corporation*
*Consulting Neurology*
*Diplomate American Board of Psychiatry and Neurology*

5872 South 900 East, Suite 250
Salt Lake City, Utah 84121

Telephone: (801) 314-2308
Facsimile: (801) 441-1730

## ***CURRICULUM VITAE***

Name:                Alan J. Goldman, M.D.

Address:             5872 South 900 East Suite 250
                     Salt Lake City, Utah 84121

Mailing Address:     P.O. Box 981298
                     Park City, Utah 84098-1298

Phone:               (801) 314-2308
Phone (Direct):      (435) 615-7147

Fax:                 (801) 441-1730

E-mail:              agoldmanmd@msn.com

Profession:          Neurologist

### ***EDUCATION***

Undergraduate:       University of Michigan
                     Ann Arbor, Michigan, 1963-1967
                     Bachelor of Science in Zoology

Graduate:            University of Michigan Medical School
                     Ann Arbor, Michigan, 1967-1971
                     Medical Doctorate

Post-Graduate:       University of Colorado and Affiliated Hospitals
                     Denver, Colorado
                     Rotating Medicine Internship, 1971-1972

Residencies:         University of Colorado and Affiliated Hospitals
                     Denver, Colorado

Internal Medicine; 1972-1973

University of California, Los Angeles (UCLA)
Neurology; 1973-1976

## *ACADEMIC APPOINTMENTS*

| | |
|---|---|
| 1991-1999 | Associate Clinical Professor of Neurology<br>University of California, Irvine Medical School<br>Department of Neurology |
| 1976-1985 | Assistant Clinical Professor of Neurology<br>U.C.L.A. Medical School<br>Harbor General Hospital Campus<br>Department of Neurology |

## *AWARDS AND HONORS;*

| | |
|---|---|
| 1962 | American Field Service International<br>Scholarship, the Nation of Japan |
| 1966 | National Science Foundation Research<br>Scholarship in Science of Zoology |
| 1967 | National Science Foundation Research<br>Scholarship in Science of Zoology |
| 1970-1971 | Research Fellowship in Neuromuscular Disease, University of<br>Michigan Medical School,<br>Newcastle-upon-Tyne, England<br>Professor John Walton, Mentor |
| 1975 | Jean-Luis Reihl Award for Outstanding Scientific Work, UCLA<br>Medical Center, Department of Neurology |
| 1976 | The Augustus S. Rose Award for Excellence in Teaching, UCLA<br>Medical Center, Department of Neurology |

## *CONTINUING EDUCATION*

| | |
|---|---|
| 1972-Present | Certifications in Continuing and Updated Medical Education, |

## *PUBLICATIONS*

| | |
|---|---|
| 1967 | Activity Pattern of Microtus Pennsylvanicus in a Caged Environment<br>Authors:  Goldman and Graham<br>University of Michigan Scientific Journals<br>University of Michigan Press |
| 1975 | Invasive Thymoma and Myasthenia Gravis<br>Authors:  Goldman, Herrmann, Keesey, et al.<br>Journal of *Neurology*, November, 1975 |
| 1975 | Invasive Thymoma and Myasthenia Gravis—A Second Opinion<br>Authors:  Goldman, AJ, Herrmann, Keesey, et al.<br>*Journal of the American Medical Association*, Sept. 1975 |
| 1975 | Myasthenia Gravis<br>Authors:  Goldman, Herrmann, Keesey, et al.<br>*Journal of the American Neurological Society*, June 1975 |
| 1975 | New Treatment Therapies for Myasthenia Gravis and Invasive Thymoma<br>Authors:  Goldman, Herrmann, Keesey, et al.<br>Transactions of the American Neurological Society<br>New York, New York, May, 1975 |
| 1985 | "Mature Health and Fitness" newsletter,<br>Neurologic Editor and Contributing Author<br>(Multiple Publications) |
| 1994 | Editorial:  Dermatomal Somatosensory Evoked Potentials<br>Author:  Goldman, AJ<br>*Journal of the Neuromusculoskeletal System*<br>Volume 2, No. 2; Summer, 1994 |
| 2001 | Letter to the Editor:  Clinical Utility of Surface EMG;<br>Goldman, AJ<br>*Neurology*, Volume 56, No. 10, May 22, 2001, pg. 1421 |
| 2008 | Special Lecture; 15th World Congress of Bronchoscopy, Tokyo, Japan; The Psychological Aspects of Bronchoscopy;<br>March 30-April 2, 2008<br>*Medimond International Proceedings*<br>Authors:  Goldman, AJ, Knippa, J, Ensell, E, Colt, H |

### *PROFESSIONAL ORGANIZATIONS*

- American Academy of Neurology (Elected June 1, 1978)

- Utah Medical Association

### *BOARD CERTIFICATIONS*

- American Board of Psychiatry and Neurology (Elected April, 1978)

### *MEDICAL LICENSES*

- The State of Utah Division of Occupational and Professional Licensing

- Alaska State Medical Board

### *WORKERS COMPENSATION APPOINTMENTS*

- Medical Panel Chairperson, The State of Utah Labor Commission, Division of Adjudication, 2005-2011

- Independent Medical Examiner, State of California, 1990

- Qualified Medical Examiner, State of California, 1991

- Agreed Medical Examiner, State of California, 1992

### *ACTIVITIES*

- Thirty-five plus years in the practice of Neurology

- Assistant Clinical Professor of Neurology, UCLA Medical Center, Harbor General Hospital Campus, 1976-1985, Dr. Mark Goldberg, Chairman

- Associate Clinical Professor of Neurology, UCI Medical Center, Dept. of Neurology, Dr. Stanley Van den Noort, Chairman

- Founder and Past Co-Director of a Stroke Rehabilitation Unit, Canyon General Hospital, Anaheim, California

- Founder and Past Director of a Stroke Rehabilitation Center, Tustin Community Hospital, Tustin, California

- Past Chief of Staff and Chairman of the Department of Medicine, The Medical Center of Garden Grove, Garden Grove, California

- Past President of Orange County Neurological Society (California)

- Past Chairman of the Governing Board, The Medical Center of Garden Grove

- Previous Member of Ethics Committee of the Orange County Medical Association

- Multiple Hospital Peer Review and Committee Memberships.

- Research Investigator for several pharmaceutical studies including Long Term Beta-Seron International Study for Multiple Sclerosis (1996-1999)

- Previous Member, Medical Advisory Board, Blue Cross of California

- Neurologic reviewer for multiple insurance and independent medical review companies

- Over twenty-five years of experience in medical/legal cases with multiple depositions and court Expert Witness appearances

- Co-Founder and Vice President for Clinical and Medical Affairs, iTech Medical, Inc.

- Former Delegate, Summit County Medical Association, to the Utah Medical Association

- Lecturer in Neurology

# COURT CASES, DEPOSITIONS, & ARBITRATIONS

## ALAN J. GOLDMAN, M.D.

| Date | Case | Attorney | Venue |
|------|------|----------|-------|
| 02/11/16 | Standish v. Castlewood | Bruce Burt | Salt Lake City |
| 12/03/15 | Archer v. Wyoming | William MacPherson | Deposition |
| 11/16/15 | Thompson v. State Farm | Kimberly Colbo | Deposition |
| 11/13/15 | Herron v. Anderson | Kristin VanOrman | Deposition |
| 10/08/15 | * Raab v. IHC Heathcare | Nathan Burbidge | Deposition |
| 08/11/15 | *Argeris v. Talbot/PCMC | Larry White | Deposition |
| 08/10/15 | *Jackson v. Hammad | Kathy Larson | Deposition |
| 06/04/15 | Beech v. Halliburton | Thomas Thompson | Deposition |
| 04/29/15 | *Toomalatai v. IMC | James Hasenyager | Deposition |
| 04/07/15 | Crandal v. AFI | Terry Plant | Arbitration |
| 02/14/15 | Lazarus v. State Farm | Bruce Burt | Deposition |
| 12/23/14 | Clark v. Geiko | Peter Christensen | Deposition |
| 10/30/14 | Fountain/Gines v. Edwards | Warren Wadsworth | Provo Court |
| 04/02/14 | Dickey v. Depositors Ins. | Bruce Burt | Salt Lake City |
| 03/21/14 | Brandi D'hulst | Lynn Davies | Ogden Court |
| 01/16/14 | Hansen v. Mid-Century | Jason Casper | Deposition |
| 12/10/13 | Udy v. Moore | Warren Wadsworth | Deposition |
| 11/15/13 | Saechao v. Horschel | Rebecca Hozubin | Deposition |
| 10/15/13 | Womack v. Springfield | Gary Johnson | Deposition |
| 05/10/13 | Baldwin v. Gold | J. Kelly Walker | Superior Court |

| 03/26/13 | Cox v. IMH | Patrick Tanner | (Utah-SLC) Provo Arbitration |
| 01/17/13 | Johnson v. Gibby | Jared Casper | Provo Superior Court |
| 01/03/13 | Price-Wren | Rebecca Hozubin | Alaska Arbitration |
| 10/01/12 | Halladay v. Blakey | Rafael Seminario | Provo Superior Court |
| 01/14/12 | Kristi Hess | Lloyd Jones | Deposition |
| 02/13/12 | Rocky Halliday | Rafael Seminario | Deposition |
| 11/15/11 | Hanson v. Wasatch Valley Pizza | Jennifer Mastrorocco | Deposition |
| 08/09/11 | Shupe/Coop v. Nielsen | Todd Turnblom | Depostition |
| 04/11/11 | Lamkin v. O'Toole-Hilling | Kristin VanOrman | Logan (Utah) Superior Court |
| 05/24/11 | Murray v. Bybee | Stacey McNeil | Deposition |
| 05/04/10 | Smith V. Betten | Ryan Schriever | Deposition |
| 02/24/10 | Maggliaccio v. Bambrough | Richard Gray | Superior Court (Utah) |

An asterisk (*) designates a malpractice case.

### ALAN J. GOLDMAN, M.D.
*A Professional Corporation*
*Consulting Neurology*
*Diplomate, American Board of Neurology and Psychiatry*

5872 South 900 East, Suite 250
Salt Lake City, Utah  84121

Phone:   (801) 314-2308
FAX:      (801) 441-1730

January 1, 2016

## Dr. Alan Goldman's Fee Schedule

1.)   All professional activities including record reviews, conference calls, meetings, examinations, research, report preparations, pre-deposition and/or pre-court appearance preparations are billed on an hourly basis at **$400.00/hr.**

2.)   Depositions are billed at **$500.00/hr.**

3.)   Court appearances are billed as follows:

    a.) Half-day:  **$ 2,500.00**

    b.) Full-day:  **$ 4,000.00**

4.)   Cancellations are billed as follows:

    a.) Patient Examination/Evaluation

    Failure to appear or cancel within two (2) working days of appointment:  **$ 450.00**

    b.) Court/Arbitration/Deposition appearance

    Case settles or is continued within five (5) working days of expected testimony:  **$1,000.00**

5.)   Out of area travel/expenses are reimbursed at out-of-pocket costs.