Lisa A. Marcy (#5311)
lmarcy@clydesnow.com
**CLYDE SNOW & SESSIONS, P.C.**
201 South Main Street, 13th Floor
Salt Lake City, Utah  84111
Telephone:  801-322-2516
Facsimile:  801-521-6580

John K. Johnson (#3815)
jkjohnson1080@hotmail.com
**JOHN K. JOHNSON, LLC**
10 West 300 South, Suite 800
Salt Lake City, Utah  84101
Telephone:  801-915-2616

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOSHUA CHATWIN,<br><br>        Plaintiff,<br><br>v.<br><br>DRAPER CITY; DRAPER CITY POLICE DEPARTMENT; POLICE CHIEF MAC CONNOLE; OFFICER J. PATTERSON, in his individual and official capacity; OFFICER DAVID HARRIS, in his individual and official capacity; OFFICER HEATHER BAUGH, in her individual and official capacity; and JOHN DOES 1-10,<br><br>        Defendants. | PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br><br>Civil No. 2:14-cv-375<br>Judge Dale A. Kimball<br>Magis. Judge Dustin B. Pead |

Plaintiff, by and through his counsel, responds to Defendants' Motion for Partial

Summary Judgment as follows:

***Plaintiff's Response to Defendants' Statement of Undisputed Facts – Official Policy***

1.      Plaintiff's Amended Complaint alleges that "[Defendants] developed and maintained policies, practices and/or customs exhibiting deliberate indifference" to the laws "prohibiting unlawful seizures" and "excessive force," the laws "requiring provision of necessary and immediate medical care," and the laws "prohibiting deprivation of the constitutional rights of citizens, including Plaintiff."  (Amended Complaint ¶¶ 242-245).

Response:  Undisputed.

2.      The Court's Memorandum Decision and Order filed November 9, 2015 [Docket No. 30], attached hereto as **Exhibit A**, *states* on page 6:

> Whether or not Draper City had a specific policy, there is enough alleged regarding practices and customs to allow a failure to train claim to move forward. The court finds that Chatwin's *Monell* claim adequately puts Draper City on notice of the alleged failures that occurred which led to his harm. Moreover, Chatwin asserts and the court agrees that he cannot identify specific policies that may have contributed to the alleged harm until Draper City turns over the relevant information in discovery.

Response:  Undisputed.

3.      The parties have now conducted discovery, and the deadlines for fact discovery and expert discovery have now passed.  (*See* Docket).

Response:  Undisputed.

4.       Plaintiff has not identified any explicit policy as the moving force behind the harm alleged.

Response:  Disputed.  Specifically controverting the statement contained in paragraph 4, Plaintiff has stated from the time that he filed his Notice of Claim that the City's inadequate training and lack of any adequate City policy on the use of force led to the injuries he sustained

from Patterson on May 18, 2010. Patterson actually testified that he did not remember getting any training on controlling a combative person who was resisting arrest after he left the Academy (Peace Officers Training Academy, a state-run program, "POST"). Exhibit 1, Deposition of Joshua Patterson dated December 7, 2015 ("Patterson Depo."), 30:12-24. Patterson testified that he could not recall, but assumed, that Draper City Police Department ("DCPD") provided training on defensive tactics. Ex. 1, Patterson Depo. 42:20-43:3; 48:4-8. Patterson testified that the last time he received use of force training was "at the academy." Ex. 1, Patterson Depo. 48:20-49:11. Patterson also testified that he and his field training officer only discussed the Utah Code section on deadly force. He could not remember what they discussed. Ex. 1, Patterson Depo. 58:12-59:2. Patterson testified that he did not recall any training on restraining individuals. Ex. 1, Patterson Depo. 67:10-21. Patterson testified that he did not recall receiving any training from DCPD on reasonable force. Ex. 1, Patterson Depo. 69:11-70:19, 24-71:1. Patterson continued that determining the use of force is "vague," because every case is different. The officer must meet the level of force. Ex. 1, Patterson Depo. 71:2-9; 72:1-16. Patterson agreed that police officers fight but rarely train whereas their military cousins train and rarely fight, as discussed in a PowerPoint entitled "Draper City Police Department Defensive Tactics 05/05/2009." He agreed with Plaintiff's counsel that budget and time restraints make it, as noted in the PowerPoint presentation, difficult to provide training. Ex. 1, Patterson Depo. 80:23-82:24.

In response to Plaintiff's Interrogatory No. 2: "Identify any custom and/or procedure that you qualify as training on the use of force, including excessive force, for Draper City Police Officers in effect from 2005 to 2010. For each custom and/or procedure that you qualify as

training on the use of force, identify and describe the name of the custom and/or procedure, the details of the custom and/or procedure; including the use of force on an individual in handcuffs, the name and contact information for the provider(s) of said training, the reason(s) for using the provider(s), the process for implementation of the custom and/or procedure, the training dates, if any, of the custom and/or procedure, and the dates, if any, when each of the defendant officers participated in the custom and/or procedure," Defendants admitted that they had "few records for this time frame [2005-2010] because there was a change in training coordinators and procedure for record keeping." Defendants have never produced any training documents for the time period when Chatwin was injured. Exhibit 2, Response to Interrogatory No. 2, Defendants' Mack Connole and Draper City's Responses to Plaintiff's First Set of Interrogatories ("Draper Interrog. Response"); Exhibit 3, Draper City Police 30(b)(6) Deposition dated December 8, 2015 ("30(b)(6) Depo."), 15:14-19:21.

Kirk Torgensen, Plaintiff's expert witness on the use of force policies of police departments, explained why the Draper City policy was inadequate. He testified that "the problem with the policy is that it is so bare bones, and it is so – it states the **conclusion** that force has to be reasonable. And in my many years of experience, that is not sufficient to guide somebody in what it means, how to comport yourself with it." Exhibit 4, Deposition of Kirk Torgensen dated June 17, 2016 ("Torgensen Depo."), 39:13-18 (emphasis added). He further explained that the policy was inadequate because it should not just state what the law was at the time, that when the officer has to use reasonable force, it must be reasonable. He explained that the policy has to give specifics on directing and guiding officers who are responsible for using force. He called the policy "useless." Ex. 4, Torgensen Depo., 41:1-22. Torgensen further

testified that because the policy was lacking with respect to providing guidance on the use of reasonable force, it was therefore unconstitutional. Ex. 4, Torgensen Depo., 42:7-16. He further opined that because the policy was ambiguous and not clear, it sent a message to the police "that it was not important." Ex. 4, Torgensen Depo., 44:13-24. He explained why the policy was "tremendously lacking." He noted that the many factors listed in the new Draper City Police Department policy adopted in 2013 were an example of a policy that attempted to put in writing what factors need to be considered, such as impairment, including intoxication, the size of the individuals, whether the person is handcuffed, under control, attitude, and type of resistance that the suspect can apply. Ex. 4, Torgensen Depo., 45:13-46:10; 50:8-11, 18-53:23; 78:16-79:13; 80:3-12; Exhibit 5, 2013 DCPD Use of Force Policy attached to 30(b)(6) Depo. as Exhibit 13. He testified that the policy was completely lacking, that it had "absolutely no substance." Ex. 4, Torgensen Depo., 47:4-5. Torgensen further explained that these factors must be considered in their totality and that a sound policy with solid training is critical. "One without the other is not sufficient." Ex. 4, Torgensen Depo., 52:3-6; 80:17-19. Torgensen also confirmed that it was important for cities to have additional training aside from POST, because the POST Academy is limited. He explained that the POST training could not come close to the amount of training that a police officer has to get to become "really proficient at their job." He explained that is why mandatory hours have to be done every year. Ex. 4, Torgensen Depo., 111:5-25. The POST training provides only a foundation for training on the use of force. Ex. 4, Torgensen Depo., 112:1-15. Torgensen was asked by Defendants' counsel about his recollection of Ken Wallentine talking to Torgensen about the need to change policies on the use of force while both individuals worked at the Attorney General's office. Ex. 4, Torgensen Depo. 37:20-38:13.

5.     Plaintiff has produced no evidence of a pattern of incidents in which citizens were injured by the DCPD.

Response:  Undisputed.

6.     Plaintiff has disclosed Kirk Torgensen as an expert witness and filed Mr. Torgensen's Expert Report on January 15, 2016 [Docket No. 34], attached hereto as **Exhibit B**. In his Expert Report, Mr. Torgensen concludes (1) that the DCPD's use of force policy was inadequate because it lacks "any concrete guidance on the factors to consider" to determine when use of force is proper, and (2) that the training provided to Officer Patterson by the DCPD was inadequate.  (Torgensen Expert Report, pgs. 3-4).[1]

Response:  Undisputed that Mr. Torgensen gave these opinions; however, disputed in that Mr. Torgensen made additional conclusions on how the DCPD's use of force policy was inadequate. *See* Response to Statement No. 4.

7.     Mr. Torgensen's Expert Report also states that he based his opinions in part on the fact that in 2013, about three years after the events at issue, the DCPD updated its use of force policy.  (Torgensen Expert Report, pgs. 3-4).

Response:  Disputed. Specifically controverting the statements made in paragraph 7. Torgensen actually stated that whereas he compared the 2010 and 2013 policies, he did so to show that the 2013 policy "is an example of a policy that gives concrete factors to be aware of and of course if there is solid training that teaches officers on how to consider these factors and others, it greatly increases the likelihood of a desired outcome." Ex. 4, Torgensen Depo., Exhibit A, Expert Report of Kirk Torgensen Report. Torgensen also noted that the 2013 policy was an

---

[1] Defendants are not disputing Mr. Torgensen's testimony only for the purposes of summary judgment as to not create a disputed material fact.

example of the kind of policy that gave some factors for an officer to consider when using

excessive force. Ex. 4, Torgensen Depo. 45:16-25. Torgensen testified: "[s]o the 2013 policy, for

me, was a huge step in the right direction in stating things that an officer has to think about and

be aware of." Ex. 4, Torgensen Depo. 46:4-5.

> Q. Okay. And so you relied upon the 2013 policy when you were making
> your decision or stating your opinion regarding the 2010 policy?
> A. **I don't think I relied on it.**
> …
> Q. You didn't do any comparisons. You don't -- in your report, you're not
> making any comparisons to any other report, except for the 2013 policy,
> correct?
> A. **I did not make any comparisons**.

Ex. 4, Torgensen Depo. 46:24-47:2; 48:10-14.

8. In Mr. Torgensen's deposition ("Torgensen Depo."), he admits that Draper City's

use of force policy is a correct statement of the law. Torgensen Depo. 39:23-40:6, excerpt

attached hereto as **Exhibit C**.

<u>Response</u>: Undisputed that Mr. Torgensen said that Draper City's use of force policy "is

a correct statement of the law"; however, it is disputed as to the mischaracterization of that

statement. Specifically controverting the statement contained in paragraph 8, although

Torgensen stated that it was a correct restatement of the Utah State statute at that point, he

explained that a policy cannot "simply flat out state -- what the law is. The policy is to be useful

in directing and guiding and making sure that people who are responsible comply with it. To

state a conclusion that it has to be reasonable, basically tells someone almost nothing." Ex. 4,

Torgensen Depo., 39:23-41:22. Torgensen stated that Draper's conclusory policy, while a true

statement of law, was "useless." He found the policy to be unconstitutional. Ex. 4, Torgensen Depo., 42:5-16.

9. Plaintiff has not produced evidence of inadequate training. Plaintiff's expert witness, Mr. Torgensen, has stated that in his opinion, one officer, Officer Patterson, received inadequate training due to a lack of evidence of training provided to him by the DCPD.

Response: Disputed. Specifically controverting the facts contained in paragraph 9, Defendants have made no citation to the record. Torgensen never testified as such. Patterson actually testified that he did not remember getting any training on controlling a combative person who was resisting arrest after he left the Academy. Ex. 1, Patterson Depo. 30:12-24. Patterson testified that he could not recall, but assumed, that DCPD provided training on defensive tactics. Ex. 1, Patterson Depo. 42:20-43:3; 48:4-8. Patterson testified that the last time he received use of force training was "at the academy." Ex. 1, Patterson Depo. 48:20-49:11. Patterson also testified that he and his field training officer only discussed the Utah Code section on deadly force (the same circuitous language of "reasonableness" in question). He could not remember what they discussed. Ex. 1, Patterson Depo. 58:12-59:2. Patterson testified that he did not recall any training on restraining individuals. Ex. 1, Patterson Depo. 67:10-21. Patterson testified that he did not recall receiving any training from DCPD on reasonable force. Ex. 1, Patterson Depo. 69:11-70:19-71:1. Patterson continued that determining the use of force is vague, because every case is different. The officer must meet the level of force. Ex. 1, Patterson Depo. 71:2-9; 72:1-16. Patterson agreed that police officers fight but rarely train whereas their military cousins train and rarely fight, as discussed in a PowerPoint entitled "Draper City Police Department Defensive Tactics 05/05/2009." He agreed with Plaintiff's counsel that budget and time restraints make it,

as noted in the PowerPoint presentation, difficult to provide training. Ex. 1, Patterson Depo. 80:23-82:24.

In response to Plaintiff's Interrogatory No. 2: "Identify any custom and/or procedure that you qualify as training on the use of force, including excessive force, for Draper City Police Officers in effect from 2005 to 2010. For each custom and/or procedure that you qualify as training on the use of force, identify and describe the name of the custom and/or procedure, the details of the custom and/or procedure; including the use of force on an individual in handcuffs, the name and contact information for the provider(s) of said training, the reason(s) for using the provider(s), the process for implementation of the custom and/or procedure, the training dates, if any, of the custom and/or procedure, and the dates, if any, when each of the defendant officers participated in the custom and/or procedure," Defendants admitted that they had "few records for this time frame [2005-2010] because there was a change in training coordinators and procedure for record keeping." Defendants have never produced any training documents for the time period when Chatwin was injured. Ex. 2, Draper Interrog. Response; Ex. 3, 30(b)(6) Depo. 15:14-19:21.

10. Officer Patterson entered the police academy in January of 2009 and graduated about ten months later, in late 2009. Deposition of Joshua Patterson ("Patterson Depo.") 11:17-19, 13:17-14:8, attached hereto as **Exhibit D**.

Response: Undisputed.

11. The incident at issue regarding the alleged injury to Plaintiff occurred about eight months after Officer Patterson graduated from the police academy.

<u>Response</u>:  Disputed.  No citation to the record exists here; however, it is undisputed that the incident at issue occurred on May 18, 2010.

12.      Officer Patterson received training on use of force at the Academy. Patterson Depo. 49:6-11; Torgensen Depo. 23:13-25:7.

<u>Response</u>:  Undisputed.

13.      Officer Patterson also received training on use of force from his field training officer when he joined the DCPD.  Patterson Depo. 49:25-52:18, 54:5-56:3, 58:8-59:2.

<u>Response</u>:  Disputed.  Specifically controverting the facts contained in paragraph 13: Patterson did not testify that he received training from his field training officer when he joined the DCPD.  He actually testified as follows:  Patterson's field training officer and Patterson only <u>discussed</u> training, but Patterson could not recall what he and his field training officer discussed about the category "violently resist during control and restraint," "violently resist after being restrained," "department policy," "intoxicated persons" and "use of force."  Ex. 1, Patterson Depo. 56:18-58:1, 12-59:2.

***Plaintiff's Response to Municipal Defendants' Statement of Undisputed Facts – Causation***

1.      Plaintiff has failed to provide or identify any evidence during discovery of an official custom or policy that was the "moving force" behind the constitutional violations alleged in his Amended Complaint.

<u>Response</u>:  Disputed.  Specifically controverting the statement contained in paragraph 1, Plaintiff has stated from the time that he filed his Notice of Claim that the City's inadequate training and lack of any adequate City policy on the use of force led to the injuries he sustained from Patterson on May 18, 2010.  Patterson actually testified that he did not remember getting

any training on controlling a combative person who was resisting arrest after he left the Academy. Ex. 1, Patterson Depo. 30:12-24. Patterson testified that he could not recall, but assumed, that DCPD provided training on defensive tactics.  Ex. 1, Patterson Depo. 42:20-43:3; 48:4-8. Patterson testified that the last time he received use of force training was "at the academy." Ex. 1, Patterson Depo. 48:20-49:11. Patterson also testified that his field training officer and he only <u>discussed</u> the Utah Code section on deadly force.  He could not remember what they discussed.  Ex. 1, Patterson Depo. 58:12-59:2. Patterson testified that he did not recall any training on restraining individuals.  Ex. 1, Patterson Depo. 67:10-21. Patterson testified that he did not recall receiving any training from DCPD on reasonable force.  Ex. 1, Patterson Depo. 69:11-70:19, 24-71:1.  Patterson continued that determining the use of force is "vague," because every case is different.  The officer must meet the level of force.  Ex. 1, Patterson Depo. 71:2-9; 72:1-16.  Patterson agreed that police officers fight but rarely train whereas their military cousins train and rarely fight, as discussed in a PowerPoint entitled "Draper City Police Department Defensive Tactics 05/05/2009".  He agreed with Plaintiff's counsel that budget and time restraints make it, as noted in the PowerPoint presentation, difficult to provide training.  Ex. 1, Patterson Depo. 80:23-82:24.

In response to Plaintiff's Interrogatory No. 2:  "Identify any custom and/or procedure that you qualify as training on the use of force, including excessive force, for Draper City Police Officers in effect from 2005 to 2010.  For each custom and/or procedure that you qualify as training on the use of force, identify and describe the name of the custom and/or procedure, the details of the custom and/or procedure; including the use of force on an individual in handcuffs, the name and contact information for the provider(s) of said training, the reason(s) for using the

provider(s), the process for implementation of the custom and/or procedure, the training dates, if any, of the custom and/or procedure, and the dates, if any, when each of the defendant officers participated in the custom and/or procedure," Defendants admitted that they had "few records for this time frame [2005-2010] because there was a change in training coordinators and procedure for record keeping." Defendants have never produced any training documents for the time period when Chatwin was injured. Ex. 2, Draper Interrog. Response; Ex. 3, 30(b)(6) Depo. 15:14-19:21.

Kirk Torgensen, Plaintiff's expert witness on the use of force policies of police departments, explained why the Draper City policy was inadequate. He testified that "the problem with the policy is that it is so bare bones, and it is so – it states the **conclusion** that force has to be reasonable. And in my many years of experience, that is not sufficient to guide somebody in what it means, how to comport yourself with it." Ex. 4, Torgensen Depo. 39:13-18 (emphasis added). He further explained that the policy was inadequate because it could not just state what the law was at the time "that when the officer has to use reasonable force, it must be reasonable." He explained that the policy has to give specifics on directing and guiding officers who are responsible for using force. He called the policy "useless." Ex. 4, Torgensen Depo. 41:1-22. Torgensen further testified that because the policy was lacking with respect to providing guidance on the use of reasonable force, it was therefore, unconstitutional. Ex. 4, Torgensen Depo. 42:7-16. He further opined that because the policy ambiguous and not clear, it sent a message to the police that "it was not important." Ex. 4, Torgensen Depo. 44:13-24. He explained why the policy was "tremendously lacking." He noted that the many factors listed in the new policy adopted in 2013 were an example of a policy that attempted to put in writing what

factors need to be considered, such as impairment, including intoxication, the size of the individuals, whether the person is handcuffed, under control, attitude, and type of resistance that the suspect can apply. Ex. 4, Torgensen Depo. 45:13-46:10; 50:8-11, 18-51:23; 78:16-79:13; 80:3-12. He testified that the policy was completely lacking, that it had "absolutely no substance." Ex. 4, Torgensen Depo. 47:4-5. Torgensen further explained that these factors must be considered in their totality and that a sound policy with solid training is critical. "One without the other is not sufficient." Ex. 4, Torgensen Depo. 52:3-6; 80:17-19. Torgensen also confirmed that it was important for cities to have additional training aside from POST, because the POST Academy is limited. He explained that the POST training could not come close to the amount of training that a police officer has to get to become "really proficient at their job." He explained that is why these mandatory hours have to be done every year. Ex. 4, Torgensen Depo. 111:5-25. The POST training provides only a foundation for training on the use of force. Ex. 4, Torgensen Depo. 112:1-15.

2.      In Mr. Torgensen's deposition, he admits that Draper City's use of force policy is a correct statement of the law. Torgensen Depo. 39:23-40:6.

<u>Response</u>: Undisputed that Mr. Torgensen said that Draper City's use of force policy "is a correct statement of the law"; however, it is disputed as to the mischaracterization of that statement. Specifically controverting the statement contained in paragraph 8, although Torgensen stated that it was a correct restatement of the Utah State statute at that point, he explained that a policy cannot "simply flat out state -- what the law is. The policy is to be useful in directing and guiding and making sure that people who are responsible comply with it. To state a conclusion that it has to be reasonable, basically tells someone almost nothing." Ex. 4,

Torgensen Depo. 39:23-41:22. Torgensen stated that Draper's conclusory policy, while a true statement of law, was "useless." He found the policy to be unconstitutional. Ex. 4, Torgensen Depo. 42:5-16.

      3.      Plaintiff has not challenged the Utah state statute or the use of force policy as being unconstitutional or incorrect on their face.

    <u>Response</u>: Disputed. Specifically controverting the statement made in paragraph 3, Plaintiff stated in his Amended Complaint:

> 209.    Draper City, the Draper City Police Department, and Police Chief Connole possess the final decision-making authority to create the unconstitutional policies or practices, which resulted in the deprivation of rights suffered by Plaintiff.
> 210.    Draper City, the Draper City Police Department, and Police Chief Connole possess the final decision-making authority to create the unconstitutional policies or practices, which resulted in the damages suffered by Plaintiff.
> 211.    Draper City, the Draper City Police Department, and Police Chief Connole were the moving forces behind the constitutional violations suffered by Plaintiff.
> …
> 214.    Draper City, the Draper City Police Department, and Police Chief Connole, through their agents and employees, were responsible for the policies and practices of the Draper City Police Department.
> …
> 236.    By omissions, or acts of commission, Draper City, the Draper City Police Department and Police Chief Connole failed to properly train, supervise and/or discipline Officer Patterson.
> 237.    By omissions, or acts of commission, Draper City, the Draper City Police Department and Police Chief Connole failed to properly train, supervise and/or discipline Officer Harris.
> 238.    By omissions, or acts of commission, Draper City, the Draper City Police Department and Police Chief Connole failed to properly train, supervise and/or discipline Officer Baugh.

Docket No. 12.

In addition, Kirk Torgensen, when asked by Plaintiff's counsel, whether he thought that the use of force policy was unconstitutional, he replied that it was. Ex. 4, Torgensen Depo. 42:5-16.

4.　　Plaintiff has produced no evidence in discovery of an official or unofficial policy or custom that was the moving force behind the harms alleged.

Response: Disputed. Specifically controverting the statement contained in paragraph 4, Plaintiff has stated from the time that he filed his Notice of Claim that the City's inadequate training and lack of any adequate City policy on the use of force led to the injuries he sustained from Patterson on May 18, 2010. Patterson actually testified that he did not remember getting any training on controlling a combative person who was resisting arrest after he left the Academy. Ex. 1, Patterson Depo. 30:12-24. Patterson testified that he could not recall, but assumed, that DCPD provided training on defensive tactics. Ex. 1, Patterson Depo. 42:20-43:3; 48:4-8. Patterson testified that the last time he received use of force training was "at the academy." Ex. 1, Patterson Depo. 48:20-49:11. Patterson also testified that his field training officer and he only discussed the Utah Code section on deadly force. He could not remember what they discussed. Ex. 1, Patterson Depo. 58:12-59:2. Patterson testified that he did not recall any training on restraining individuals. Ex. 1, Patterson Depo. 67:10-21. Patterson testified that he did not recall receiving any training from DCPD on reasonable force. Ex. 1, Patterson Depo. 69:11-70:19, 24-71:1. Patterson continued that determining the use of force is "vague," because every case is different. The officer must meet the level of force. Ex. 1, Patterson Depo. 71:2-9; 72:1-16. Patterson agreed that police officers fight but rarely train whereas their military cousins train and rarely fight, as discussed in a PowerPoint entitled "Draper City Police Department

Defensive Tactics 05/05/2009."  He agreed with Plaintiff's counsel that budget and time restraints make it, as noted in the PowerPoint presentation, difficult to provide training.  Ex. 1, Patterson Depo. 80:23-82:24.

In response to Plaintiff's Interrogatory No. 2:  "Identify any custom and/or procedure that you qualify as training on the use of force, including excessive force, for Draper City Police Officers in effect from 2005 to 2010.  For each custom and/or procedure that you qualify as training on the use of force, identify and describe the name of the custom and/or procedure, the details of the custom and/or procedure; including the use of force on an individual in handcuffs, the name and contact information for the provider(s) of said training, the reason(s) for using the provider(s), the process for implementation of the custom and/or procedure, the training dates, if any, of the custom and/or procedure, and the dates, if any, when each of the defendant officers participated in the custom and/or procedure," Defendants admitted that they had "few records for this time frame [2005-2010] because there was a change in training coordinators and procedure for record keeping."  Defendants have never produced any training documents, including for any officers, for the time period when Chatwin was injured.  Ex. 2, Draper Interrog. Response; Ex. 3, 30(b)(6) Depo. 15:14-19:21.

Kirk Torgensen, Plaintiff's expert witness on the use of force policy of Draper City, explained why the Draper City policy was inadequate.  He testified that "the problem with the policy is that it is so bare bones, and it is so – it states the **conclusion** that force has to be reasonable.  And in my many years of experience, that is not sufficient to guide somebody in what it means, how to comport yourself with it."  Ex. 4, Torgensen Depo. 39:13-18 (emphasis added).  He further explained that the policy was inadequate because it could not just state what

the law was at the time, "that when the officer has to use reasonable force, it must be reasonable." He explained that the policy has to give specifics on directing and guiding officers who are responsible for using force. He called the policy "useless." Ex. 4, Torgensen Depo. 41:1-22. Torgensen further testified that because the policy was lacking with respect to providing guidance on the use of reasonable force, it was therefore unconstitutional. Ex. 4, Torgensen Depo. 42:7-16. He further opined that because the policy was ambiguous and not clear, it sent a message to the police that it was not important. Ex. 4, Torgensen Depo. 44:13-24. He explained why the policy was "tremendously lacking." He noted that the many factors listed in the new policy adopted in 2013 were an example of a policy that attempted to put in writing what factors need to be considered, such as impairment, including intoxication, the size of the individuals, whether the person is handcuffed, under control, attitude, and type of resistance that the suspect can apply. Ex. 4, Torgensen Depo. 45:13-46:10; 50:8-11, 18-51:23; 78:16-79:13; 80:3-12. He testified that the policy was completely lacking, that it had "absolutely no substance." Ex. 4, Torgensen Depo. 47:4-5. Torgensen further explained that these factors must be considered in their totality and that a sound policy with solid training is critical. "One without the other is not sufficient." Ex. 4, Torgensen Depo. 52:3-6; 80:17-19. Torgensen also confirmed that it was important for cities to have additional training aside from POST, because the POST Academy is limited. He explained that the POST training could not come close to the amount of training that a police officer has to get to become "really proficient at their job." He explained that is why these mandatory hours have to be done every year. Ex. 4, Torgensen Depo. 111:5-25. The POST training provides only a foundation for training on the use of force. Ex. 4, Torgensen Depo. 112:1-15.

5.      Plaintiff has produced no evidence in discovery of a pattern of incidents in which citizens were injured by the DCPD.

<u>Response</u>:  Undisputed.

6.      Plaintiff has not produced evidence of inadequate training. Plaintiff's expert witness, Mr. Torgensen, has stated that in his opinion, one officer, Officer Patterson, received inadequate training due to a lack of evidence of training provided to him by the DCPD.

<u>Response</u>:  Disputed.  Specifically controverting the statement in paragraph 6, Defendants have made no citation to the record. Torgensen did not testify as such. Patterson actually testified that he did not remember getting any training on controlling a combative person who was resisting arrest after he left the Academy. Ex. 1, Patterson Depo. 30:12-24. Patterson testified that he could not recall, but assumed, that DCPD provided training on defensive tactics. Ex. 1, Patterson Depo. 42:20-43:3; 48:4-8. Patterson testified that the last time he received use of force training was "at the academy." Ex. 1, Patterson Depo. 48:20-49:11. Patterson also testified that his field training officer and he only <u>discussed</u> the Utah Code section on deadly force.  He could not remember what they discussed.  Ex. 1, Patterson Depo. 58:12-59:2. Patterson testified that he did not recall any training on restraining individuals.  Ex. 1, Patterson Depo. 67:10-21. Patterson testified that he did not recall receiving any training from DCPD on reasonable force. Ex. 1, Patterson Depo. 69:11-70:19, 24-71:1.  Patterson continued that determining the use of force is "vague," because every case is different.  The officer must meet the level of force.  Ex. 1, Patterson Depo. 71:2-9; 72:1-16.  Patterson agreed that police officers fight but rarely train whereas their military cousins train and rarely fight, as discussed in a power point entitled "Draper City Police Department Defensive Tactics 05/05/2009."  He agreed with Plaintiff's

counsel that budget and time restraints make it, as noted in the PowerPoint presentation, difficult to provide training.  Ex. 1, Patterson Depo. 80:23-82:24.

In response to Plaintiff's Interrogatory No. 2:  "Identify any custom and/or procedure that you qualify as training on the use of force, including excessive force, for Draper City Police Officers in effect from 2005 to 2010.  For each custom and/or procedure that you qualify as training on the use of force, identify and describe the name of the custom and/or procedure, the details of the custom and/or procedure; including the use of force on an individual in handcuffs, the name and contact information for the provider(s) of said training, the reason(s) for using the provider(s), the process for implementation of the custom and/or procedure, the training dates, if any, of the custom and/or procedure, and the dates, if any, when each of the defendant officers participated in the custom and/or procedure," Defendants admitted that they had "few records for this time frame [2005-2010] because there was a change in training coordinators and procedure for record keeping."  Defendants have never produced any training documents, including for any other officers, for the time period when Chatwin was injured.  Ex. 2, Draper Interrog. Response; Ex. 3, 30(b)(6) Depo. 15:14-19:21.

7.       Officer Patterson entered the police academy in January of 2009 and graduated about ten months later, in late 2009. Patterson Depo. 11:17- 19, 13:17-14:8.

Response:  Undisputed.

8.       The incident at issue regarding the alleged injury to Plaintiff occurred about eight months after Officer Patterson graduated from the police academy.

Response:  Disputed.  This statement contains no citations to the record; however, the incident at issue occurred on May 18, 2010.

9.     Officer Patterson received training on use of force at the academy. Patterson Depo. 49:6-11; Torgensen Depo. 23:13-25:7.

Response:  Undisputed.

10.     Officer Patterson also received training on use of force from his field training officer when he joined the DCPD.  Patterson Depo. 49:25-52:18, 54:5-56:3, 58:8-59:2.

Response:  Disputed.  Specifically controverting the facts contained in paragraph 10: Patterson did not testify that he received training from his field training officer when he joined the DCPD.  He actually testified as follows:  Patterson's field training officer and Patterson only discussed training, but Patterson could not recall what he and his field training officer discussed about the category "violently resist during control and restraint," "violently resist after being restrained," "department policy," "intoxicated persons" and "use of force."  Ex. 1, Patterson Depo. 56:18-58:1, 12-59:2.

### *Plaintiff's Response to Municipal Defendants' Statement of Undisputed Facts – State of Mind*

1.     Plaintiff alleges in his Amended Complaint that "[Defendants] developed and maintained policies, practices and/or customs exhibiting deliberate indifference." (Amended Complaint ¶¶ 242-45).

Response:  Disputed.  Defendants failed to include the rest of the language contained in those paragraphs: Paragraph 242 ends with "to the laws prohibiting unlawful seizures." Paragraph 243 ends with "to the laws prohibiting the use of excessive force."  Paragraph 244 ends with "to the laws requiring the provision of necessary and immediate medical care. Paragraph 245 ends with "to the laws prohibiting deprivation of the constitutional rights of citizens, including Plaintiff." Undisputed that Plaintiff alleged deliberate indifference.

2.    Plaintiff has not produced or identified any evidence that Draper City acted with deliberate indifference.

Response:  Disputed.  Specifically controverting the statements contained in paragraph 2, Plaintiff's expert Kirk Torgensen testified extensively about the unconstitutional policies and Draper City's failure to train.  Ex. 4, Torgensen Depo. 23:13-25:7; 39:13-18, 23-41:22; 42:5-16; 44:13-24; 45:13-46:10; 47:4-5; 50:8-11, 18-19; 51:6, 8-23; 52:3-6, 17-53:22; 78:16-79:13; 80:3-12; 80:17-19; 111:5-25; 112:1-15.  Defendants themselves admitted that they possessed few records concerning the years 2005 through 2010.  They have never produced any training records for the year 2010.  Ex. 2, Draper Interrog. Response; Ex. 3, 30(b)(6) Depo. 15:14-19:21; 25:17-28:23; 35:10-18.  After taking a break with its counsel during a pending question, the 30(b)(6) designee, Deputy Police Chief John Eining, returned and pointed to the three pages about reasonableness as being the only use of force policies for 2010, Ex. 3, 30(b)(6) Depo. 49:3-20; Exhibit 6, Draper City Police Department's 2010 Use of Force Policy [Bates Nos. 3273-3275].  The 30(b)(6) designee for Draper City claimed that records were missing on the training on the use of force in 2010.  Ex. 3, 30(b)(6) Depo. 56:23-60:16; 118:4-13.

"Failure to provide adequate medical care is a violation of the Eighth Amendment if it is a result of deliberate indifference to a prisoner's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97 (1976). Witness Jason Scott provided testimony that instead of attending to Chatwin, the officers were at the other end of the driveway, smiling and laughing. Exhibit 7, Deposition of Jason Scott dated November 20, 2015, ("Scott Depo."), 82:20-83:1; 101:20-103:2; and Witness Statement attached to Scott Depo. as Plaintiff's Exhibit 2. "[A] highly predictable consequence of the failure to train [is] the delay or denial of medical care to an acutely ill inmate." *Montoya*,

115 F. Supp. 3d at 1285. "Essentially, the officer must be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' Where disputed material facts implicate either of the two questions of whether a serious medical need existed or whether an officer was deliberately indifferent to it, a court may not grant summary judgment." *Olsen*, 312 F.3d 1304, 1315-16 (internal citations omitted).

3.  Plaintiff has not produced or identified any evidence of a pattern of tortious conduct by the DCPD.

<u>Response</u>:  Disputed.  Specifically controverting the statements contained in paragraph 3, Officer Patterson testified that he pivoted Chatwin around 270° while Chatwin was handcuffed, standing on concrete.  Ex. 1, Patterson Depo. 139:3-23. Witness Jason Scott testified that he saw Chatwin face down on the driveway and that the police officers were laughing in a group.  Ex. Scott Depo. 82:20-83:1; 101:20-103:2; and Witness Statement attached to Scott Depo. as Plaintiff's Exhibit 2.  Patterson testified at the criminal preliminary hearing that Chatwin hit his head "pretty hard."  Exhibit 8, Transcript of Preliminary Hearing ("Prelim. Tr."), 37:21.  The only independent witness, neighbor Kathy Torrence, reported that despite Patterson's testimony at the preliminary hearing, and as stated in his police officer's report, that he moved Chatwin to the ground because Chatwin had unlocked the officer's retention gun and was arching his back to head-butt the officer, Torrence said that absolutely did not happen.  She guaranteed it.  She could see Chatwin's hands and the officer's belt.  All Chatwin did was to say something to Patterson and then Patterson grabbed Chatwin and threw him to the ground.  Chatwin also did not jerk his head back in such a fashion as described by Patterson.  Exhibit 9, Deposition of Kathy Torrence dated November 19, 2015 ("Torrence Depo."), 27:18-28:9; 30:11-32:5; 33:8-35:6; 60:3-10; 61:2-

62:5; 63:4-64:1. Torrence testified that Chatwin was thrown to the ground while handcuffed behind his back, while the officers failed to check on him or provide any medical attention. Ex. 9, Torrence Depo. 106:22-107:10.

4.      Officer Patterson received training on use of force at the academy. Patterson Depo. 49:6-11; Torgensen Depo. 23:13-25:7.

Response:  Undisputed.

5.      Officer Patterson also received training on use of force from his field training officer when he joined the DCPD.  Patterson Depo. 49:25-52:18, 54:5-56:3, 58:8-59:2.

Response:  Disputed.  Specifically controverting the facts contained in paragraph 5: Patterson did not testify that he received training from his field training officer when he joined the DCPD.  He actually testified as follows:  Patterson and his field training officer only discussed training, but he recognized that he could not recall what he and his field training officer discussed about the category "violently resist during control and restraint," "violently resist after being restrained," "department policy," "intoxicated persons" and "use of force."  Ex. 1, Patterson Depo. 56:18-58:1, 12-59:2.

## STATEMENT OF ADDITIONAL DISPUTED FACTS

1.      On May 18, 2010, Sgt. Harris responded to an "ATL broadcast" (attempt to locate) on a vehicle that had left the State liquor store. Dispatch ran the license plate provided by the liquor store clerk and the associated address was 12534 South 150 East, Draper [Chatwin's parents' house]. Harris waited at that address. The vehicle arrived. Ex. 8, Prelim. Tr. 5:7-25.

2.      Officer David Harris testified that on May 18, 2010, he arrested Joshua Chatwin for a DUI.  Ex. 10, Harris Depo. 18:18-19.

3.      When Sgt. Harris initially interacted with Chatwin, he stated that Chatwin was "very quiet." For instance, Chatwin handed the keys to Sgt. Harris without saying anything. Exhibit 10, Deposition of David Harris dated December 9, 2015 ("Harris Depo."), 72:23-77:10. As for the degree of potential threat, Sgt. Harris concedes that Chatwin was compliant. Sgt. Harris stated that Chatwin was "very cooperative up to that point [the last field sobriety test]." Ex. 10, Harris Depo. 82:21-24.

4.      He turned Chatwin over to Officer Patterson while he went to prepare Chatwin's vehicle for impound.  When he turned around from photographing the vehicle, he noticed Chatwin lying on the ground, unconscious.  He called for medical help.  Ex. 10, Harris Depo. 18:23-19:12.

5.      When Sgt. Harris turned around, he saw Chatwin's head in the gutter and his body was face down.  Ex. 10, Harris Depo. 23:21-25.

6.      Blood was emanating from Chatwin's left ear facing down on the ground.  Ex. 10, Harris Depo. 24:5-15.

7.      Sgt. Harris was worried about Chatwin's condition, so he called dispatch a second time, because they were taking a long time to arrive. Ex. 10, Harris Depo. 26:10-27:5.

8.      Sgt. Harris took photographs of Chatwin after the incident on May 18, 2010.  Ex. 10, Harris Depo. 40:16-41:20. *See* photos attached to Harris Depo. as Exhibit 5.

9.      Sgt. Harris testified that although Chatwin became argumentative during the last field sobriety test, he did not yell, fight, squirm or take any aggressive actions toward him.  Ex. 10, Harris Depo. 87:8-88:8.

10. Patterson testified, however, that Chatwin became louder and more argumentative, more uncooperative, agitated and more aggressive and was moving around during that same field sobriety test. Ex. 1, Patterson Depo. 86:9-87:17. Patterson stated that Chatwin became verbally combative and angry. Chatwin squirmed and "pulled against [him]." Ex. 1, Patterson Depo. 90:4-19; 91:23-25.

11. Patterson claims that Chatwin began fumbling with the front of Patterson's gun belt. Ex. 1, Patterson Depo. 92:6-20.

12. Patterson escorted Chatwin over to Sgt. Harris' patrol vehicle and leaned him over the vehicle in an attempt to get more control. Ex. 1, Patterson Depo. 93:18-94:13.

13. Patterson testified that he told Chatwin to comply but Chatwin kept saying "F___ You, A__hole. Let go of me." He continued to struggle when Patterson heard the retention lock on his weapon holster unlock. Seeing that Chatwin had unlocked it and had his right hand on the gun, he feared for his safety as well as the other officers. Patterson ordered Chatwin to let go, as Chatwin arched his back and swung his head back toward Patterson's face, attempting to head-butt him. Patterson attached his left hand on the handcuffs and pulled his hands away from Patterson's weapon. Patterson then attached his right hand on Chatwin's right bicep and "moved him down and away from [his] primary weapon side." Ex. 1, Patterson Depo. 95:13-96:8; 102:9-103:16.

14. Patterson was trained to take those actions at the Police Academy only. Ex. 1, Patterson Depo. 103:17-20.

15. Patterson stated that he pivoted Chatwin around and that is when Chatwin fell to the ground. Ex. 1, Patterson Depo. 105:16-18. When Patterson moved Chatwin away, Chatwin

went limp.  Ex. 1, Patterson Depo. 106:15-18. He claimed that he "placed" Chatwin into a prone

position, meaning lying down on the ground, lying flat.  Ex. 1, Patterson Depo. 106:19-22.

16.     Witness Mehdi Mahmoudi, a neighbor, testified that while changing a car tire in

his driveway, he heard a noise like something dropping on the ground.  He looked up and saw

Chatwin on the ground not moving. Exhibit 11, Deposition of Mehdi Mahmoudi dated

November 20, 2015 ("Mahmoudi Depo.") 10:20-25.

17.     Patterson testified that he had control of Chatwin with both hands on him until he

ended on the ground.  He directed him into a prone position on the ground, face down.  Ex. 1,

Patterson Depo. 111:13-112:11.

18.     Patterson stated that he had to turn Chatwin at least 270° as he moved him to the

ground.  Ex. 1, Patterson Depo. 139:3-23.

19.     Witness Jason Scott testified that on May 18, 2010, he saw Chatwin face down on

the driveway.  He stated that the police officers were laughing in a group. Ex. 7, Scott Depo.

82:20-83:1; 101:20-103:2; and Witness Statement attached to Scott Depo. as Plaintiff's Exhibit

2. No officers were attending to the subject or moving him. However, Sgt. Harris and Patterson

stated that they remained with Chatwin the entire time near the end of the driveway until the

paramedics arrived.  Ex.1, Patterson Depo. 143:11-21; Ex. 10, Harris Depo. 46:3-9. Jason Scott

testified that:

> A.     … they were jolly and giggly and kind of like different than I would be if I
> had just seen a person either -- if that person fell down on their own, I
> guess they might think that's funny, but I guess I don't. If they somehow
> took him to the ground and he got hurt, that's also not the way I'd react.
> Either way, I'd be down there checking on the guy.
>
> Q.     So go head and tell us more about what you mean by -- what did you say
> giggly?

A.      They had all smiles and they were all like pretty pleased with themselves with whatever happened.

Q.      How do you know that?

A.      Smiles and joking back and forth and giggly like they were, you know, and then when I came over there, they went more quiet and then they, you know.

Ex. 7, Scott Depo. 64:22-65:11.

20.     Patterson testified at the criminal preliminary hearing that "I mean, it seemed like he hit his head pretty hard." Ex. 8, Prelim. Tr. 37:21.

21.     However, an independent witness who actually saw the incident, Kathy Torrence, a neighbor of Chatwin, reported that she was standing in front of her window across the street from Chatwin's house. She watched the officers conduct a field sobriety test. She saw the first officer arrive (Sgt. Harris), the second officer (Patterson) and an animal control officer (Heather Baugh). She watched Sgt. Harris stay with the car and go through the car. Ex. 9, Torrence Depo. 17:7-20:17. She watched the officers walk Chatwin, handcuffed, back to one of the trucks close to the end of the driveway. Ex. 9, Torrence Depo. 22:3-23:18. From her window, she could see Chatwin's hands and the officer's belt. Ex. 9, Torrence Depo. 27:18-28:17. They were two feet apart. Ex. 9, Torrence Depo. 29:3-12. She saw Chatwin looking to his right, say something to Patterson, and then Patterson "grabbed him and threw him to the ground." She saw his lips moving but could not hear anything. Ex. 9, Torrence Depo. 30:15-33:21. She saw Chatwin land on his head. Ex. 9, Torrence Depo. 35:1-6. She testified that Patterson "whipped [Chatwin] around so hard that when he hit the pavement, his head bounced up." Ex. 9, Torrence Depo. 53:24-54:17. Torrence was absolutely positive and guaranteed that Chatwin did not undo the gun clip on the officer's belt. Ex. 9, Torrence Depo. 61:2-62:9. Chatwin also did not jerk back simultaneously. Ex. 9, Torrence Depo. 61:2-62:5.

22.     Plaintiff's expert on the use of force by police officers, Trevor Petersen, currently holds instructor certifications with the Federal Bureau of Investigations (FBI) and the National Technical Officers Association (NTOA). He was a certified law enforcement officer for the Utah State Parks and Recreation, Kane County Sheriff's Office as a narcotic and undercover agent, and the Weber County Sheriff's Office, serving in many capacities, including, patrol, Field Training Officer, SWAT, less-lethal weapons/chemical munitions instructor, firearms instructor, gang/organized crime investigator, homicide investigator, and Use of Force Committee Member, criminal intelligence, financial crime investigator, Internet Crimes Against Children (ICAC) Investigator, and Utah (POST) police academy instructor. As an instructor, Petersen drafted and instructed training and policies designed to ensure the safety of law enforcement officers, arrestees, and citizens. He also conducted training classes involving the use of force involving individuals under the influence of alcohol. Exhibit 12, Trevor Petersen Deposition dated July 13, 2016 ("Petersen Depo.") 36:4-23; 38:11-14; and Exhibit 13, Expert Report of Trevor Petersen, dated January 14, 2016 ("Petersen Report"), at 1-2.

23.     Petersen explained how the level of intoxication of an individual affects the amount of force to be used. For example, one has to identify the potential arrestee's state of mind, their abilities dealing with reaction time, and delayed responses. Ex. 12, Petersen Depo. 45:14-48:9.

24.     As a member of the Use of Force Committee with the Weber County Sheriff's Office, Petersen would meet quarterly with the other members to review all of the incidents where the officers used force. Petersen reviewed anywhere from 60 to 100 incidents per yearly quarter. Ex. 12, Petersen Depo. 72:2-19. During those committee meetings, the members,

including Petersen, would consider, while evaluating the use of force, the mental and physical condition of the person being arrested, the types of force, soft- or hard-hand techniques, aerosols, tasers, and impact weapons. Ex. 12, Petersen Depo. 72:20-73:4.

25.     Petersen also reviewed another officer's use of force to determine whether it was reasonable. In 2010 or 2011, Grand County Sheriff requested that Weber County Sheriff's Office assist with the investigation of Brody Young, a State Park Ranger who was shot multiple times in Moab, Utah. Petersen was assigned to be the use-of-force investigator to evaluate whether the officer had used appropriate force. Ex. 12, Petersen Depo. 71:9-23.

26.     During that time, Petersen also taught many law enforcement related courses involving arrest control. Ex. 13, Petersen Report at 2. He wrote, drafted and instructed training and policies designed to ensure the safety of law enforcement officers, arrestees, and citizens. Ex. 13. Petersen Report at 3.

27.     Petersen served as a Law Enforcement Professional (LEP) in Afghanistan. He trained the Afghanistan National Police and Coalition forces on law enforcement related subjects, including detainee operations, the use of less-lethal munitions and use of force. Ex. 13, Petersen Report at 3.

28.     Following that employment, he served as a Police Advisor, working with the United States Department of State and the United Nations in Haiti as an Assistant Team Lead for the United Nations Special Weapons And Tactics (SWAT) Unit. In 2014-2015, Petersen provided training and oversight of the Haitian and Jordanian SWAT teams. He trained and evaluated the SWAT teams on many subjects, including arrest control tactics and use of force. Ex. 13, Petersen Report at 3; Ex. 12, Petersen Depo. 80:10-18.

29.     Petersen concluded that on May 18, 2010, Officer Patterson did not take the proper safety precautions, considering the intoxication level of Chatwin, Chatwin being in handcuffs on a concrete surface, and Patterson's failure to use the proper arrest control tactics, weapon retention tactics and use of force, while interacting with an arrestee, as proper law enforcement training would have provided. Ex. 13, Petersen Report at 4.

30.     It is Petersen's opinion that Patterson used excessive force in executing the arrest of Josh Chatwin. Ex. 13, Petersen Report at 3.

31.     He further concluded that the training provided by Draper City to its officers concerning the proper procedures to execute the arrest of a handcuffed, intoxicated individual was "completely inadequate." Ex. 13, Petersen Report at 4. Petersen gave certain bases for his opinions. For example, he explained that because Chatwin was so intoxicated, pursuant to Patterson's testimony, Patterson should have put Chatwin into a kneeling or prone position, considering the concrete, so that he did not fall during the search. Placing Chatwin next to the patrol truck to conduct a search of Chatwin's person put him at greater risk of injury, because the truck was located on concrete. Ex. 13, Petersen Report at 4.

32.     Petersen noted that according to the testimony of the three officers at the scene, Chatwin was constantly swaying and barely able to keep his balance, yet Patterson was the only officer, out of three, who was dealing with Chatwin. Although one of the officers performed a search of Chatwin's vehicle, there was no urgency to search such a vehicle without any other occupants. Petersen concluded that the officers determined that either Patterson was able to secure Chatwin himself, or Chatwin was not a credible threat to the officers' safety. Ex. 13, Petersen Report at 4.

33. Petersen was concerned that an animal control officer, with no law enforcement training on defensive tactics, Officer Baugh, was assisting Patterson. Ex. 13, Petersen Report at 5; Exhibit 14, Trevor Petersen Rebuttal Report of Ken Wallentine ("Petersen Rebuttal"), at 2.

34. Petersen opined that even given Patterson's testimony of events that conflicted with those of Kathy Torrence, the proper weapons retention tactics, taught in local, state and federal law enforcement, instructs an officer to place his hand on top of the suspect's hand which is attempting to remove the duty weapon and push it down in order to keep the weapon in the holster. Then the officer must move the weapon away from the threat and perform "soft hand techniques," such as pain compliance to break the hold. Ex. 13, Petersen Report at 5.

35. While Chatwin was handcuffed, Petersen stated that the handcuffs restrict his ability to injure himself or others but can also be used in "twist lock controls." By moving Chatwin away, turning him approximately 270°, while handcuffed and while Chatwin allegedly had a hold of Patterson's duty weapon, would have allowed the weapon to come out of the holster, causing a greater threat to the officers, suspect and bystanders. Ex. 13, Petersen Report at 5.

36. Because Chatwin was in handcuffs, his safety was not considered, because he did not have the ability to stop himself from falling or grabbing on to anything. If Sgt. Harris, the first officer on the scene, had been assisting in restraining Chatwin, the injury to Chatwin would have been avoided. Ex. 13, Petersen Report at 5; Ex. 12, Petersen Depo. 59:16-61:16.

37. Petersen testified that you have to consider the totality of the circumstances to make a conclusive opinion regarding how the incident could have been avoided. Ex. 12, Petersen Depo. 63:5-20.

38.     Because of the testimony of Patterson and the injuries that Chatwin sustained, those two things, according to Petersen, did not add up. Petersen based his opinion upon his own experience. Ex. 12, Petersen Depo. 90:23-92:2.

39.     When discussing the statements of Torrence, Petersen stated that the two officers initially performed proper procedures when taking Chatwin into custody. Ex. 13, Petersen Report at 6.

40.     Petersen concluded that Patterson did not take the proper precautions and use proper arrest control or weapons retention techniques on May 18, 2010, on Chatwin. The three officers did not use proper techniques or training to protect Chatwin, because he was intoxicated, on concrete, in handcuffs, and in custody. Ex. 13, Petersen Report at 7.

41.     Petersen reached these conclusions, in part, because Patterson testified that he did not recall the use of force training being provided to him by Draper City, and Animal Control Officer Heather Baugh never received use of force training because it "does not apply to me" as it pertained to an intoxicated person. Ex. 13, Petersen Report at 5; Exhibit 15, Deposition of Heather Baugh dated December 9, 2015 ("Baugh Depo."), 73:14-20.

42.     Petersen also stated that in his own experience, he conducted numerous searches of individuals who were handcuffed behind their backs and were touching and grabbing equipment located on his belt, including his firearm. He used the proper weapon retention tactics he described, none of which included throwing an individual to the ground. Patterson's decision and technique that he used to throw Chatwin to the ground was not "in the realm of reasonable tactical responses." Ex. 14, Petersen Rebuttal at 1.

43.     Petersen stated that it "is imperative that each agency implement its' [sic] own policies and provide training to its' [sic] employees. In this case, Draper City did not have any use of force policies in place and clearly did not consider the importance as they ordered an animal control officer (who has not been certified as a law enforcement officer or had any formal use of force training) to perform law enforcement functions." Ex. 14, Petersen Rebuttal at 3.

44.     With his experience of dealing with many individuals who were under the influence of drugs, narcotics, or alcohol as well as participating on the Use of Force Committee at Weber County for several years, evaluating officers' use of force, Petersen stated that this training and experience helped him formulate the opinion that the incident could have been avoided. Ex. 12, Petersen Depo. 64:10-22; 66:12-25.

45.     Petersen also testified that at the time he was at the Weber County Sheriff's Office during 2009-2012, the Weber County Sheriff's Office was a "CALEA-accredited law enforcement agency, which is a nationally recognized accreditation nationally [sic] who comes in and actually evaluates our SOPs, our standard practices, and evaluates and makes sure that Weber County Sheriff's Office was to the national standard." Ex. 12, Petersen Depo. 68:4-25; 69:20-23; 70:4-9.

46.     Defendant's expert of the use of force by police officers, Kenneth R. Wallentine ("Wallentine"), testified that "prior to 2010 … a discussion arose with the Chiefs of Police Association, which … I was a member of … about the state of policy in the state of Utah." Exhibit 16, Deposition of Kenneth R. Wallentine dated June 28, 2016 ("Wallentine Depo."), 43:12-18.

47.     Wallentine could not recall an exact date, but testified that it was during the 2008 to 2010 time period. Ex. 16, Wallentine Depo. 50:19-23.

48.     Wallentine testified that the group was a collaboration of Chiefs of Police and Sheriffs' Association soliciting input from other groups. Ex. 16, Wallentine Depo. 52:5-9.

49.     Wallentine further testified that the purpose of the committee was to provide uniform and best practices of policies as they pertain to critical issues in use in the state of Utah, and that those critical issues included use of force. Ex. 16, Wallentine Depo. 52:22-53:7.

50.     Wallentine additionally testified that the committee looked at, researched, and considered outside police policy service providers. One of those service providers was a group from California named Lexipol. Ex. 16, Wallentine Depo. 53:10-54:17.

51.     Wallentine testified that the "I certainly agree that the 2013 policy is more comprehensive." Ex. 16, Wallentine Depo. 120:17-18.

52.     The 2013 DCPD Use of Force Policy was provided to Draper and published by Lexipol. Exhibit 5 at Footer.

# INTRODUCTION

When law enforcement officers abuse their power, those who have been wronged may seek redress. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Pursuant to 42 U.S.C. § 1983, anyone who "under color of … [law] …subjects, or causes to be subjected, … any [person] … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." While the statute itself creates no substantive civil rights, it does allow for an avenue through which those civil rights can be redeemed. *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995). In order to state a claim for relief under Section 1983, the plaintiff must establish that he was (1) deprived of the rights secured by the Constitution or laws of the United States; and (2) that the alleged deprivation was committed under color of state law. *See Am. Mfr's Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). The parties do not dispute that Defendants were acting under color of state law.

To establish liability of a municipality under Section 1983, a plaintiff must point to a policy or custom of the defendant that inflicted injury on him. Moreover, the defendant municipality may be liable under Section 1983 where a failure to train amounts to deliberate indifference to the plaintiff's constitutional rights. *City of Canton Ohio v. Harris*, 498 U.S. 378, 388 (1989). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id*. at 389.

In *Canton*, the Supreme Court specifically states that "…there are limited circumstances which an allegation of a 'failure to train' can be the basis for liability under 1983." *Id*. at 387. To prevail on a failure to train claim, "[p]laintiff must first prove the training was in fact inadequate,

and then satisfy the following requirements: (1) the officers exceeded constitutional limitations…; (2) the [violation] arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the party of the city toward persons with whom the police officers come into contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training." *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003). This "deliberate indifference" standard may be satisfied "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1999). "[D]eliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action." *Id*. at 1307 (citations omitted). This position must operate as the "moving force" behind the violation, and the plaintiff must demonstrate a 'direct causal link' between the action and the violation of the constitutional right. *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 399 (1997). In other words, "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *City of Canton*, 489 U.S. at 391. In regard to the question of "deliberate indifference" by a municipality, the existence of "material issues of material fact preclude [s]ummary judgment." *Cruz v. City of Laramie*, 239 F.3d 1183, 1191 (10th Cir. 2001). "In deciding summary judgment issues, the court is not free to weight the evidence or pass on the credibility of any witness. … Given this restriction, the court is required to evaluate the evidence as if

plaintiff's testimony is true." *Davidson v. City of Kansas City*, 1994 U.S. Dist. LEXIS 2243

(citing *Zuche v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989)).

## ARGUMENT

I.     **Defendant Draper City Inadequately Trained its Officers on the Use of Force, Including Using the Proper Amount of Force for a Person in Handcuffs, Standing on Cement, Extremely Intoxicated, and Who Was Not Resisting Arrest.**

"[A] showing of specific incidents which establish a pattern of constitutional violations is

not necessary to put the City on notice that its training program is inadequate." *Allen v.*

*Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997). "In a failure to train case where, as here, the

policy itself is not unconstitutional, a single incident of excessive force can establish the

existence of an inadequate training program if there is some other evidence of the program's

inadequacy." *Brown v. Gray*, 227 F.3d 1228, 1286 (10th Cir. 2000) (citing *Allen*, 119 F.3d at

844-45). Draper City claims, incorrectly, that "Plaintiff has not produced evidence of inadequate

training." Defendants' Motion for Partial Summary Judgment ("Summary Judgment Motion"), p.

6, ¶ 9; p. 7, ¶ 6.

Kirk Torgensen, Plaintiff's expert witness on the use of force policies of police

departments, explained in detail why the Draper City policy was inadequate. He stated that the

policy was so "bare bones" that it merely makes a conclusion that a force has to be reasonable.

Torgensen Depo. 39:13-18. He outlined specific deficiencies in the training program and policy

such as impairment, including intoxication, the size of the individuals, whether the person is

handcuffed, under control, his attitude, and type of resistance that the suspect can apply. Ex. 4,

Torgensen Depo. at 45:13-46:10; 50:8-11, 18-19; 51:6, 8-23; 52:20-53:22; 78:16-79:13; 80:3-12.

He stated that the considerations noted in the revised 2013 Draper City policy were factors that

needed to be considered in their totality. Ex. 4, Torgensen Depo. 52:3-6; 80:17-19. Torgensen concluded that Draper City's failure to provide training in this area was "useless," "unconstitutional," "tremendously lacking," and "had absolutely no substance." Ex. 4, Torgensen Depo. 39:13-18; 41:1-22; 42:7-16; 45:13-47:4-5. These facts, when taken in the light most favorable to Plaintiff, provide a sufficient basis to determine that the training was inadequate.

Moreover, when Chatwin sought training records on the use of force, including excessive force, from DCPD for the time period when he was injured by Patterson, Defendants responded that they had few records at that time. They failed to produce **any** training documents, however, for that time period. Ex. 2, Draper Interrog. Response; Ex. 3, 30(b)(6) Depo. 15:14-19:21. When a municipality has lost or destroyed records in an excessive force case, at least one court has noted that the spoliation of evidence can be sufficient to support a theory of official capacity liability, leading to an adverse inference from such spoliation. *See, e.g., Montoya v. Newman*, 115 F. Supp. 3d 1263, 1287-88 (D. Okla. 2015). Since Defendants have not produced any training records for 2010 since their receipt of Chatwin's GRAMA request and Notice of Claim in 2011, an adverse inference should be drawn that no such records on training existed, thereby confirming that the training on the use of force in 2010 was not only lacking, it did not exist.

**II.**    **The Defendant Officers Exceeded Constitutional Limitations When They Threw Chatwin to the Ground While Chatwin was Extremely Intoxicated, in Handcuffs, Standing on Cement and Not Resisting Arrest, and by Failing to Provide Medical Attention**.

"Whether an officer acted reasonably in using deadly force is 'heavily fact dependent.'

**Consequently, this court will not approve summary judgment in excessive force cases – based on qualified immunity or otherwise – if the moving party has not quieted all disputed issues of material fact**. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002)

(emphasis added). "Where a disputed issue of material fact remains, that ends the matter for summary judgment. The court may not move on to determine whether an officer's actions were 'objectively reasonable.'" *Id.*

To determine whether the force was reasonable is judged "from the perspective of a reasonable officer on the scene," because police officers are often forced to make split-second judgments in certain difficult situations." *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). This reasonableness inquiry in an excessive force case [is] an objective one. "The question is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to … the officer's underlying intent and motivation." *City of Canton*, 489 U.S. at 389-91. The reasonableness standard for the purposes of a Section 1983 action requires the court to consider factors such as the severity of the alleged crime, the degree of the potential threat that the suspect poses to an officer's and to others' safety, and the suspect's efforts to resist or evade arrest. *Medina*, 252 F.3d at 1131.

Driving under the influence of alcohol is, of course, a severe crime, potentially endangering the driver, any passengers, and other drivers and bystanders. Fortunately, in this case, Chatwin was able to drive home without injuring himself or others. The danger had therefore passed when he turned off the ignition in his parents' driveway. It was only then that Sgt. Harris approached Chatwin. When Sgt. Harris initially interacted with Chatwin, he stated that Chatwin was "very quiet." For instance, Chatwin handed the keys to Sgt. Harris without saying anything. Ex. 10, Harris Depo. 72:23-77:10. As for the degree of potential threat, Sgt. Harris concedes that Chatwin was compliant. Sgt. Harris stated that Chatwin was "very

cooperative up to that point [the last field sobriety test]." Ex. 10, Harris Depo. 82:21-24.

Additionally, at the time that Patterson claims Chatwin attempted to take his gun and then head-butt him, Chatwin was in handcuffs, leaning over a truck, with Patterson directly behind him. Chatwin was therefore extremely limited in his ability to threaten anyone.

Taking the facts in the light most favorable to Chatwin, an independent witness who actually saw the incident, Kathy Torrence, a neighbor of Chatwin, testified that she was standing in front of her window across the street from Chatwin's house. She watched the officers conduct a field sobriety test. She watched the officers walk Chatwin, handcuffed, back to one of the trucks close to the end of the driveway. From that window, she saw Chatwin's hands and the officer's belt. Chatwin's hands and the officer's belt were arms' length apart. She saw Chatwin looking to his right, say something to Patterson, and then Patterson "grabbed him and threw him to the ground." She saw Chatwin's lips moving before that and then saw Chatwin land on his head. She testified that Patterson "whipped [Chatwin] around so hard that when he hit the pavement, his head bounced up." Torrence was absolutely positive and guaranteed that Chatwin did not undo the gun clip on the officer's belt. Chatwin also did not jerk his head toward Patterson. Ex. 9, Torrence Depo. 27:18-28:9; 30:11-32:5; 33:8-35:6; 60:3-10; 61:2-62:5; 63:4-64:1. Chatwin was therefore not "resisting or evad[ing] arrest" (the third prong of the *Medina* analysis of reasonableness).

Contrary to his testimony in his deposition, Patterson testified at the criminal preliminary hearing that Chatwin "hit his head pretty hard." Ex. 8, Prelim. Tr. 37:21. Moreover, Plaintiff's expert on the use of force by police officers, Trevor Petersen, determined that on May 18, 2010, Patterson did not take the proper safety precautions, considering the intoxication level of

Chatwin, Chatwin being in handcuffs on a concrete surface, and Patterson's failure to use the proper arrest control tactics, weapon retention tactics and use of force, while interacting with an arrestee, as proper law enforcement training would have provided. Ex. 13, Petersen Report at 4. To avoid the injury, Patterson should have put Chatwin into a kneeling or prone position, considering the concrete, so that he did not fall during Patterson's search. Placing Chatwin next to the truck to conduct the search put him at a greater risk of injury, because the truck was located on concrete. Ex. 13, Petersen Report at 5.

Material issues of fact also exist as to whether the officers provided medical attention to Chatwin, another factor in determining the constitutionality of the officers' actions. Witness Jason Scott testified that he saw Chatwin face down on the driveway and that the police officers were laughing in a group. Ex. 7, Scott Depo. 82:20-83:1; 101:20-103:2; and Witness Statement attached to Scott Depo. as Plaintiff's Exhibit 2. No officers were attending to the subject or moving him. Sgt. Harris and Patterson stated, however, that they remained with Chatwin the entire time near the end of the driveway until the paramedics arrived. Ex. 1, Patterson Depo. 143:11-16; Ex. 10, Harris Depo. 29:22-31:9. Sgt. Harris disagreed, saying that they were not standing in a group and laughing or failing to attend to Chatwin, Ex. 10, Harris Depo. 35:11-22. Jason Scott, however, testified that:

> A.  … they were jolly and giggly and kind of like different than I would be if I had just seen a person either -- if that person fell down on their own, I guess they might think that's funny, but I guess I don't. If they somehow took him to the ground and he got hurt, that's also not the way I'd react. Either way, I'd be down there checking on the guy.
> Q.  So go head and tell us more about what you mean by -- what did you say giggly?
> A.  They had all smiles and they were all like pretty pleased with themselves with whatever happened.
> Q.  How do you know that?

A.      Smiles and joking back and forth and giggly like they were, you know, and then when I came over there, they went more quiet and then they, you know.

Ex. 7, Scott Depo. 64:22-65:11.

Deputy Police Chief Eining, as the 30(b)(6) designee for the Draper City Police, testified that the only step that the police were to take in 2010 was to call Unified Fire to provide medical treatment. Ex. 3, 30(b)(6) Depo. 123:17-22. He believed that officers were taught basic first aid and "probably" CPR. Ex. 3, 30(b)(6) Depo. 124:11-12. Unified Fire taught first aid every year from 2011 to 2015. Ex. 3, 30(b)(6) Depo. 130:5; 131:1-4. Draper City provided no records of any medical training for the year 2010 when Chatwin was injured. The Draper Police received no training to treat someone who lost consciousness. Ex. 3, 30(b)(6) Depo. 125:21-126:2. Law enforcement was supposed to monitor the arrestee to make sure that the arrestee was still breathing and the bleeding was controlled. Ex. 3, 30(b)(6) Depo. 131:24-25. Yet witness Jason Scott saw the three officers standing at the top of the driveway, away from Chatwin, laughing, "jolly and giggly." Ex. 7, Scott Depo. 64:22.

**III.   The Excessive Use of Force by Patterson Occurred in Circumstances Constituting a Usual and Recurring and Situation with Which Officers Must Deal**.

> [Plaintiff] must show that the situation [defendant's officers] were faced with on the day of the [incident] was "common" (or at least not "uncommon"), *Allen*, 119 F.3d at 842, "like[ly]," *Id*., at 845. "foreseeable" *Zuchel v. Denver*, 997 F.2d 730, 738 (10th Cir. 1993), or "predictable." *Id.* The situation need not be frequent or constant; it must merely be of the type that officers can reasonably expect to confront.

*Brown v. Gray*, 227 F.3d 1278, 1288 (10th Cir. 2000) (internal citations omitted).

"[T]he practice of dealing with drunken, rude, and potentially violent suspects is 'usual and recurring.'" *Diaz v. Salazar*, 924 F. Supp. 1080 (D.N.M. 1996). It is foreseeable that officers

will encounter a person suffering from intoxication. *Bowen-Soto v. City of Liberal*, 2010 WL 4643350 (D. Kan. Nov. 9, 2010). On May 18, 2010, Sgt. Harris responded to an "ATL broadcast" (attempt to locate) on a vehicle that had left the State liquor store. Dispatch ran the license plate provided by the liquor store clerk and the associated address was 12534 South 150 East, Draper [Chatwin's parents' house]. Harris waited at that address. The vehicle arrived. Ex. 8, Prelim. Tr. 5:7-25. Chatwin's situation was therefore exactly the type of occurrence that the officers would have to confront. Another example of such a usual and recurring situation for police would "include individuals requiring medical care while in custody," such as Chatwin. *City of Canton*, 489 U.S. at 387-89.

III.    **Chatwin Provided Ample Evidence that Draper City's Inadequate Training on the Use of Force Constituted the City's Deliberate Indifference**.

Chatwin must show that the need for more or different training was so obvious and the inadequacy so likely to result in the violation of Chatwin's constitutional rights that the policymakers of Draper City were deliberately indifferent to the need. *City of Canton*, 489 U.S. at 390. The analysis therefore centers on the risk that the inadequate training poses and the City's awareness of that risk. *Brown*, 227 F.3d at 1289.

Chatwin has provided sufficient evidence of deliberate indifference. For the reasons described above, DCPD provided little to no training on the use of force in 2010. The policy was merely a restatement of the Utah statute that provided a circuitous definition of reasonableness.

It is undisputed that Draper City provided no training documents on the use of force for the year 2010. Instead, it produced limited training documents beginning in the years after. Notably, the policy was changed significantly by the end of 2012 and the beginning of 2013 when Draper City added Lexipol's factors to be considered when using force. Ex. 4. Kirk

Torgensen, Plaintiff's expert on use of force policies, testified that the training provided by POST was only foundational, and it was paramount that municipalities continued with training. It is plainly obvious that if an officer does not have adequate training on the use of force while carrying weapons and using restraints on citizens, that those detained persons, like Chatwin, could suffer serious injuries.

Draper City was also aware of the risk of harm. Defendants' own expert, Kenneth Wallentine, testified that in the years leading up to the 2013 change in policy, "many police executives recognized a need for more clearly-expressed and detailed policy statements to guide police officers and to shape police procedures and training." Ex. 16, Wallentine Depo. 52:22-53:7; Exhibit 17, Report of Kenneth R. Wallentine in Response to Kirk Torgensen[2] ("Wallentine Rebuttal"), at 3. Those years included 2010, the year that Chatwin was injured. Ex. 17, Wallentine Rebuttal at 3.

Draper City was a member of the Utah Chiefs of Police Association in 2010. Exhibit 18, Declaration of Kirk M. Torgensen dated September 1, 2016 ("Torgensen Dec."), ¶ 6. Draper is currently a member of that organization. Exhibit A, Public Record of the Utah Chiefs of Police Association, attached to Torgensen Dec. Kirk Torgensen was associated with the Utah Chiefs of Police Association from 2001 to 2014. He attended many of their meetings during that time and was very involved in their legislative efforts. Ex.18, Torgensen Dec. ¶¶ 3, 4. Wallentine, testified that before 2010 that organization assembled in part to revise the use of force policies for their members to make them more uniform and provide more guidelines for the officers belonging to their organization. Ex. 16, Wallentine Depo. 52:22-53:7. Kirk Torgensen, Plaintiff's expert,

---

[2] Plaintiff is not disputing Mr. Wallentine's testimony only for the purposes of summary judgment as to not create a disputed material fact.

confirmed these activities of the organization. Ex. 4, Torgensen Depo. 37:17-38:13; Exhibit 19, Report of Kirk Torgensen in Rebuttal to Ken Wallentine, at 1; Ex. 18, Torgensen Dec. ¶ 2. "'Municipal liability under 1983 attaches where -- and only where-- a *deliberate choice to follow a course of action is made from among various alternatives*' by city policymakers." *Zuchel*, 997 F.2d 730, 740, n. 5 (citations omitted). Draper City was aware of the need to revise its policies on the use of force before 2010 but chose not to.

IV.     **Chatwin Provided a Direct Causal Link Between the Constitutional Violation and Draper City's Inadequate Training on Use of Force**.

Sufficient evidence exists to conclude that the inadequate training on the use of force led to the injuries Chatwin received. In *Monell v. New York Dept. of Soc. Serv.*, 436 U.S. 658 (1978), municipalities are subject to liability only "when execution of a government's policy or custom … inflicts the injury that the government as an entity is responsible under Section 1983. *Id*. at 694. Consequently, "the identified deficiency in a city's training program must be closely related to the ultimate injury," so that it "actually caused" the constitutional violation. *City of Canton*, 489 U.S. at 391. Chatwin has presented sufficient evidence to conclude that Patterson's and Harris' actions were directly attributable to their lack of training. Draper City provided no evidence of any training. Ex. 2, Draper Interrog. Response; Ex. 3, 30(b)(6) Depo. 15:14-19:21. Although Patterson received some basic training at the Academy, he did not remember any training on controlling someone who is resisting arrest, defensive tactics, restraining individuals, reasonable force, and he and his field training officer only discussed the Utah Code section on deadly force [which only contains the circuitous definition of reasonableness]. Ex. 1, Patterson Depo. 30:12-24; 42:20-43:3; 48:4-8; 48:20-49:11; 58:12-59:2; 67:10-21; 69:11-70:24; 71:1.

Trevor Petersen, Plaintiff's expert on the use of force by police officers, testified in detail that even if the facts occurred as stated by Patterson, Chatwin was injured because of the way Patterson handled the situation – specifically, by turning Chatwin away 270°, while Chatwin was handcuffed, standing on concrete and being heavily intoxicated. Ex. 12, Petersen Depo. 59:16-61:16; 63:5-20; 90:23-92:2; Ex. 13, Petersen Report at 4-7. In addition Trevor Petersen was concerned that Animal Control Officer Baugh had no training on the use of force, including using tasers on human beings. Baugh testified that the Draper City use of force policies did not apply to her, despite the fact that Draper City asked her to assist the other two officers with Chatwin's arrest. Ex. 15, Baugh Depo. 73:14-20.

## CONCLUSION

Based upon the foregoing arguments, this Court should deny Defendants' Motion for Partial Summary Judgment. Material issues of disputed facts preclude entry of summary judgment since Draper City provided inadequate to no training on the use of force. "[R]easonable jurors could conclude [Chatwin] was not resisting arrest at the time he was taken to the ground by officer [Patterson]. *Becker v. Bateman*, 709 F.3d 1019, 1025 (10th Cir. 2013) (citing *Graham*, 490 U.S. at 396).

DATED this 1st day of September 2016.

CLYDE SNOW & SESSIONS


/s/ Lisa A. Marcy
Lisa A. Marcy
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of September 2016, I caused a true and accurate copy of the foregoing Plaintiff's Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment to be filed via the Court's ECF system, which in turn sent copies to counsel of record in accordance with the Court's protocols.

/s/ Michelle Carter