# EXHIBIT 1

DEPOSITION OF JOSHUA PATTERSON

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

 3                        -ooOoo-

 4   JOSHUA CHATWIN,           : CIVIL NO. 2:14-cv-375

 5          Plaintiff,         : DEPOSITION OF:
                                 JOSHUA PATTERSON
 6   v.                       :
                                 TAKEN: December 7, 2015
 7   DRAPER CITY; DRAPER CITY :
     POLICE DEPARTMENT;          Judge Dale A. Kimball
 8   OFFICER J. PATTERSON, in :
     his individual and
 9   official capacity;       :
     OFFICER HEATHER BAUGH,
10   in her individual and
     official capacity;
11   OFFICER DAVID HARRIS, in
     his individual and
12   official capacity;
     OFFICER KURT IMIG, in
13   his individual capacity;
     SUPERVISOR TBA; and JOHN
14   DOES 1-10,

15          Defendants.

16   _____

17
                          -ooOoo-
18

19          Deposition of JOSHUA PATTERSON, taken on

20   behalf of the plaintiff, at 201 South Main Street,

21   Suite 1300, Salt Lake City, Utah, before PHOEBE S.

22   MOORHEAD, Certified Shorthand Reporter for the State

23   of Utah, pursuant to Notice.

24

25          SOME PORTIONS CONSIDERED CONFIDENTIAL
```

1   if they would try to kick, try to head butt, try to grab

2   you with the hands.  Most everything -- and the same

3   thing, officer safety was always paramount.  So it's

4   weapon side away, trying to move the suspect away from

5   any weapons you have, or any weapons they might get

6   ahold of.

7          And most everything was to the ground to gain

8   control if they were already combative while standing.

9   If there was no other officer there to help or, you

10  know, if there's any danger to yourself or to anybody

11  else, including the suspect.

12         Q.  After your academy training on -- on that

13  particular -- those techniques, did you ever get any

14  training anywhere else on -- on controlling a combative

15  person who is resisting arrest?

16         A.  I don't recall when training was as far as

17  department training.  That, I don't recall.

18         Q.  You don't -- well, I'm just asking you if you

19  had any; not when it was.

20         A.  No.  I'm saying I don't recall if there was --

21  I don't recall if there was any after that.  So after

22  the academy, when I department -- any department

23  training, I don't recall if I had any more training on

24  resisting arrest.

25         Q.  Okay.  We'll get back to that in second.  But

1      Q.   Okay.  And what other information does it have

2  on the rotation schedule?

3      A.   If you know what shift you're on, you're

4  working those days that week.  And then if there's a

5  training day involved, then you know you'll have to show

6  up that day for training.

7      Q.   Where did they post it?

8      A.   I don't recall.  I imagine it was at briefing

9  or on a board.  I -- I don't recall.

10     Q.   But it's in the building of the -- the old

11  building of the police department in Draper?

12     A.   Sure.  Yes.

13     Q.   All right.  And you said there was monthly

14  training?

15     A.   I believe we trained once a month.

16     Q.   Where was that training held?

17     A.   Depends what training it was.  It could be in

18  a board room like this, could be at the old school.  It

19  all depends on what we were training on.

20     Q.   What were the subject matters that you were

21  trained on?

22     A.   Anything from Taser training to active gunman,

23  active shooter training to -- all the aspects of law

24  enforcement.

25     Q.   Was there training on defensive tactics?

DEPOSITION OF JOSHUA PATTERSON

43

1    A.  I would imagine.  I don't recall.  But I

2  assume there would be.  Like I said, Taser training is

3  part of defensive tactics, baton training, OC training.

4    Q.  That reminds me.  I've got to back up for a

5  little bit.

6       When you were talking about the Salt Lake

7  academy, you mentioned you also got training in ethics.

8  When you say you got training in ethics, what kind of

9  training?

10       MR. HAMILTON:  Objection.  Form.  Make sure

11  you give a verbal response, not an "uh-huh," "mm-hmm."

12  Make sure you say "yes," "no."

13       THE WITNESS:  Sorry.

14  BY MS. MARCY:

15    Q.  Well, do you know what ethics means?

16    A.  Basically, this was the importance of

17  truthfulness, telling the truth and not lying, being an

18  honest officer.

19    Q.  In what scenarios?

20    A.  In every scenario.

21    Q.  So testifying in court?

22    A.  Correct.

23    Q.  All right.  You -- so what was the training,

24  aside from saying, "Tell the truth," what was the

25  training?

DEPOSITION OF JOSHUA PATTERSON

48

1    Q.   Okay.   Did they cover one topic per training

2  session?

3    A.   Generally, yes.

4    Q.   Do you -- do you remember any of the topics?

5  Besides tasering and the baton?

6    A.   No.   I don't remember anything more specific.

7  You would show up for the training and start getting

8  training on whatever the subject was.

9        MS. MARCY:   Okay.   I think now's a good time

10 to take about a five-minute break or so, and we'll come

11 back.

12       VIDEOGRAPHER:   We're off the record.   It's

13 9:48.

14       (A recess was taken from 9:48 a.m. to

15 10:02 a.m.)

16       VIDEOGRAPHER:   This is the beginning of video

17 No. 2.   We're on the record.   It's 10:02.   Counsel may

18 proceed.

19 BY MS. MARCY:

20    Q.   So Mr. Patterson, let's go back to the -- when

21 we were talking about the training at the police

22 department.   You were talking about the topics, and you

23 mentioned tasering, and you mentioned training on

24 batons, but you don't have any specific information

25 about being trained on the use of force, do you?

1            MR. HAMILTON:  Objection.  Form.

2            THE WITNESS:  No.

3  BY MS. MARCY:

4        Q.  I'm sorry.  What was your answer?

5        A.  No.

6        Q.  All right.  When was the last time, when you

7  were a police officer, that you were trained on the use

8  of force?

9        A.  While I was employed at Draper?

10       Q.  Yes.

11       A.  In the academy.

12       Q.  And what was that training at the academy?

13       A.  Are you talking classroom?  Or physical?  What

14  are you talking?

15       Q.  Let's talk -- was there training in Part 1 of

16  the --

17       A.  I don't recall.

18            MS. MARCY:  Okay.  Well, let me show you

19  something here.  Mark this as Exhibit 1, please.

20            (Whereupon, Exhibit No. 1 was marked for

21  identification.)

22  BY MS. MARCY:

23       Q.  Just take a look at it.

24       A.  Okay.

25       Q.  Do you recognize Exhibit 1?

1       A.   No.  Oh, it looks like FTO -- FTO Manual.

2       Q.   The what?

3       A.   Field Training Officer Manual, I believe.

4       Q.   And what is the Field -- what is that?

5       A.   When you're on field training, your field

6   training officer has to make sure to cover all these

7   topics in training and make sure that you are

8   satisfactory in being able to do those.

9       Q.   All right.  Now, on the -- on the bottom -- on

10  the bottom right of all these pages, you'll see these --

11  it will say -- there's a numbering system that says,

12  "Draper CHD" -- like on the -- "0668."  Do you see that?

13      A.   Yeah.  Yes.

14      Q.   I'm going to refer to just those last three

15  numbers as page numbers.  It just makes it easier.

16      A.   Okay.

17      Q.   All right.  Those are numbers that your

18  attorney stamped on the -- had stamped on the bottom.

19  That's how we do it.

20      A.   Okay.

21      Q.   Okay?  So if you look at -- if you look at

22  669, it says, "January 2010."  Have you seen that chart

23  before?  Do you know what it is?

24      A.   Yeah.  That's the rotation schedule.

25      Q.   Oh, is this -- is this the rotation schedule

1   for Draper City Police Department?

2       A.  It appears so.

3       Q.  So what is the field training manual?  What is

4   this document?

5       A.  What is this -- as I said, it's your field

6   training officer has this -- is given this to make sure

7   that the trainee is able to complete, satisfactory, all

8   these different items, all these different actions.

9       Q.  Okay.  So the field training manual, this --

10  this was -- this was done after you graduated from SLCC

11  Academy?

12      A.  Correct.

13      Q.  All right.  This is -- you're being -- now, at

14  this point, with this field training manual, this is

15  documentation of -- of while you were -- what would you

16  call yourself at this point?

17      A.  In training.

18      Q.  In training.  Got it.  Okay.

19      A.  And the field training officer is who has

20  this.

21      Q.  All right.  And who was your field training

22  officer?

23      A.  I had three.  I had Officer Holst, Officer

24  Newman, and I had -- hold on.  I just went blank.  I

25  apologize.

1    Q.  Well, that reminds me.  If you think of

2   anything during the deposition, if you forget something,

3   just come back and say, "Hey, I forgot to tell you this.

4   I forgot this name, or I forgot this training," or

5   whatever it is.  Like I said, it's your deposition.  You

6   can interrupt me.  It's fine.

7    A.  Okay.

8    Q.  So you had another officer.  How long did this

9   training -- for this field training manual -- how long

10  did this field training session last?

11   A.  I don't recall.  A few months, I believe.

12   Q.  So they -- did they -- did Draper City train

13  you with all of these subjects before you actually were

14  on your own on the streets?

15   A.  Correct.  You have to pass this

16  satisfactorily.

17   Q.  So is this fair to say part of this is a test?

18   A.  Sure.  Yes.

19   Q.  Now -- so on -- on -- and look at 71 -- 671.

20  Oh, that could be the name you forgot.  Eric Braegger?

21   A.  Eric Braegger, no.

22   Q.  No?  Above that, it says, "Received."  Is that

23  your signature?

24   A.  Yes.

25   Q.  So that's indicating the equipment that was

1  that -- do you see it somewhere?

2      A.  On this one, no.

3      Q.  Why is -- why do you think that --

4      A.  I have no idea.

5      Q.  Okay.  Did you ever have the opportunity to --

6  if you look at 674 through -- through 685, it looks

7  like, at the top of that document, it says, "Field

8  Training Guideline/Tasks."  Have you seen this section

9  of the manual before?

10      A.  Of this?  Yes.

11      Q.  Okay.  So what is this document -- from 674 to

12  685, explain what this is for.

13      A.  These are the different tasks that you go over

14  with -- with your field training officer.  And if you

15  have completed those, or if you have experienced those

16  on duty, then it is checked off while you are a field

17  training officer.  If you have not, of course, then it's

18  not checked off.

19      Q.  All right.  So on the first column there, on

20  674, it says, "Recruit:  JP."  Is that you?

21      A.  Yes.

22      Q.  All right.  "FTO," what's that?

23      A.  Field training officer.

24      Q.  So do you know who that is right there?

25      A.  That's probably Brian Holst.

55

1      Q.  Okay.  And then, of course the date.  And it

2  says, "Discussed."  And then next to that, "Demo."  I

3  guess that means "demonstration"?

4      A.  Yeah.  I don't know.

5      Q.  Okay.  It's not checked anywhere; you would

6  agree with me, right?

7      A.  Correct.

8      Q.  Until the very bottom there, where it says,

9  "Daily Log Codes"?

10      A.  Correct.

11      Q.  So -- so that I understand this -- so you went

12  through on these particular dates and discussed each of

13  these subjects along the chart here, correct?

14      A.  Correct.

15      Q.  So for instance, if you go down to, under

16  "Alarms," where it says -- on the third line, it says,

17  "Panic Alarms."  And you go over here -- so that means

18  it was you; he was there; it was on November 6; and you

19  discussed panic alarms?

20      A.  Correct.

21      Q.  But there was no demonstration?

22      A.  Correct.

23      Q.  All right.  Okay.  I just want to make sure I

24  understand this.  When you discussed it, what do you

25  mean by "discussed it"?

1        A.   Generally means you've experienced it and

2   discuss it after:   What you've done wrong, what you've

3   done right, what to do better the next time.

4        Q.   Okay.   Do they -- and when they say

5   "discussed," is there any other place where the -- that

6   you know of -- where the FTO has to write down what you

7   discussed?

8        A.   I have no idea.

9        Q.   So look on 675.   Down at the bottom, it talks

10  about -- under "Behavioral Cues," the second one says,

11  "Extremely agitated."   And underneath, "Demonstrates

12  violent or bizarre behavior."

13       A.   Yes.

14       Q.   All right.   Thank you.   It says, this, that

15  you both discussed those two topics.   Do you know what

16  you discussed there?

17       A.   No.

18       Q.   Then on 676, right about in the middle, under

19  this "Behavioral Cues," it says, "Violently Resist

20  During Control and Restraint."   Underneath that,

21  "Violently Resist After Being Restrained."   What did you

22  talk about there?

23       A.   I have no idea.   I don't recall back then.

24       Q.   So you don't -- you don't have any information

25  about what you discussed about those two topics?

DEPOSITION OF JOSHUA PATTERSON

57

1      A.   That's correct.  I have no idea.

2      Q.   Let's see.  On 677, just on the top there, it

3  says, "Location of Draper City Ordinances," and "Discuss

4  Draper City Ordinances."  Do you -- so what did you

5  discuss there?

6      A.   I have no idea.

7      Q.   Same thing for "Department Policy," under

8  that.  Do you know what you discussed there?

9      A.   No.

10      Q.   So you don't have any information, either,

11  about what you discussed on those topics?

12      A.   That's correct.

13      Q.   Okay.  And then on 681, the fourth topic down,

14  entitled "Intoxicated Persons."  And it looks like it's

15  referring here, the first line, "Public Intoxication,

16  UCA" -- that's Utah Code Annotated, right?  So that's

17  code, state code, 76-9-601.  It looks like you discussed

18  that.  What did you discuss about that?

19      A.   I don't recall that either.  That was a long

20  time ago.

21      Q.   So you don't have information about what you

22  discussed about --

23      A.   Correct.

24      Q.   -- about -- let me finish -- about public

25  intoxication?

1       A.   Correct.

2       Q.   Oh, yeah.  If you look here, it says, "Public

3   Intoxication" -- "Demo" is checked for all of those.

4   Because there have not been very many that have been

5   checked here.  Do you know why that one would be

6   checked?

7       A.   I have no idea.

8       Q.   And then on 685 -- let's see -- one, two,

9   three, four -- four on the way down, it says, "Use of

10  Force."

11      A.   I'm sorry.  Which page?

12      Q.   I'm sorry.  685.  The fourth category down, it

13  talks about -- it's entitled "Use of Force."  And again,

14  it's got "Department Policy," "UCA," "Reasonable

15  Force/Escalation" -- I don't know what it says the use

16  of force is -- but those first three columns right there

17  says -- it looks like you discussed that Utah code

18  section on deadly force.  You would agree with me,

19  right?  Do you see it right there?  It's checked?

20      A.   Yes.

21      Q.   Okay.  And then under that, "Reasonable Force

22  and Escalation of Force."  That's checked underneath

23  there --

24      A.   Yes.

25      Q.   -- so you've discussed that.  What did you

1   discuss on those subjects?

2       A.   I have no idea.   I don't recall.

3       Q.   So you don't have any information on what you

4   discussed about those two subjects?

5       A.   Correct.

6       Q.   All right.   And then on 687, it's got -- up at

7   the top, it says, "Draper City Police Department, Field

8   Training Daily Observation Report.   Recruit:   J.

9   Patterson."   That's down a little bit.   And it's dated

10  November 6, 2009.   Did you just have one report like

11  this?

12      A.   One report like this?   No.   I don't recall if

13  this was weekly, if this is -- I don't recall how long

14  these were, but that's through the entire process,

15  these.

16      Q.   So who -- because there's no -- there's no --

17  if you look on 688, that's part of the same document.

18  It has "Recruit Signature" and "Trainer Signature," and

19  this one is not signed.   So do you know who the trainer

20  was?

21      A.   I do not.

22      Q.   Maybe look down on the -- look down on the

23  comment section there.   Maybe that will remind you.   It

24  says, "This is your" -- it says, "first day on the road

25  with the trainer.   Had some issues with equipment and

1      Q.   You talked about ethics?

2      A.   No.  Not at the department.  I don't recall

3  ethics at the department.

4      Q.   All right.  So those two.  What else did you

5  get training on?

6      A.   At Draper City?

7      Q.   Yes.  On those Tuesdays.

8      A.   As I said, I don't recall every single

9  training session that we had.

10      Q.   Now, did you -- but did you -- okay.  Did

11  you -- so you don't recall if you got any training on

12  restraining an individual, like it says here?

13      A.   I don't recall, no.

14      Q.   So you don't have any information on any

15  training you got on the use of -- on using restraints?

16      A.   That's correct.  I don't recall any training.

17  I don't recall every training session that we had while

18  I worked there.

19      Q.   Well, that's a pretty big topic, wouldn't you

20  think?

21      A.   Yes.

22      Q.   Down here on this -- it says, again, "Arrest

23  by a peace officer."  And it says -- it says that you

24  can -- it basically says you can make -- you can arrest

25  a person without a warrant, right?

1      A.   Okay.

2      Q.   -- to those numbers.   Okay.   And it's

3  entitled "Manner of Making Arrest."   And underneath

4  that, it says, "Use of Force in Making an Arrest."

5      A.   Okay.

6      Q.   All right.   The -- it says here -- the second

7  sentence there says, "If the person flees, they are not

8  under arrest until actual restraint or commission

9  occurs.   The defendant must not be subjected to any more

10  restraint than is necessary to effect the arrest."

11        Underneath that, it says, "If a person is

12  being arrested and flees or forcibly resists, after

13  being informed of the intention to make the arrest, the

14  arresting" -- "the person arresting may use reasonable

15  force to effect the arrest."   All right.   I'm interested

16  in that phrase "reasonable force."

17      A.   Okay.

18      Q.   Did you receive any training as a Draper City

19  police officer by the Draper City Police Department on

20  what is -- what is reasonable force?

21      A.   Again, I don't recall every single training

22  session at Draper City.

23      Q.   But that's a pretty big subject?

24      A.   Yes.

25      Q.   Reasonable force.   You don't -- so you don't

1  have any information about -- about any training on the

2  use of reasonable force to effect an arrest?

3          MR. HAMILTON:  Objection.  Form.

4          THE WITNESS:  With the city of Draper?

5  BY MS. MARCY:

6      Q.  Yes.

7      A.  No.  I do not recall it.

8      Q.  Right.  But I'm -- so I'm also saying, right

9  now, as we sit here today, you don't have any

10  information about whether you were trained by the Draper

11  City --

12     A.  Correct.

13     Q.  Sorry.  Let me finish.

14     A.  Sorry.

15     Q.  It's okay -- by the Draper City Police

16  Department on the training on the use -- well, how to

17  determine the use of reasonable force to effect an

18  arrest?

19     A.  Correct.

20     Q.  When you -- when you were talking earlier

21  about -- when you were talking earlier about the Draper

22  City Police Department and their -- and their training

23  on the use of force -- so I want to -- I just want to be

24  clear on this.  You don't have any information that

25  they've ever trained you on the use of reasonable force?

1      A.   Correct.

2      Q.   Then how did you -- that's what I'm trying to

3  get at.   Then how did you determine -- when you -- when

4  you -- when you -- when you are dealing with someone who

5  you have to arrest, how did you figure out what kind of

6  "reasonable force," quote, end quote, you were supposed

7  to use on that person?

8      A.   That's all -- they -- you mean -- that's

9  really vague.   Every case is different.   So...

10     Q.   That's what I'm asking.

11     A.   Okay.

12     Q.   I'm asking -- I'm asking you, when someone is

13  about to be arrested, and -- let me try it this way.   So

14  I can talk it out loud a little bit.

15          When you are about to arrest someone, and you,

16  from those behavioral cues that we were talking about

17  earlier --

18     A.   Yes.

19     Q.   -- that you discussed with your FTO -- when

20  you are about to deal with someone you have to arrest

21  who is exhibiting some of those more aggressive cues,

22  behavioral cues, if you will --

23     A.   Okay.

24     Q.   -- how did you figure out the amount of

25  reasonable force to use on that person?

DEPOSITION OF JOSHUA PATTERSON

72

1     A.  We're trained to meet the force against us.

2  So for example, using -- if you already informed the

3  subject they're under arrest, that should be -- they

4  should be complying with that order already.  If they

5  elevate from, let's say, a normal demeanor, they have to

6  be verbally informed that they need to comply because of

7  their arrest.

8     Q.  Okay.  And when you say you have to meet

9  them -- what was the phrase you used?  You have to --

10    A.  Meet their level.

11    Q.  What does that mean?

12    A.  So for example, if you're going to place

13 somebody under arrest for shoplifting, that doesn't give

14 you cause to shoot them in the head, if you will.

15    Q.  I'm glad to hear that.

16    A.  So you meet the level of force.

17    Q.  Okay.

18    A.  So if they're vaguely resisting, you are

19 warranted to bring up just enough level to effect the

20 arrest.

21    Q.  What do you mean by "vaguely resisting"?

22    A.  Let's say slightly resisting.

23    Q.  Give me an example of slightly resisting?

24    A.  Pulling their hands away, not wanting to be

25 handcuffed.  So slight resistance.

DEPOSITION OF JOSHUA PATTERSON

80

1    Q.  How do you know it's baton training?

2    A.  Because it says "ASP" on it.  That's the brand

3  of batons we were using at the time.

4    Q.  I see.

5    A.  So I would assume -- this force continuum, I

6  believe, is similar.

7    Q.  But it's not -- it's not the same as -- so

8  this is a more specific application of force to batons?

9         MR. HAMILTON:  Objection.  Foundation.

10        THE WITNESS:  Correct.  From what I can tell.

11  BY MS. MARCY:

12    Q.  Okay.  Is that the same -- as you look at 386,

13  is that also baton?

14    A.  It appears so.

15    Q.  Okay.  So let's look at, for a minute -- can

16  you jump to 412?

17    A.  412.  Okay.

18    Q.  Are you there?

19    A.  Yes.

20    Q.  Just tell me when you've looked at 412 through

21  414.

22    A.  Okay.

23    Q.  All right.  Up at the top of this part of

24  Exhibit 3, it says, "Draper City Police Department,

25  Defensive Tactics, 05/05/2009."  Have you seen the pages

DEPOSITION OF JOSHUA PATTERSON

81

1    of the defensive tactics, 412 through 414, before?

2         A.   I don't recall these.  No.

3         Q.   On 413, it says, "Confrontation Management.

4    The 10 commandments of officer survival."  And then No.

5    1, it says, "Thou shalt not not train."  Do you see

6    that?

7         A.   Yes.

8         Q.   And then underneath it, it explains

9    Commandment No. 1 further.  And it says, "My friend,

10   Officer Jeff Chudwin once commented to me 'The military

11   trains and trains and trains and rarely fights, whereas

12   police officers fight and fight and fight but rarely

13   train.'  There are few theories that 'try' to explain

14   why most police do not train with the same integrity and

15   intensity as their military cousins.  The only valid one

16   is that budget restraints and time restraints make it

17   difficult.  But that's still no excuse."

18        Have you ever heard anything like that before

19   from any police officers or your police department?

20        A.   Like -- like what?

21        Q.   That -- those thoughts, right there.

22        A.   Those thoughts, to always keep up on your

23   training?

24        Q.   Just what it says right there.

25        A.   Sure.

DEPOSITION OF JOSHUA PATTERSON

82

1        Q.   Where did you -- where have you heard that

2    before?

3        A.   Classes in the academy and so forth.

4        Q.   So instructors have said that as well?

5        A.   Correct.

6        Q.   The ones at the academy?

7        A.   Correct.

8        Q.   What about any of your training at the police

9    department?

10       A.   I -- I don't recall there.  As far as mental

11   training?  I don't --

12       Q.   Do you agree with those statements?

13       A.   Absolutely.

14       Q.   Do you -- do you agree that budget restraints

15   and time restraints make it difficult for training, like

16   it says here?

17       A.   I don't know.  I've never really experienced

18   that.

19       Q.   Well, I asked you if you agreed with what I

20   read.  So I read that part.  So what part do you agree

21   with?  And is there any part you don't agree with?

22       A.   I agree with it.

23       Q.   With the whole thing?

24       A.   Yes.

25       Q.   All right.  Mr. Patterson, let's go back a

1      Q.   What do you do?  You enter it into a computer?

2      A.   You put it on the computer and submit it to

3 your sergeant for review.

4      Q.   So what I mean is, is it every time that you

5 make an arrest, you have to type something like this

6 out?

7      A.   Yeah.  Pretty much every call, you have to

8 type this out.

9      Q.   Okay.  In that -- okay.  So in the second

10 paragraph -- no.  I'm sorry.  The first paragraph, you

11 said, "While performing the FSTs" -- that's field

12 sobriety tests?

13     A.   Yes.

14     Q.   All right.  "I noticed the suspect's demeanor

15 becoming more and more agitated and aggressive.  He

16 became argumentative towards Officer Harris about how he

17 was performing on the test."

18          What did you mean by "becoming more and more

19 agitated and aggressive"?

20     A.   More verbally combative, noncooperative with

21 the tests, a little more animated, as far as --

22     Q.   Okay.  I guess what I mean is, instead of more

23 of the descriptions of what he did, what are the actual

24 facts?  Like, when you say -- what I mean by this is

25 when you said he became more agitated, that's a

```
 1    description of a behavior.  So what were the behaviors
 2    he was exhibiting?  What was he doing?
 3              MR. HAMILTON:  Objection.  Form.
 4              THE WITNESS:  From what I can recall, louder
 5    speech -- louder speech and more argumentative, more
 6    uncooperative, verbally, with the -- with Officer Harris
 7    doing the FSTs.
 8    BY MS. MARCY:
 9         Q.  And what -- what were the words?  What was the
10    dialogue?
11         A.  I don't recall.
12         Q.  So you don't know -- right now, you don't know
13    what the -- what the conversation was between
14    Mr. Chatwin and Officer Harris?
15         A.  Correct.
16         Q.  You said he was "moving around."  What do you
17    mean by "moving around"?  What was he doing?
18         A.  Just doing other movements besides FSTs, and
19    kind of becoming frustrated with the FSTs and the
20    instructions.
21         Q.  Okay.  When I -- "frustrated" is a
22    description.  I mean, like what were his -- what were
23    his words?  What were his behaviors?
24         A.  I don't recall.
25         Q.  So you don't have information about -- right
```

1      A.   That -- that shows that he's becoming more

2  elevated, yes.

3      Q.   Okay.

4      A.   So that's still verbally combative, beginning

5  to be verbally combative.

6      Q.   Okay.

7      A.   And how he said it; not just what he said.

8      Q.   How did he say it?

9      A.   Very elevated.  Very emotional, if you will.

10      Q.   Like angry?

11      A.   Sure.

12      Q.   Okay.  Now, here, you say, "as he squirmed and

13  pulled against me."  What did -- what was he doing?

14      A.   Just -- just always moving, always moving and

15  not standing still.  Just, like I say, kind of

16  squirming, always moving.  Hands -- hands and fingers

17  moving, touching, that sort of thing.

18      Q.   And you -- and it also says here, "pulled

19  against me."  What is "pulled against me"?

20      A.   Just when -- doing -- while performing a

21  search, incident to arrest, you know, standing at a wide

22  stance, falling, pulling, squirming, moving, not

23  standing still.

24      Q.   So --

25      A.   Because you're going to hold the suspect there

1    for their safety, as well as yours, so they don't just

2    fall on the ground.  So holding there while you're doing

3    your search to control them for control and safety.  So

4    while holding him, that's when there's still movement

5    and pulling and squirming.

6         Q.  All right.  When I'm -- I'm trying to get an

7    understanding, especially on the "pulled" part.  Like if

8    I pull open a door, I've got to grab the door handle and

9    open the door.  So when you're saying "pulling against

10   me," are you saying he was actually touching you and

11   pulling away from you?  Like taking you with him?

12        A.  So when you're holding him there, usually a

13   hand -- like on an arm, a bicep, a shoulder, and then

14   searching with the other hand, pulling against that.

15        Q.  Against -- against your arm that's holding

16   him?

17        A.  Against my arm and hand that's holding him.

18        Q.  Okay.  When you say here, after that, "He

19   continued to act aggressive and combative, which caused

20   me concern for his safety and mine," what else did he

21   do -- well, back up.  You say, "He continued to act."

22        A.  Correct.

23        Q.  So are you saying he continued to squirm and

24   pull against you?

25        A.  Correct.

1    Q.  Was he doing anything else that caused you to

2  think he was aggressive and combative?

3    A.  Everything the same, all those things.  But

4  then the fumbling with my belt, with the front of my gun

5  belt.

6    Q.  No.  I mean -- so at that point, he was

7  fumbling with your gun belt?

8    A.  Correct.  There was still, as I say, the

9  fingers moving, touching, feeling.

10    Q.  So where's the first time -- you don't -- you

11  would agree -- you don't say right here, when "he

12  squirmed and pulled against me," you don't say that he's

13  fiddling with your belt.

14    A.  Okay.

15    Q.  Right?

16    A.  Correct.

17    Q.  Okay.  When was the first time he started

18  grabbing for -- what's the phrase you want to use?

19  Touching your belt?  Grabbing your belt?

20    A.  Sure.  Grabbing the belt.

21    Q.  Grabbing the belt.  Okay.  When was the first

22  time, here, then, that he was grabbing at your belt?

23    A.  During the -- as I say, during the search,

24  incident to arrest, his hands were always moving.  So it

25  would be -- at some point during the arrest.  I don't

DEPOSITION OF JOSHUA PATTERSON

93

1    recall exactly when.

2        Q.  Was he in handcuffs at -- the first time that

3    he was going for your belt?  He was grabbing your belt?

4        A.  Correct.

5        Q.  So when, at this point --

6        A.  The suspect's handcuffed before the search,

7    incident to arrest.

8        Q.  Okay.  So when -- so this part where he is

9    grabbing at your belt, where are the two of you in

10   relation to each other?

11       A.  I'm right directly behind him performing a

12   search.

13       Q.  So he's standing?

14       A.  Correct.  Standing right in the yard, I

15   believe, right in the sidewalk yard in front of house.

16       Q.  So there's nothing in front of him yet?

17       A.  Correct.

18       Q.  Okay.  So it says here, "For better security

19   and control, I escorted the suspect over to Officer

20   Harris's patrol vehicle.  I told him to face the vehicle

21   and lean against it to help keep the suspect from losing

22   his balance and falling over due to his level of

23   intoxication.  Due to his aggressive behavior, I

24   suspected that he would resist more actively."  I read

25   that correctly, right?

DEPOSITION OF JOSHUA PATTERSON

94

1      A.   Yes.

2      Q.   Okay.   When you say here that he -- "for

3  better security and control," what did you mean?

4      A.   That standing there in the middle of the yard,

5  and with him squirming and pulling and so on, it would

6  be easier to lose control of him, for one.   And it would

7  be for his safety as well.   If he falls down and hits

8  the sidewalk, that's not a good thing.

9          So either way, we should be able to secure him

10  in a patrol vehicle soon.   So I walked him over to at

11  least lean him over the patrol vehicle, so he could at

12  least be held up, and try to get a little more control,

13  if possible.

14      Q.   Okay.   So -- and that last sentence there,

15  where you say, "due to his aggressive behavior," was

16  there any other behavior he was doing that made you

17  suspect that he was about to resist more actively, like

18  you say here?

19      A.   Which paragraph is that?

20      Q.   That same paragraph.

21      A.   Oh, the third one.   Okay.   Yeah.   Just the

22  level of -- as he was rising in his level of verbal and

23  physical actions, if you will.

24      Q.   Okay.

25      A.   So -- I mean, it's obvious that the situation

1   is elevating, so I want to try to get it back down to

2   normal.

3          Q.  Okay.  All right.

4               MR. HAMILTON:  Is this a good time to take a

5   break before we move on to the next paragraph?

6               MS. MARCY:  If it's okay, I just have a couple

7   more questions, and then we can take a break.

8               MR. HAMILTON:  Okay.

9   BY MS. MARCY:

10         Q.  All right.  So you -- was he saying anything

11  at this time to you?  Or to anybody?

12         A.  I don't recall.

13         Q.  Okay.  And then this next -- this next

14  paragraph, okay, it says, "I told the suspect to relax

15  and comply with us as he kept pulling his arms and

16  reaching against my utility belt.  He told me" -- I got

17  to say it -- "'Fuck you, asshole.  Let go of me.'  As he

18  continued to struggle against me with his arms and

19  hands, I told him to stop resisting me and relax.  And

20  he said, 'Fuck you.'  He continued to struggle against

21  me, and I heard the retention lock on my weapon holster

22  unlock.  I looked down at my weapon holster and saw that

23  the suspect had unlocked the holster and had his right

24  hand on my duty weapon.  I feared for my safety, as well

25  as the other officers on scene, if he gained control of

1   my weapon.  I ordered him to let go, as he arched his

2   back and swung his head back towards my face, attempting

3   to head butt me.  I attached my left hand on the

4   handcuffs and pulled his hands away from my weapon.  I

5   attached my right hand on his right bicep area and moved

6   him down and away from my primary weapon side."

7           Okay.  Did I read that correctly?

8       A.  Yes.

9       Q.  Okay.  Now, you say -- that first sentence

10  there, is he -- when he's pulling his arms and reaching

11  against your belt, is that the same behavior that you

12  were talking about in previous paragraphs here?

13      A.  Yes.

14      Q.  And he's -- how did -- try again.

15          Were you -- how did you feel about what he

16  was saying to you right then?

17      A.  What he was saying?

18      Q.  Well, he kept saying, "Fuck you," and --

19      A.  Yeah.  Nothing new.  So...

20      Q.  It didn't bother --

21      A.  Pardon me?

22      Q.  Didn't bother you?

23      A.  No.  Didn't bother me.

24      Q.  Let's talk about this retention lock thing.  I

25  don't know -- what's a retention lock?

DEPOSITION OF JOSHUA PATTERSON

102

1      Q.   What was your first reaction, physically?

2      A.   Physically?

3      Q.   Mm-hmm.

4      A.   To get him away from my weapon.

5      Q.   So what -- right.  So what did you do?

6      A.   Moved him away from my weapon side.

7      Q.   When you moved, do you mean you turned you?

8  Or you turned him?

9      A.   A little of both, probably.  Turned him.

10 Grabbed what I could -- I was already grabbing the right

11 side, because he was going to fall down the driveway.

12 You know, still against the truck, but he was still

13 going to fall.  So I'm already turned to the side,

14 because the driveway is at an angle, so to keep him up.

15      And then I hear the lock release, look down,

16 say, "Hey" -- I forget -- I don't recall what I said.

17 And then as soon as I look up, then the head coming

18 back.  So ducked down to miss the head butt, and then

19 move him away from -- from my duty weapon.

20      Q.   Is that what you mean here when you say, "I

21 pulled his hands away from my weapon"?  Is that part --

22 that was part of what you did right there?

23      A.   Where are you pointing?

24      Q.   The second-to-last sentence in that paragraph,

25 where you say -- but phrase -- at the very end.

1     A.   Okay.

2     Q.   Right there?   "I attached my left hand on the

3   handcuffs and pulled his hands away from my weapon."

4     A.   Yes.

5     Q.   Now, the last sentence.   "I attached my right

6   hand on his right bicep area and moved him down and away

7   from my primary weapon side."   Is that also -- well, let

8   me ask you.   What did you mean by that?   "I moved him

9   down and away from my primary weapon side."

10    A.   So the primary weapon side, for me, is my

11  right side.   So I would have to move him away from my

12  right -- from my primary weapon side.

13    Q.   So you did that with your hands?

14    A.   So already holding with the right.   Went in

15  and grabbed that, grab his cuffs, move him away from

16  this side.

17    Q.   And you -- you were trained to do that?

18    A.   Yes.

19    Q.   Again, where were you trained to do that?

20    A.   At the academy.

21    Q.   Okay.   Had you ever had to do that before?

22    A.   No.

23         MS. MARCY:   Okay.   Did you want to take a

24  break now, Blake?

25         MR. HAMILTON:   That would be great.

1  BY MS. MARCY:

2      Q.  All right, Mr. Patterson.  We were talking

3  about -- we're still on 72.

4      A.  Okay.

5      Q.  All right.  The next paragraph there says, "I

6  placed the suspect into a prone position next to Officer

7  Harris's patrol vehicle."  Now, tell me, what is "I

8  placed the subject into a prone position"?  What is --

9  what did you mean?

10     A.  That means moved him to the ground.

11     Q.  Well, what do you mean by move?  Did you --

12  did you -- did guide him to the ground?  Did you cradle

13  him to the ground?  Did you set him down?  I mean, I

14  want to know the facts, like, what the actual actions

15  were.

16     A.  So when I moved him away from my primary

17  weapon side, that's when -- I moved him away from the

18  side and pivoted, and that's when he fell to the ground.

19  So he was moved away from the weapon side, and then he

20  went to the -- you know, the driveway is at an angle, so

21  he came to the ground on the driveway.

22     Q.  Okay.  It doesn't say here that he fell to the

23  ground.  Does it?  Where does it say that he fell to the

24  ground?

25     A.  It said he was moved to the ground.  That's

1    what the report says.

2        Q.  No.  It says, "placed the subject into a prone

3    position and moved him down" -- okay.  Wait.

4        A.  Placed the subject in a prone position.

5        Q.  But I'm asking you:  Where does it say that he

6    fell to the ground?

7        A.  It doesn't say.

8        Q.  All right.  Why did you not put in here that

9    Mr. Chatwin fell to the ground?

10       A.  I have no idea.

11       Q.  Because, like, again, this is -- this is a

12   report that you have to talk about the use of force up

13   at the top.  And you're -- but you didn't put down here

14   that he fell to the ground?

15       A.  When he was moved -- when he was struggling,

16   everything was very tense and so forth.  When I moved

17   him away, it's like everything went limp.  I mean, you

18   know, it's like he relaxed after moving him.

19       Q.  Okay.  So let's go back to that first part of

20   that sentence, though.  "I placed the suspect into a

21   prone position."  What is a "prone position"?

22       A.  Laying down on the ground, laying flat.

23       Q.  Well, if you placed him into a prone position,

24   then how does it -- that doesn't make sense.  Because if

25   you place somebody into a prone position, you're going

1    ground.

2         Q.   What's a prone position?

3         A.   When somebody's laying down on the floor.

4         Q.   So this says you placed him into a prone

5    position.   So you put him in that position?

6         A.   Yes.

7         Q.   Well, how did you do that?

8         A.   By moving him.

9              MR. HAMILTON:   Objection.   Form.

10   BY MS. MARCY:

11        Q.   Okay.   Move him with your hands?   Your feet?

12   Your head?   Your nose?   I'm asking, what did you do?

13        A.   As I'm saying, again, moved him, as I

14   explained to you, with the right hand on his bicep, left

15   hand on the cuffs, moved him away from my weapon side to

16   the ground.

17        Q.   So as he's heading toward the ground, where

18   are your hands?

19        A.   Still on his -- still -- like I said, still on

20   the right bicep and on the cuffs.

21        Q.   So all the way to the ground, you're still

22   holding on to some part of Josh Chatwin?

23        A.   Correct.

24        Q.   And then when he makes contact with the

25   ground -- I'm going the wrong direction.   When he makes

1    contact with the ground, it's then that you put him in a

2    prone position?

3         A.   No.   That's where he's in.   He's in the prone

4    position now.

5         Q.   Okay.   So then he's in a prone position now

6    that he's on the ground?

7         A.   Laying on the ground is the prone position.

8         Q.   Was he face-up?

9         A.   No.

10        Q.   Face-down?

11        A.   Face-down.

12        Q.   "Due to the level" -- it says here, "Due to

13   the level of intoxication of the suspect, his head

14   swayed down, and his left ear came in contact with the

15   ground.   I immediately told the suspect to stop

16   resisting me and to comply."

17             Why did you -- why did you say, "Due to the

18   level of intoxication"?   How did that make his head sway

19   down?

20        A.   That's the limpness that I'm talking about.

21   As I moved him, everything swayed, flopped, if you will.

22   I don't know.

23        Q.   Okay.   So -- but what I'm trying to understand

24   is you say, "Due to the level of intoxication," you're

25   saying because he was loose from being intoxicated?

1        A.  Okay.

2        Q.  Lets's call that -- let's call that at "zero

3   time," as far as seconds.

4        A.  Okay.

5        Q.  How many seconds later did you -- you said you

6   checked on him to make sure he was conscious and

7   breathing.  Right away?

8        A.  Correct.

9        Q.  Okay.  So we'll say at zero?

10        A.  Yes.

11        Q.  So at zero, you check on him.  And for safety,

12   you try to keep him until medical arrived.  Okay.  What

13   do you -- for that 30 to 45 seconds, are you saying that

14   was when you said you stayed kneeling beside him and

15   kept telling him that medical was on the way?

16        A.  Yes.  From when he went to the ground, from

17   when he was in the prone position, kneeled and told him

18   it would be all right.  I don't recall which one of us

19   called for medical.  And told him to stay still in case

20   he was hurt, in case he was injured, that medical was on

21   the way.

22        Q.  Okay.  And at that -- somewhere in that 30 to

23   45 seconds, is that when you moved him into -- against

24   the wheel?

25        A.  After -- after he started to move and get up

DEPOSITION OF JOSHUA PATTERSON

139

1   Q. Right.

2   A. Correct.

3   Q. So that means, deductively, I guess, that

4 actually, you would have to turn him more than 180

5 degrees for his head to land in the curb.

6     MR. HAMILTON:  Objection.  Form.

7     THE WITNESS:  No.  Because I would turn

8 myself.  I would take a step --

9 BY MS. MARCY:

10   Q. Okay.

11   A. Take a step clockwise.

12   Q. But if Mr. Chatwin -- even -- what I'm saying

13 is if Mr. Chatwin -- if Mr. Chatwin is facing to your

14 right --

15   A. Correct.

16   Q. Towards your counsel, right?  And you're

17 turned at an angle toward the top of the house,

18 Mr. Chatwin would have to go from where your counsel

19 is -- would have to go from -- to your right -- him; not

20 you.

21   A. Correct.

22   Q. About 270 degrees before his head lands in the

23 curb.

24   A. Correct.

25   Q. And even if you were angled, since you were

Phoebe S. Moorhead, CSR, RPR
**Reporters, Inc. 801-746-5080**