# EXHIBIT 3

30(b)(6) DEPOSITION OF DRAPER CITY POLICE

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

 3                        -ooOoo-

 4    JOSHUA CHATWIN,              : CIVIL NO. 2:14-cv-375

 5          Plaintiff,            : 30(b)(6) DEPOSITION OF:
                                     DRAPER CITY POLICE
 6    v.                          :
                                     REPRESENTED BY DEPUTY
 7    DRAPER CITY; DRAPER CITY    : POLICE CHIEF JOHN EINING
      POLICE DEPARTMENT;
 8    OFFICER J. PATTERSON, in    : TAKEN: December 8, 2015
      his individual and
 9    official capacity;          : Judge Dale A. Kimball
      OFFICER HEATHER BAUGH,
10    in her individual and
      official capacity;
11    OFFICER DAVID HARRIS, in
      his individual and
12    official capacity;
      OFFICER KURT IMIG, in
13    his individual capacity;
      SUPERVISOR TBA; and JOHN
14    DOES 1-10,

15          Defendants.

16    ------------------------

17

18                        -ooOoo-

19          30(b)(6) Deposition of DRAPER CITY POLICE,

20    represented by Deputy Police Chief John Eining, taken

21    on behalf of the plaintiff, at 201 South Main Street,

22    Suite 1300, Salt Lake City, Utah, before PHOEBE S.

23    MOORHEAD, Certified Shorthand Reporter for the State

24    of Utah, pursuant to Notice.

25
```

30(b)(6)  DEPOSITION OF DRAPER CITY POLICE                    15

1  there any information that we've requested in that

2  amended notice that is not known or reasonably available

3  to Draper City?

4          MR. HAMILTON:  And before the witness answers,

5  I think this is as good a time as any to state that we

6  have filed formal objections.  We sent a meet and confer

7  letter with you.  So subject to those objections, he's

8  here to testify.  But we did have some issues, as you

9  know, with the -- even the amended notice.  So -- but

10  he's ready to testify, subject to those objections.

11  BY MS. MARCY:

12      Q.  Okay.  So what I'm asking -- I'm asking you.

13  All right?  So your attorney has made the objection.

14          What I'm asking is:  Is there anything in the

15  amended notice, any of these questions, where you read

16  the question, and you feel like there's anything that is

17  not known to Draper City or was not reasonably available

18  to Draper City to provide today?

19          MR. HAMILTON:  Objection.  Form.

20          THE WITNESS:  Okay.  So I do believe that

21  there is probably some documentation in the earlier

22  years that we did not have and could not produce, based

23  on the fact that we had a change in our training

24  coordinators at the time.

25          ///

1    BY MS. MARCY:

2        Q.  Okay.  So let's talk about that, then.  When

3    you say there's some information that was not available

4    to Draper City, what is that information?

5        A.  Well, I think, specifically, what I'm saying

6    is that we didn't have all of the training records from,

7    like, 2005.  I don't know, specifically, every year

8    after that that we did provide in later years.  For

9    example, in the training calendar, specifically, you

10   don't have them for the earlier years, but you do have

11   them, I think, from -- I believe from 2011 to 2015, so

12   that would be an example of one thing.

13           Specific training outlines are probably not

14   there, also, for 2005 to 2010.

15       Q.  Specific training outlines?

16       A.  Or 2009.

17       Q.  Is that what you said?

18       A.  Yes.

19       Q.  What's that?

20       A.  So you'll see that from 2011 -- actually, from

21   2010 to 2015, you'll have, for example, a defensive

22   tactic outline, things that were covered during the

23   defensive tactic training.

24       Q.  What else is -- is missing?

25       A.  I can't think of anything else off the top of

1    my head.

2         Q.  So where are they?

3         A.  I don't know.

4         Q.  Do you know -- does Draper City know what

5    happened to them?

6         A.  No.

7         Q.  Does Draper -- has Draper City -- meaning the

8    police department part of Draper City -- have they lost

9    records before?

10        A.  No.  Not that I'm aware of.

11        Q.  Did Draper City keep these records from 2005

12   forward on computers?

13        A.  No.  Well, it -- so let's be more specific.

14   From -- it depends on what records you're talking about.

15   There are some records from that time period that have

16   been kept on computers; others from that time period

17   were kept in a hard copy.  And those records, whether or

18   not -- for whatever reason, those records are not there,

19   whether or not they've been purged, whether or not

20   they've been cleaned, whatever the system that they used

21   back in 2005, we just -- we cannot find those records.

22        Q.  And when you say -- well, so what is the

23   system that they use to take care of these records?  You

24   said -- well, that's a bad question.  When you said

25   "purge," what do you mean, "purge"?

1          A.   Again, when I say that, I'm speculating on

2    what could have happened to those records.   I'm not

3    saying that's what happened to those records.   I'm just

4    saying that you're talking about records that go back

5    ten years.   I'm not sure how they stored those records

6    or how long that they intended to even keep those

7    records.

8          Q.   Does Draper City have a policy on document

9    retention?

10         A.   Not for training records.

11         Q.   What about any other records?

12         A.   We have policy on retention for case reports,

13   evidence, video cameras, all those type of things.

14         Q.   How long are those documents kept?

15              MR. HAMILTON:   Objection.   Form.

16   BY MS. MARCY:

17         Q.   Go ahead.

18         A.   Those documents are kept dependent on what the

19   case is.   For misdemeanors, we might keep them up to

20   five years; for a felony, serious felony, homicides, we

21   keep indefinitely.

22              I think our standard policy right now for just

23   basic body camera video on an incident that's not on a

24   crime-related, it could be just an informational

25   exchange between police officers, I think we're keeping

1    those for about 180 days right now.

2         Q.  So why doesn't Draper City keep the training

3    records?

4              MR. HAMILTON:  Objection.  Form.

5              THE WITNESS:  Why didn't they keep the

6    training records?

7    BY MS. MARCY:

8         Q.  Why didn't they?

9         A.  I don't know.

10        Q.  Does Draper City keep the training records

11   now?

12        A.  Yes.  I --

13        Q.  When did -- I'm sorry.  See?  I talked over

14   you.  Sorry.

15        A.  It's okay.

16        Q.  When did Draper City start keeping the

17   training records?

18        A.  Well, what I can tell you is what we've been

19   able to produce for you.  So any training records that

20   you have is when they -- obviously had those training

21   records kept for you.

22        Q.  I noticed in the documents -- and it's part of

23   what's been in the exhibits -- like for instance, it

24   looks like -- I'm just trying to see if that's what

25   you're referring to.  It looks like when we had Exhibit

1    stamps number" -- and it says, "156 to 598."  Do you see

2    that?

3            A.  No.

4            Q.  Okay.  It's on --

5            A.  Where are you at?  Are you just on the next

6    page?

7            Q.  Right.

8            A.  Under the "Responses"?

9            Q.  Right.

10           A.  Okay.

11           Q.  Okay.  So Draper City 156 to 598, with a

12   couple of extra pages on the end, is Exhibit 3 right

13   there.

14           A.  Okay.

15           Q.  All right?  See how it starts there with 156?

16           A.  Okay.

17           Q.  Okay.  Will you show me in that document --

18   it's not a document -- but show me in Exhibit 3 where

19   the records are that reference 2010.

20           A.  You want me to go through the entire document

21   and show you where it talks about our policies -- let me

22   see what you're saying here.  So you would like me to go

23   through this document and show you everything in here

24   that is in relation to use of force, including excessive

25   force, for Draper City police officers for a time period

1   of 2005 to 2010?

2        Q.   Right.   What I'm not clear on is this -- we

3   started this conversation talking about -- when I asked

4   you questions, I asked you if there was some information

5   that I requested in the amended notice that is not known

6   or reasonably available to Draper City.   And I believe

7   you were talking -- you answered -- in part of your

8   answer, you were talking about there were some records

9   missing in 2010 but that you did provide some.   Does

10  that sound like a fair --

11            MR. HAMILTON:   Objection.   Form.

12            THE WITNESS:   Basically, yes.   I think your --

13  what I'm saying is going back to 2005, which this asks

14  for in Interrogatory No. 2, you wanted to identify all

15  customs, procedures, and training on the use of force,

16  going back to 2005 to 2010.

17            What I was telling you is that back in 2005,

18  we didn't have certain records that we later did

19  produce.   For example, back in 2005, I don't have -- as

20  you see on the top of Exhibit 3, it says, "2011 Monthly

21  Training Calendar."   I don't have that for you

22  for 2005.   I didn't have that documentation.

23       Q.   2005 or 2010?

24       A.   I didn't have it for 2005.   That would be an

25  example of one of the things that we weren't able to

1    produce for you.

2          Q.   All right.   So --

3          A.   And in addition to that, as you can see, as

4    you go through this document, 2003 [sic], just off the

5    top, the first thing you have is a monthly training

6    calendar.   I think the next thing you might have here is

7    the defensive tactic department training that is dated

8    April 12th and 19th of 2011.

9                I don't believe I was able to produce anything

10   for the years of 2005 that would be similar that we

11   produced for you in 2011.   So that was just an example

12   of some of the things I was telling you that we weren't

13   able to necessarily find going back to those earlier

14   years.

15         Q.   Well, let's keep looking at Exhibit 3.   So it

16   looks -- so 2010.   And then there's some documents if

17   you turn to -- 175, it's got 2012.   Are the documents

18   that are behind all of these dates, do they correspond

19   with that day?   For instance, with 175, when it talks

20   about 2012; and then after 175, it goes into when

21   it's -- the numbers like 176, 177, and so on, are those

22   also 2012 documents?

23         A.   I think they're the same document.   You just

24   start it on 175.   I don't think -- I think they're all

25   the same training outline.   So I'm looking at this

1    really quick.  So it looks like, to me, that 175 to 180

2    is all the same document.

3         Q.  So what -- so what year is 181?

4         A.  It looks like -- 181 -- this looks like it

5    is -- this looks like the 2010 policy, if I'm looking at

6    this correctly.

7         Q.  181 is the 2010 policy?

8         A.  Starting on page 180, this looks like the

9    policy from 2010.  Or it could be 2011 or 2012, because

10   I think they're all the same.  And maybe even back.  I

11   have to take a look at 2009.  I'm not sure.  What's the

12   date on the bottom?  It's not there.  But this would

13   have been that earlier policy, prior to going to Lexipol

14   in, I think, 2013.

15        Q.  All right.  So how do you -- how do you know

16   that -- starting with 180, that that is 2010?

17        A.  Well, like I said, it looks like the policy

18   that I have read from 2010.  It's probably the same

19   policy, because I don't believe it changed in 2011 to

20   2012.  And it probably was -- and I'm guessing here,

21   because I haven't verified this, and I don't remember

22   exactly -- it was probably the same policy that was in

23   effect prior to 2010, also.

24        Q.  How do you know, as a designee, that it's the

25   same policy --

1          MS. MARCY:  We're not in a category.  I'm

2    still doing the preliminary questions.

3          MR. HAMILTON:  Okay.

4          THE WITNESS:  So from 2010 to 2015, I'm not

5    certain of anything that is missing without going

6    through these specifically again.  I'm not certain if

7    anything is missing.  I think we answered in 2010 to

8    2015 all of your interrogatories.  I think it's all

9    there.

10         What I was saying is that from 2005 to 2010,

11   there were some documents that we believe are missing,

12   based on what information we have from 2010 to 2015.

13   And as we compare that from 2005 to 2010, we find that

14   we don't have the same documentation.  So whether those

15   documents are missing, or those documents were never

16   produced, I don't know.  I just know it's not as

17   complete in those early years as it was in the latter

18   years.

19         MS. MARCY:  Okay.  Objection to the answer.

20   It's nonresponsive to the question.  That's one of the

21   things I have to say.

22   BY MS. MARCY:

23         Q.  All right.  So -- and when you -- I noted you

24   said at the beginning -- I thought you said you produced

25   everything in 2010 to 2015; and then I heard you say

49

1    I just want to make sure that these are -- where's

2    this --

3              This might be -- can we take a break?  Can we

4    take a break?

5              MS. MARCY:  Sure.  That's probably a good

6    idea.

7              MR. HAMILTON:  Do you want to go talk?

8              THE WITNESS:  Yeah.  Let's go talk.  I'll take

9    my book with me.

10             (A recess was taken from 10:09 a.m. to

11   10:19 a.m.)

12   BY MS. MARCY:

13        Q.  All right.  So I believe the pending question

14   was:  What are the policies on the use of force for

15   2010?  Right?

16        A.  Right.

17        Q.  Okay.  What are they?

18        A.  So do you want me to just go -- so I have in

19   front of me the policy for 2010.  It starts with the

20   heading -- the first heading is "Use of Force."  It just

21   goes to a basic explanation of what the department's

22   stance is on the use of force.  Then it goes into deadly

23   force, statutory authority, justification to use deadly

24   force; and then it goes into use of force other than

25   deadly force, statutory guidelines; and then it goes and

1   BY MS. MARCY:

2       Q.  So -- so are you -- are you -- I just want to

3   clarify.  So you're saying this mirrors the language --

4   when I say "this," Exhibit 180 [sic] through --

5       A.  No.  So page 180 --

6       Q.  Okay.

7       A.  That looks like -- even going to page 181 --

8   is -- looks like it's been copied and pasted from the

9   policy manual.

10      Q.  I see.

11      A.  And then the others -- then starting 182,

12  there's different things there from other areas of the

13  policy manual.

14      Q.  All right.  So 180 through 181 are from the

15  policies in 2010.  And you said this looks like it was

16  used for training?

17      A.  Yes.  I think so.  Yes.

18      Q.  All right.  So let's -- let's talk about

19  training, then.  So I'm going to ask you the same

20  question that I asked you about policies, but just --

21  and procedures -- but just reference it as far as

22  training.

23          So what -- what is the training -- what was

24  the training for the Draper City Police Department for

25  the use of force in 2010?

1      A.   I think -- specifically, I think there's a

2  training -- you have the training outline that we just

3  talked about in 180 to --

4      Q.   I'm sorry.  180 to --

5      A.   180 to -- I think this is all related to use

6  of force.  Maybe just 180 to 181 or 182.  So you have

7  that training outline that's before you on those

8  particular dates.  Now, the specific -- tell me what

9  your question was again.  You want all the use of force

10  training?

11     Q.   Right.  Training -- training on the use of

12  force in 2010.

13     A.   So there's somewhere -- there's a training

14  outline -- there's a training calendar, I think, from

15  2010 that outlined what training occurred on what dates.

16  I would have to look at that to tell you, specifically,

17  in that year what training occurred.  Do I have that?

18           I have it for 2011.  So this is what I would

19  be looking for for 2010.  I think you have this

20  somewhere.

21           MS. MARCY:  Blake, is that somewhere?

22           THE WITNESS:  So that's 2011's training

23  calendar.  And I know there's one for 2010.

24           MR. HAMILTON:  There is, but --

25           THE WITNESS:  Yeah.  "Where?" is the question.

1    In addition to that, I know there's a defensive tactic

2    outline for 2010, also, somewhere.

3                 MS. MARCY:  Do you want to go off the record

4    so you can look at it?  We can leave --

5                 THE WITNESS:  Blake, it's up to you if you

6    want to go off the record.

7                 MR. HAMILTON:  No.  Let's find this thing.

8                 THE WITNESS:  I'm finding a lot of other

9    dates.

10                MR. GIANNA:  We're trying to help you, too.

11                THE WITNESS:  Well, the electronic version is

12   much easier to sort through.

13                MS. MARCY:  True.

14                THE WITNESS:  This here?  It's not on here.

15   This is what you sent to me.  I need, specifically --

16                MR. HAMILTON:  You're sure there's a 2010?

17                THE WITNESS:  I don't know how you have your

18   documents organized.  I don't know.  All I know is --

19                MR. GIANNA:  It's not a PowerPoint, is it?

20                THE WITNESS:  Is this just a copy of this?

21                MR. HAMILTON:  Yes.

22                THE WITNESS:  I've got in my car, too, all the

23   notes -- we had specific years and what was included

24   and --

25                MR. GIANNA:  '12, '14.  No '10.  I'll look at

1    the next volume.

2            MR. HAMILTON:  Use your computer.  If you

3    don't have the Bates range, that's fine.

4            THE WITNESS:  See if I have it in here.  I

5    can't find it in here either.

6            MS. MARCY:  Can we go off the record just for

7    a second?  Just for me to get a cup of coffee.

8            (A recess was taken from 10:38 a.m. to

9    10:44 a.m.)

10           MS. MARCY:  Back on the record.  So wait.

11   Wait.  Hold on.  So let me just -- let the record

12   reflect that we've been looking through documents to try

13   to find 2010 training documents on the use of force.

14           THE WITNESS:  There's specifically two

15   documents that I was looking for.  And this

16   documentation that I'm pretty confident is there -- and

17   without accessing my computer at the office, it's hard

18   to find it.  So specifically what I was looking for is

19   this defensive tactics outline and then the yearly

20   monthly training calendar that would outline everything

21   that was trained on for 2010.

22   BY MS. MARCY:

23       Q.  Do you -- well, let's talk about those, then.

24   Are you talking about -- when you talk about the

25   defensive tactic training, are you talking about the

1    monthly defensive tactic training?

2        A.  Or yearly, actually.

3        Q.  Oh, it's yearly.  So that's for 2010?

4        A.  Right.

5        Q.  And then you're talking about -- the other

6    document you're talking about is a calendar?

7        A.  So for example, on the very top of Exhibit 3,

8    you have a 2011 monthly training calendar.  I'm pretty

9    sure that there's one somewhere for 2010 that says

10   similar things.  Not the exact training those specific

11   months, but during the year, you will see that defensive

12   tactics was trained during the year of 2010, along with

13   a plethora of other topics that were trained for the

14   calendar year.

15           So that's the document I can't find in this

16   stuff.

17       Q.  And so where are those documents?

18       A.  I think I have them on my computer back at

19   work.  I just went through this last night, so -- I

20   thought they were here.  Everything that I have on my

21   computer that I was looking at last night has been sent.

22       Q.  Okay.  Let me -- then let me ask you.  I'm

23   trying to understand this.  So if you go back -- again,

24   we you go back to Exhibit 7 -- that's the "Defendants

25   Mac Connole and Draper City's Responses to

1    BY MS. MARCY:

2        Q.  Okay.  What else is similar between the

3    subjects contained in the 2010 policy and the 2013

4    policy on the use of force?

5        A.  I think there's a "Sergeant Responsibilities"

6    in both the 2013 -- excuse me -- 2010 and 2013.  I

7    think -- is covered in a different section.  I think

8    that's it.

9        Q.  Okay.  Now let's talk about what is different

10   between the policies in 2010 and 2013 on the use of

11   force.  What are the differences?

12       A.  So it looks like in 2013, they've added a

13   policy that talks about duty to intercede.  That policy

14   deals with another officer who witnesses use of force

15   that might be -- that may not be reasonable, that they

16   have a duty to intercede and stop that force.

17       Q.  Anything else?

18       A.  There's a more comprehensive list that talks

19   about the factors used to determine the reasonableness

20   of force in 2013, under Section 300.3.2.  There's a list

21   from A to Q.

22       Q.  And when you say -- when you say, "more

23   comprehensive list," where is --

24       A.  It's not.  These would be the differences.

25   Let me see if I can find it.  I don't know if there's

1    anything -- there might be something in 2013 -- or in

2    2010.  No.  I don't think 2010 even addresses that.

3         Q.  Addresses the factors contained in 300.3.2?

4    Is that what you're talking about?

5         A.  Yeah.  Other than it talked again about using

6    reasonable force, which is clearly stated in 2010.

7             So in 2013, it talks about "When determining

8    whether to apply force and evaluating whether an officer

9    has used reasonable force, a number of factors should be

10   taken into consideration."  And 2010 just pretty much

11   summarizes that when you use force, it has to be

12   reasonable in nature.

13        Q.  Okay.  What else is different, if anything?

14        A.  2013, it touches on pain compliance

15   techniques, carotid control holds.  It has a "Reporting

16   the Use of Force."

17        Q.  Where is that?

18        A.  300.5.

19        Q.  Okay.

20        A.  I believe in 2010, that was probably covered

21   in the report section, and not the use of force section.

22        Q.  What about 300.5.1?  Is that subject the same

23   in 2013 as in 2010?

24        A.  So 300.5.1 is just a notification saying that

25   "The officer shall notify a supervisor as soon as

1   possible."  That is not in 2010.

2       Q.  What about 300.4?  I don't think we talked

3   about that.  That's on page 1268.  Is that the same or

4   different?

5       A.  That's deadly force application.  That would

6   be the same.  That would be covered on page 3273.

7       Q.  Anything else that is different between the

8   two policies on the use of force?

9       A.  I think in 2013, there's a whole section here

10  on 300.6, on medical considerations.

11      Q.  As it relates to the use of force?

12      A.  Yes.

13      Q.  All right.  Is 300.7 dealing with supervisor

14  responsibility --

15      A.  Yes.

16      Q.  I'm sorry.  Let me finish.  Is that the same

17  subject matter as in 2010?

18      A.  Yes.  On page 3275, there's a section there

19  that talks about sergeant responsibility.  Not the same

20  verbiage.

21      Q.  Is it the same subject matter?

22      A.  Yes.

23      Q.  Does -- the 2010 policy on supervisory

24  responsibility, does it talk about the fact -- the

25  broken out Paragraphs A through H?

1   And so Deputy Chief Eining, I think, can tell you what

2   we found out.

3               MS. MARCY:  Okay.

4               THE WITNESS:  So I made a phone call to the

5   administrative sergeant back at the police department

6   and had him access my case file that I have for this.

7   And those two documents that I told you I was pretty

8   confident existed, they're not there.  So specifically,

9   when you talk about the training calendar for 2010, and

10  then a defensive tactic outline, they're not there for

11  2010.  So I was -- I was wrong on that.

12              MR. HAMILTON:  And obviously, if we later find

13  the documents, we'll make sure we supplement.

14  BY MS. MARCY:

15      Q.  Okay.  All right.  Let's talk about -- on page

16  6 of the amended notice of the deposition, the topic is:

17  "The policies, procedures, training practices, and

18  customs, if any, for providing medical attention for

19  persons in custody and arrestees."  So 15 just asks what

20  they are.

21      A.  So I would reference back to the individual

22  policy manuals.  Because I believe from 2010 to 2015,

23  there is a section for that.  In 2013 to 2015, there's a

24  medical consideration section in the use of force policy

25  itself.  And the years 2010, 2011, and 2012, while

1  use -- pursuits, there might be something.  If somebody

2  gets hurt in a pursuit, you would need to contact

3  medical or something along those lines.

4            I'm thinking there's probably going to be

5  subcategories as you go throughout the policy between

6  2010 and 2015, that's also going to address medical or

7  injured people, as opposed to just these two specific

8  policies that I talked to you about.

9        Q.  Okay.  Do you know why the policies in 2013

10 were modified?

11       A.  The entire policy manual?

12       Q.  No.  The one involving -- I'm sorry.  Do you

13 know why the policies involving medical assistance were

14 modified in 2013?

15       A.  Other than they went to Lexipol in 2013, as

16 opposed to not having it prior to 2013, would probably

17 be the only reason.  The medical is still very

18 comprehensive through 2010 to 2012, in that if we have

19 injured people, our response is basically to call

20 Unified Fire and have them and come and do the

21 treatment.  I mean, that's what we do with injured

22 people.  We have Unified Fire come and respond.

23       Q.  So with the -- when you're talking about

24 Lexipol, is that "Medical Assistance" section part of

25 the 2013 policy that Lexipol drafted?

1      A.   Yes.

2      Q.   So what about -- what about training for

3  police officers?  And this is paragraph 16.   The

4  training of police officers -- I mean, you know, how are

5  they trained to determine whether medical attention is

6  needed by a potentially injured person in custody?

7      A.   So, again, I think as you look at the

8  different training calendars, you'll see in the training

9  calendars, there will be first aid that is being taught

10 as one of the double-back trainings throughout the year.

11 And as a part of that first aid, what our officers are

12 being taught is basic first aid and probably CPR.

13     Q.   Can you show -- can you tell me the Bates

14 number page you're referring to?

15     A.   I'm looking specifically here.  Let me see if

16 I can find it.  I'm looking at the monthly training

17 calendar of 2011 and just seeing if it's -- what month

18 that would have been taught.  It doesn't occur every

19 single year.  It occurs a lot of the time.  I don't see

20 it in -- oh, yeah.  November 1st of 2011.

21     Q.   Are you on 159?  Page 159?

22     A.   Yes.  159.

23     Q.   Okay.  So can you -- can you tell us about

24 what that training of the first aid entails?

25     A.   Again, it's just basic first aid.  So it would

1   be controlling bleeding, opening airways, and CPR.

2        Q.  Anything else?

3        A.  No.

4        Q.  So when you say "controlling bleeding," for

5   instance, how are the officers taught to control

6   bleeding?

7        A.  Again -- so I -- I guess the way I want to

8   answer this question is based on my knowledge of how

9   I've been trained, again.  And I'm not so sure that's

10  exactly what you want to hear as a representative.  So

11  what I'm about to tell you is what I've been trained on,

12  and what I believe the current first aid practices still

13  are.

14          So when you talk about controlling bleeding,

15  it's by direct pressure.  It's pressure points.  It's

16  tourniquets, if need be.  What I'm telling you

17  specifically that Draper trains on is first aid,

18  whatever that encompasses at a basic first aid level.

19  There is no advanced life support-type training that is

20  given.

21       Q.  What about -- what about if someone loses

22  consciousness?  Is there any training for -- for

23  providing any type of aid or treatment to someone?

24       A.  Other than what falls under the general first

25  aid umbrella, there is no specific outline or anything

1   in writing that would dictate how to deal with somebody

2   who has lost consciousness.

3              MS. MARCY:   Okay.   Give me two minutes.   I've

4   got to get my glasses.   I'll be right back.   Plus, I

5   want to show you something.

6              (A recess was taken from 1:46 p.m. to

7   1:48 p.m.)

8              (Whereupon, Exhibit No. 15 was marked for

9   identification.)

10  BY MS. MARCY:

11     Q.   So Mr. Eining, just take a look at this for a

12  moment.   Have you ever seen anything like this, what

13  I've marked -- what she's marked as 15, posted on a

14  wall, like in a break room in Draper City or anything

15  like that?

16     A.   Not that I can recall.

17     Q.   So have you ever seen these first aid papers

18  like this on the walls, where they talk about, you know,

19  the basic -- like it says at the top, first aid?

20     A.   I am not -- I don't remember ever seeing this

21  page anywhere.

22     Q.   I'm not saying that it's at Draper City.   I'm

23  just asking if you've ever seen anything like this in

24  Draper City.   I'm not saying it's this very one.   No.

25  This is an example.   In fact, I will proffer it's in our

130

```
1        A.   Right.

2        Q.   All right.  Are there -- in 19, I'm asking

3   here, who are the -- any of the instructors or vendors

4   who train the police officers every two years in CPR?

5        A.   That would be Unified Fire Authority.

6        Q.   So it's only Unified Fire?

7        A.   Mm-hmm.  I believe so.

8        Q.   No. 20, where do they do that training?

9        A.   I do not know where they do that training.  I

10  don't know if it was at the police department.  I don't

11  know if it was at a fire department bay.  I don't know

12  where they gather for that training.

13       Q.   And you said -- but it is every two years?

14       A.   The certification is every two years.  Now,

15  sometimes -- I would have to go back and look at all the

16  different training calendars that I provided you from

17  2011 to 2015 and see -- I think there's some occasions

18  where it's been trained every year, first aid.  Not

19  necessarily the CPR portion.

20            It could have been, and I'm not sure -- it

21  could have been that there was a certification process

22  each year for those that needed it that particular year.

23  So what I'm saying is that not everybody in the

24  department is going to expire at the exact same time.

25  So maybe every year when they did first aid.  And I
```

1  believe, if I'm remembering correctly, that first aid
2  was taught every year from 2011 to 2015.  And during
3  that process, there could have been a recertification on
4  CPR for those that needed it at that time.
5        Q.  Okay.  And on Exhibit 3, on page 159, where it
6  talks about first aid, in those two places on November 1
7  and November 8, are those the certifications you're
8  talking about?
9        A.  I'm not sure that they did CPR in that
10  particular day, on that first aid training, but they
11  very well could have under that title of "first aid."
12       Q.  And we talked -- we talked -- I think we
13  talked a little bit about the policies, about medical
14  assistance, they changed.  Any other reason besides the
15  fact of using Lexipol that they changed?
16       A.  No.  They -- well, no.
17       Q.  What about anybody's desire to make the
18  policies more comprehensive than the way they were in
19  2010?
20       A.  No.  Because you remember, I think one of the
21  important things is that all medical issues are handled
22  by somebody else.  They're not handled by law
23  enforcement officers.  Law enforcement is just to
24  monitor and make sure that the patient is still
25  breathing, the bleeding is controlled, and then wait for