# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

---

)
JOSHUA CHATWIN,                    )
                                   )
            Plaintiff,             )
                                   )
vs.                                )   Case No. 2:14-cv-00375
                                   )
DRAPER CITY; OFFICER J.            )   Judge Dale A. Kimball
PATTERSON, in his                  )
individual and official           )
capacity; OFFICER DAVID            )
HARRIS, in his individual          )
and official capacity;            )
OFFICER HEATHER BAUGH, in          )
her individual and                 )
official capacity; and            )
JOHN DOES 1-10,                    )
                                   )
            Defendants.            )
                                   )

---

VIDEOTAPED DEPOSITION OF:  KIRK TORGENSEN

Taken:  June 17, 2016

Reported by: Kelly Sommerville, RPR

*Intermountain Court Reporters*
*Murray, UT 84107*
*(801) 263-1396*



1

1    Q.    So what -- what years were you teaching at

2    POST?

3    A.    I think I started in 1991, and I think I

4    taught at the academy until -- well, just with -- with

5    the basic program, probably 2015, maybe --

6    Q.    Okay.

7    A.    -- end of 2014.

8    Q.    And you would agree with me that during

9    that period of time that cadets are taught -- or were

10   taught those things that you lay out in that sentence,

11   correct?

12   A.    Correct.

13   Q.    For example, when you were instructing the

14   academy -- and you would agree with me that you were

15   instructing the academy when Officer Patterson actually

16   went through the academy, true?

17   A.    Probably true, yes.

18   Q.    And so you would agree that he would have

19   been trained regarding the constitutional requirements

20   regarding the use of force in the academy?

21   A.    There was a class that specifically focused

22   on that, yes.

23   Q.    So in that class that specifically focused

24   on that, you would agree that he received training

25   regarding those constitutional requirements, true?

```
 1        A.       I don't know if I could guarantee it, if I
 2   didn't do it, but it certainly -- it certainly was a
 3   course that was required for each cadet to take, and so
 4   I would assume, yes.
 5        Q.       And you would agree that during that time,
 6   he would have also been taught about statutory
 7   requirements regarding the use of force, true?
 8        A.       True.
 9        Q.       And you would agree that he would have
10   learned about the case law that gives guidance
11   regarding the use of force?
12        A.       Yes.
13        Q.       And you would agree that he would have been
14   taught how courts view the use of force and whether
15   it's reasonable or not?
16        A.       True.
17        Q.       And you would agree that he would have
18   received instructions on how juries view the use of
19   force and whether it's reasonable or not?
20        A.       True.
21        Q.       And so he would have been trained what use
22   of force was reasonable in the academy, true?
23        A.       He would have been trained on the concepts
24   of what the standard was and particularly how juries
25   and courts looked at how an officer does or does not
```

1    meet that standard.

2         Q.    And so he would have been trained

3    specifically on what use of force would be considered

4    to be reasonable?

5         A.    True.

6         Q.    And how that analysis would take place?

7         A.    True.

8         Q.    If you go to the next page of your report,

9    the first full paragraph on that page, you have a

10   sentence that starts on the third line, it says "I

11   explained."  Do you see that?

12        A.    The first full paragraph?

13        Q.    Yes, the first full paragraph --

14        A.    Uh-huh, I do.

15        Q.    -- on that page.  That sentence says "I

16   explained the need for policy and procedure to be

17   straightforward and simple," and there's a comma there.

18   I'd like to talk about that.

19             You would agree with me that police

20   policies should be simple.  They should be able -- an

21   officer should be able to understand them, correct?

22        A.    They should be straightforward, correct.

23        Q.    Okay.  And your language here is simple,

24   "straightforward and simple," true?

25        A.    What I meant by simple is that it needs to

                                                            25

```
 1        Q.      But, again, during that period of time,
 2   again, same questions that I asked with respect to your
 3   time at the Utah attorney general's office.  Do you
 4   have any recollection of actually physically making,
 5   you personally, making any changes to the use of force
 6   policy?
 7        A.      I -- I -- I would guarantee you that that
 8   happened at Adult Probation & Parole.  If those changes
 9   were sitting down with somebody and saying, "This
10   doesn't look right or this needs to be changed," those
11   discussions happened all the time.
12        Q.      Okay.  With respect to the use of force
13   policy at the AG's office, again, you've been critical
14   of the use of force policy with respect to Draper City
15   that was in place in 2010, correct?
16        A.      Correct.
17        Q.      And with respect to your rebuttal report,
18   and we haven't looked at that yet, and we can mark it
19   as an exhibit, if you need to, but you also opined
20   about something that Mr. Wallentine talked about in his
21   report, where he talked about the chiefs' association
22   getting together and making changes to use of force
23   policies throughout the state.  Do you remember that?
24        A.      I do.
25        Q.      And do you recall earlier, when you were
```

                                                            37

1   talking about the use of force policy at the attorney

2   general's office, you said that you had some

3   recollection of Ken Wallentine talking to you about the

4   need to change policies in kind of a nationwide change

5   with respect to use of force policy?

6        A.    I don't know if it was nationwide, but I do

7   recall the whole discussion.  There were a number of

8   issues.  It wasn't just use of force.  There were a

9   number of critical law enforcement issues that we were

10  trying to engage in with the sheriffs' association or

11  the chiefs' association.  And I -- yeah, I recall those

12  discussions about the need to -- to look at improving

13  what was in place.

14       Q.    Okay.  I want to talk specifically, though,

15  about the use of force policy, and let me just cut to

16  the chase here.  In 2010, it's true that the use of

17  force policy at the attorney general's office was

18  almost identical to the use of force policy in Draper

19  City?

20       A.    I don't know that.  I know that your expert

21  has said that.  I have not independently verified that.

22       Q.    Okay.  You wouldn't be here today telling

23  me that the use of force policy, where you were the

24  division chief or the chief deputy, and the buck at

25  least came to your desk as one of the higher-ups in

                                                        38

1  management, was unconstitutional, correct?

2      A.    If, in fact, the policy at the attorney

3  general's office in 2010 was similar to the one in

4  Draper, I would say that that policy was inadequate.

5  And if that's the fact, that's the fact.

6      Q.    And let's not -- let's not quibble about

7  terms, but language is important, and so I want to talk

8  specifically about whether it was constitutional or

9  unconstitutional.  Would you say that that policy was

10 unconstitutional in 2010 at the AG's office, where you

11 were in charge, if it was indeed identical to Draper

12 City's?

13     A.    If it -- the problem with the policy is

14 that it is so bare bones, and it is so -- it states the

15 conclusion that force has to be reasonable.  And in my

16 many years of experience, that is not sufficient to

17 guide somebody in what it means, how to comport

18 yourself with it.  If that was true and that's what the

19 AG policy said, I think it was lacking in giving the

20 direction and the guidance to officers in the AG's

21 office of what was expected of them, and if that's the

22 way it was, then that's the way it was.

23     Q.    But you would agree with me that in 2010,

24 that the Draper City policy, and again, if -- if the

25 AG's office policy was similar or identical to it, did

1  correctly state the law in Utah, true?

2      A.    It recited the state statute which said

3  that force had to be reasonable.

4      Q.    And that's a correct statement of Utah

5  state statute at that point in time, true?

6      A.    It was a correct statement of the law.

7      Q.    Okay.  And not only was it a correct

8  statement of state law, but that state statute and

9  federal law were consistent with respect to use of

10 force, true?

11     A.    I don't understand.

12     Q.    That use of force, again, this is from your

13 report here, if you flip over to the next page, you can

14 look at the exact language, second full paragraph

15 underneath your opinions, the language you used there

16 is that "The 2010 use of force policy in place at the

17 time of the incident simply cites the Utah state

18 statute which states that force may be used which is

19 reasonably believed to be necessary to effect an

20 arrest.  In other words, the officers are told simply

21 to use force that is reasonable."

22          And, sir, you would agree with me that that

23 is the standard with respect to use of force.  Force --

24 when you use force as an officer, it has to be

25 reasonable, true?

                                                      40

1        A.       True.   But the purpose of a policy is not

2    to just simply flat-out state what the -- what the law

3    is.   The policy is to be useful in directing and

4    guiding and making sure that the people who are

5    responsible comply with it.   To state a conclusion that

6    it has to be reasonable basically tells someone almost

7    nothing.   What is reasonable?   What is unreasonable?

8    In all of the years I've taught, we -- we have to spend

9    a tremendous amount of time talking about the fact that

10   -- in fact, we joke about it.   You have to use force

11   that is reasonable.   You look at a student and the

12   student goes, "Well, how do I know what's reasonable or

13   not?"   And the only way you can do that is by going

14   through and using case law and scenarios and studies

15   and looking at things that have been found clearly to

16   be unreasonable.

17            When you take somebody and you're trying to

18   guide them through policy -- a policy, for me, is there

19   to give someone direction and guidance as to what's

20   expected of them.   When you state the conclusion that

21   it has to be reasonable, it is while a true statement

22   of the law, practically, it's useless.

23        Q.       Okay.   And I understand that you're

24   critical of this policy.   But I want to talk, again, my

25   question was specific, that this was a correct

                                                              41

```
 1   statement, not only of state law, but federal law?

 2        A.    It's a correct statement of the law.

 3        Q.    It's a correct statement of the law, true?

 4        A.    True.

 5        Q.    And, therefore, as a correct statement of

 6   the law, it's not unconstitutional, correct?

 7        A.    That -- that's a complex question, because

 8   the responsibility of the police department is to have

 9   a policy and to have training, which is going to

10   describe to an officer what, in fact, is reasonable and

11   what is not reasonable.

12             So if your policy is lacking with respect

13   to their constitutional need to provide reasonable

14   force, then it can lead to the fact that the policy is

15   part of them not meeting their constitutional

16   obligation.

17        Q.    So let's talk about this, because this

18   sounds like exactly what you did for 23 years in the

19   academy.  You would tell the cadets that when you use

20   force, the law specifically states that your use of

21   force has to be reasonable, correct?

22        A.    Correct.

23        Q.    And then you said that it was kind of a

24   joke, because then one of the cadets would raise their

25   hand and say, "Well, what does that mean?"  And then
```

1   Draper here, correct?

2           MS. MARCY:   Objection.   Ambiguous.

3       Q.     (BY MR. HAMILTON)   Okay.   Let me try to

4   clear that up for you.   If you have a policy, and

5   again, you were the chief -- or the deputy chief at the

6   time, and the AG's office has a policy exactly

7   identical to this policy in Draper City, obviously you

8   would hope that the people underneath you and you

9   yourself would be taking the time to train those

10  officers, law enforcement officers, what reasonable

11  force was, true?

12      A.     Well, I would hope that the training is

13  occurring.   However, I will say this:   If the policy is

14  lacking -- what is written down is typically what cops

15  pay attention to.   We all do.   And if what's written

16  down is ambiguous and not clear, then I will tell you

17  it sends a message that it isn't important.

18          So if I came upon a policy that I felt like

19  was -- was ambiguous, I would be concerned that from an

20  agency standpoint, I need to change that policy to make

21  a clear statement to the employee what is expected of

22  them.   So I think when you have a policy that's

23  lacking, you -- you're starting off from the beginning

24  with a problem.

25      Q.     Okay.   But again, you would agree, and

44

```
 1    let's -- let's start back -- let's go back to this
 2    point.  You would agree with me that Draper City's
 3    policy in 2010 was a correct statement of law, true?
 4         A.    We've established that, yes.
 5         Q.    Your concern was that it didn't provide --
 6    and again, you go on in your report here, and explain
 7    that it doesn't provide factors, what factors courts
 8    look at with respect to whether force is reasonable or
 9    not, true?
10         A.    True.  It doesn't provide anything.
11         Q.    And that's really your critique of Draper
12    City's policy in 2010?
13         A.    I -- I think the policy was tremendously
14    lacking.  I don't think it gave any significant
15    structure or guidance to a police officer.
16         Q.    So what factors do you believe should have
17    been listed?
18         A.    Well, you -- there are lots of factors that
19    can be listed.  I -- I wrote in my report that when
20    they adopted a new policy in 2013, it was an example of
21    the kind of policy, maybe still could be improved,
22    frankly, but it was an example of a policy that at
23    least attempted to put down in writing that these are
24    things you must be aware of.  These are things you must
25    think through.
```

45

1           For example, that if somebody is

2     intoxicated, somebody is impaired, you've got a whole

3     different set of circumstances to think through on what

4     kind of force you use.  So the 2013 policy, for me, was

5     a huge step in the right direction in stating things

6     that an officer has to think about and be aware of.

7          Q.    Okay.  So you considered the 2013 policy

8     when you rendered your opinion, correct?

9          A.    I did look at that.

10         Q.    And would you say that that was part of

11    your methodology of coming up with your opinion of --

12    with respect to Draper City's policy?

13         A.    No, I don't think so.  I looked at it, and

14    I put in my report that it is an example of a policy

15    that at least does a good job of attempting to do the

16    very things that I think a policy should do.

17         Q.    Not only did you put it in your report, but

18    you also put it in your rebuttal report, correct?

19         A.    Correct.  It was as -- it was a rebuttal to

20    your expert witness talking about the fact that he was

21    involved in this change that occurred in 2013.  And I

22    said yes, I think that was a step in the right

23    direction.

24         Q.    Okay.  And so you relied upon that 2013

25    policy when you were making your decision or stating

1    your opinion regarding the 2010 policy?

2        A.    I don't think I relied on it.  What I

3    looked at was the policy that was in place in 2010, and

4    looked and said this is lack -- this is completely

5    lacking.  It has absolutely no substance.  I mean, I've

6    looked at over time many use of force policies that do

7    the very thing I've talked about and state much more

8    specifically what an officer has to be aware of, be

9    concerned about.  And the 2013 policy at least was an

10   example of something that I thought was an improvement.

11   I don't -- I didn't need it to rely upon my opinion

12   that the 2010 was lacking.

13       Q.    Did you compare that 2010 policy with any

14   other policies in place in the nation at that point in

15   time?

16       A.    Just through my many years of experience of

17   having looked at them and taught them, and I didn't

18   specifically pull up other, you know, other states or

19   anything like that.  But I've looked at many, many over

20   the years.

21       Q.    So you didn't pull up any examples of

22   policies that were in place regarding use of force

23   anywhere else in the nation in 2010, correct?

24       A.    Just based on my experience of what I've

25   done through my career is -- was the basis of what I

1  look at particular issues that we know are going to be

2  critical.

3      Q.     And with respect to, again, your statement

4  just a minute ago, that you enjoy reading the case law

5  regarding this, in this area, what does the case law

6  say with respect to factors, what factors should be

7  looked at?

8      A.     Case law talks about all kinds of things.

9  For example, in a use of force situation, you factor in

10 the size of the individuals that are involved in the

11 use of force.

12     Q.     Do you think that -- let me stop you right

13 there and we'll just kind of go through this list.   Do

14 you think that was something that should have been in

15 the policy, in Draper City's policy, back in 2010?

16     A.     I think it would have been helpful.

17     Q.     Okay.

18     A.     Factors as to the impairment of the

19 individual, the suspect, is absolutely critical.

20     Q.     And you actually -- let me stop you again.

21 You actually mentioned that in your report, and in your

22 rebuttal report, you go as far as to say "In looking at

23 the 2013 policy, these factors go from A to Q, and

24 importantly, include the need to factor in the effects

25 of drugs and alcohol in a suspect."   And just a second

1    ago you said that was critical.  So you -- would you

2    believe that that should have been in place in the 2010

3    policy?

4          A.    I do.

5          Q.    Okay.  What other factors?

6          A.    Time of day, circumstances.

7          Q.    Again, let me stop you again.  Is that,

8    again, something -- another factor that you believe

9    should have been listed in that 2010 policy?

10         A.    I don't know if that had to be listed in

11   the policy.  It's one that, you know, there's cases

12   called Graham vs. Connor and different cases that

13   outline what the courts have said.  You look at the

14   totality of the circumstances when you look at these

15   kind of cases.  So no two cases are ever alike.  That

16   makes it challenging.  But they give some things that

17   you really should look at.

18              Another big one is whether or not -- what

19   circumstance do you have the suspect in?  Is he under

20   control?  Is he -- does he have cuffs on?  Those kind

21   of circumstances are critical.  So what kind of

22   resistance can this suspect apply?  There are just all

23   of those kind of factors that go into it.

24              Now, you get into the era of Tasers and

25   different kind of things.  They become critical issues

1   as to whether or not a police officer should pull out a

2   Taser and use the Taser in a given circumstance.

3        Q.    So you just stated there Graham vs. Connor

4   and the case law talking about in these cases, you look

5   at the totality of the circumstance, true?

6        A.    True.

7        Q.    So you would agree with me it's impossible

8   to put together an exhaustive list of all of the

9   factors that an officer could confront with trying to

10   make a determination whether to use force or not, true?

11        A.    You could not do an exhaustive list.

12        Q.    You cannot do it, correct?

13        A.    Correct.

14        Q.    And that's what the case law says, that

15   each case is going to be different, correct?

16        A.    Correct.

17        Q.    And that, again, you're supposed to look at

18   the totality of the circumstances, true?

19        A.    True.

20        Q.    But you believe that there should be some

21   factors listed in a policy so that an officer has an

22   idea of what reasonable force is, and you specifically

23   latched on to that one factor that you think is

24   critical is drugs and alcohol, true?

25        A.    True.

1       Q.      You think -- do you believe it's important

2    to also train on that factor?

3       A.      Critical.

4       Q.      And you're obviously critical of the 2010

5    policy for not including that as one of the factors

6    that an officer should look at when making a

7    determination on their use of force, true?

8       A.      The lack of understanding what impairment

9    brings to the --

10      Q.      Yes.

11      A.      Yes, it's true.

12      Q.      And you, in your report, are also critical

13   of the fact that Officer Patterson, you couldn't find

14   any indication that he had received training with

15   respect to alcohol and drugs being -- being an

16   impairment and a factor that he should have been taught

17   by Draper City?

18      A.      Yeah.   I looked very carefully to see if

19   Patterson acknowledged having received any training

20   from Draper PD with respect to any use of force issue,

21   and there was no evidence that he had received any, and

22   that concerned me.

23      Q.      Sir, do you -- do you drink alcohol?

24      A.      I do.

25      Q.      Have you ever used drugs before?

53

1  that you would put in size.

2      Q.    So give me -- give me an example of how you

3  -- how you would do that, then, with the policy.  The

4  policy says if you are to use force, it has to be

5  reasonable, and one of the things --

6      A.    I'm not the one who brought up the size, I

7  believe.  You -- we talked about Graham vs. Connor, a

8  case that says there are factors to be considered.

9      Q.    And I -- I believe -- I apologize if I

10  misheard you, but I thought you said size was one of

11  the factors.

12      A.    Graham vs. Connor, the case talks about

13  that.  Those are the kind of factors that should be

14  looked at.  I didn't say that it has to be stated in a

15  policy, that size --

16      Q.    So give me a factor that you think should

17  be considered.

18      A.    Absolutely the -- whether somebody is

19  intoxicated or impaired.

20      Q.    So what would you put in the policy

21  regarding intoxication or impairment?

22      A.    That there are special issues that have to

23  be taken into consideration when somebody is

24  intoxicated or impaired, their inability to be stable,

25  where you have them -- where they're located.  Can you

78

1  put them someplace that it's going to be safer for them

2  to be in light of the fact that they may not be stable?

3           The policy is a statement that says those

4  are the kind of things we want the officer to think

5  about.  It's then combined with training, good

6  sufficient training, that walks an officer through how

7  you -- the kind of issues.  Do you prone somebody on

8  the ground?  Do you have them kneel down so that it's

9  safer so that somebody's not going to fall and get

10  hurt?  Those kind of things.

11       Q.    You would agree with me that location is a

12  factor that should be considered?

13       A.    True.

14       Q.    So, for example -- but it can cut both

15  ways.  Location -- if a person is at an elevated area,

16  they shouldn't be Tasered, or that should be a factor

17  that cuts against using a Taser, true?

18       A.    True.

19       Q.    Or if a person's in swimming pool, a Taser

20  should probably not be deployed, correct?

21       A.    Correct.

22       Q.    Okay.  But location can also cut in favor

23  of using force.  For example, you would agree with me

24  that if a person is by a busy road, that makes a

25  situation more unstable and an officer needs to get

                                                      79

1    control of the situation more quickly, true?

2         A.    It can.

3         Q.    So when we are listing factors, you would

4    agree with me that, again, your words, it's pretty

5    difficult to use concrete guidelines, correct, because

6    you have to provide training?

7         A.    I think -- I would not agree with that.

8    What you want to do is at least in the policy state

9    concrete things that the officer should be concerned

10   with, should -- should walk through, should consider.

11   That, then, coupled with the training, is what you

12   really want.

13        Q.    But you would agree with me that putting in

14   the policy that, for example, the location should be a

15   factor, you're still going to have to provide training

16   about how location should be considered?

17        A.    Clearly my report talks about the policy in

18   conjunction with good solid training is what's

19   critical.  One without the other is not sufficient.

20        Q.    Earlier, in your report, if you can flip

21   back a page for me, you talk about one of the other

22   things that makes you an expert in this area is that --

23   and this is the third full paragraph, "In addition, in

24   August 2011 I was awarded a contract with a partner to

25   provide federal court ordered training to the entire

1          A.      Well, I was his direct supervisor.

2          Q.      Okay.  Why -- since POST training exists,

3     why do you train police departments for other training,

4     if -- with the assumption -- let me rephrase that.

5               If POST training is supposed to be so

6     adequate, why -- as far as use of force, then why does

7     other training for other police departments even exist?

8               MR. HAMILTON:  Objection.  Form.

9               THE WITNESS:  The academy is a -- it's a

10    limited amount of weeks.  And over the years, there's

11    always been this real tough battle for how many -- you

12    can only do so many weeks, otherwise, it gets too

13    expensive.  It -- the chiefs and sheriffs aren't happy

14    with their people going through and not being on the

15    force.  So you have to make tough decisions as to

16    priority and time and everything else, and literally,

17    that training is to get someone to a standard.  And I

18    would say a minimum standard that, you know, they are

19    now certifiable to go be a police officer.

20              That training cannot be, is not, not even

21    close, the end to the training that a police officer

22    has to continue to get to become really proficient at

23    their job.  And that's why they have these mandatory

24    hours that have to be done every year to keep their

25    certification.

1          If they don't do that, they can lose their

2    certification.  Because it's clear that the academy

3    does a good job to a certain point.  It's the police

4    department's responsibility to make sure that that

5    training continues and continues in an efficient and

6    significant way.

7          Q.    Why is it important for that training to

8    continue?

9          A.    Well, I can tell you that the police

10   academy's -- the legal part of the police academy on

11   the use of force may have been eight hours all total.

12   And you can understand that somebody who's brand-new to

13   this, eight hours is enough to kind of get them a

14   foundation, but it certainly isn't the end-all, never

15   could be the end-all.

16          There are things that occur in law

17   enforcement that changes.  There are -- there are all

18   kinds of issues that become important, whether or not

19   you -- how you can restrain somebody.  And I, you know,

20   have been aware of cases in Utah where, you know,

21   suspects have been hogtied and died from that, even

22   though there was absolutely no training or no

23   indication that that was a safe method to do.  And so

24   those things change.  It's ever evolving.  You have to

25   stay on top of, you know, the current -- what's the

# EXHIBIT A

# Expert Witness Report of Kirk Torgensen
## In the matter of Josh Chatwin v. Draper City et al.

### I.  Statement of Assignment

I have been retained to perform a review of the Draper City policies and procedures and training with respect to use of force issues. My opinions expressed herein are based upon review of the material summarized herein in section III. My firm is being compensated at the rate of $150 per hour for all tasks performed in connection with this matter. I have not testified as an expert in any case prior to this case. I have not published any articles.

### II.  Background and qualifications

I have a law degree from the University of Utah and became a member of the bar in 1986. I went into the United State Air Force in 1986 as a Judge Advocate General and remained for four years. In 1990 I Joined the Utah Attorney General Office as an Assistant Attorney General. In 1991 I became the section Chief of the Civil Rights section and remained in that position for several years. I left the AG office in 1998 to become the Director of Adult Probation and Parole. After 3 years in this position I was appointed the Chief Deputy Attorney General a position I held for 13 years. I am currently working for Private OPS a local private investigation firm in Salt Lake City.

I have been asked to review the policy and procedures for Draper City PD on the use of force and training provided by the department in 2010 at the date prior to the incident in question in this case. My background and experience allows me to review these issues as I have spent over 23 years teaching police officers and criminal justice students about the constitutional and statutory requirements associated with the use of force. In 1990 I began teaching at the Utah Police Academy and I taught the legal curriculum to basic cadets trying to become certified as police officers. This was a 40 hour legal block that included the legal issues surrounding the use of force. We discussed the constitutional issues and the case law that gives guidance as to how the use of force would be viewed by courts and juries to determine if it was reasonable. I taught this curriculum on average at least 5 to 6 times a year. This included also teaching within the Advanced Officer training program. This included officers who were already certified and had been police officers for years. This training was certified by the Police Academy and was part of the 40 hours officers are required to complete each year to maintain their certification. I also provided similar training to departments upon their request.

Over the 23 years of providing this training I spent hundreds of hours and taught thousands of officers on these issues. I also taught as an adjunct professor for Weber State University in their Criminal Justice program. I taught there for 24 years and in that capacity I also taught the constitutional and statutory issues associated with a police officers use of force. We reviewed case law and examined all the factors a court

would look at to determine if the force used was constitutionally acceptable. Over the 24 years at Weber State I taught well over a thousand students on these issues.

As a police academy certified instructor and adjunct professor I also taught officers and students about the use of policy and procedure, and its importance in guiding officers on important legal standards and how to comport with those standards. I explained the need for policy and procedure to be straight forward and simple, but also to be thorough enough that it could guide a relative inexperienced officer in what was expected of them and how to meet those expectations. We discussed how critical solid policy is in protecting against liability and how critical it is to train officers with respect to the policy and the issues involved.

As the Chief Deputy Attorney General for 13 years I had responsibility to create policy and procedure office wide, which included policy and procedure for the 30 plus sworn officers in the office. I reviewed policy for adequacy and approved policies as part of the office policy manual. This included use of force policy and procedure for the sworn officers and associated training on that policy. I also was responsible to review use of force complaints and issues and discipline officers if they violated the policy or did not meet the expected standard. I did this for the entire 13 years I was the Chief Deputy.

In addition, in August 2011 I was awarded a contract with a partner to provide Federal court ordered training to the entire Atlanta Georgia police department. This training was mandated by the Federal court as a result of losing a civil rights lawsuit. The training was on the fourth amendment and focused heavily on search and seizure constitutional issues as well as training on the departments policy and procedure and the necessity to know and follow policy and procedure. Over 2000 officers had to receive four hours training on these issues. I spent several weeks providing this training.

II.  Materials Examined

I have reviewed:
  (a) the complaint in Chatwin v. Draper City et al
  (b) The deposition of Deputy Chief Eining
  (c) The deposition of Officer Joshua Patterson
  (d) The deposition of Officer Harris
  (e) The deposition of Officer Baugh
  (f) Witness statement of Kathy Torrence
  (g) 2010 use of force policy at Draper PD
  (h) 2013 use of force policy at Draper PD
  (i) The deposition of Kathy Torrence
  (j) The deposition of Joshua Chatwin
  (k) The deposition of Mehdi Mahmoudi
  (l) The deposition of Steven Merrin
  (m)The deposition of Jason Scott
  (n) The criminal preliminary hearing transcript of Joshua Chatwin
  (o) The criminal Information of Joshua Chatwin
  (p) The 2011 training documents provided by the defendants

III. Opinions, Basis and Reasons for Opinions

After reviewing all the material stated herein it is my opinion that the Draper policy in place at the time of this incident on May 18, 2010 was extremely inadequate and did not provide sufficient guidance and direction on the constitutional and statutory issues that an officer faces in use of force situations. The policy is completely lacking in any concrete guidance on the factors to consider to determine if the use of force was reasonable as dictated by the Constitution and Utah state statutes. Furthermore, there is no evidence of any training provided to Officer Patterson by the department as there are no training records. Also Officer Patterson admits in his deposition that he could not recall receiving any such training.

The 2010 use of force policy in place at the time of this incident simply cites the Utah state statute which states that force may be used which is reasonably believed to be necessary to affect an arrest. In other words, the officers are told simply to use force that is reasonable. This type of conclusory statement is of little or no help to officers. There is nothing within the policy that helps an officer analyze and dissect what factors should be considered in deciding if any particular use of force is reasonable under the circumstances. This coupled with the fact that Draper PD did not produce any evidence of any training provided to Officer Patterson since joining the force and Patterson's own admission that he could not recall receiving any such training shows a lack of attention to the department's legal obligations. The department, in my opinion, was woefully inadequate in having sufficient policy and procedure, and associated training, to assure officers would meet their legal obligations. The basis and the reasons for my opinion are as follows: The 2010 policy is nothing more than a cite to the state statute that says the force used must be reasonable. This statement provides no clear guidance or instruction on how to determine what use of force is reasonable. It does not provide any factors to consider or any concrete guidelines on how to ascertain the amount of force that would be reasonable. It is merely a statement that states the standard without any factors or guidance on how to meet that standard.

Having a comprehensive and through policy is only the first step in assuring that an officer is prepared to only use the force that is reasonable. Training is an absolute critical component. An officer must be trained thoroughly on how to deal with situations and circumstances in a reasonable way so when confronted with that situation their training helps them react appropriately. An officer will react according to their training if that training has been conducted appropriately and with sufficient repetition. That is why on-going training on such situations and appropriate responses is critical. In this case, Draper PD has not provided much, if any evidence, of any such training.

I also reviewed the 2013 policy adopted by Draper PD and compared it to the 2010 policy. The 2013 policy is a much more comprehensive policy. For example this policy covers critical topics like the fact the officer cannot be the aggressor and it importantly lists factors to be considered in determining if the force is reasonable. Factors listed are (a) through (q) and contain factors like the effects of drugs and alcohol

and the subject's mental state or capacity. Also the degree to which the subject has been effectively restrained and their ability to resist must be factored in to the situation All of these issues end up being critical issues in the incident on May18 2010. The 2013 policy is an example of a policy that gives concrete factors to be aware of and of course if there is solid training that teaches officers on how to consider these factors and others, it greatly increases the likelihood of a desired outcome. The training received at the police academy is meant to provide just the minimum amount of training necessary and it is the departments responsibility to continue to train the officer on critical issues like the use of force.

My opinions are based upon my twenty four plus years of study and review of writing proper policy and procedures and my teaching and training of others on how to do the same, and my years of producing and implementing policy and procedure and providing training for employees of the Utah Attorney General office. I also have spent hundreds of hours studying case law on the factors in the use of force and training officers on those issues and what the legal standards are with respect to those issues.

IV. Conclusion

     I conclude that Draper PD. Did not have a sufficient policy and procedure in place in May 2010 to meet their obligations under the constitution, to train and guide officers in the department in the proper and legal use of force. They also did not provide evidence of specific sufficient training on the proper use of force that is required to meet their obligations under the law.

_____   _____
Signature                                Date

## **ADDENDUM TO EXPERT REPORT OF KIRK TORGENSEN**

I will use:

     1.     Draper City's policies and procedures on the use of force by police officers on arrestees in effect in 2010 and 2013 produced by Defendants and identified by Defendants as such;

     2.     Documents produced by Defendants and identified by Defendants as training procedures on the use of force by police officers on arrested persons;

I may use:

     1.     A summary chart to explain or illustrate my opinions and conclusions;

     2.     Other documents produced by the defendants in this case;

     3.     Photographs and illustrations, including computerized images, of an example of ex-Officer Patterson's handcuffs, gun and holster used in the arrest of Mr. Chatwin;

     4.     Illustrations, including computerized images and photographs, of the location of the arrest; and,

     5.     An example of the type of gun, handcuffs and holster used by ex-Officer Patterson in Mr. Chatwin's arrest.

# Kirk Torgensen

### 385-216-5607
### e-mail: ktorgens@gmail.com

## Qualifications Summary

Over 27 years of legal experience including Prosecutor, Defense Counsel, Civil Litigator and Law Instructor. Management experience includes over 13 years of managing over 400 employees and budgets of over 50 million dollars. Significant experience with human resource and personnel issues, budget and budget development, employee motivation and organizational management.

## Professional Experience

PrivateOps/CourtOps                                         November 2015 to Present

Chief Deputy Attorney General                              January 2001 to January 2015
State of Utah

~Responsible for the day-to-day management of the Utah Attorneys General office. This includes supervision of over 210 Attorney's and over 200 support personnel. Direct management of a budget exceeding 50 million dollars. Direct supervision of all legal decisions within the office including capital homicide and murder cases, antitrust cases, white-collar criminal cases, securities fraud cases, civil rights cases, litigation and child welfare cases.  Developed the first ever manager training for the Utah Attorneys General office.

Director of Adult Probation and Parole                     June 1998 - December 2000
Utah Department of Corrections

~Responsible for the entire department of AP&P, which included the statewide supervision of over 600 employees and supervision of over 15,000 probationers and parolees. Managed a budget of over 35 million dollars.

Section Chief, Financial Crimes Prosecution Unit            July 1994 - June 1998
Utah Attorneys General Office

~Started the first statewide Financial Crimes Prosecution Unit. Responsible for statewide prosecution of financial crimes. Drafted the state's first money laundering statute passed into law.

Section Chief, Civil Rights Litigation Section                    July 1991 - July 1994
Utah Attorneys General Office

~Defended the state in all civil rights litigation cases. Included all aspects of litigation from the
beginning of a case completely through trial. Supervised over 40 employees.

Assistant Attorney General, Criminal Appeals Division            August 1990 - July 1991
Utah Attorneys General Office

~Handled criminal appeals and evidentiary hearings. Handled all post convictions Writs of
Habeas Corpus filed in the state.

Judge Advocate General                                          August 1986 - August 1990
United States Air Force, Zweibrucken, Germany

~Prosecuted and defended over 40 jury trials throughout Europe.

## Awards

I was recognized by the Utah Police Chief's Association in 2004 as the outstanding contributor
to Law Enforcement.

I was given the Nelson Kempsky award in 2006 as the top manager by the Conference of
Western Attorneys General.

In 2013 I was recognized again by the Conference of Western Attorneys General as the Jim Jones
award recognizing outstanding commitment to public service.  I have been the only person to
receive both the Kempsky and Jones award.

## Academic Positions

Adjunct Professor                                                        1998 present
Weber State University

~Teaching in the Criminal Justice Program focusing on Criminal Law and Constitutional Law.

Adjunct Professor                                                        1999 present
University of Utah

~Teaching legal classes in the Masters of Public Administration Program focusing on

Constitutional Law and Administrative Law

Instructor                                                                                  1987 - 1990
City College of Chicago, European Branch, Germany

~Taught Business and Criminal Law

Instructor                                                                                  1988 - 1996
Salt Lake Community College, Utah

~Taught in the Paralegal Program. Classes ranged from Criminal and Constitutional Law to Wills
and Estates.

Instructor                                                                                  1990 - present
Utah Police Academy

~Involved in developing the entire legal curriculum for the Peace Officers Academy.  Includes
teaching statewide for over 20 years.

## Additional Instructor Experience

~Mountain West College, Utah.  Paralegal Program.

~Narcotics Officer Training, Utah.  Training for narcotic officers on search and seizure and use
of force.

## Education

J.D.                                                                                        1986
University of Utah College of Law

Leary Scholar (Top 20% of class)

B.A.                                                                                        1983
Utah State University

G.P.A. 3.9; History and Political Science Major
Magna cum Laude;
Named Outstanding Graduating Senior, College of Humanities, Arts and Social Sciences
Who's Who in American Colleges 1984-1985

## Volunteer Work

~General Counsel for the Utah Narcotic Officers Association.

~Small Claims Judge in Salt Lake City, Murray and Sandy courts in Utah.

~Mentor in the Juvenile Court Mentor program.