# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

JOSHUA CHATWIN,                                )
                                               )CASE NO.
                        PLAINTIFF,             )2:14-cv-00375
                                               )
Vs.                                            )
                                               )
DRAPER CITY; OFFICER J. PATTERSON,             )
IN HIS INDIVIDUAL AND OFFICIAL                 )
CAPACITY; OFFICER DAVID HARRIS, IN             )
HIS INDIVIDUAL AND OFFICIAL                    )
CAPACITY; OFFICER HEATHER BAUGH, IN            )
HER INDIVIDUAL AND OFFICIAL                    )
CAPACITY; AND JOHN DOES 1-10.                  )
                                               )
                        DEFENDANTS.            )
─────────────────────────────────             )


Videotaped Deposition of Trevor Petersen

Taken:  July 13, 2016




Reported by: Linda J. Smurthwaite, RDR


***Intermountain Court Reporters***
***Murray, UT 84107***
***(801) 263-1396***



1

1    other discipline while you were with Weber County

2    Sheriff, besides what you've described?

3         A.    No, I did not.

4         Q.    Prior to being employed with Weber County

5    Sheriff's office, you were employed with the Kane County

6    Sheriff's office, correct?

7         A.    That is correct.

8         Q.    And you were with them from September of 2000

9    to May of 2002?

10        A.    That is correct.

11        Q.    Were you ever disciplined by the Kane County

12   Sheriff's office?

13        A.    No, I was not.

14        Q.    Prior to that employment you were employed by

15   the Utah State Parks and Recreation from March of 2000 to

16   September of 2000?

17        A.    That is correct.

18        Q.    Were you ever disciplined while you were with

19   the Utah State Parks and Recreation?

20        A.    No, I was not.

21        Q.    And my understanding was that that was your

22   first law enforcement job; is that correct?

23        A.    As a certified law enforcement officer, yes.

24        Q.    Why did you leave Utah State Parks and

25   Recreation?

                                                    36

1         A.    Yes, sir.

2         Q.    You'd agree with me that none of those things

3    that are listed there, have anything to do with respect

4    to the assignment that you were given in this case?

5         MS. MARCY:   Objection, form.

6         THE WITNESS:   That is not correct.   The less lethal

7    training that I performed with the deployment of less

8    lethal munitions, chemical munitions, noise/diversion

9    devices, specifically pertain to use of force.

10        Q.    That was during August of 2011?

11        A.    That is when I created the Power Point.   I

12   was a actual certified instructor through the National

13   Tactical Officers Association.   I believe I received that

14   certification in September of 2006.

15        Q.    I want to ask you specifically what that

16   training entailed.   What did that training entail?

17        A.    It was in Burbank, California where they

18   were --

19        Q.    No, I want to ask you specifically about the

20   training that you've listed here, that you did for the

21   Weber Metro SWAT?

22        A.    Oh, okay.   So, sorry, I didn't understand

23   your question.   You want me to talk about the training

24   that I instructed, or the training that I received to

25   become an instructor?

                                                          38

1      Q.   You would agree with me that sitting here

2 today, the only thing you can recall is conducting one

3 training class involving the use of force involving

4 individuals under the influence of alcohol?

5      MS. MARCY:  Objection, form.

6      THE WITNESS:  To clarify, are you talking one

7 subject, or several training classes, separate training

8 classes?

9 BY MR. HAMILTON:

10     Q.   Well, I'm using your verbiage here from your

11 report.

12     A.   Yes, I have done several classes under the

13 same subject.

14     Q.   So, during that period, or when you were

15 talking or testifying earlier, you were talking about

16 providing that training course multiple times?

17     A.   Yes, sir.

18     Q.   So you provided that training class multiple

19 times?

20     A.   That is correct.

21     Q.   Over a period between sometime in 2005, 2006?

22     A.   To the best of my knowledge, yes.

23     Q.   How many times did you provide that training

24 class?

25     A.   I don't recall.

1      Q.   Was it a situation where you trained one day

2   because half the department was able to come to training

3   that day, and then you did the same training the

4   following week when the other portion of the department

5   could be there?

6      MS. MARCY:  Objection, form.

7      THE WITNESS:  It could have been actual law

8   enforcement officers, and it also involved police academy

9   students at Weber State University.

10  BY MR. HAMILTON:

11     Q.   So when you were talking about doing this

12  training class, you did it for not only the Weber County

13  Sheriff's department, but you also did it for the police

14  academy at Weber State?

15     A.    That is correct.

16     MS. MARCY:  Objection, form.

17  BY MR. HAMILTON:

18     Q.   And how did that specific class or that

19  training deal with how you use, or when you use force

20  with individuals that are intoxicated?

21     MS. MARCY:  Objection, form.

22     THE WITNESS:  You have to identify the -- their

23  coherent state of mind, also their abilities, dealing

24  with their reaction times.  And there is actually a

25  portion -- let me finish answering your question then I

                                                    46

1    can go back to that.

2         Just -- as I recall, those are the things that we

3    discussed.  It's --

4         Q.    So you have to determine their reaction time.

5    How do you determine their reaction time?

6         A.    Well, there's actually scientific data.

7    That's what I was going to add to my statement, is in my

8    use less lethal class.  I discuss alcohol responses to

9    different chemical munitions, and noise/flash diversion

10   devices that can actually, with an intoxicated person,

11   gives you actually more time than with a normal person

12   that's not intoxicated, as far as their delayed responses

13   and so forth.

14        Q.    Okay.  So now we're going back to the less

15   than lethal munition training?

16        A.    That is correct.

17        Q.    I want to specifically focus in on the 2005,

18   2006 training that you can recall doing regarding

19   training cadets at Weber State University, and training

20   Weber County Sheriff's office regarding the use of force

21   involving individuals that were under the influence.

22   What did that training entail specifically about when to

23   use force with people that were intoxicated?

24        A.    To the best of my knowledge, it's what we

25   already discussed.  Identifying that these individuals

                                                    47

1    are intoxicated, that -- handling them, establishing

2    their demeanor, body language, and so forth.

3        Q.    And how would their -- I guess I'm trying to

4    understand what the impact of a person being intoxicated

5    has on your use of force.  What were you training them to

6    do?  If the person was intoxicated, use less force,

7    different types of use of force, tools?

8        A.    It was all scenario-based training, so every

9    situation was different.

10       Q.    Been going for about an hour at this point,

11   I'd like to take a break.

12       (Off the record at 10:07)

13    (Returning on the record at 10:26)

14   BY MR. HAMILTON:

15       Q.    Sir, I want to go back to something I asked

16   you earlier on.  I talked to you a little bit about the

17   communications you had with Ms. Marcy, and I asked you

18   whether she ever asked you to assume certain things, make

19   certain assumptions as you were doing your analysis, or

20   rely upon certain facts as she provided to you, or data,

21   and you said that you couldn't recall, is that correct?

22       A.    I believe so.

23       Q.    So, it could have happened, Ms. Marcy could

24   have told you to assume certain things during those 12 to

25   15 email communications that you had with her, and those

                                                          48

1        Q.    You would agree that there is nothing that

2   indicates that he wasn't highly intoxicated?

3        A.    According to the information I was given,

4   yes.

5        Q.    So yes, you'd agree with that?

6        A.    Yes, in my opinion.

7        Q.    Okay.  And would you agree with me that if

8   the search was done of Mr. Chatwin on the grass, that

9   that would have been safe?

10       MS. MARCY:  Objection, form.

11       THE WITNESS:  Safer than on the concrete, yes.

12  BY MR. HAMILTON:

13       Q.    And you wouldn't fault the officers for doing

14  that search on the grass, true?

15       A.    No, I wouldn't.

16       Q.    Is it really your whole opinion regarding

17  safety, really does it just boil down to the fact that he

18  was taken on to the concrete surface?

19       A.    No.

20       Q.    What else does it include?

21       A.    Having multiple officers to assist with

22  handling Mr. Chatwin.

23       Q.    What do you mean by multiple officers?

24       A.    You have two sworn Draper City police

25  officers on scene, Officer Harris and Officer Patterson.

                                                        59

Intermountain Court Reporters *** (801) 263-1396

1    You also have a animal control officer, who I believe was

2    Officer Balm.  It's my opinion that if you have multiple

3    individuals there to assist with taking an intoxicated

4    person, as they put in their reports is barely capable of

5    standing on his own, why wouldn't you use those multiple

6    individuals to assist this highly intoxicated person to

7    the vehicle to prevent him from harming officers and/or

8    himself?

9         Because at this point, to go and search Mr.

10   Chatwin's vehicle, there are no other individuals inside

11   the vehicle.  There is no urgency, there is no threat of

12   the vehicle harming them.  The highest safety

13   consideration is Mr. Chatwin himself.

14        Q.    So really, wouldn't you agree with me that

15   your main critique is that this whole situation basically

16   could have been avoided if they would have done the

17   search there on the grass, and just put him in the prone

18   position there on the grass?

19        A.    Could have put him in a prone, could have put

20   him in a kneeling position.  A second officer could have

21   helped stabilize him.  You could have done -- each

22   officer take a side of Mr. Chatwin, and conduct the

23   search of his person for any weapons or contraband.

24   There you have two individuals helping support him, and

25   if he's unable to be supported, then yes, you can put him

                                                          60

1    in a kneeling position or in a prone position.

2        Q.    Again, though, I'm trying to understand, I

3    mean, you make this critique that they didn't adequately

4    look out for the safety of Mr. Chatwin, and the other

5    officers involved.  And it seems like your main critique

6    is, and that you're basically saying, if they would have

7    done the search and put the person in a prone or kneeling

8    position there on the grass, Mr. Chatwin, this whole

9    incident could have been avoided.  Is that what you are

10   saying?

11       A.    Not everything to that extent.  But as I'd

12   mentioned before, if Officer Harris would have assisted

13   Officer Patterson with escorting Mr. Chatwin to the

14   vehicle and securing him, if they did the search on the

15   grassy area, they didn't need to do a secondary search on

16   the concrete next to the vehicle.

17       Q.    So your whole critique about the search and

18   it not being safe, is your assumption that there was a

19   second search done by the truck?

20       MS. MARCY:  Objection.

21       MR. HAMILTON:  Or that there was a search done by

22   the truck?

23       MS. MARCY:  Objection, form.

24       THE WITNESS:  No.  There are two contradicting

25   information in here pertaining to Kathy Torrence's

                                                        61

```
 1   safety issue, right?

 2        MS. MARCY:  Objection, form.

 3        THE WITNESS:  Not entirely, no.

 4   BY MR. HAMILTON:

 5        Q.   But your opinion is that if they would have

 6   done the search there, and they would have just left him

 7   on the grass in a kneeling position, and then escorted

 8   him to the truck, the whole incident could have been

 9   avoided?

10        A.   No, sir.  Those are options that could have

11   happened.

12        Q.   Well, you state right here that that's your

13   opinion.

14        A.   Yes, sir.

15        Q.   All right.  Is it your opinion or not your

16   opinion?

17        A.   It is my opinion, but there's other

18   circumstances involved in it to where that's not my

19   complete statement involving the totality of the

20   circumstances.

21        Q.   Okay.  With respect to safety and this

22   critique that you have, I asked you what your methodology

23   was coming to that opinion.  And you went on and kind of

24   explained some of the facts that you looked at and

25   considered?
```

63

1      A.     Yes, sir.

2      Q.     But I'm trying to understand your methodology

3  to reach that opinion.  Did you just look at those facts

4  and that led to the opinion, or did you use your

5  experience?  How did your experience play into

6  formulating that opinion?  Can you explain that to me?

7      MS. MARCY:  Objection, form.

8      THE WITNESS:  Training and experience, sir.

9  BY MR. HAMILTON:

10      Q.     How did your training and experience help you

11  formulate that opinion?

12      A.     My experience of dealing with multiple

13  individuals, taking multiple individuals into custody,

14  whether it was an intoxicated level under the influence

15  of drugs or other narcotics.  Excited delirium.  Also

16  evaluating these types of incidents with the Weber County

17  use of force committee for several years, and evaluating

18  officers' use of force.  As well as anything from arrest

19  control tactics to using lethal force, using impact

20  weapons, using chemical munitions, using different types

21  of techniques and tactics to use to take somebody into

22  custody.

23      Q.     What was the standards, at that time that the

24  incident took place, regarding safety and how to take

25  someone that was intoxicated into custody safely?  What

                                                          64

```
 1   just want to make sure, since you are relying on your
 2   experience.  What is your specific experience dealing
 3   specifically relating to the safety procedures that
 4   should be followed while taking a person into custody
 5   that's intoxicated, safely?
 6        A.    It deals with safety of the officers as well
 7   as the arrestee himself, and other citizens and
 8   bystanders.
 9        Q.    I apologize, maybe the question was
10   confusing.  But what is your experience in that area?
11        A.    Taking --
12        Q.    What experience were you drawing upon as you
13   formulated that opinion?
14        A.    Life experience as a police officer, as well
15   as working as a certified instructor, as well as working
16   as an evaluator on the use-of-force committee with the
17   Weber County Sheriff's office.
18        Q.    Let me ask it a different way.  How would you
19   explain that your experience qualifies you to know more
20   about police safety procedures than a person without your
21   experiences?
22        A.    Because I've actually done it in real life.
23   I've had to consider my safety as well as the safety of
24   other officers, as well as the safety of the person that
25   I was taking into custody.
```

66

```
 1   methodology used by police practices experts?
 2        A.   Well, it's based on my training and
 3   experience.
 4        Q.   So you think police practice experts just use
 5   their training and experience?
 6        A.   Well, the training that has been given to me
 7   has been certified or accredited through Police Officer
 8   Standards and Training, or at the time Weber County
 9   Sheriff's office was a CALEA accredited law enforcement
10   agency, which is a nationally recognized accreditation
11   nationally, who comes in and actually evaluates our SOPs,
12   our standard practices, and evaluates and makes sure that
13   Weber County Sheriff's office was to the national
14   standard.
15        Q.   But you're specifically saying this is the
16   standard methodology used by someone with my training and
17   experience, right?
18        A.   Correct.
19        Q.   How did you get that understanding?  Did you
20   talk to other people that have been police practice
21   experts?
22        A.   I would assume that the CALEA accreditation
23   holds you to a national standard, holds you to a level to
24   where it's nationally recognized and accepted throughout
25   the nation.
```

68

```
 1        Q.    Sir, what I'm getting at is this is your
 2   first time ever being a commercial expert, correct?
 3        A.    Correct.
 4        Q.    This is the first time you've ever written a
 5   report, correct?
 6        A.    No, sir.
 7        Q.    An expert report?
 8        A.    Yes, sir.
 9        Q.    Sorry.  First time you've ever written an
10   expert report, first time you've ever been retained as an
11   expert commercially on police practices, correct?
12        A.    Yes, sir.
13        Q.    And you're saying here that your methodology
14   is the standard methodology used in the field, true?
15   That's what you're stating here?
16        A.    Yes, sir.
17        Q.    How did you come to that conclusion that it's
18   the standard methodology?
19        MS. MARCY:  Objection, form.
20        THE WITNESS:  Because of what I had just explained
21   before.  That these practices were nationally accredited,
22   and we use them to evaluate our own officers within Weber
23   County Sheriff's office on use of force.
24        Q.    Okay.  So the training that you received from
25   CALEA, did they say this is the methodology used to make
```
                                                                69

Intermountain Court Reporters *** (801) 263-1396

```
 1    a determination of whether their use of force is

 2    reasonable or not reasonable?

 3         A.    No, they did not.

 4         Q.    Or follows the standard practice?

 5         A.    It is my understanding that as a CALEA

 6    accredited law enforcement agency, that as long as we

 7    meet these standards, then that's the accepted practices

 8    nationwide.  So that is my opinion of that being a

 9    standard methodology.

10         Q.    Did you use, in your time as a certifiable

11    police officer, law enforcement officer, did you actually

12    ever go to any training about how to evaluate officers

13    use of force and whether it was, or met the standard?

14         MS. MARCY:  Objection, form.

15         THE WITNESS:  I attended a SWAT commander's

16    decision-making course that was performed by the National

17    Tactical Officer's Association that dealt with the

18    decision making on use of force issues, as a SWAT

19    commander, as well as it would also relate to any other

20    types of law enforcement response.

21         Q.    Let's start with this phase.  During your

22    time as a certifiable law enforcement officer, did you at

23    any point in time have the occasion to evaluate officers

24    use of force and make a determination of whether their

25    use of force was appropriate to the standard practices in
```

                                                           70

1    the field of law enforcement?

2           MS. MARCY:   Objection, form.

3           THE WITNESS:   Could you please repeat that

4    question.

5           MR. HAMILTON:   Sure.

6           Q.    During the entire time that you were an

7    officer, law enforcement officer --

8           A.    Yes, sir.

9           Q.    -- did you ever have the occasion to review

10   another officer's use of force and make a determination

11   or evaluate whether their use of force was reasonable or

12   met the general standard for use of force?

13          A.    Yes.

14          Q.    When was that?

15          A.    The last one was in, I want to say 2010 or

16   2011, when the Grand County Sheriff or Grand County

17   attorney's office contacted the Weber County Sheriff's

18   office with the incident involving Brody Young, who was

19   the state park ranger who was shot multiple times in

20   Moab, Utah.   They requested that Weber County assist with

21   the investigation.   I was assigned as use-of-force

22   investigator to evaluate whether or not Brody Young used

23   the appropriate force in discharging his duty weapon.

24          Q.    Okay.   Besides that one occasion, did you

25   ever have any other occasions where you --

                                                            71

```
1        A.    Yes, sir.

2        Q.    How many occasions?

3        A.    As I recall, on the use-of-force committee

4   with the Weber County Sheriff's office, we would meet

5   quarterly, and we would have a list of all the incidents

6   that officers used force, and we would evaluate those.

7        Q.    How long were you on that committee?

8        A.    To the best of my recollection, a couple

9   years.  Two years, maybe.

10        Q.    During that two-year period, during your

11   quarterly meetings, can you give me an estimate of how

12   many cases you actually evaluated?

13        A.    To the best of my recollection, I believe

14   there was anywhere from 60 to 100 a quarter.

15        Q.    And you say a quarter?

16        A.    Correct.

17        Q.    So are you saying that there was -- there

18   could have been as many as 400 a year that you evaluated?

19        A.    Possibly, yes.

20        Q.    And what did you do when you evaluated those

21   use-of-force incidents?

22        A.    We evaluate all the information involved in

23   the reports, which can include injuries to officers

24   and/or the individual being arrested.  The level, the

25   mental or the physical condition of the individual being
```

72

1    arrested, what types of force was used, whether it was

2    soft or hard-hand techniques, aerosols, tasers, impact

3    weapons.  They varied in all different aspects of use of

4    force.

5         Q.    How many people sat on the committee?

6         A.    I don't recall.

7         Q.    So were you personally evaluating all those

8    cases each quarter?

9         A.    Yes, I was part of the committee.

10        Q.    Okay.  And as a member of the committee, did

11   you evaluate every case or was there assignments made

12   that you would evaluate?

13        A.    No, as the committee, every single one of us

14   went through each case.

15        Q.    Okay.  And when you were trying to make those

16   determinations on whether the use of force was

17   appropriate, what did you do?  What did you rely upon to

18   make that determination?

19        MS. MARCY:  Objection, form.

20        THE WITNESS:  Training and experience.

21   BY MR. HAMILTON:

22        Q.    Just so it's clear in my mind about what you

23   did after being retained as an expert in this case, it's

24   true you never spoke to any other police practices expert

25   about how to put together a police -- or one of these

                                                        73

Intermountain Court Reporters *** (801) 263-1396

1        Q.      How do you know that to be true?

2        A.      Well, when I worked for the United Nations, I

3   was actually training police officers in Haiti on use of

4   force.

5        Q.      Were you sitting on a review board during

6   that period of time?

7        A.      No, but it's safe to assume that if I am

8   teaching off of their standards, that they would hold the

9   same accountability for violating those standards.

10       Q.      And when you say that you were training

11  Haitian officers regarding use of force, when was that?

12       A.      That was in 2014 to '15.

13       Q.      What were you training them?

14       A.      I was actually assigned to the Haitian SWAT

15  team, and I also trained the Jordanian SWAT team in

16  Haiti.  Part of my job was to go out on operations and

17  evaluate any type of human rights violations, or

18  use-of-force violations.

19       Q.      So during that period of time you were

20  evaluating use of force --

21       A.      Correct.

22       Q.      -- incidents?

23       A.      Correct.

24       Q.      Did you list that you were sitting on an, or

25  reviewing use-of-force incidents with respect to your

                                                        80

1 opinion with respect to that language, aren't you?

2   A. Yes, sir.

3   Q. And you're really not qualified to do that,

4 are you?

5   MS. MARCY:  Objection, form.

6   THE WITNESS:  What qualifications would that be?  I

7 don't understand the question.

8 BY MR. HAMILTON:

9   Q. I mean, you don't have a master's degree in

10 English?

11   A. No, sir.

12   Q. You are not a linguist.

13   A. No, sir.

14   Q. You're just basically critiquing his verbiage

15 without any real expertise in that area, true?

16   A. Yes, sir.

17   Q. You're just looking on Wikipedia?

18   A. Yes, sir.

19   Q. And with respect to you using the term

20 'thrown to the ground', you are just relying upon what

21 Kathy Torrence testified to, correct?

22   A. Yes, sir.

23   Q. And you're disregarding what Officer

24 Patterson stated in his report, and testified under oath

25 to, true?

                   90

```
1        A.    Not to the extent of disregarding, just the
2   totality of the circumstances, the injuries that were
3   sustained, and the language that he provided.  In my
4   opinion those two things don't add up.
5        Q.    What are you basing that opinion on?
6        A.    Experience.
7        Q.    What type of experience?
8        A.    Placing somebody to the ground or taking
9   somebody into custody, several years of working as a law
10  enforcement officer, reviewing --
11       Q.    You'd agree with me these are all factually
12  --
13  MS. MARCY:  Wait, he's still talking.  Wait, he's
14  still talking.
15  MR. HAMILTON:  I don't care if he was still
16  talking.
17  MS. MARCY:  Well, wait, you asked him a question,
18  let him answer it.  You cut him off.
19  MR. HAMILTON:  This is not your deposition, if you
20  want to go back and redirect him, you can do that
21  afterwards.
22  MS. MARCY:  So you just are gonna interrupt him if
23  you don't like the answer.
24  MR. HAMILTON:  That's not what I'm doing, I'm
25  asking a question.  He is not answering questions.  He's
```

91

```
 1    just rattling on about things he wants to rattle on
 2    about.  I want to ask a specific question.  Can I ask you
 3    a specific question?
 4         THE WITNESS:  Proceed.
 5    BY MR. HAMILTON:
 6         Q.    Okay.  The specific question I want to ask
 7    you is, you would agree with me, because you said this
 8    earlier on in your deposition testimony, that all these
 9    circumstances or situations are factually distinct,
10    correct?
11         A.    I don't understand the question.
12         Q.    Well, when you are doing scenario-based
13    training, all these different -- there's different
14    scenarios that you encounter as a police officer all the
15    time, correct?
16         A.    Yes, sir.
17         Q.    You can't provide every scenario during your
18    training, true?
19         A.    No, sir, you cannot.
20         Q.    Okay.  And so, there were -- there were
21    things in this scenario that are different than basically
22    other scenarios you've been involved in with respect to
23    law enforcement, that you've encountered?
24         MS. MARCY:  Objection, form.
25         THE WITNESS:  Possibly.  Like you just said, no
```

                                                                92