```
           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF UTAH
                     CENTRAL DIVISION
```

----

JOSHUA CHATWIN,

    Plaintiff,

vs.                                    Case No. 2:14-cv-00375

DRAPER CITY; OFFICER J.                Judge Dale A. Kimball
PATTERSON, in his
individual and official
capacity; OFFICER DAVID
HARRIS, in his individual
and official capacity;
OFFICER HEATHER BAUGH, in
her individual and
official capacity; and
JOHN DOES 1-10,

    Defendants.

----

VIDEOTAPED DEPOSITION OF:   KIRK TORGENSEN

Taken:  June 17, 2016

Reported by: Kelly Sommerville, RPR

*Intermountain Court Reporters*
*Murray, UT 84107*
*(801) 263-1396*



1

```
 1   Wallentine, because Ken was very proficient at that
 2   program and I think he helped develop it.  So I
 3   remember looking at the program.  I don't know, frankly
 4   -- I think I did oftentimes go to somebody to help me
 5   get logged on to it.
 6        Q.   Would you be able to tell me what your last
 7   password was to log on?
 8        A.   I don't recall.
 9        Q.   Okay.  With respect to the use of force
10   policies at the AG's office, do you ever recall
11   actually working on the use of force policy?
12        A.   It depends on how you define "work."
13        Q.   Did you ever review it?
14        A.   I don't recall.
15        Q.   You don't recall ever reviewing the use of
16   force policy?
17        A.   I know that it changed.  I know there was a
18   discussion at some point where we -- our office was
19   involved in changing the use of force policy, kind of
20   in an overall law enforcement was looking at policies
21   in general.  And I remember discussions with Ken
22   Wallentine with respect to that.
23        Q.   So you can recall discussions with Ken
24   Wallentine about the fact that the policy changed, but
25   do you actually recall looking at the language of the
```

```
 1   systematically we looked at an inventory policy for the
 2   AG's office, which hadn't existed.  So those things
 3   were kind of a moving thing.  It was a consistent --
 4   obviously I relied upon -- I had 13 divisions reporting
 5   to me from all kinds of different areas.  The Law
 6   Enforcement Bureau was one of 13.  And so I typically
 7   would get involved in those things as they were brought
 8   to my attention by the bureau director.
 9        Q.   Sitting here, though, today, can you -- can
10   you recall ever creating a policy for the Utah attorney
11   general's office regarding law enforcement?
12        A.   Me, where I sat down and wrote it out?
13        Q.   Yes.
14        A.   No.
15        Q.   Sitting here today, can you recall, during
16   your 13 years with the attorney general's office, ever
17   making -- personally making substantial changes to a
18   policy regarding law enforcement?
19        A.   It's hard to answer that in light of the
20   fact that there were discussions and had input.  If
21   what you're asking, did I sit down and put something in
22   writing?  I don't know whether that happened or not.  I
23   can't recall.
24        Q.   So you can't recall actually putting
25   anything in writing.  Can you recall having something
```

```
 1  printed off for you where you were making notes over
 2  those law enforcement policies and making changes?
 3       A.   I think that had the division director been
 4  doing his job, he would have provided those documents
 5  to me for my review, and I -- my recollection --
 6  recollection is that occurred.
 7       Q.   But you can't recall ever actually doing
 8  the physical writing yourself, where you were making
 9  the changes, or after receiving a document like that
10  from the division?
11       A.   I don't know.  I cannot recall whether that
12  occurred.
13       Q.   Okay.  During your time at Adult Probation
14  & Parole, do you recall what the use of force policy
15  was there?
16       A.   I recall looking at that specifically.  I
17  remember discussions about portions of the use of force
18  policy.  I'll give you an example of -- I was concerned
19  that our policy was lacking with respect to engagement
20  and pursuits by agents with their cars.  And I recall
21  asking folks who worked for me to engage in that
22  discussion and look at the policy.  So yeah, I was very
23  involved in those kind of things.  Again, I had 500
24  employees that I was responsible for, so it was one of
25  many things I did.
```

1  management, was unconstitutional, correct?
2      A.   If, in fact, the policy at the attorney
3  general's office in 2010 was similar to the one in
4  Draper, I would say that that policy was inadequate.
5  And if that's the fact, that's the fact.
6      Q.   And let's not -- let's not quibble about
7  terms, but language is important, and so I want to talk
8  specifically about whether it was constitutional or
9  unconstitutional. Would you say that that policy was
10 unconstitutional in 2010 at the AG's office, where you
11 were in charge, if it was indeed identical to Draper
12 City's?
13     A.   If it -- the problem with the policy is
14 that it is so bare bones, and it is so -- it states the
15 conclusion that force has to be reasonable. And in my
16 many years of experience, that is not sufficient to
17 guide somebody in what it means, how to comport
18 yourself with it. If that was true and that's what the
19 AG policy said, I think it was lacking in giving the
20 direction and the guidance to officers in the AG's
21 office of what was expected of them, and if that's the
22 way it was, then that's the way it was.
23     Q.   But you would agree with me that in 2010,
24 that the Draper City policy, and again, if -- if the
25 AG's office policy was similar or identical to it, did

```
 1  correctly state the law in Utah, true?
 2       A.    It recited the state statute which said
 3  that force had to be reasonable.
 4       Q.    And that's a correct statement of Utah
 5  state statute at that point in time, true?
 6       A.    It was a correct statement of the law.
 7       Q.    Okay. And not only was it a correct
 8  statement of state law, but that state statute and
 9  federal law were consistent with respect to use of
10  force, true?
11       A.    I don't understand.
12       Q.    That use of force, again, this is from your
13  report here, if you flip over to the next page, you can
14  look at the exact language, second full paragraph
15  underneath your opinions, the language you used there
16  is that "The 2010 use of force policy in place at the
17  time of the incident simply cites the Utah state
18  statute which states that force may be used which is
19  reasonably believed to be necessary to effect an
20  arrest. In other words, the officers are told simply
21  to use force that is reasonable."
22             And, sir, you would agree with me that that
23  is the standard with respect to use of force. Force --
24  when you use force as an officer, it has to be
25  reasonable, true?
```