IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

JOSHUA CHATWIN,  )
                ) CASE NO.
        PLAINTIFF,  ) 2:14-cv-00375
                )
Vs.             )
                )
DRAPER CITY; OFFICER J. PATTERSON,  )
IN HIS INDIVIDUAL AND OFFICIAL      )
CAPACITY; OFFICER DAVID HARRIS, IN  )
HIS INDIVIDUAL AND OFFICIAL         )
CAPACITY; OFFICER HEATHER BAUGH, IN )
HER INDIVIDUAL AND OFFICIAL         )
CAPACITY; AND JOHN DOES 1-10.       )
                                    )
        DEFENDANTS.                 )
                                    )

Videotaped Deposition of Trevor Petersen

Taken: July 13, 2016

Reported by: Linda J. Smurthwaite, RDR

*Intermountain Court Reporters*
*Murray, UT 84107*
*(801) 263-1396*



1  and adequate procedures designed to ensure the safety of
2  the officers and the arrestee?
3       A.   Correct.
4       Q.   So I want to now focus in on your opinions
5  that you gave.  You state that 'he did not take the
6  proper safety precautions.'
7       MS. MARCY:  Where are you, Blake?
8       MR. HAMILTON:  Page four of 15, under your
9  opinions.  Do you see where I'm reading?
10      A.   Yes, sir.
11      Q.   Again, so your first opinion, as I understand
12 it, is that Officer Patterson did not take the proper
13 safety precautions.  Is that fair to say, that's your
14 first opinion you list in that paragraph?
15      A.   That is correct.
16      Q.   Okay.  What methodology did you use to come
17 to the conclusion that he didn't use the proper safety
18 precautions?
19      MS. MARCY:  Objection, form.
20      THE WITNESS:  After reading through the reports,
21 with there being multiple officers on scene, also as
22 Officer Patterson describes, the intoxication level of
23 Mr. Chatwin at the point of where they were on the grassy
24 surface, where they first initially took him into
25 custody, where they could have taken the safety

53

1  precautions to perform the search of Mr. Chatwin's person
2  at that point, where both Officer Harris and Officer
3  Patterson were present while they were taking him into
4  custody. And also using two officers to escort Mr.
5  Chatwin to the police truck, or to where they were going
6  to place him in the vehicle for transport.
7      Q.  So, really what you're saying, is that you
8  think it was improper for them not to have done the
9  search of Mr. Chatwin on the grass?
10     MS. MARCY: Objection, form.
11     THE WITNESS: It's an option for them to do it on
12 that position where they took him initially into custody,
13 while they had two officers present, and to also take
14 that precaution to where they say that Mr. Chatwin was
15 under such a highly intoxicated level to where they could
16 have used two officers to escort him to the vehicle,
17 because as he describes, that officer -- or Mr. Chatwin
18 is unable to stand because of his highly intoxicated
19 level.
20     Q.  Okay. Well, sir, is it your opinion that Mr.
21 Chatwin wasn't intoxicated on that day?
22     A.  I wasn't there that day, so I can't determine
23 the level of his intoxication. The opinions and what I'm
24 basing off of, are the facts in this case which include
25 the depositions, reports, and witness statements.

54

1  A. Yes, sir.
2  Q. But I'm trying to understand your methodology
3  to reach that opinion. Did you just look at those facts
4  and that led to the opinion, or did you use your
5  experience? How did your experience play into
6  formulating that opinion? Can you explain that to me?
7  MS. MARCY: Objection, form.
8  THE WITNESS: Training and experience, sir.
9  BY MR. HAMILTON:
10  Q. How did your training and experience help you
11  formulate that opinion?
12  A. My experience of dealing with multiple
13  individuals, taking multiple individuals into custody,
14  whether it was an intoxicated level under the influence
15  of drugs or other narcotics. Excited delirium. Also
16  evaluating these types of incidents with the Weber County
17  use of force committee for several years, and evaluating
18  officers' use of force. As well as anything from arrest
19  control tactics to using lethal force, using impact
20  weapons, using chemical munitions, using different types
21  of techniques and tactics to use to take somebody into
22  custody.
23  Q. What was the standards, at that time that the
24  incident took place, regarding safety and how to take
25  someone that was intoxicated into custody safely? What

64

1  Q. Okay. Going back to Exhibit Number 3. Maybe
2  this will help us with all of your opinions, because you
3  have a section in your report talking about methodology.
4  Page seven. Do you see the section there called
5  Methodology?
6  A. Yes, sir.
7  Q. You say 'The methodology used in coming to my
8  opinions is standard methodology used by someone with my
9  training and experience in evaluating the force used in
10 an arrest, is the methodology generally accepted by my
11 peers in the law enforcement community, and is in
12 accordance with the standard recognized proper law
13 enforcement procedures used by police departments,
14 domestic and international, to determine whether an
15 arrest was made with force, under the circumstances.'
16 A. Yes, sir.
17 Q. Where did you get that language, first of
18 all?
19 A. I believe that I drafted it myself.
20 Q. So, this is something you just came up with
21 yourself?
22 A. I believe so.
23 Q. Okay. And so, I'm going to look at this long
24 sentence and kind of break it down so I can understand
25 better your methodology. What is the standard

67

```
 1   methodology used by police practices experts?
 2         A.    Well, it's based on my training and
 3   experience.
 4         Q.    So you think police practice experts just use
 5   their training and experience?
 6         A.    Well, the training that has been given to me
 7   has been certified or accredited through Police Officer
 8   Standards and Training, or at the time Weber County
 9   Sheriff's office was a CALEA accredited law enforcement
10   agency, which is a nationally recognized accreditation
11   nationally, who comes in and actually evaluates our SOPs,
12   our standard practices, and evaluates and makes sure that
13   Weber County Sheriff's office was to the national
14   standard.
15         Q.    But you're specifically saying this is the
16   standard methodology used by someone with my training and
17   experience, right?
18         A.    Correct.
19         Q.    How did you get that understanding?  Did you
20   talk to other people that have been police practice
21   experts?
22         A.    I would assume that the CALEA accreditation
23   holds you to a national standard, holds you to a level to
24   where it's nationally recognized and accepted throughout
25   the nation.
```

```
 1        MS. MARCY:  Objection, form.
 2        THE WITNESS:  Not only that, but as well as my POST
 3   training here in Utah, as well as the training that is
 4   provided by the state department.
 5   BY MR. HAMILTON:
 6        Q.   Do you specifically recall POST providing
 7   training on how a use-of-force review board should be set
 8   up?
 9        A.   No.
10        Q.   Or how a department should review
11   use-of-force incidents?
12        A.   No.
13        Q.   And again, you don't know whether CALEA
14   actually looks at how a department looks at use of force
15   or reviews use of force incidents, correct?
16        A.   No, I do not.
17        Q.   So when you say this, you really are just
18   saying that you believe you used the same methodology you
19   used when you sat on the use-of-force review board for
20   Weber County for two years?
21        MS. MARCY:  Objection, form.
22        THE WITNESS:  Could you please repeat the question.
23   BY MR. HAMILTON:
24        Q.   When you make the statement about methodology
25   here, the long sentence about methodology, what you are
```

78

```
 1   saying is, I use the same methodology in this case, the
 2   Chatwin case, that I did when I reviewed use-of-force
 3   incidents during my two-year period in Weber County,
 4   that's why I believe the methodology is correct?
 5        A.   Yes, sir.
 6        MS. MARCY:  Objection, form.
 7   BY MR. HAMILTON:
 8        Q.   You continue on there in that sentence with
 9   regard to methodology and say, 'that the standard is the
10   recognized proper standard for international
11   departments'; do you see that?
12        A.   Un-huh.
13        Q.   How do you know that?
14        A.   Because it's the CALEA standard.  I'm not
15   sure if they're just domestic here in the United States,
16   or if other national or nations use CALEA also.  But
17   basing my use of force on the things that are being
18   taught.  So with my training, it doesn't necessarily have
19   to do with evaluating use of force.  It has to do with
20   actually using use of force.
21        Q.   You're making the statement though, here in
22   this methodology section, that the methodology I use was
23   the same methodology that international police
24   departments use?
25        A.   Un-huh.
```

79