# EXHIBIT B

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

 3                          -ooOoo-

 4   JOSHUA CHATWIN,              : CIVIL NO. 2:14-cv-375

 5          Plaintiff,            : DEPOSITION OF:
                                    JOSHUA PATTERSON
 6   v.                           :
                                    TAKEN: December 7, 2015
 7   DRAPER CITY; DRAPER CITY     :
     POLICE DEPARTMENT;             Judge Dale A. Kimball
 8   OFFICER J. PATTERSON, in    :
     his individual and
 9   official capacity;          :
     OFFICER HEATHER BAUGH,
10   in her individual and
     official capacity;
11   OFFICER DAVID HARRIS, in
     his individual and
12   official capacity;
     OFFICER KURT IMIG, in
13   his individual capacity;
     SUPERVISOR TBA; and JOHN
14   DOES 1-10,

15          Defendants.
     _____
16

17
                            -ooOoo-
18

19       Deposition of JOSHUA PATTERSON, taken on

20   behalf of the plaintiff, at 201 South Main Street,

21   Suite 1300, Salt Lake City, Utah, before PHOEBE S.

22   MOORHEAD, Certified Shorthand Reporter for the State

23   of Utah, pursuant to Notice.

24

25          **SOME PORTIONS CONSIDERED CONFIDENTIAL**
```

1  September.  It was right -- I stopped with Grant Mackay
2  when I went to work for Draper, when I was hired by
3  Draper City.
4      Q.  Okay.  When were you hired by Draper City?
5      A.  I believe it was 2010.
6      Q.  Let me get the time line -- let me back up
7  just a little bit.
8          We're going to be talking today about events
9  that happened with Mr. Chatwin on May 18, 2010.
10     A.  Okay.  So that was -- September of 2009.
11     Q.  Okay.
12     A.  Is when I was done with Grant Mackay.
13     Q.  All right.  While you were at Grant Mackay,
14 were you training to become a police officer?
15     A.  Yes.  I was going to the police academy at
16 night.
17     Q.  When did you start going to the police
18 academy?
19     A.  So that would be January of 2009, I believe.
20     Q.  What made you decide to become a police
21 officer?
22     A.  The work was slow -- construction work was
23 slow.  The outlook didn't look good.  I had -- like I
24 said, I previously studied criminal justice back in
25 college.  So...

1  Q. Was it something that interested you, becoming
2  a police officer?
3  A. Yes.
4  Q. And why is that?
5  A. Pardon me?
6  Q. Why is that?
7  A. To help people, to have an ability to do the
8  job, and to make a difference.
9  Q. Okay. You -- what month did you begin
10 training at the academy?
11 A. I believe it was January.
12 Q. Okay. January of 2009?
13 A. Yes.
14 Q. Now, when -- when you say things like
15 "academy," I'll have to ask you questions about that,
16 because I don't know. When you say the "academy," what
17 is the name of the academy?
18 A. Salt Lake Community College, Class 060.
19 Q. I'm sorry. What --
20 A. Class 060, which is the start of the class.
21 That's when the classes started in January.
22 Q. So is it actually -- is it actually -- are
23 they classes that are offered by the community college?
24 A. No. It's the police academy itself. It has
25 their own building here in Sandy.

1    Q.  Well, give me an idea when you say -- let's
2  take -- you said you were taking the classes at night.
3    A.  Correct.
4    Q.  And it's --
5    A.  Evening, if you will.  5:30 to whenever we
6  were done.
7    Q.  And how many months was that?
8    A.  Ten months.
9    Q.  So give me an example.  When you -- when you
10 say you took classes, you were trained.  Let's talk
11 about the defensive tactics.  That's what you called it,
12 right?
13   A.  Yes.
14   Q.  All right.  Let's talk about your training for
15 defensive tactics.  Is that a phrase used by the police?
16   A.  Yes.
17   Q.  What does it mean?
18   A.  Everything from arrest control, officer
19 safety, controlling a scene, controlling a suspect.
20   Q.  And what do they -- what do they teach about
21 these defensive tactics?
22      MR. HAMILTON:  Objection.  Form.
23      THE WITNESS:  They're -- I mean, the list is
24 huge.  I don't know what -- I mean, everything.
25 Everything from first interaction with the suspect to an

```
 1  arrest, to any kind of resistance.
 2  BY MS. MARCY:
 3       Q.  Well, who teaches -- who teaches those
 4  courses?
 5       A.  The law enforcement instructor.  They are law
 6  enforcement officers themselves, who are -- I don't know
 7  to say -- certified by POST.  So a POST-certified
 8  instructor.
 9       Q.  Do you know any of the names of those
10  instructors?
11       A.  Not anymore, no.
12       Q.  Well, let's talk about -- instead of talking
13  about all the defense -- what did you say?  Defensive
14  tactics?
15       A.  Yeah.
16       Q.  Let's talk about -- let's talk about the
17  training you got for somebody who you've detained.
18       A.  Okay.
19       Q.  All right.  What do they teach you about --
20  from the time you -- you have to face that particular
21  person?
22           MR. HAMILTON:  Objection.  Form.
23           THE WITNESS:  I mean, I guess you would say
24  about arrest control is what you're talking about.  Just
25  everything about safety, search incident to arrest, and
```

1  all the techniques of doing a safe search, of officer
2  safety, of suspect safety. I'm not sure what else you
3  want -- I'm not sure what you want to know.
4  BY MS. MARCY:
5        Q.  Okay.  What about an intoxicated person?  What
6  do they teach you about when you have to approach
7  someone who you think is intoxicated?
8        A.  It's the same as any other suspect -- any
9  other subject.  There's not anything different.  Officer
10 safety should always be the same.
11       Q.  Okay.  So -- but when you're approaching
12 someone who's intoxicated, you have to give them, I'm
13 assuming, those tests that you give them?
14       A.  That's a whole different subject.  If you're
15 just talking FSTs, field sobriety tests.
16       Q.  Okay.  But as far as defensive tactics,
17 there's no difference?
18       A.  No.
19       Q.  As far as anybody else that you have to
20 approach?
21       A.  Correct.
22       Q.  Okay.  All right.
23       A.  Officer safety should always be the same.
24       Q.  Okay.  What about once you've -- what about
25 the use of handcuffs?  Are there specific training

1  A. Anything that's not complying with -- with
2 their custody.
3  Q. Do -- that reminds me. Do you -- when you
4 were at the SLCC Academy, when you were being trained as
5 far as what -- the whole techniques about resisting
6 arrest, did the academy ever address whether you treat
7 an intoxicated person who's handcuffed differently than
8 someone who you don't think is impaired?
9  A. In the classes of -- of defensive tactics,
10 you're asking?
11  Q. Right.
12  A. No.
13  Q. So in your opinion, as a police officer, do
14 you -- do you approach those intoxicated people in
15 handcuffs differently than anybody else?
16  A. The handcuffs doesn't make a difference. The
17 intoxicated person, you're reading their body language,
18 their -- all their symptoms, if you will, that they're
19 giving, you're reading those -- you're reading those.
20 But it doesn't have anything to do with arrest or not,
21 or control or not, and so forth.
22  Q. What I mean is if someone's -- if someone's
23 intoxicated --
24  A. Okay.
25  Q. You would agree with me that -- that they tend

1  to -- sometimes people can be more verbally combative,
2  more argumentative, more unreasonable?
3      A.  In my experience, it's always hard to say.
4  Each individual is different.
5      Q.  Well, in your history, you've dealt with
6  people who are intoxicated when you were trying to
7  arrest them?
8      A.  Correct.
9      Q.  What were they like?
10     A.  From one end of the spectrum to the other.
11 Calm, quiet; very verbally abusive, very physically
12 abusive.  Like I say, one end of the spectrum to
13 another.
14     Q.  Okay.  When -- so in those ten months, when
15 did you -- so about when did you complete your training?
16     A.  I believe it was --
17         MR. HAMILTON:  Objection.  Form.
18         THE WITNESS:  I believe it was August.
19 BY MS. MARCY:
20     Q.  Of what year?
21     A.  Of '09.
22     Q.  And when you say it was completed, is there a
23 graduation ceremony?
24     A.  Absolutely.
25     Q.  Do you get a -- is it a degree?

1  state has their own Police Officer Standards of
2  Training.  So they set all the guidelines for training
3  for police officers before they can be hired by a
4  department and work in the field.
5       Q.  And where are they located?
6       A.  That, I don't know.
7       Q.  Is the POST training -- was that offered at
8  SLCC academy?
9       A.  Was it -- I'm sorry.  What?
10      Q.  The POST -- you're saying it's training --
11 POST -- it's POST training?
12      A.  Yes.
13      Q.  All right.  Where did you get that training?
14      A.  At the academy.
15      Q.  Okay.  Was that during both phases of --
16      A.  Yes.  All the training is POST-certified.
17      Q.  Let me finish.  I know this seems laborious,
18 but I got to get it clear.
19          So the POST training, that is part -- that's
20 part of both -- both phases of the academy?
21      A.  Yes.
22      Q.  Does -- is POST -- does POST run the training?
23      A.  Yes.
24      Q.  Your instructors, were they all POST
25 instructors?

1     A.  Yes.
2     Q.  Are these instructors, these POST instructors,
3  these are -- these are police officers themselves?
4     A.  Correct.
5     Q.  And they were active police officers at the
6  time?
7     A.  Some might be retired.  I don't know their
8  status.  But, yeah, they all had law enforcement
9  experience.
10    Q.  So is your -- when you are finished with the
11 POST training, you mentioned you were certified.  Is
12 that certifiable or certified?
13        MR. HAMILTON:  Objection.  Form.
14        THE WITNESS:  Certified through POST to be a
15 police officer.
16 BY MS. MARCY:
17    Q.  Are you familiar with the phrase -- or with
18 the word "certifiable"?
19    A.  No.
20    Q.  Are you -- do you know the -- are you -- well,
21 let me rephrase this.  Are you familiar with the
22 phrase "being commissioned as a police officer"?
23    A.  No.
24    Q.  So if you graduate from POST, do you have a
25 designation, as far as "I am" -- "I am commissioned to

1  don't know if supervisors do it.  I don't know if admin
2  does it.  I have no idea.
3       Q.  Do you know if there are any reporting
4  requirements to POST concerning training?
5       A.  I have no idea.
6       Q.  Do you know if there are any minimum hourly
7  requirements per year for training?
8       A.  I would suspect there would be, but I have no
9  idea what they are.
10      Q.  Did you -- did you do any training while you
11 were employed at Draper City?
12      A.  Yeah.  There was always periodic training for
13 just -- from one end to the other.  Just -- you weren't
14 in control.  We just -- we had periodic training, and we
15 would be trained on whatever the training was that
16 session.
17      Q.  Was it -- was the training mandatory?
18      A.  I'm sure it was, yeah.
19      Q.  But do you know if it was?
20      A.  I don't recall.
21      Q.  Is there anything that would help you recall?
22      A.  I don't -- probably not.  I...
23      Q.  Do you know -- again, you don't know if there
24 were any minimum hourly requirements per year?
25      A.  I have no idea what those requirements were.

1    Q.  Okay.  And what other information does it have
2  on the rotation schedule?
3    A.  If you know what shift you're on, you're
4  working those days that week.  And then if there's a
5  training day involved, then you know you'll have to show
6  up that day for training.
7    Q.  Where did they post it?
8    A.  I don't recall.  I imagine it was at briefing
9  or on a board.  I -- I don't recall.
10   Q.  But it's in the building of the -- the old
11 building of the police department in Draper?
12   A.  Sure.  Yes.
13   Q.  All right.  And you said there was monthly
14 training?
15   A.  I believe we trained once a month.
16   Q.  Where was that training held?
17   A.  Depends what training it was.  It could be in
18 a board room like this, could be at the old school.  It
19 all depends on what we were training on.
20   Q.  What were the subject matters that you were
21 trained on?
22   A.  Anything from Taser training to active gunman,
23 active shooter training to -- all the aspects of law
24 enforcement.
25   Q.  Was there training on defensive tactics?

DEPOSITION OF JOSHUA PATTERSON     47

```
 1  workday?
 2       A.   Correct.
 3       Q.   And you are still considered to be working?
 4       A.   Correct.
 5       Q.   Even though you're not on duty?
 6       A.   Correct.
 7       Q.   All right.  When you are on duty on those
 8  monthly Tuesdays, you had to attend the training?
 9       A.   Correct.
10       Q.   Now, at the beginning, you said you didn't
11  know if it was mandatory.  Now, to me --
12       A.   No.  I said training is mandatory through the
13  department.  You know?  You have to show up to training.
14  It's a -- scheduled hours that you have to be at work.
15  So when we're at work, and it was our training day, we
16  are trained.
17       Q.   And those were monthly?
18       A.   As I recall, yes.
19       Q.   How long -- during those Tuesdays, how long
20  did the training last?
21       A.   A full shift.
22       Q.   How long is a full shift?
23       A.   It was ten hours, I believe.  I think around
24  ten.  So it would be, like I say, just like a regular
25  work shift.
```