# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

---

JOSHUA CHATWIN,

       Plaintiff,

vs.

Case No. 2:14-cv-00375

DRAPER CITY; OFFICER J.
PATTERSON, in his
individual and official
capacity; OFFICER DAVID
HARRIS, in his individual
and official capacity;
OFFICER HEATHER BAUGH, in
her individual and
official capacity; and
JOHN DOES 1-10,

       Defendants.

Judge Dale A. Kimball

---

VIDEOTAPED DEPOSITION OF:  KIRK TORGENSEN

Taken:  June 17, 2016

Reported by: Kelly Sommerville, RPR

**_Intermountain Court Reporters_**
**_Murray, UT 84107_**
**_(801) 263-1396_**



```
 1              MS. MARCY:  And, Blake, let me just add

 2     something.  Mr. Torgensen -- I'm not his counsel,

 3     obviously.  I'm just here to make objections.  But he

 4     has decided to not follow my advice and he will talk

 5     about the incident, but I still want to make the

 6     objections on the record, that obviously you can ask

 7     those questions again, I'll have a standing objection

 8     that they are argumentative, prejudicial, not relevant,

 9     and asked to annoy, embarrass and oppress for the

10     following next series of questions about the incident

11     in July of 2015.

12         Q.     (BY MR. HAMILTON)  Sir, I'd like to talk to

13     you a little bit then about that incident in July of

14     2015.  You seemed to want to correct me to the fact

15     that it was your ex-wife.

16         A.     It was not my ex-wife.

17         Q.     Are you currently married to Linda

18     Torgensen?

19         A.     I am.

20         Q.     Okay.  And it's true that in July 17, 2015,

21     that officers, Salem City Police officers, were called

22     to a domestic violence call?

23         A.     They were called, yes.

24         Q.     And they were called specifically to 15

25     South 100 East, Salem, which is Sonya -- I want to make
```

1    sure I say her name right -- Shayna Phillips'

2    residence, correct?

3        A.    Correct.

4        Q.    And at that point in time, your wife, Linda

5    Torgensen, was there with her daughter, true?

6        A.    Her daughter was not -- she was in the

7    house but she wasn't there.

8        Q.    Okay.  So Shayna and her husband were in

9    the home, correct?

10       A.    They were.

11       Q.    And you and your wife had an altercation in

12   the -- another portion of the house, true?

13       A.    We did not have an altercation, no.

14       Q.    You were upset that your wife had not been

15   returning your calls during the day, correct?

16       A.    What happened is, if you want to know what

17   happened is, we were discussing -- we were having a

18   discussion.  She said, "Let me see my phone."  And I

19   flipped her phone towards her, and it hit her in the

20   forehead.  And when the police were called, she told

21   the policeman right there on the spot, because I heard

22   it, "This was a complete accident.  He didn't intend

23   for this to happen.  I didn't see the phone."

24            And it was her daughter who ended up

25   calling the police.  She wasn't there.  She wasn't

63

1    involved, and that was what happened.  And my wife

2    subsequently told the prosecutor that very thing.

3         Q.    Sir, you didn't make, obviously, the call

4    to the police, correct?

5         A.    The daughter did.

6         Q.    Okay.  And when she called, she called the

7    police, stating that you, as the suspect, were

8    intoxicated and the victim was bleeding, true?

9         A.    I have no idea what she told the police.

10        Q.    Okay.  But you would agree with me that

11   your wife at that point in time was bleeding from her

12   head?

13        A.    The phone accidentally hit her in the

14   forehead, and yeah, it did draw some blood.

15        Q.    And when the officers arrived, you were

16   standing outside near the driveway of the home?

17        A.    I believe so.

18        Q.    Do you recall making -- or Officer Cobbley

19   making contact with you?

20        A.    I do.

21        Q.    At that point in time, were you aware of

22   the fact that there -- could you -- could you hear

23   yelling going on in the home?  Commotion?

24        A.    No.  I know that my wife was upset that her

25   daughter had called the police.  She was trying to

1    explain things, that it wasn't -- it was an accident,

2    that there was no altercation.  That, I recall.

3         Q.    So your recollection is that your wife

4    said -- was making statements that this was a complete

5    accident?

6         A.    She told the police officer that this was

7    an accident.

8         Q.    Did you hear what else your wife told the

9    police that day?

10             MS. MARCY:  Objection.  Vague.

11             THE WITNESS:  I don't know.

12        Q.    (BY MR. HAMILTON)  Did you hear her tell

13   the police that you had a drinking problem?

14        A.    I didn't hear her tell them that, no.  I

15   think she wrote that in her report.

16        Q.    And that you were spiraling out of control?

17        A.    I, at that point in my life, was probably

18   having a few too many drinks.  It's true.

19        Q.    And were you aware that she also informed

20   the police that your drinking was affecting or causing

21   problems in your life?

22        A.    I'm sure she could have very well said

23   that, because we were both having some -- I was having

24   a tough time with my situation in life at that point.

25        Q.    When you talk about your situation, you're

1          MS. MARCY:   Objection.   Calls for

2     speculation.

3          THE WITNESS:   There is no granddaughter,

4     and no, the grandson was nowhere around when this

5     happened.

6          Q.   (BY MR. HAMILTON)   A 20-month-old child

7     came into the room.   Do you recall that?

8          A.   After -- clear after the incident, yes.

9          Q.   And was upset?

10         A.   Don't know.

11         Q.   You didn't hear him crying?

12         A.   I didn't hear him crying.

13         Q.   Didn't notice that he was upset?

14         A.   I've answered the question.

15         Q.   Okay.   Again, are you refusing to answer

16    that question?

17         MS. MARCY:   Objection.   Asked and answered.

18    He already answered it.

19         Q.   (BY MR. HAMILTON)   Do you recall telling

20    the officers that "I didn't mean to do that.   I didn't

21    mean to do that"?

22         A.    I explained to them what happened; that it

23    was a complete accident; that I flipped the phone.

24    There was no intent for the phone to hit her.   That's

25    exactly what my wife told them.

1   Q.  Do you recall that once you were booked

2 into jail, that you were informed that your wife had a

3 restraining order?

4   A.  My wife did not have a restraining order.

5   Q.  That Shayna had gotten a straining order --

6 a restraining order?

7   A.  Yes.

8   Q.  And that you were to have no contact?

9   A.  With Shayna, yes.

10   Q.  Do you recall that you immediately, upon

11 release of jail, went back to Shayna's home and knocked

12 on the door?

13   A.  What happened was my car was there.  My

14 brother picked me up.  My brother took me back to the

15 home.  My brother knocked on the door to inquire about

16 my wife, and she called the cops again.  That's the

17 truth.

18   Q.  It's true that you were arrested on that

19 occasion?

20   A.  I was again, yes.

21   Q.  And the police officers explained the fact

22 that you had been informed that there was -- that you

23 were to have no contact?

24   A.  I didn't have contact.  My brother did.

25   Q.  It's true, at this incident, that you told

1    the police officers that you had given your life to law

2    enforcement?

3         A.    I don't recall.

4         Q.    28 years that you had instructed at the

5    academy?

6         A.    You know what, I'm proud of my years of

7    supporting law enforcement.  I always will support law

8    enforcement.  It's part of my heart.  It's who I am.

9         Q.    It's true that you --

10        A.    So I may have said that.

11        Q.    It's true that you tried to talk yourself

12   out of being arrested by telling the officers who you

13   were --

14        A.    That is not true.

15        Q.    -- and what you had done?

16        A.    That is not true.  I explained to them it

17   was an accident.  There was absolutely nothing

18   happened.  My wife reiterated that.  And the young

19   officer said that he had no discretion.  His chief said

20   that in these circumstances, he had to do what he had

21   to do.

22        Q.    It's true that you specifically told that

23   officer that it would be okay if he removed the cuffs?

24   That you would prefer --

25        A.    That is not true.

1      Q.    That you would prefer that he remove the

2  cuffs?

3      A.    He asked me, "Kent, do you want me to

4  remove the cuffs?  Are we going to have an issue?"

5          And I said, "Of course we're not going to

6  have an issue."  That's what happened.

7      Q.    It's true that the officer told you that he

8  couldn't remove the cuffs from you?

9      A.    No.

10     Q.    Your testimony is that the officer --

11     A.    I don't recall, Counsel.

12     Q.    You don't recall being --

13     A.    I don't recall whether --

14     Q.    You don't recall being cuffed?

15     A.    I do recall being cuffed, yes.

16     Q.    And you were cuffed in the back, right?

17     A.    I do recall being cuffed.

18     Q.    And the officer told you that he'd move

19  your cuffs to the front, true?

20     A.    I have no problem with the officer who was

21  doing his job.

22     Q.    And you, at that point, told the officer,

23  well, you would prefer if he'd just remove the cuffs

24  completely?

25         MS. MARCY:  Objection.  Asked and answered,

72

1    and as well as the standing objections.

2        Q.    (BY MR. HAMILTON)  That's what you told the

3    officer, true?

4        A.    I don't recall.

5        Q.    And the officer told you that he couldn't

6    remove the cuffs?

7        A.    I don't recall.

8        Q.    And this was after you had told the officer

9    that you had given your whole life to law enforcement

10   and taught for 28 years?

11       A.    I don't recall.

12       Q.    Sir, let's jump back to your report,

13   Exhibit-1, and talk about the factors that we were

14   talking about just a minute ago.  I'm on page 4.  You

15   have it in front of you?

16       A.    I have it in front of me.

17       Q.    Okay.  If you look to that second full

18   paragraph, under opinions, basis and reasons for

19   opinions, the very bottom of that paragraph, about four

20   lines up from the bottom, there's a sentence that says

21   that your critique of the 2010 Draper City policy is

22   that "It does not provide any factors to consider."  Do

23   you see that?

24       A.    I do see that.

25       Q.    And we've gone through and we've talked

73

```
 1        Q.    You would agree with me, though, that there

 2   was another chief deputy attorney for a period of time

 3   while you were the chief deputy?

 4        A.    I stated yes.

 5        Q.    And that person for a term -- for a time

 6   was John Swallow, correct?

 7        A.    For a year, yes.

 8        Q.    So for a year, he was the chief deputy

 9   attorney general with you; is that right?

10        A.    True.

11        Q.    And prior to John Swallow being the other

12   dual chief deputy attorney general, who was that chief

13   deputy attorney general?

14        A.    Ray Hintze.

15        Q.    And how long was he the chief deputy

16   attorney general?

17        A.    From 2001.

18        Q.    So from 2001 to the time that John Swallow

19   became the chief deputy attorney general, Ray Hintze

20   was your dual chief deputy attorney general?

21        A.    The chain of command that Mark Shurtleff

22   had in place was that he had a direct line to me, and

23   then it cropped off to Ray Hintze is the way I remember

24   it, but he did provide pretty much a dual role at that

25   time.
```

```
 1        Q.     Had the same title as you?

 2        A.     I think he did, yes.

 3        Q.     So it's true he would actually be -- and he

 4   probably had responsibilities for supervising certain

 5   individuals, correct?

 6        A.     That's fair.

 7        Q.     And how many attorneys did he supervise?

 8        A.     I don't know.  I can't -- I don't know the

 9   numbers.

10        Q.     But it's true that you actually -- you

11   didn't actually supervise all 210 attorneys, correct?

12        A.     I -- I felt like my responsibility was, and

13   I think Ray felt the same, we were responsible for all

14   of the attorneys in the office.  And so it was kind of

15   a dual management type of thing where we -- we

16   supervised everybody.

17        Q.     Would you have said that John Swallow, when

18   he took the position, took more of the role with

19   respect to the civil side and you took the criminal

20   side?

21        A.     I think he probably was a little more

22   territorial.

23        Q.     And so when you say he was "territorial,"

24   are you telling me that he had certain individuals that

25   he felt like he was in charge of supervising?
```

1     A.    Yeah, that's fair.

2     Q.    And that you had other people that you were

3  in charge of supervising?

4     A.    That's probably accurate, yeah.

5     Q.    And so during that period of time, do you

6  think it's fair for you to say that you actually

7  supervised all 210 attorneys?

8     A.    I -- I still think that with respect to the

9  way it was under Mark Shurtleff, I felt responsible for

10  all of them.  It might have been in a dual role, but

11  that's -- that's the way I think Mark Shurtleff would

12  have described it.  Did John Swallow have some dual

13  responsibility?  Yes.

14     Q.    But you said he was also territorial,

15  correct?  And I would imagine --

16     A.    There were many times where I was doing all

17  kinds of chief deputy work in areas that he also was

18  doing chief deputy work, so I --

19     Q.    So you would stand by the fact that you

20  claim that you supervised all 210 attorneys?

21     A.    I supervised an awful lot of attorneys in

22  the AG's office.  Let me put it that way.

23     Q.    You also state here that you had "direct

24  supervision of all legal decisions within the office."

25  Do you stand by that statement?

88

1          A.      I do.

2          Q.      So even when John Swallow was in his

3    position, also as a dual chief deputy attorney general,

4    and you've already testified under oath that he was

5    territorial, is it your --

6          A.      It was ultimately Mark Shurtleff who had

7    the ultimate decision.  It was really a team effort.

8    And we sat down as a team and saw -- when those legal

9    issues were discussed, I was in the room.  Ultimately,

10   it was Mark Shurtleff who got to make the decision.

11         Q.      We've talked about how you were placed on

12   paid administrative leave from your position with the

13   attorney general's office.  Can you explain to me when

14   you -- or how you were informed that you were being put

15   on paid administrative leave?

16              MS. MARCY:  I'm going to make the same

17   objections as before, prejudicial, argumentative, not

18   relevant --

19              THE WITNESS:  How I was --

20              MS. MARCY:  Just a minute.

21              THE WITNESS:  I'm sorry.

22              MS. MARCY:  -- and asked to annoy,

23   embarrass and oppress.  Go ahead.

24              THE WITNESS:  How I was informed?

25         Q.      (BY MR. HAMILTON)  Yes.  First of all,

1    let's start with who informed you that you were being

2    put on paid administrative leave?

3         A.    The then chief deputy, Spencer Austin.

4         Q.    Do you recall when that was?

5         A.    April of, I guess, 2014.

6         Q.    So when we are looking here at your CV, is

7    that when you would say that your time as the chief

8    deputy ended?

9         A.    Yeah.  It certainly had ended at that

10   point.

11        Q.    Prior to that, had -- had you already been

12   demoted?

13        A.    I had not been demoted.

14        Q.    Had you been -- had the title of chief

15   deputy been removed?

16        A.    Yes.

17        Q.    And had Spencer Austin taken that role?

18        A.    He had.

19        Q.    Do you recall when that was?

20        A.    January of 2014, I think.

21        Q.    So, again, wouldn't that be when you --

22        A.    Yeah.

23        Q.    -- no longer were the chief deputy?

24        A.    Yeah.  If you're pointing out, you know,

25   that the resumé could have been a little more clear on

90

1    that, that's fair.

2         Q.    Okay.  So in January of 2014, Spencer

3    Austin becomes the chief deputy.  What was your title

4    at that point in time?

5         A.    It never -- the title never changed,

6    strangely enough.  I guess assistant attorney general.

7         Q.    Okay.  What did your job description --

8    what was your job description at that point in time?

9         A.    I didn't -- I didn't really have one.

10        Q.    There was a transition taking place?

11        A.    Yes.

12        Q.    And so from January to April, you were kind

13   of in this transitional phase.  Is that fair to say?

14        A.    Yes.

15        Q.    And then in April, you were informed that

16   you were being put on paid administrative leave?

17        A.    Correct.

18        Q.    Were you informed why you were being put on

19   paid administrative leave?

20             MS. MARCY:  Same objections.

21             THE WITNESS:  Yeah.  It was pretty clear,

22   because the two former attorneys general were under

23   investigation, and the -- there was absolutely not a

24   concrete reason given to me for putting me on admin

25   leave, other than this investigation was going on with

1   respect to the former prior attorneys general.

2        Q.     (BY MR. HAMILTON)  Were you aware that you

3   were under investigation?

4        A.     For what?

5        Q.     Did you hire an attorney?  Were you

6   concerned that you were under some type of criminal

7   investigation?

8        A.     I don't consider that I've ever been under

9   criminal investigation.

10        Q.     So you knew about the criminal

11   investigation involving --

12        A.     I did.

13        Q.     -- Mark Shurtleff --

14        A.     I did.

15        Q.     -- and John Swallow?  My question to you

16   was, were you concerned that you were under criminal

17   investigation and hired an attorney?

18             MS. MARCY:  Objection.

19             THE WITNESS:  I did not hire an attorney.

20             MS. MARCY:  Wait a minute.  Wait a minute.

21   Objection.  Asked and answered.  And I'm just going to

22   make standing objections about all of this line of

23   questioning as well.

24        Q.     (BY MR. HAMILTON)  So it's your testimony

25   that you never hired Brett Tolman to represent you?

1     A.     Brett Tolman represented me.  I never hired

2  him to represent me.  He was my lawyer.  We can put it

3  that way.

4     Q.     As far as you were concerned, you were

5  never being investigated for deleting a large portion

6  of e-mails from your e-mail account?

7     A.     No.

8     Q.     So you never had any concerns that you were

9  being criminally investigated for intentionally

10  deleting e-mails specifically regarding Marc Sessions

11  Jenson?

12     A.     I didn't -- no.

13     Q.     And you said that you never hired Brett

14  Tolman, but he represented you.  You would agree with

15  that?

16     A.     He did represent me, yes.

17     Q.     And what was your understanding of why he

18  was representing you?

19     A.     I obviously knew that my two former bosses

20  were under a major investigation, and I knew that there

21  was stuff going on.  He and I were good friends, and he

22  basically said, you know, "Let's" -- "Let's be smart

23  about this and go through it together."

24     Q.     Did you approach him about representing you

25  or did he approach you?

93

1      A.    I don't recall.  I think we had a friendly

2  conversation about -- I'd talked to Brett Tolman about

3  issues I had with Mark Shurtleff and John Swallow,

4  because we were friends, and it just sort of

5  naturally...

6      Q.    You wouldn't quibble with me that you had

7  Mr. Tolman make statements for you to the press or that

8  he made statements on your behalf to the press, true?

9      A.    True.

10     Q.    And I just want to make sure your testimony

11  is clear today.  Is your testimony that you were never

12  concerned that you were being investigated for deleting

13  e-mails?

14          MS. MARCY:  Objection.  Asked and answered.

15          THE WITNESS:  That issue came up in an

16  audit that was done by the legislature.  It happened

17  years ago, so I really wasn't concerned that I was

18  being investigated for that, no.

19     Q.    (BY MR. HAMILTON)  But you were aware that

20  there was an allegation that was made, or a discovery

21  made, that you had directed a secretary to go to your

22  office during the Christmas break of 2010 and '11 to

23  delete e-mails?

24     A.    That happened, understanding that we all

25  felt like that there was a repository or a place where

1  the e-mails went.  And so really there was no issue

2  with -- we didn't believe that they just went away.  It

3  was just getting them off of the -- the computer.

4        Q.    And that there was an audit that had

5  uncovered that that had happened and was critical of

6  you for that, true?

7        A.    I don't know if it was critical of me.  It

8  pointed it out in the audit.

9        Q.    But you had no concern that you were also

10  going to be investigated criminally for that?

11            MS. MARCY:  Objection.  Asked and answered.

12            THE WITNESS:  I've answered it.

13        Q.    (BY MR. HAMILTON)  Earlier, I asked you

14  some specific questions about whether you had ever

15  violated policy.  Do you remember that?  Or had an

16  accusation made against you that you had violated

17  policy?  Do you remember that?  Me asking you that

18  question?

19        A.    An accusation that I violated policy?

20        Q.    Yes.  Earlier, I asked you the question,

21  and you stated that you had never personally been

22  accused of not following policy.  Do you remember that?

23        A.    I don't recall being asked that, no.

24        Q.    Is that true?

25        A.    That I had been accused of violating

1   policy?

2        Q.     Yeah, you personally.

3              MS. MARCY:  Same --

4              THE WITNESS:  Accused --

5              MS. MARCY:  Same standing objections for

6   this line of questioning as well.

7              THE WITNESS:  Would you like to refine what

8   you mean by "accused"?  Did somebody make an

9   allegation?  What?

10       Q.     (BY MR. HAMILTON)  That's usually what

11  accused means, that someone made an allegation that you

12  didn't follow policy.

13       A.     Somebody brought up an issue with respect

14  to a state car that I had, that I was responsible for.

15  Didn't -- there wasn't an investigation.  There was a

16  committee formed to look at the issue as to whether

17  that was appropriate and found that it was; that there

18  was absolutely no violations of state policy.  The

19  question was raised as to whether or not I should be

20  driving a state vehicle.

21       Q.     Were you aware that the state auditor, John

22  Dougall, said that "Of all the cases, Torgensen seems

23  to be ignoring policy and state statutes the most and

24  was the most egregious in the office"?

25       A.     That's completely 100 percent wrong.

96

1      Q.     When you say it's wrong --

2      A.     I didn't violate any policy.   There was

3 no --

4      Q.     Are you -- okay.   Let me back up.   Are you

5 saying that John Dougall never said that, the state

6 auditor never said that?

7      A.     I don't know what he said, but he didn't --

8 I don't know to what degree -- nobody ever presented me

9 with any findings.   In fact, I think the newspaper

10 article was wrong with respect to that.   There was

11 another individual in the AG's office who was found to

12 be in violation of policy, and that wasn't me.   And I

13 think that that was a wrong statement attributed by --

14 by Dougall to the -- a statement, by the way, which I

15 called the reporter for the Tribune and clarified.

16      Q.     So when you say "wrong," you're saying that

17 your understanding is that John Dougall, the state

18 auditor, never said that?

19      A.     I don't know what he said.   What I'm saying

20 is that the statement is wrong.   The audit -- and you

21 can go and read the audit for yourself.   The audit

22 found that there was one person who was not entitled to

23 a state vehicle, and that was not me.

24      Q.     I'd like you to look at Exhibit-2, and if

25 you'll flip to the second page of Exhibit-2, are you